UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LANTHEUS MEDICAL IMAGING, INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>                              Defendant. | Case No. 10 Civ. 9371 (LTS) (MHD)<br><br>ECF CASE |

### DECLARATION OF RUKESH A. KORDE IN SUPPORT OF PLAINTIFF LANTHEUS MEDICAL IMAGING INC.'S MOTION FOR ISSUANCE OF <u>AMENDED LETTERS ROGATORY</u>

Rukesh A. Korde hereby declares as follows:

1. I am an attorney admitted to practice in the District of Columbia, and have been admitted *pro hac vice* to the United States District Court for the Southern District of New York for the purposes of the above-captioned case. I am Special Counsel at the law firm of Covington & Burling LLP of Washington, D.C. My firm represents plaintiff Lantheus Medical Imaging, Inc. ("Lantheus") in the above-captioned matter.

2. Except as noted below, I am familiar with the matters set forth herein based upon my personal knowledge and make this declaration in support of Lantheus's Motion for Amended Letters Rogatory seeking the assistance of the Canadian courts in obtaining relevant evidence for use at trial from Atomic Energy of Canada Limited ("AECL), a Canadian crown corporation.

3. Counsel for Lantheus conferred with counsel for Zurich American Insurance Company ("Zurich") regarding this motion by telephone on August 1, 2011. Zurich does not oppose Lantheus's Motion for Amended Letters Rogatory.

A. **AECL Has Information Critical to the Resolution of this Action.**

4. As explained in greater detail in the Joint Preliminary Pretrial Statement ("JPPS") filed March 28, 2011, "Lantheus has brought this civil action for declaratory relief and money damages against defendant Zurich arising out of the alleged breach" of the insurance policy at issue in this case ("the Policy"). (JPPS at 1.) The dispute between Lantheus and Zurich is whether the Policy covers "contingent business interruption ("CBI") losses sustained by Lantheus as a result of physical loss or damage to 'contingent properties' owned and operated by third parties, from which Lantheus receives the delivery of materials or services that are essential for the continuation of its business." (*See* JPPS at 1-2.) Here, the contingent property is a nuclear research reactor ("the NRU Reactor") owned and operated by AECL. (JPPS at 5.) The NRU Reactor provides Lantheus with a critical raw ingredient, molybdenum-99, a metastable nuclear isotope, used in the manufacture of various medical imaging products sold by Lantheus to hospitals and radiopharmacies for diagnostic procedures. (JPPS at 2.) The NRU Reactor was shut down for 15 months from May 2009 to August 2010. (JPPS at 2-3.) Lantheus alleges that as a result of the shutdown of the NRU, it "lost substantial revenue . . . and incurred substantial extra expense attempting to obtain alternate supplies of [molybdenum-99] in order to continue, as nearly as practicable, its pre-loss business operations." (JPPS at 3.)

5. One critical issue in the coverage litigation is whether the damage to the NRU reactor was caused by a covered or excluded peril under the Policy. Lantheus's position is that its losses "arose from physical loss or damage to the [NRU Reactor] resulting from a 'covered cause of loss'" under the Policy. (*See* JPPS at 5-6.) Lantheus seeks discovery from

2

AECL in order to show that "the exclusions [in the Policy] cited by Zurich in its Answer [to the Complaint] do not preclude coverage of Lantheus's CBI Losses." (JPPS at 7.)

6. In particular, Zurich contends that there is no coverage for Lantheus's CBI losses under the Policy because the damage to the NRU Reactor may have resulted from the following excluded perils:

    a. "[d]eterioration, depletion, rust, corrosion . . ." (Answer at 10-11);

    b. the "[a]ccumulated effects of . . . vapor, liquid . . . or other developing defects" (*id.* at 10);

    c. "[e]rrors in, or faulty, inadequate or defective . . . [c]onstruction . . . design . . . renovation, specifications, workmanship, installation or process" (*id.* at 12);

    d. "[e]rrors in, or faulty, inadequate or defective . . . maintenance" (*id.* at 12);

    e. "[l]atent defect or the quality in property that causes it to damage or destroy itself, decay or other spoilage" (*id.* at 12); or

    f. the "effects or causes of . . . [l]eakage of contents" (*id.* at 13).

7. Lantheus does not agree that any of the exclusions quoted in paragraph 6 and invoked by Zurich apply to limit or foreclose coverage for Lantheus's CBI loss. At this point, however, Lantheus does not have a sufficiently detailed understanding of the sequence of events that led to the NRU Reactor shutdown, the chemical additives that might have been present in the NRU Reactor, or the chemical reactions that apparently occurred to prepare for trial. For example, a few heavily redacted documents made available by AECL suggest that nitric acid formed in the Annulus (an empty space surrounding the aluminum vessel in which the nuclear reaction takes place) as a result of the breakdown of a carbon dioxide distribution system and leakage of water from backed-up drains. (*See* Ex. 1 at 000002; 000041). However, the events leading to the alleged malfunctioning of the carbon dioxide distribution system and the

introduction of air and water in to the Annulus have not been established, and AECL has not publicly released the analytical testing data and engineering documents underlying its lengthy investigation of the root cause(s) of the shutdown. (*See* Harrison Decl. ¶ 14, Ex. 3 at 49:9-50:9.) In the absence of these documents, it will be difficult for the parties in this case to develop admissible evidence as to the precise causal mechanism that led to the damage to the NRU Reactor vessel. Such documents and information are of critical importance to the prosecution of Lantheus's claim for coverage.

        8.      Another factual dispute in this case relates to the time period over which the damage to the NRU Reactor took place. Lantheus contends that standard exclusions for loss or damage caused by "[d]eterioration, depletion, rust, corrosion" and "decay" refer to the inevitable degradation of an object over time as it wears out or reaches the end of its useful life, and that such exclusions do not apply to unexpected damage caused by fortuitous events. (JPPS at 7-8.) Information regarding the time period during which the damage to the NRU Reactor vessel took place will thus be highly relevant in assessing the applicability of these exclusions. A related issue to be tried in this case is whether the alleged nitric acid attack on the NRU Reactor vessel resulted from a gradual, natural, inevitable process of wear and tear, or whether it occurred over a short period of time as a result of extrinsic events (such as the presence of reported desiccants in the Annulus). Information concerning the chemical and metallurgical analyses performed on the Annulus and on the NRU Reactor vessel wall will be highly relevant to resolving that dispute. Paragraphs 11 to 16 below explain in greater detail how the specific information sought by Lantheus from AECL bears directly on the core disputed factual issues to be determined by the jury in this case.

9. Based on a review of the very narrow universe of limited documents that AECL has made public about the NRU Reactor shutdown, it appears that AECL has substantial documents and information regarding the sequence of events that led to the NRU Reactor shutdown. In particular, AECL has stated, in testimony before the Canadian Nuclear Safety Commission ("CNSC") that it conducted "a visual inspection of the full circumference of the NRU [nuclear reactor] vessel . . . *followed by a comprehensive non-destructive or NDE campaign undertaken over five months to determine the thickness of the* [nuclear reactor] *vessel wall*. Progressively more sophisticated probes and delivery systems were used *to expand the area of inspection and the quality of data.*" (CNSC Public Hearing (July 5, 2010) at 10:14-23 (attached as Exhibit 2) (statement of Bill Pilkington, AECL Senior Vice President and Chief Nuclear Officer (emphases added)).) At the same hearing, the CNSC stated that "CNSC staff required AECL to . . . conduct a *root cause investigation* into the leak" of heavy water that preceded the shutdown. (Ex. 2 at 41:8-11 (statement of Peter Elder, CNSC Director General of the Directorate of Nuclear Safety and Facilities Regulation (emphasis added)).) That investigation was "divided into two parts: *a technical investigation* . . . and a wider organizational investigation." (*Id.* at 41:12-14 (emphasis added).) At the same hearing, CNSC also stated, "AECL was required to perform an extensive assessment of the [nuclear reactor] vessel to determine its complete condition, define a repair strategy and a detailed repair plan based on the condition assessment and the technical root cause." (*Id.* at 41:18-41:22.)

10. Lantheus has also been provided with a heavily redacted copy of AECL's "Event Report May 2009 Heavy Water Leak in NRU." (*See* Ex. 1.) That report states that AECL has undertaken: (a) visual examinations of the NRU Reactor vessel, taking videos of the interior and exterior of the vessel; (b) ultrasonic testing and eddy-current testing of the NRU

Reactor vessel wall thickness and vessel conditions; (c) microscopic and chemical examination of material removed from the NRU Reactor; and (d) destructive examination of material removed from the NRU Reactor vessel. (*See* Ex. 1 at 000043.) Other documents indicate that AECL collected thousands of data points during these tests, and that AECL collected samples of water and other chemical constitutes found in the Annulus after the leak occurred. (*See* Ex. 3 at 000061; 000063; 000065.) Neither the results of these specific tests nor the underlying analytical data have been disclosed.

        11. The documents sought by Lantheus's Motion for amended letters rogatory are set for in Schedule A (Revised) to the proposed amended letters rogatory. The documents and information sought by Lantheus falls in to the following general categories:

    1. documents and technical data relied upon by AECL in reaching conclusions regarding the causes of the damage to the NRU Reactor vessel and the damage mechanism (Schedule A (Revised) Nos. 7-10, 12-13);

    2. documents considered in evaluating the metallurgical conditions of the aluminum alloy comprising the NRU Reactor vessel, including documents regarding its micro-structure and how the micro-structure was impacted by chemical constituents inside the Annulus (*id.* No. 1, 14);

    3. documents considered in evaluating the alleged formation of nitric acid in the Annulus of the NRU Reactor vessel, including how the nitric acid developed and the concentrations of any nitric acid found in the Annulus (*id.* Nos. 2, 3);

    4. documents considered in evaluating the functioning of the carbon dioxide pumping system and drainage system intended to keep the NRU Reactor Annulus free from water and air (*id.* Nos. 4-7);

    5. documents considered in determining whether any chemicals, desiccants, or impurities were found in the Annulus or in water in the Annulus prior to or during the NRU Reactor shutdown (*id.* Nos. 7, 11).

12. Each of these categories of documents and information sought by Lantheus is highly relevant to the insurance issues to be tried in this case.

13. The documents and data relied upon by AECL in reaching its conclusions regarding the cause of the damage to the NRU Reactor vessel and the precise manner in which the damage took place are essential to enable Lantheus to prove a covered cause of loss and to rebut Zurich's contentions that the damage was caused by "corrosion," the "accumulated effects of vapor [or] liquid," or "[l]atent defect." That information is also necessary to enable Lantheus to establish how rapidly and fortuitously the damage took place, and to address whether a rapid nitric acid attack on the aluminum reactor vessel, which may have been caused by the accidental introduction of chemical additives into the Annulus, falls within the scope of the standard "corrosion" exclusion in the Zurich insurance Policy.

14. Information about metallurgical conditions of the micro-structure of the aluminum alloy composing the NRU Reactor vessel and the formation of nitric acid in the NRU Reactor Annulus are crucial to determining the effects and rates of any metallic attack by nitric acid or some other substance on the NRU Reactor vessel.

15. Information regarding the malfunctioning of systems intended to keep water and air out of the Annulus will assist in determining whether the damage to the NRU Reactor vessel resulted from an external cause (such as operator error), and in rebutting Zurich's allegations of "[l]atent defect" or "[e]rrors in faulty, in adequate or defective [c]onstruction . . . design . . . renovation, specifications, workmanship, installation or process."

16. Documents regarding the addition of any chemicals (such as desiccants) to the Annulus will assist in determining whether the damage resulted from operator error rather than the excluded causes relied upon by Zurich.

**B.    Lantheus's Efforts to Obtain the AECL Documents Before Seeking the Issuance of Letters Rogatory.**

17. Lantheus has made substantial efforts to obtain production of documents and information regarding the May 2009 NRU Reactor shutdown from AECL prior to initiating the letters rogatory process. The steps summarized below are in addition to the steps described in the Declaration of Anna St. John, also submitted in support of Lantheus's motion for amended letters rogatory.

18. By letter dated March 2, 2011 to Jonathan Lundy, Senior Vice-President and General Counsel of AECL, Lantheus's Canadian counsel, Brett Harrison, at McMillan LLP, requested multiple categories of documents and information from AECL. Attached as Exhibit 4 is a true and correct copy of the March 2, 2011 from Mr. Harrison to Mr. Lundy. That letter advised AECL that Lantheus sought "voluntary production of these documents in the hope of avoiding the use of formal process." (Ex. 4 at 2.) AECL did not respond to that letter.

19. I understand that on April 5, 2011, my colleague at Covington & Burling LLP, William F. Greaney, together with Lantheus's Vice-President and General Counsel, Michael P. Duffy, attempted to reach Mr. Lundy by phone to discuss obtaining the documents and information requested by Lantheus. It is my understanding that Mr. Lundy did not return the call.

20. On April 11, 2011, Lantheus submitted an Access to Information Act Request to AECL (the "ATI Request") pursuant to Canada's *Access to Information Act*, R.S.C., 1985, c. A-1. Attached as Exhibit 5 is a true and correct copy of Lantheus's April 11, 2011 ATI Request.

21. I understand that on April 21, 2011, AECL's Access Coordinator, Jean Boulais contacted Lantheus's Canadian counsel, Mr. Harrison, concerning Lantheus's ATI

8

Request. Mr. Harrison memorialized that discussion and responded to AECL in a letter to Mr. Boulais dated May 4, 2011, a true and correct copy of which is attached as Exhibit 6. Mr. Harrison emphasized in his May 4 letter that any documents that AECL was willing to produce needed to be made available promptly, and that due to court-imposed deadlines in this case, Lantheus was unwilling "to engage in a consultative process of indeterminate length, with no guarantee that all required materials will be provided in time for the information to be used in the U.S. litigation." (Ex. 6 at 1.) That letter also advised AECL that due to AECL's delays in processing Lantheus ATI Request, "Lantheus will be seeking approval by the U.S. court of a letter of request to the Canadian courts to require production of all the requested materials and deposition testimony by AECL." (Ex. 6 at 2.)

22. On May 6, 2011, Mr. Boulais again contacted Mr. Harrison by phone about Lantheus's ATI Request, and confirmed AECL's position that it would not produce any documents beyond the limited set of documents that it had previously provided in response to requests from other unrelated persons.

23. Mr. Harrison sent Mr. Boulais a letter on May 9, 2011 to confirm and follow-up on their conversation of May 6, a true and correct copy of which is attached as Exhibit 7. Lantheus again advised AECL that "[g]iven AECL's position, and the importance of obtaining the requested document within the court-imposed deadlines [in this case], Lantheus has no choice but to proceed with its request for approval by the U.S. court of a letter of request to the Canadian courts to require production of the requested materials and deposition testimony by AECL." (*See* Ex. 7 at 1-2.)

24. Instead of responding to Lantheus's ATI Request, AECL sent, on May 11, 2011, a letter forwarding copies of documents that it appears AECL had already produced in

9

response to other apparently unrelated Access to Information Act requests from third parties. Attached as Exhibit 8 is a true and correct copy of the May 11, 2011 letter from Mr. Boulais to Mr. Harrison.

        25.     AECL's May 11, 2011 production of documents comprised 2,200 pages. More than 80% of these documents do not relate to the events underlying the May 2009 NRU Reactor shutdown at issue, but instead relate to other incidents that have occurred at the NRU Reactor, such as a December 2007 shutdown due to a dispute with the CNSC, and the termination of an AECL project to construct one or more new nuclear reactors. Nearly 100 of the remaining pages contained in the May 11, 2011 production were duplicates of materials that AECL had previously provided to Zurich apparently in response to a separate Access to Information Request made by Zurich. Attached as Exhibit 9 are excerpts of the documents provided to Zurich. The AECL documents provided to Zurich are heavily redacted and incomplete. A review of those documents shows that the unredacted portions do not contain AECL's underlying technical data or analyses of the cause(s) of the May 2009 shutdown. In addition, the unredacted portions of the documents refer to other reports and materials, including a review of the NRU Reactor and the damage mechanism by independent experts, which are not included in AECL's production to Zurich. (*See* Ex. 9 at 000113.)

        26.     On May 26, 2011, AECL sent an e-mail to Mr. Harrison advising that AECL would give itself an extension of up to 150 days to process Lantheus's ATI Request. Attached as Exhibit 10 is a true and correct copy of AECL's May 26, 2011 e-mail.

        27.     On June 6, 2011, Mr. Boulais sent a letter to Mr. Harrison, a true and correct copy of which is attached as Exhibit 11. AECL's June 6 letter officially extended the time period for AECL to respond to Lantheus's ATI Request by 90 days beyond the original

statutory limit of 30 days. AECL also indicated in this letter that AECL may require additional extensions; AECL's June 6 letter did not provide any assurances that additional responsive documents would be provided to Lantheus at the conclusion of this 120-day period.

28.    As a result of AECL's refusal to comply with its obligations under Canada's Access to Information Act, Lantheus was ultimately forced to file a complaint with the Canadian Information Commissioner, requesting an investigation into AECL's actions. A true and correct copy of Lantheus's Complaint to the Information Commissioner is attached as Exhibit 12.

29.    By a letter dated August 9, 2011, which Lantheus's Canadian counsel received on August 17, 2011, a true and correct copy of which is attached as Exhibit 13, AECL advised that it had estimated that AECL would require an additional 155 hours to gather documents responsive to Lantheus's ATI Requests and requesting that Lantheus pay $1,500 for AECL do so. That letter contains no indication that AECL had used the three month extension, or the original 30-day response period, to begin collecting documents responsive to Lantheus's ATI Request. AECL's August 9, 2011 Letter did not indicate either the scope of the documents AECL proposed to gather in response to Lantheus's ATI Request or the timing of any responsive production. (Ex. 13 at 1-2.) Nor did AECL's August 9, 2011 letter provide any assurances that AECL would not continue its practice of redacting nearly all meaningful information from the documents it planned to produce. (*Id.*) AECL did state, however, that Lantheus's ATI Request "is now on hold until your search fee payment is received." (*Id.* at 1.)

30.    At no point during the ATI Request process prior to the issuance of the initial letters rogatory did AECL indicate that it wanted to be notified if Lantheus asked this Court to issue letters rogatory.

### C.  Lantheus's Attempt to Enforce the Initial Letters Rogatory

31. On May 10, 2011, Lantheus filed an Unopposed Motion for Issuance of Letters Rogatory with this Court. On May 12, 2011, this Court (per Judge Swain) granted the Order for Letters Rogatory, and on May 18, 2011, the Clerk's Office provided Lantheus with letters rogatory bearing the seals of the United States District Court for the Southern District of New York.

32. On May 26, 2011, Lantheus served AECL with a Notice of Application for a July 21, 2011 hearing in the Ontario Superior Court of Justice ("the Ontario Court") to enforce the letters rogatory ("the Notice of Application").

33. I understand that on May 26, 2011, shortly after the Notice of Application was served, Patrick Murphy an inside attorney at AECL, contacted Lantheus's Canadian counsel, Mr. Harrison, to begin discussions regarding the enforcement of the letters rogatory. I also understand that Mr. Harrison and Mr. Murphy spoke again on June 1, 2011. It is my understanding that during these calls Mr. Murphy did not suggest that there were any legal impediments to the enforcement of the letters rogatory.

34. On or about June 10, 2011, I attempted to contact Mr. Murphy by phone and e-mail to discuss Lantheus's Application to enforce the letters rogatory ("Lantheus's Application"). Mr. Murphy responded that another attorney at AECL, Natalie Cefaraatti, had been given responsibility for the matter, and referred me to her. A true and correct copy of that e-mail exchange is attached as Exhibit 14.

35. On June 13, 2011, I e-mailed Ms. Cefaraatti to arrange a time to discuss Lantheus's Application. On June 14, 2011, Ms. Cefaraatti, advised me that outside counsel, Mr. Ahab Abdel-Aziz of Heenan Blaikie LLP, had been given responsibility for the matter, and referred me to him. That day, I attempted to reach Mr. Abdel-Aziz by phone to discuss the

matter. Mr. Abdel-Aziz responded by e-mail and advised me to contact his assistant to make an appointment. A true and correct copy of the June 13-14, 2011 e-mail exchange between myself and Ms. Cefaraatti is attached as Exhibit 14.

36. On June 16, 2011, my colleague Anna St. John and I spoke with Mr. Abdel-Aziz, his associate and Ms. Cefaraatti regarding Lantheus's Application. For the first time, AECL suggested that it was immune to process within Canada and that production of the documents requested by Lantheus raised export control and "public policy" issues. Mr. Abdel-Aziz also for the first time suggested that Lantheus should have asked this Court to consider AECL's status as a crown corporation. Despite repeated questions, however, Mr. Abdel-Aziz did not explain why that information was relevant, and he did not during that conversation mention the Foreign Sovereign Immunities Act ("the FSIA"), 28 U.S.C. § 1330, §§ 1602-1611 (2010). During that conversation, the parties discussed the possibility of narrowing Lantheus's document requests to accommodate AECL's concerns. Counsel for AECL also advised, during this conversation, that Lantheus should abandon its efforts to seek enforcement of the letters rogatory as AECL would provide, in due course, a response to Lantheus's ATI Request of April 11, 2011. I asked Mr. Abdel-Aziz when AECL expected to produce documents in response to Lantheus's ATI Request, and what documents AECL expected to produce. Mr. Abdel-Aziz stated that he would consult with his client and attempt to answer those questions.

37. On June 20, 2011, Mr. Harrison wrote to Mr. Abdel-Aziz to follow-up on the June 16, 2011 telephone conference. A true and correct copy of Mr. Harrison's June 20, 2011 letter to Mr. Abdel-Aziz is attached as Exhibit 15. That letter specifically asked AECL to provide "a written summary of [AECL's] position to which [Lantheus] can respond." (Ex. 15, at 1.) In addition, Lantheus expressed the hope that "AECL and Lantheus can work together

13

towards a common solution for both parties," and suggested that "it would be helpful in doing so if AECL could provide [Lantheus] with an overview of the specific information it has about the May 2009 - August 2010 shutdown of the [NRU] reactor so that Lantheus can determine whether any narrowing of its document requests is warranted." (*Id.* at 2.)

        38.     On June 23, 2011, Mr. Abdel-Aziz responded to Mr. Harrison's June 20, 2011 letter. A true and correct copy of Mr. Abdel-Aziz's June 23, 2011 letter to Mr. Harrison is attached as Exhibit. 16. That letter alleged that Lantheus did not properly disclose AECL's status as a Canadian federal crown corporation to this Court, but it did not cite any U.S. case or statute suggesting that AECL's status as a crown corporation was in any way relevant to the issuance by this Court of letters rogatory requesting the assistance of the Canadian courts in obtaining evidence from AECL. Nor did that letter explain the specifics of AECL's legal position.

        39.     Lantheus and AECL had discussed during the June 16, 2011 conference call the prospect of narrowing Lantheus's document requests in order to facilitate production, and Lantheus had asked AECL to provide an overview of the information that it possessed so that the parties could have an informed discussion about doing so. AECL responded, in its June 23 letter, that it would not "'negotiate' its disclosure obligations and exemptions" or provide "a preview of what documents or type of documents might be available." (Ex. 16 at 2.) Although AECL had suggested during the June 16 conference call that Lantheus abandon its Application in favor of its ATI Request, AECL also refused, in June 23 letter, to "give a more precise timeline" for obtaining a response to Lantheus's pending ATI request beyond that provided by AECL's letter of June 6, 2011. (*Id.* at 2-3.)

40. Lantheus responded to AECL's June 23 letter by a letter of June 28, 2011 from Mr. Harrison to Mr. Abdel-Aziz, a true and correct copy of which is attached as Exhibit 17. Lantheus's June 28 letter explained in detail, citing specific U.S. and Canadian case law, why AECL's arguments regarding its purported immunity were incorrect. Lantheus also explained that it "has always been, and still remains willing to discuss the scope" of the materials sought from AECL. It again asked that AECL provide Lantheus with information as to the "the type of documents in its possession" so that any discussion about narrowing the scope of the requested documents could take place on an informed basis.

41. AECL responded by letter of June 30, 2011 from Mr. Abdel-Aziz to Mr. Harrison, a true and correct copy of which is attached as Exhibit 18. That letter did not provide the requested explanation of AECL's legal position. Instead, AECL wrote that it would "provide its substantive response to [Lantheus's] arguments in due course, as part of the legal proceedings." (Ex. 18 at 1.) That letter also did not provide the requested information about the responsive documents in AECL's possession so that the parties could engage in a meaningful discussion about narrowing Lantheus's document requests. Instead, that letter sought to adjourn the July 21 hearing date on Lantheus's Application to enforce the letters rogatory and proposed a schedule that would have delayed any decision on Lantheus's Application by several months.

42. Lantheus responded to AECL's letter of June 30 by a letter of July 4, 2011 from Mr. Harrison to Mr. Abdel-Aziz, a true and correct copy of which is attached as Exhibit 19. Lantheus explained that the deadlines imposed in this case required a prompt hearing on Lantheus's Application before the Ontario Court to enforce the letters rogatory. It also noted that AECL had not requested an adjournment until June 30, 2011, even though AECL "has been aware that Lantheus intended to bring this application since May 9, 2011."

43. AECL responded to Lantheus's letter of July 4, 2011 by a letter dated July 5, 2011 from Mr. Abdel-Aziz to Mr. Harrison, a true and correct copy of which is attached as Exhibit 20. AECL again demanded an adjournment of the July 21 hearing on Lantheus's Application.

44. On July 7, 2011, AECL wrote to the Civil Scheduling Unit of the Ontario Superior Court of Justice demanding that the July 21, 2011 hearing date for Lantheus's Application be stricken. Attached as Exhibit 21 is a true and correct copy of Mr. Abdel-Aziz's July 7, 2011 letter to the Civil Scheduling Unit of the Ontario Superior Court of Justice.

45. On July 8, 2011, Mr. Harrison wrote to the Civil Scheduling Unit, responding to AECL's demand that the July 21, 2011 hearing date be stricken. A true and correct copy of Mr. Harrison's July 8, 2011 letter to the Civil Scheduling Unit of the Superior Court of Justice is attached as Exhibit 22.

46. On July 11, 2011, Lantheus and AECL appeared before the Civil Scheduling Unit, which denied AECL's request to adjourn the July 21, 2011 hearing date on Lantheus's Application.

### D. AECL's Demands for a Release

47. After the Civil Scheduling Unit denied AECL's request to adjourn the July 21 hearing on Lantheus's Application, Mr. Abdel-Aziz wrote to counsel for Lantheus and counsel for Zurich, stating "[i]n anticipation of the upcoming application to enforce Letters Rogatory in Ontario, are your respective clients willing to release AECL from any claim either of them may make against AECL in relation to the shutdown of the NRU?" Attached as Exhibit 23 is a true and correct copy Mr. Abdel-Aziz's July 11, 2011 letter to Mr. Harrison and to counsel for Zurich, Mr. Wilson.

48. In response to AECL's request for a release, I sent, on July 19, 2011, an e-mail to Don Jack, outside counsel for AECL who had taken over the matter from Mr. Abdel-Aziz, a true and correct copy of which is attached as Exhibit 24. In that e-mail, Lantheus advised AECL that "Lantheus has no current intention to assert any negligence claims against AECL" because Lantheus "is seeking coverage for its contingent business interruption losses resulting from the events of May 2009 [at the NRU Reactor] from its first-party property insurer Zurich." (Ex. 24 at 1-2.) Lantheus further explained that any release by Lantheus of its potential claims "may be viewed by Zurich as a breach of Lantheus's obligations under the Policy." (*Id.* at 2.) Lantheus also pointed out "it is unreasonable to condition Lantheus's access to probative evidence on action that could jeopardize its contract claim against Zurich." (*Id.*)

49. My e-mail of July 19, 2011 to Mr. Jack also explained that Lantheus would agree to make further accommodations in order to resolve Lantheus's Application. These included: (1) withdrawing 9 of Lantheus's 23 document requests; and (2) narrowing 9 other document requests; (3) agreeing to a mechanism to handle any specific documents that AECL believed were subject to export control regulations; (4) agreeing that AECL would have standing under the Protective Order in this case to enforce the provisions of that order with respect to any materials that AECL chose to designate as confidential; and (5); reimbursing AECL at a rate of $150/per hour for time spent gathering documents. (*See* Ex. 24 at 1.)

50. AECL nonetheless continued to oppose Lantheus's Application.

E. **The Proceedings Before the Canadian Court and AECL's Further Attempts to Delay.**

51. On July 21, 2011, the Ontario Superior Court, *sua sponte*, adjourned the hearing on Lantheus's Application to July 25, 2011.

17

52. On July 25, 2011, the Ontario Superior Court conducted a hearing on Lantheus's Application. At the conclusion of the hearing, the Court directed the parties to file by 4:30 p.m. the next day (i.e., July 26, 2011) supplemental briefs addressing the narrow issue of whether under section 60 of Ontario Evidence Act, R.S.O., 1990, c. E-23, as amended, which authorizes the enforcement of letters rogatory, this Court was a "court of competent jurisdiction" that had "duly authorized" the letters rogatory, as those terms are used in the Ontario Evidence Act. The Ontario Court also stated that the hearing on Lantheus's Application would resume on July 27, 2011 to take up that narrow issue.

53. The parties exchanged supplemental briefs on July 26, 2011 as directed by the Court. Notwithstanding the Court's direction to address a single narrow statutory issue, AECL's Supplemental Brief argued for the first time that any use of the Ontario Evidence Act to enforce letters rogatory against a Canadian federal entity raised issues requiring the involvement of the Canadian Ministry of Justice.

54. On the afternoon of July 26, 2011, Ms. Dale Yurka, of the Canadian Ministry of Justice, advised Lantheus that the Ministry, which had apparently just been contacted by AECL, would appear before the Ontario Superior Court at the July 27, 2011 resumption of the hearing on Lantheus's Application and would seek an adjournment of 30 days to decide whether or not to intervene in the case with respect to the issues newly raised by AECL. Attached as Exhibit 25 is a true and correct copy of Ms. Yurka's July 26, 2011 e-mail to Mr. Harrison.

55. On July 27, 2011, the Court conducted further hearings on Lantheus's Application. At the outset of the hearing, the Ministry of Justice asked the Ontario Superior Court to adjourn the proceedings for 30 days so that it could decide whether it would intervene. At the conclusion of the hearing the Court issued an oral ruling, denying Lantheus's application

without prejudice and declining to rule on the Ministry of Justice's request for an adjournment. The Ontario Court's ruling was based on the conclusion that this Court should have considered whether, because AECL is a Canadian federal crown corporation, the FSIA precluded this Court from issuing letters rogatory as to AECL.

56. A true and correct transcript of the Ontario Superior Court's ruling on Lantheus's Application is attached as Exhibit 26.

57. A true and correct copy of the May 14, 2003 opinion in *E-Beam Servs., Inc. v. AECL Technologies, Inc.*, No. 02-2256 (D.N.J.) is attached as Exhibit 27.

58. A true and correct copy of the May 12, 2003 Certification of John B. Pinney filed in *E-Beam Servs., Inc. v. AECL Technologies, Inc.*, No. 02-2256 (D.N.J.) is attached as Exhibit 28.

59. A true and correct copy of the letter rogatory issued by the court in *Al-Misehal Commercial Group Ltd. v. Armored Group LLC*, No. 2:10-cv-01303 JWS (D. Ariz.) is attached as Exhibit 29.

60. A true and correct copy of the June 16, 2003 opinion in *E-Beam Servs. Inc. v. AECL Technologies, Inc.*, 2003 CarswellOnt 2371 (S.C.J.) is attached as Exhibit 30.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2011

Rukesh A. Korde