# EXHIBIT 12



Office of the Information          Commissariat à l'information
Commissioner of Canada      du Canada

### *Access to Information Act*
### Complaint Form

The Office of the Information Commissioner of Canada (OIC) reviews the complaints of persons who believe that federal institutions have not respected their rights under the *Access to Information Act*.

**If you wish to file a complaint with the Office of the Information Commissioner of Canada, please complete this form and send it with any accompanying documents, by mail or by fax to:**

**Office of the Information Commissioner of Canada**
Place de Ville, Tower B
112 Kent Street, 7th Floor
Ottawa, Ontario  K1A 1H3

**Fax: (613) 947-7294**

**NOTE**: At the present time, we do not accept complaints via electronic mail.

More information to assist you in completing this form is available here or by calling (613) 995-2410 or toll-free in Canada 1-800-267-0441.

1) To expedite the processing of your complaint, please provide as much information as possible.

2) Complaints must be made to the OIC in writing within 60 days of receiving your response or a notice from the federal institution, or when you become aware that grounds for a complaint exist.

**The personal information provided on this form is protected under the provisions of the *Access to Information Act* and the *Privacy Act*. Please note that your name and the details of your complaint will be provided to the institution that is the subject of the complaint.**

**\*Required field**

| First name \* Brett | | Last name \* Harrison | |
|---|---|---|---|
| **Mailing address \*** Brookfield Place, 181 Bay Street, Suite 4400 | | | |
| **City \*** Toronto | **Province \*** Ontario | | **Postal code \*** M5J 2T3 |
| **Contact phone number \*** ( 416 ) 865-7932 | **Alternative phone number** (    ) | | **Fax number** ( 647 ) 722-6756 |
| **Email address** Brett.Harrison@mcmillan.ca | | | |
| **Please indicate the best time to contact you, as well as any contact restrictions:** (The OIC's hours of business are Monday to Friday, 8:30 am – 5:00 pm EST) | | | |



**Office of the Information
Commissioner of Canada**

**Commissariat à l'information
du Canada**

---

| | |
|---|---|
| **1.** Are you making this complaint | ☐ on your own behalf |
| | ☑ on behalf of another person * |

*(*If you checked "on behalf of another person", attach any documentation that indicates that you are authorized to act for another individual)*

---

**2.** Name of the institution that is the subject of your complaint.

Lantheus Medical Imaging, Inc.

---

**3.** Indicate any file or reference numbers and dates relevant to your complaint (for example, date of request for access to information, date you received a response or other).

See attached letter.

_____

_____

_____

**3. (a)** Have you complained to this office before about this same access request? If so, please identify the type of complaint (see 5. below "Type of complaints")

No

---

**4.** Have you received a written response or any notice (i.e. extension of time limits, fee assessment or other) from the institution?

☑ Yes   ☐ No   If "Yes", what is the date of the letter, and when did you receive it?

See attached letter.

---

**5.** Identify the type of complaint you are making:

☐ Incomplete search/no records response

☐ Deemed refusal (delay beyond the 30 day time limit or extended time limit)

☑ Exemptions/exclusions (records or portions of records were withheld from access)

☐ Fee assessment to produce records is not justified

☑ Time extension (institution informed you of extra time necessary to process your request)

☐ Language (your request to obtain records in your official language of choice was denied)

☐ Alternative format (person with sensory disability is refused access to records in an alternative format)

☐ Publication bulletin (complaint about the publication by government institutions (InfoSource))

☐ Any other reason(s) (Please describe in section 6 below).

 **Office of the Information Commissioner of Canada**   **Commissariat à l'information du Canada**

---

6.  Provide a summary of your complaint and describe the action or events that prompted you to complain together with any relevant date(s) of event(s). (Use additional pages if required)

See attached letter.

_____

_____

_____

_____

---

7.  Attach copies of the following documents, if applicable:
   ☑ Your request to the institution
   ☑ The institution's response to your request (if any) that prompted this complaint
   ☑ Any other correspondence between you and the institution on this matter
   ☑ Any documentation indicating that you are authorized to act on behalf of another individual (if applicable)
   ☐ Other_____

---

I certify, to the best of my knowledge, that the information provided on this form is true and complete.

Signature  (on behalf of Bett Harrison)

Date   August 5, 2011

---

Reserved for OIC date Stamp

---



combining Lang Michener LLP and McMillan LLP

| | |
|---|---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | August 5, 2011 |

**FAXED**

The Information Commissioner of Canada
Place de Ville, Tower B
112 Kent Street, 7th Floor
Ottawa, ON  K1A 1H3

Dear Sir or Madam:

> **Re:     Lantheus' Access to Information Request**

We act as Canadian counsel for Lantheus Medical Imaging, Inc. ("**Lantheus**"), which has filed an Access to Information Request ("**ATI Request**") to obtain documents and information from Atomic Energy of Canada Limited ("**AECL**") for use in a lawsuit against Lantheus' insurer, Zurich American Insurance Company ("**Zurich**").  That lawsuit is now pending in the United States (the "**U.S. Action**").  AECL has refused to comply with its obligations under the *Access to Information Act*, R.S.C., 1985, c. A-1 (the  "**ATI Act**") to produce documents responsive to Lantheus' ATI Request in a reasonably timely fashion in violation of section 9 of the ATI Act.  While AECL has produced a handful of responsive documents to Lantheus, those documents have been redacted to point of being meaningless, in violation of Section 10 of the ATI Act.

AECL's conduct in this matter violates the letter and purpose of the ATI Act. Pursuant to section 30(1) of the ATI Act, Lantheus formally requests that the Information Commissioner institute an investigation into AECL's refusal to meaningfully respond to Lantheus' ATI Request and makes this formal complaint. As outlined in more detail below, due to the current timetable set in the U.S. Action, Lantheus requires that all responsive documents be promptly produced to it in unredacted form.  Given the importance of the information sought to the U.S. Action, Lantheus requests that the Information Commissioner's investigation take place on a priority basis.

## The Importance of the Information Sought by Lantheus' ATI Request

Prompt production of the documents sought by Lantheus' ATI Request is critical to the U.S. Action between Lantheus and Zurich.  The U.S. Action arises from Zurich's alleged breach of its obligation to indemnify Lantheus for lost business income and extra expense

McMillan LLP | Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 | t 416.865.7000 | f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

sustained by Lantheus as a result of a 15-month (May 2009-August 2010) shutdown of the
National Research Universal reactor (the "**NRU Reactor**"), which is located in Chalk River,
Ontario and operated by AECL. The NRU Reactor is a primary supply source of Molybdenum-
99, a fission-produced isotope that is a critical raw ingredient used by Lantheus in the
manufacture of various radiopharmaceutical products, which are used in Canada and the U.S. for
coronary and vascular diagnostic medical imaging.

A principal issue in dispute in the U.S. Action is whether the NRU Reactor
shutdown and the resulting loss of business income by Lantheus was caused by a covered or
excluded peril under the Zurich insurance policy. AECL is in exclusive possession of facts,
information and documents addressing the cause(s) of the NRU Reactor shutdown underlying
Lantheus' claim for coverage against Zurich. AECL's information is of critical importance to
the resolution of the U.S. Action because the documents and information sought will establish
the facts, circumstances and sequence of events surrounding the shutdown of the NRU Reactor,
and whether the loss for which Lantheus seeks insurance coverage was caused by events covered
or excluded by the Policy.

Lantheus is currently subject to a number of court-ordered deadlines in the U.S.
Action that make the timing of its receipt of these documents critical. The parties in the U.S.
Action are required to participate in mandatory mediation and are currently required to submit
mediation briefs by September 12, 2011. The current court schedule requires the parties to serve
initial expert reports by October 31, 2011. Lantheus' experts cannot draft meaningful reports in
the absence of AECL's underlying technical data. Finally, the current schedule contemplates the
completion of all documentary and oral discovery by December 30, 2011. As discovery in the
U.S. Action will rely heavily on documents and information uniquely within the knowledge of
AECL, Lantheus will need to review and assimilate the documents and information provided by
AECL in order to prepare for discovery.

**Lantheus Repeatedly Sought Voluntary Production from AECL**

More than a year ago, on May 27, 2010, Lantheus and its U.S. counsel attended a
meeting in Toronto with Richard Coté ("**Mr. Coté**"), Vice President, Isotopes Business for
AECL, to discuss the shutdown of the NRU Reactor. While Mr. Coté provided some helpful
information, he emphasized that his knowledge of the circumstances surrounding the shutdown
of the NRU Reactor was based primarily on information provided by other AECL employees.
Mr. Coté advised that he would try to set up a follow-up call or meeting with AECL chemists,
engineers and metallurgists who had investigated the causes of the shutdown, and who could
explain in more detail the nature of the damage to the NRU Reactor and how it had occurred, but
wanted to check with AECL management first.

Despite Mr. Coté's statements, AECL has subsequently failed to provide
Lantheus with any meaningful information. On multiple occasions after the meeting with Mr.
Coté, Lantheus' U.S. counsel called him to follow-up on his offer to have AECL technical
personnel meet or speak with them concerning the results of their investigation. Neither Mr.
Coté, nor anyone else at AECL, returned these calls.

On separate occasions in June, July and October 2010, Lantheus attempted to contact AECL to arrange a meeting between AECL technical personnel and Lantheus' counsel to obtain technical information about the NRU Reactor shutdown. Despite repeated efforts, and assurances from AECL that it would contact Lantheus' counsel and set up the meeting, Lantheus was unable to obtain the meeting.

On March 2, 2011, I sent a letter to Jonathan Lundy, Senior Vice-President and General Counsel of AECL requesting that AECL voluntarily produce certain documents and information. AECL did not respond to that letter. Attached as Exhibit "**A**" is a true and correct copy of my letter to AECL.

On April 5, 2011, Lantheus and its U.S. Counsel again attempted to reach Mr. Lundy by phone to discuss obtaining the documents and information requested by Lantheus. Mr. Lundy did not return the call.

**The Access to Information Request**

Given AECL's refusal to voluntarily produce the documents and information, and given the pending deadlines in the U.S. Action, Lantheus submitted its ATI Request to AECL on April 11, 2011. Attached as Exhibit "**B**" is a copy of the ATI Request.

On April 21, 2011, AECL's Access Coordinator, Jean Boulais ("**Mr. Boulais**"), contacted me concerning the ATI Request. I responded to AECL in a letter dated May 4, 2011 and emphasized that any documents that AECL was willing to produce needed to be made available promptly due to court-imposed deadlines in the U.S. Action. I further indicated that Lantheus was unwilling "to engage in a consultative process of indeterminate length, with no guarantee that all required materials will be provided in time for the information to be used in the U.S. litigation." Attached as Exhibit "**C**" is a copy of this letter to AECL.

On May 6, 2011, Mr. Boulais again contacted me concerning Lantheus' ATI Request, and confirmed that AECL would not produce any documents beyond the limited set of documents that had previously been provided in response to requests from other unrelated parties. Mr. Boulais also indicated that AECL would be extending the time period for its response. In a follow-up letter dated May 9, 2011, I expressed concerns that AECL had "not committed to providing Lantheus with any additional documents beyond those already available and has not committed to any definite time frame for producing such materials." Attached as Exhibit "**D**" is a copy of this letter to AECL.

In lieu of responding to Lantheus' ATI Request, on May 11, 2011, AECL sent a letter forwarding copies of documents which AECL had already produced in response to other, apparently unrelated, ATI Requests from third parties. Attached as Exhibit "**E**" is a copy of this letter.

AECL's May 11 production of documents to Lantheus comprised 2,200 pages. More than 80% of these documents did not relate to the events underlying the May 2009 NRU Reactor shutdown at issue, but instead related to other irrelevant incidents that have occurred at the NRU Reactor, such as a December 2007 shutdown and the termination of an AECL project

to construct one or more new nuclear reactors. Those documents actually relating to the May 2009 NRU shutdown were extensively redacted to the point of being meaningless. Attached as Exhibit "F" are excerpts from this production, demonstrating the pervasive extent of AECL's redactions.

On June 6, 2011, AECL sent a letter unilaterally granting itself an extension of 90 days beyond the original statutory limit of 30 days, to respond to the ATI Request. AECL also stated in this letter that additional extensions may be needed, but did not provide any assurances that additional responsive documents would be provided to Lantheus. Attached as Exhibit "G" is a copy of this letter.

On July 25, 2011, counsel for AECL sent an e-mail advising that it took the position that the deadline for its response had been extended to September 9, 2011, 121 days beyond the original statutory limit. Again, no assurance was provided that any documents would be provided. Attached as Exhibit "H" is a copy of this e-mail.

**Lantheus' Complaint**

Lantheus makes this complaint pursuant to sections 30(1)(a) and 30(1)(c) of the *Access to Information Act*, which state as follows:

**Receipt and investigation of complaints**

**30. (1)** Subject to this Act, the Information Commissioner shall receive and investigate complaints

    (a)  from persons who have been refused access to a record requested under this Act or a part thereof;

…

    (c)  from persons who have requested access to records in respect of which time limits have been extended pursuant to section 9 where they consider the extension unreasonable.

The very limited number of relevant documents produced by AECL thus far are so heavily redacted and incomplete that they amount to a refusal to grant access, pursuant to section 30(1)(a) of the *Access to Information Act*. The unredacted portions do not contain AECL's underlying technical data or analyses of the cause(s) of the NRU Reactor shutdown, which is the precise information required by Lantheus for use in the U.S. Action. In addition, the unredacted portions refer to other reports and materials, including a review of the NRU Reactor and the damage mechanism by independent experts, which are not included in the production.

AECL has also granted itself an unreasonable extension of its time limit. Despite its awareness of current court-ordered deadlines in the U.S. Action, AECL has taken an extra 121 days, beyond the original statutory limit of 30 days, to respond to the ATI Request. It has also indicated that more extensions may be needed and has not provided any assurances that any additional responsive documents will ultimately be produced. AECL's refusal to produce responsive documents promptly may amount to a constructive refusal as it may significantly reduce the use to which the documents can be put in the U.S. Action.

   The purpose of the ATI is to "provide a right of access to information in records under the control of a government institution in accordance with the principles that government information should be available to the public, that necessary exceptions to the right of access should be limited and specific and that decisions on the disclosure of government information should be reviewed independently of government." AECL's conduct to date is frustrating that purpose.

   In light of these concerns, Lantheus requests that the Information Commissioner of Canada investigate this matter. Please advise if any further information or assistance from Lantheus is required. Your assistance is much appreciated.

        Yours truly,

        Brett Harrison

Encl.
Copy to: Danielle Estrada, Covington & Burling LLP
    Rukesh Korde, Covington & Burling LLP



combining Lang Michener LLP and McMillan LLP

| Reply to the Attention of | Brett Harrison |
|---|---|
| Direct Line | 416.865.7932 |
| Direct Fax | 647.722.6756 |
| Email Address | brett.harrison@mcmillan.ca |
| Our File No. | 66591 |
| Date | March 2, 2011 |

**E-MAIL**

Mr. Jonathan Lundy
Senior Vice President, General Counsel
& Corporate Secretary
Atomic Energy of Canada Limited
2251 Speakman Drive
Mississauga, Ontario L5K 1B2
Email: lundyj@aecl.ca

Dear Mr. Lundy:

Re:   Lantheus Medical Imaging, Inc. v. Zurich American
Insurance Company

We act as Canadian counsel for Lantheus Medical Imaging, Inc. ("Lantheus") in the above noted matter. Lantheus recently filed a lawsuit in the United States against its insurance company, Zurich American Insurance Company ("Zurich"), seeking payment of losses that it sustained as a result of the shutdown of the Chalk River National Research Universal ("NRU") reactor in May 2009. By this letter, Lantheus asks that Atomic Energy Canada, Limited ("AECL") voluntarily provide Lantheus with the documents and information identified on Exhibit 1.

The information that Lantheus is asking AECL to voluntarily produce is highly relevant to the U.S. lawsuit between Lantheus and Zurich. As you know, the NRU reactor produces molybdenum-99 ("moly"), a critical raw material used by Lantheus in manufacturing its radiopharmaceutical products. As a result of the May 2009 shutdown of the NRU reactor, the supply of moly was interrupted for an extended period, and Lantheus incurred a substantial loss of income. Lantheus contends, in its U.S. lawsuit, that those losses are covered under an insurance policy it purchased from Zurich. Zurich has denied coverage based upon contentions that the NRU reactor shutdown was caused by, among other things, "low standards" at the NRU reactor, "errors in, or faulty, inadequate or defective ... construction ... design ... renovation, specifications, workmanship, installation or process," "[e]rrors in, or faulty, inadequate or defective [m]aintenance," a "latent defect" in the reactor, and the effects of "corrosion." The documents sought by Lantheus from AECL pertain to the reasons for, and events surrounding the NRU reactor shutdown, which are central issues in the U.S. lawsuit.

McMillan LLP · Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 · t 416.865.7000 · f 416.865.7048
Lawyers · Patent & Trade-mark Agents · Avocats · Agents de brevets et de marques de commerce
Vancouver · Calgary · Toronto · Ottawa · Montréal · Hong Kong · mcmillan.ca

MBDOCS_5404354.1

# mcmillan

Lantheus is mindful of the time involved in responding to a request for documents such as this one, and has attempted to make its document requests as narrow as reasonably possible in the circumstances.  We are writing you now to request voluntary production of these documents in the hope of avoiding the use of formal process, and I am happy to discuss with you any reasonable accommodations that Lantheus can make with AECL to facilitate production of these materials.

Given the schedule for discovery in this proceeding we would ask that you please provide us with a response by no later than March 15, 2011

Yours truly,

Brett Harrison

/wl
cc: Rukesh Korde, Covington & Burling LLP

MBDOCS_5404364.1

## EXHIBIT 1

The term "documents" as used below includes reports, memoranda, data or analysis of data.

1.   The documents that AECL relied upon in reaching the conclusions identified below in its presentations (and any associated written testimony or reports) to the Canadian Nuclear Safety Commission ("CNSC") of January 20, 2011 and July 5, 2010:

(a) January 20, 2011 presentation: conclusions regarding (i) root causes of the NRU reactor vessel leak, (ii) maintenance of the carbon dioxide concentration and improvements to the carbon dioxide system, in the J-Ring Annulus ("the Annulus") of the NRU reactor, (iii) human performance issues, (iv) the drain system in the Annulus, and (v) defective fuel issues.

(b) July 5, 2010 presentation: conclusions regarding (i) causes of the heavy water leak in the NRU reactor, (ii) damage and other effects of the heavy water leak to the NRU reactor, and (iii) the statement that "corrosion ha[d] been progressing" at the time of the license renewal in 2007.

2.   The documents that AECL relied upon in reaching conclusions regarding the cause of the leak in the NRU reactor, the damage mechanism or the condition assessment of the NRU reactor, as set forth in the following presentations (and any associated written testimony or reports):

(a) the presentation to the House of Commons Standing Committee on Natural Resources meeting on October 19, 2009;

(b) the presentation to the CNSC on August 27, 2009;

(c) the presentation to the House of Commons Standing Committee on Natural Resources on August 21, 2009;

(d) the presentation to the CNSC on July 8, 2009;

(e) the presentation to the CNSC on June 11, 2009; and

(f) the presentation to the House of Commons Standing Committee on Natural Resources on June 4, 2009.

3.   The documents which AECL considered or reviewed in evaluating whether or not radiation caused or contributed to an alteration of the micro-structure of the aluminum alloy

MBDOCS_5404354.1

composing the NRU reactor vessel, and whether any such alteration caused or contributed to the May 2009 shutdown of the NRU reactor.

4. The documents which AECL considered or reviewed in evaluating the cause or causes of the nitric acid formation in the Annulus of the NRU reactor.

5. The documents which AECL considered or reviewed in evaluating the nitric acid concentration in the Annulus of the NRU reactor at the time of or during the period prior to the May 2009 NRU reactor shutdown.

6. The documents which AECL considered or reviewed in evaluating carbon dioxide flow rates, variations of such flow rates and air leakage in or into the NRU reactor or the Annulus at the time of or during the period prior to the May 2009 NRU reactor shutdown.

7. The documents which AECL considered or reviewed in evaluating whether or not water drainage difficulties or obstructions to water drainage in the Annulus of the NRU reactor at the time of or during the period prior to the May 2009 NRU reactor shutdown caused or contributed to that shutdown.

8. Documents reporting on the results of inspections and scans of the NRU reactor vessel conducted in 2004, 2005, 2009, 2010 and 2011.

9. The results of any coupon tests, that is, tests regarding the damage mechanism, of the NRU reactor vessel following the May 2009 NRU reactor shutdown.

10. Documents graphically or numerically depicting the specific locations of the damage to the NRU reactor vessel (including "pitting" or leak holes) at the time of the shutdown.

11. Documents describing damage to the NRU reactor that could be or were caused by a heavy water leak.

12. The documents which AECL considered or reviewed in evaluating whether or not defective fuel had any role in causing or contributing to the May 2009 shutdown of the NRU reactor.

13. The documents which AECL considered or reviewed in evaluating whether or not any chemicals or dessicants were introduced into or found in the Annulus or water in the Annulus space at the time of or during the period prior to the May 2009 NRU reactor shutdown.

14. The manuals, guidelines or written procedures, or the portions of such manuals, guidelines or written procedures, applicable to the maintenance and inspection of the NRU reactor in force in May 2009.



combining Lang Michener LLP and McMillan LLP

| | |
|---|---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | April 11, 2011 |

**E-MAIL AND DELIVERED**

Mr. Jean Boulais
Access to Information and Privacy Coordinator
Atomic Energy of Canada Limited
Place de Ville, Tower B
112 Kent Street, Suite 501
Ottawa, ON  K1A 0S4
E-mail: boulaisj@aecl.ca

Dear Mr. Boulais:

      **Re:**    **Access to Information Request**

      We act as Canadian counsel for Lantheus Medical Imaging, Inc. ("Lantheus"). Lantheus recently filed a lawsuit in the United States against its insurance company, Zurich American Insurance Company ("Zurich"), seeking payment of losses that it sustained as a result of the shutdown of the Chalk River National Research Universal ("NRU") reactor in May 2009. Please find attached a formal Access to Information Request Form, whereby Lantheus requests that Atomic Energy Canada Limited ("AECL") provide it with documents and information related to this matter, identified in Exhibit 1.

      Lantheus is mindful of the time involved in responding to a request for documents of this nature, and has attempted to make its requests as narrow as is reasonably possible in the circumstances. Given the schedule for discovery in this proceeding, we would appreciate a response as soon as possible.

                    Yours truly,

                    Brett Harrison

McMillan LLP · Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 · t 416.865.7000 · f 416.865.7048  LEGAL_DOCS_6441648.1
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

mcmıllan

## EXHIBIT 1

The term "documents" as used below includes reports, memoranda, data or analysis of data.

1.  The documents that AECL relied upon in reaching the conclusions identified below in its presentations (and any associated written testimony or reports) to the Canadian Nuclear Safety Commission ("CNSC") of January 20, 2011 and July 5, 2010:

(a)  January 20, 2011 presentation: conclusions regarding (i) root causes of the NRU reactor vessel leak at the J-41 area of the J-Ring Annulus ("Annulus"), (ii) maintenance of the carbon dioxide concentration and improvements to the carbon dioxide distribution system in the Annulus, (iii) operational performance issues that contributed to or caused the leak, (iv) the drain system in the Annulus, and (v) defective fuel issues.

(b)  July 5, 2010 presentation: conclusions regarding (i) causes of the heavy water leak in the NRU reactor, including localized cavities discovered at the J-41 and J-13 to 18 areas of the Annulus, (ii) damage and other effects of the heavy water leak to the NRU reactor, including emissions of tritium above weekly action levels from May until July 2009, and (iii) the statement on page 66 of the hearing transcript that "corrosion ha[d] been progressing" at the time of the license renewal in 2007.

2.  The documents that AECL relied upon in reaching conclusions regarding the cause of the leak in the NRU reactor, the damage mechanism or the condition assessment of the NRU reactor, as set forth in the following presentations (and any associated written testimony or reports):

(a)  the presentation to the House of Commons Standing Committee on Natural Resources meeting on October 19, 2009;

(b) the presentation to the CNSC on August 27, 2009;

(c) the presentation to the House of Commons Standing Committee on Natural Resources on August 21, 2009;

(d) the presentation to the CNSC on July 8, 2009;

(e) the presentation to the CNSC on June 11, 2009; and

(f) the presentation to the House of Commons Standing Committee on Natural Resources on June 4, 2009.

3.   The documents which AECL considered or reviewed in evaluating whether or not radiation caused or contributed to an alteration of the micro-structure of the aluminum alloy composing the NRU reactor vessel, and whether any such alteration caused or contributed to the May 2009 shutdown of the NRU reactor.

4.   The documents which AECL considered or reviewed in evaluating the cause or causes of the nitric acid formation in the Annulus of the NRU reactor.

5.   The documents which AECL considered or reviewed in evaluating the nitric acid concentration in the Annulus of the NRU reactor at the time of or during the period prior to the May 2009 NRU reactor shutdown.

6.   The documents which AECL considered or reviewed in evaluating carbon dioxide flow rates in the Annulus, variations of such flow rates over time, and air leakage into the Annulus during the period prior to the May 2009 NRU reactor shutdown.

7.   The documents which AECL considered or reviewed in designing or implementing a more effective carbon dioxide distribution system in the Annulus and preventing air leaks into the Annulus after May 2009.

8.   The documents which AECL considered or reviewed in evaluating whether or not inadequate water drainage in the Annulus of the NRU reactor during the period prior to the May 2009 NRU reactor shutdown caused or contributed to that shutdown.

MBDOCS_5441548.1

April 11, 2011
Page 4

    9.   Documents reporting on the results of inspections and scans of the NRU reactor vessel conducted in 2004, 2005, 2009, 2010 and 2011.

    10. The results of any coupon tests, that is, tests regarding the damage mechanism, of the NRU reactor vessel following the May 2009 NRU reactor shutdown.

    11. Documents graphically or numerically depicting the specific locations of the damage to the NRU reactor vessel (including "pitting," leak holes, "dish shaped" irregularities, and thinning of the reactor vessel wall) at the time of the shutdown.

    12. Documents describing damage to the NRU reactor that could be or were caused by a heavy water leak.

    13. The documents which AECL considered or reviewed in evaluating whether or not defective fuel had any role in causing or contributing to the May 2009 shutdown of the NRU reactor.

    14. The documents which AECL considered or reviewed in evaluating whether or not any chemicals, dessicants, or "impurities" were introduced into or found in the Annulus or in water in the Annulus space at the time of or during the period prior to the May 2009 NRU reactor shutdown.

    15. The manuals, guidelines or written procedures, or the portions of such manuals, guidelines or written procedures, applicable to the maintenance and inspection of the NRU reactor in force in May 2009.

    16. Documents sufficient to identify any litigation, mediation, arbitration, settlement, or other legal disputes or claims in which AECL is involved arising out of the May 2009 shutdown of the NRU reactor.

17. Documents sufficient to identify any claim for insurance coverage made by AECL as a result of the May 2009 reactor shutdown, including the resolution of any such claim.

18. Documents sufficient to identify the persons or entities involved in maintenance of the NRU reactor, including any third party companies or consultants, prior to the May 2009 shutdown of the NRU reactor.

19. Documents sufficient to identify the two experts who reviewed AECL's interim "corrosion" assessment and any reports or other documents reflecting the expert's opinions regarding the interim "corrosion" assessment.

20. Photographs, drawings, or other images depicting the damage to the NRU reactor vessel (including "pitting" or leak holes) at or around the time of the shutdown.

21. Reports analyzing or addressing the cause(s) of the May 2009 shutdown authored, in whole or in part by any of the following persons: I. Muir, T.A. Moir, C. Bromley, G. Arsenault, K. Sedman, L. Lupton, G. Mark and C.W. Turner.



**Government of Canada     Gouvernement du Canada**

# Info Source

## Access to Information Request Form

Protected when completed

For official use only

### Access to Information Act

| **Step 1** | **Step 2** | **Step 3** | **Step 4** |
|---|---|---|---|
| Determine which federal government institution is most likely to have the information you are seeking. Decide whether you wish to submit an informal request for the information or a formal request under the *Access to Information Act*. If you wish to make an informal request, contact the appropriate institution. The address can likely be found in *Info Source* publications which are available across Canada, generally in major public and academic libraries, constituency offices of federal Members of Parliament and most federal government public enquiry and service offices. | To apply for information under the *Access to Information Act*, complete this form or a written request mentioning the Act. Describe the information being sought and provide any relevant details necessary to help the institution find it. If you require assistance, refer to *Info Source (Sources of Federal Government Information)* for a description of program records held by the institution or contact its Access to Information Coordinator. | Forward the access request to the Coordinator of the institution holding the information. The address is listed in the "Introduction" to *Info Source*. Enclose a $5.00 money-order or cheque payable to the Receiver General of Canada. Depending upon the type or amount of information being sought, you may be asked to authorize further charges. | When you receive an answer to your request, review the information to determine whether you wish to make a further request under the Act. You also have the right to complain to the Access to Information Commissioner should you believe that you have been denied any of your rights under the Act. |

Federal Government Institution
**Atomic Energy of Canada Limited**

Provide details regarding the information being sought
**Please see Exhibit 1.**

Method of access preferred     ☒ Receive copies of originals     ☐ Examine originals in government offices

Name of applicant
**Brett Harrison on behalf of Lantheus Medical Imaging, Inc.**

| Street, address, apartment | | City or town |
|---|---|---|
| Brookfield Place, 181 Bay Street, Suite 4400 | | Toronto |
| Province | Postal Code | Telephone number |
| ON | M5J 2T3 | 416.865.7932 |

This request for access to information under the *Access to Information Act* is being made by
☐ a Canadian citizen, permanent resident or another individual present in Canada, or
☒ a corporation present in Canada

Signature _____

Date _April 1, 2011_

The personal information provided on this form is protected under the provisions of the *Access to Information Act* and the *Privacy Act*.

**Canada**

TBC 350-57 (Rev. 2000/05/19)


combining Lang Michener LLP and McMillan LLP

Reply to the Attention of    Brett Harrison
Direct Line    416.865.7932
Direct Fax    647.722.6756
Email Address    brett.harrison@mcmillan.ca
Our File No.    202043
Date    May 4, 2011

**E-MAIL**

Mr. Jean Boulais
Access to Information and Privacy Coordinator
Atomic Energy of Canada Limited
Place de Ville, Tower B
112 Kent Street, Suite 501
Ottawa, ON  K1A 0S4
E-mail:  boulaisj@aecl.ca

Dear Mr. Boulais:

Re:    Access to Information Request

We write regarding the Access to Information Request that Lantheus Medical Imaging, Inc. ("Lantheus") sent to Atomic Energy of Canada Limited ("AECL") on April 11, 2011, and our subsequent conversation on April 21, 2011 regarding that request.

In our conversation, you confirmed that AECL is willing to provide Lantheus with the same materials that it has already produced in response to Access to Information Requests from other parties. We have discussed this with our client and they would like to receive these materials as soon possible. We would ask that you confirm that they will be provided no later than May 11, the date on which AECL's response to the access request is due.

You also stated that AECL has withheld a number of other documents as exempt from production in response to prior Requests. While you indicated that AECL was willing to revisit prior exemptions, there was no discussion regarding when any further production would be made.

Unless these documents would be produced by May 11, Lantheus cannot agree to this proposal. Lantheus is subject to a court deadline in the United States which, as a practical matter, prevents Lantheus from being able to engage in a consultative process of indeterminate length, with no guarantee that all required materials will be provided in time for the information to be used in the U.S. litigation. Accordingly, Lantheus requests full compliance with its Access to Information Request by the deadline for AECL's response of May 11, 2011. We would ask that to the extent possible, the documents be provided electronically and sent to my attention at Brett.Harrison@McMillan.ca.

McMillan LLP · Brookfield Place · 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 · t 416.865.7000 · f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal  Hong Kong  mcmillan.ca

MBDOCS_6462779.1



Furthermore, because it is apparent from our discussion that AECL is unlikely to produce all of the materials requested in the Access to Information Request, Lantheus will be seeking approval by the U.S court of a letter of request to the Canadian courts to require production of all the requested materials and deposition testimony by AECL.

Sincerely,

Brett Harrison

/ar

McMillan LLP   Brookfield Place  181 Bay Street, Suite 4400, Toronto Ontario Canada M5J 2T3   t 416 865-7000   f 416 865-7048
Lawyers : Patent & Trade-mark Agents | Avocats    Agents de brevets et de marques de commerce
Vancouver | Calgary · Toronto · Ottawa · Montréal | Hong Kong : mcmillan.ca



combining Lang Michener LLP and McMillan LLP

| | |
|---|---|
| Reply to the Attention of | Brett Harrison |
| Direct Line | 416.865.7932 |
| Direct Fax | 647.722.6756 |
| Email Address | brett.harrison@mcmillan.ca |
| Our File No. | 202043 |
| Date | May 9, 2011 |

**VIA E-MAIL**

Mr. Jean Boulais
Access to Information and Privacy Coordinator
Atomic Energy of Canada Limited
Place de Ville, Tower B
112 Kent Street, Suite 501
Ottawa, ON  K1A 0S4
E-mail:  boulaisj@aecl.ca

Dear Mr. Boulais:

Re:      **Access to Information Request**

        I write to confirm and follow-up on our telephone conversation of May 6, 2011 concerning the Access to Information Request that Lantheus Medical Imaging, Inc. ("Lantheus") sent to Atomic Energy of Canada Limited ("AECL") on April 11, 2011 and Lantheus' subsequent letter of May 4, 2011.

        Based on our conversation, I understand that AECL does not intend to produce any documents in response to Lantheus' request beyond the limited materials it has already provided to other parties. This would only be a partial response to Lantheus' request. I also understand that AECL will be extending the time period for its response as you believe that additional time will be required to determine what, if any, additional documents will be disclosed. AECL has not committed to providing Lantheus with any additional documents beyond those already available and it has not committed to any definite time frame for producing such materials.

        The documents sought by Lantheus are highly relevant to litigation pending in the United States seeking insurance coverage for losses that Lantheus incurred when supplies of Molybendum-99 were disrupted following the May 2009 shutdown of the AECL NRU reactor at Chalk River. In order to be able to comply with court-imposed deadlines in the U.S. litigation, Lantheus requires prompt and meaningful compliance with its requests. Given AECL's position, and the importance of obtaining the requested document within the court-imposed deadlines,

McMillan LLP | Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 | t 416.865.7000 | f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

MBDOCS_5465808.2

Page 2

Lantheus has no choice but to proceed with its request for approval by the U.S. court of a letter of request to the Canadian courts to require production of the requested materials and deposition testimony by AECL.

Sincerely,

Brett Harrison

MAY 1 2 2011

 

AECL
Atomic Energy
of Canada Limited

EACL
Énergie atomique
du Canada limitée

Jean Boulais
Director, Access to Information and Privacy
Directeur, Accès à l'information et de la
protection des renseignements personnels

**PROTECTED-Sensitive**

AECL File Number
A-2011-0001

May 11, 2011

Mr. Brett Harrison
McMillan LLP
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON
M5J 2T3

Dear Mr. Harrison:

This refers to your request made pursuant to the *Access to Information Act*, which was originally received on April 12, 2011 at Atomic Energy of Canada Limited and clarified by email on May 4, 2011, following our telephone conversation on April 21, 2011. Your request is as follows:

**A-2011-0001** *"We act as Canadian Counsel for Lantheus Medical Imaging, Inc. Lantheus recently filed a lawsuit in the United States against its insurance company, Zurich American Insurance Company, seeking payment of losses that it sustained as a result of the shutdown of the Chalk River National Research Universal (NRU) Reactor in May 2009. Please find attached a formal access request form, whereby Lantheus requests that AECL provide it with documents and information related to the May 2009 Shutdown of the Chalk River National Research Universal reactor identified in Exhibit 1."*

Attached you will find copies of documents that were previously released on the NRU under the *ATI Act* in 2008 and 2009.

As a result of the clarification received on May 4, 2011, the new statutory deadline date is May 31, 2011.

Should you have any questions, please do not hesitate to contact me at (613) 782-2025 or by e-mail at boulaisj@aecl.ca.

Sincerely yours,

Jean Boulais
Director, Access to Information and Privacy

Place de Ville, Tower B
112 Kent Street, Suite 501
Ottawa, Ontario
Canada   K1A 0S4
Direct: 613-782-2025
Fax: 613-782-2017
boulaisj@aecl.ca
www.aecl.ca

Place de Ville, Tour B
112 rue Kent, Bureau 501
Ottawa, (Ontario)
Canada   K1A 0S4
Ligne Directe: 613-782-2025
Fax: 613-782-2017
boulaisj@aecl.ca
www.aecl.ca





# AECL · EACL

## 599- Detailed Report

**PROTECTED - SENSITIVE**

CRL-508780-FM-925 Rev. 1

Page 1 of 8
Ref. Procedure CRL-508780-PRO-045

| Field | Value |
|---|---|
| **Impact No.** | NRU-09-0428Y |
| **Impact Title** | Heavy Water Leak |
| **Discovery Date** | 2009 May 15 |
| **Location** | NRU  a.16(2) |
| **Facility Branch** | NRU |
| **Date/Time Occurred** | 2009 May 15 |
| **Equipment ID** | N/A |

**Conditions Prior to Problem, including Reactor Power Level if applicable**

On 2009 May 14 at 15:22h the reactor tripped on Unit 39 due to a loss of Class IV power, and a poison outage was conceded. Class IV power was restored at 00:38h on 2009 May 15.

**Description of the Problem**

On 2009 May 15, a small leak of heavy water was detected from the NRU reactor. The leak rate of approximately 5 kg/h was well within the capabilities of NRU's make-up system, and therefore did not pose an immediate safety risk for the reactor. Tritium releases associated with the water leak were above weekly action levels but remained well below regulatory limits. The prudent course of action was taken to keep the reactor shut down to locate and repair the leak. On 2009 May 18, the leak was located on the outside of the NRU vessel. A remote camera showed water seeping out of a corrosion deposit on the outer wall near the bottom of the vessel.

**Immediate Action Taken**

Immediately following indication of a leak, actions focused on enhanced oversight of nuclear safety were implemented. These actions included increased monitoring of NRU's leak detection systems, increased monitoring of the heavy water level in the vessel, increased availability of heavy water for addition to the system and ensuring staff readiness should the emergency cooling system automatically initiate as designed. Longer-term initiatives were then undertaken to contain the leaking water, to control the emissions of tritium, and to determine the cause and extent of corrosion.

The water leakage was collected by a purpose-designed NRU system, and transferred to specially-designed drums for storage and eventual disposition. Evaporation was removed by the NRU ventilation system, protecting workers from tritium exposures. The tritium emissions with the evaporation remained below 0.1% of the regulatory limit (extrapolated to a full year).

Efforts were made to reduce the leakage by lowering the water level in the NRU vessel, and adding a solution of material to block the leak path. By the end of June, fuel, isotope and control rods had been removed from the reactor vessel and the water level was reduced, resulting in a 10-fold decrease in leak rate. In mid-July, the vessel was completely drained, which stopped the water leak.

Extensive visual and non-destructive examinations have revealed a band of corrosion around the lower outer surface of the vessel. The corrosion resulted in "dish-shaped" areas of regional wall loss, and a few highly localised cavities. It was one of the latter cavities that led to the heavy-water leak.

**Remarks on Conditions Prior to Problem**

N/A

**Remarks on Description of the Problem**

N/A

**Remarks on Immediate Action Taken**

N/A

6-40 report for NRU leak crrtrl.doc

000001

S-99 Detailed Report

s.18(c)
s.20(1)(c)

PROTECTED - SENSITIVE
Information Use

CRL-509780-FM-328 Rev. 1

Page 6 of 8
Ref. Proceedings CW-SI-4505-XXX-XXX

**Review of Operating Experience / Previous Similar Conditions**

**Extent of Condition**

An extensive investigation has been completed for corrosion of the NRU vessel, and the sites that require remediation have been identified, including the leak site.

In addition, a review is underway of NRU systems for degradation mechanisms that may not have been previously adequately addressed. The outcome of this review, and any required actions, will be documented separately.

**Cause Analysis Conclusions**

**Technical Cause**

An extensive inspection has been conducted to determine the technical cause of the corrosion on the outside of the vessel and extent of the degraded condition. This inspection included:

- visual examinations of the outer and inner surfaces of the vessel wall,
- ultrasonic testing (UT) and eddy-current testing (ET) measurements of the wall thickness and vessel condition,
- microscopic and chemical examination of various components removed from the annulus, and
- destructive examination of material removed from the vessel wall.

The visual and non-destructive examinations have revealed a circumferential band of corrosion on the outer surface of the reactor vessel at the bottom of the annulus. In general, this corrosion has resulted in insignificant thinning of the vessel wall. Within the band, however, there are regions where there has been more substantial wall thinning. In these regions the vessel wall has been corroded in a shallow "dish" shape. In some cases, the remaining wall thickness at the minimum of the dish is less than 1 mm (of the original ~8 mm). In addition to the general corrosion there are a few sites where highly localized corrosion has penetrated the vessel wall. It was at one of these sites of localized corrosion that the vessel wall was penetrated and led to the heavy water leak.

The corrosion of the NRU vessel was due to nitric acid produced from air and water leaking into the annulus between the vessel and the water reflector. Radiolysis of the air in the presence of water produces nitric acid, which corrodes the aluminum vessel. The larger patches would result from water containing nitric acid impinging on the vessel wall (e.g. splashing and spraying). Destructive examination of a coupon removed from the vessel wall adjacent to the leak site indicates that the localized corrosion is due to an electrochemical mechanism where water leaking into the base of the annulus meets acidic water running down the vessel wall leading to an aggressive local water chemistry. For both the general corrosion and local penetration, the primary agent for corrosion was most likely nitric acid.

**Organizational Cause**

An organizational root cause analysis has provided valuable insight into process issues and resulting actions that will provide lasting improvements and contribute to the organization's future success. Some of these same organizational causes were identified in the Talisman Report commissioned jointly by the CNSC and AECL in 2008 June.

When reviewing the organizational root causes, it is important to recognize that a complex series of events has occurred over the years, resulting in actions that sometimes differ from common industry management practices. These events mainly include changes in public policy affecting the operation and funding of Chalk River Laboratories and the planning assumption that an extended NRU outage to address maintenance issues would be taken following the Dedicated Isotope Facilities (DIF) becoming operational.

The NRU reactor plays a significant role in medical isotope supply (30% globally). Delays with the DIF project and its eventual cancellation in 2008 May, placed increased operating demands on NRU.

An investigation into the organizational causes for the events has revealed the following causal factors:

1.  *Changing Future of NRU.* NRU's mission and planned life have changed several times over the past two decades, which has

S-99 report for NRU leak event.doc

000006

AECL 00006

**S-99 Detailed Report**

CRL-508760-FM-325 Rev. 1

placed NRU's maintenance and condition under pressure. In 1996, AECL informed the Atomic Energy Control Board that the NRU reactor would not be operated beyond 2005 December 31. Also in 1996 the MDS Nordion Medical Isotopes Reactor (MMIR) contract was signed to have the Dedicated Isotope Facilities project in-service in accordance with its terms. This contributed to a shorter-term focus for operation of NRU.

2. *Focus on Short-Term Isotope Production:* An extended outage for NRU may result in shortages in isotope supply, which makes preventative work requiring an extended outage very difficult to plan and schedule.

3. *Symptom-Based Problem Solving:* A lack of questioning attitude by staff led to problems being addressed by focussing on symptoms and not by looking for root causes and extent of condition. As a result, evidence that there was corrosion of the lower vessel was not sufficiently considered (e.g., deterioration of the C03 header at the bottom of the annulus and visual examinations of the annulus for other purposes that showed corrosion on the vessel wall).

4. *Ineffective Use of Operating Experience:* Until recently, NRU, like other research reactors, was not considered to be part of the nuclear power reactor community. Consequently, there has been little learning from power reactor organizations.

5. *Low Standards and Acceptance of Plant Operational Problems:* When repair attempts were not fully effective, and light-water leakage persisted, it was accepted as a "normal" operating condition for NRU, and the focus was on managing the light-water leakage rather than prevention.

6. *Less Than Adequate Management Oversight:* Historically CRL management did not ensure high standards for operation and that strong barriers were in place to prevent events.

These causal factors point to certain barriers that were either non-existent or compromised, and which could have prevented the event. Having said that, the event evolved over a number of decades and the assessment is based on current standards and practices for operation. In some cases, the barriers would not have been expected to be in place at that time.

Looking at the organization, as it exists now, there have been a number of improvements introduced that address causal factors for the event. For example:

- In 2005, a Chief Nuclear Officer position was introduced and staffed to bring in utility standards and an operational focus. This has resulted in increased attention to nuclear and conventional safety, and elements of a learning organization being established.

- A Leadership Academy was implemented in 2006 to train leaders and ensure they share a common understanding of expectations and standards for operation.

- In 2007, the position of Chief Nuclear Engineer/Design Authority was created for Research and Technology Operations. This has resulted in establishing engineering programs that reflect current industry practice for supporting operations such as change control, operability evaluations, configuration management, and system/equipment health monitoring.

- Following the decision to discontinue the Dedicated Isotope Facilities in 2008, the Isotope Supply Reliability Program was established to ensure that the reliability of isotope production is improved by addressing plant, process and people issues in NRU, and other facilities supporting isotope production.

- In 2009, AECL secured a trial membership in the World Association of Nuclear Operators that brings training, workshops, technical support missions, and the peer review process, all of which will help raise standards and improve practices.

- The position of Vice-President and General Manager of Operations was staffed in 2009 with an individual with broad nuclear industry experience.

The above improvements have been implemented in recent years and have been effective in addressing some, but not all aspects of the causal factors. In assessing the safety culture of today, the following organizational barriers still require further improvement:

- Accountability: Staff and management tend to not accept responsibility and to regard "best-effort" as sufficient rather than taking responsibility for achieving results.

- Standards: Standards for operation are not in-line with current utility industry practice.

- Technical Support: There is a tendency to solve issues within a work group or to under value support, rather then seek input from other work groups, or beyond AECL.

- Questioning Attitude: Staff and management can be overly optimistic, without appropriate challenging of assumptions.

Asking, "Why are these barriers weakened, or what fundamental organizational failing has these symptoms?" points to an underlying organizational cause:

000007

AECL 00007

Litigation and Solicitor-Client Privileged and Confidential

<u>Organizational Cause</u>

An organizational root cause analysis has provided valuable insight into process issues and resulting actions that will provide lasting improvements and contribute to the organization's future success. Some of these same organizational causes were identified in the Talisman Report commissioned jointly by the CNSC and AECL in 2008 June.

When reviewing the organizational root causes, it is important to recognize that a complex series of events has occurred over the years, resulting in actions that sometimes differ from common industry management practices. These events mainly include changes in public policy affecting the operation and funding of Chalk River Laboratories and the planning assumption that an extended NRU outage to address maintenance issues would be taken following the Dedicated Isotope Facility (DIF) becoming operational.

The NRU reactor plays a significant role in medical isotope supply (30% globally). Delays with the DIF project and its eventual cancellation in 2008 May, placed increased operating demands on NRU.

An investigation into the organizational causes for the event has revealed the following causal factors:

1. *Changing Future of NRU*:  NRU's mission and planned life have changed several times over the past two decades, which has placed NRU's maintenance and condition under pressure. In 1996, AECL informed the Atomic Energy Control Board that the NRU reactor would not be operated beyond 2005 December 31. Also in 1996 the MDS Nordion Medical Isotopes Reactor (MMIR) contract was signed to have the Dedicated Isotope Facility project in-service in accordance with its terms. This contributed to a shorter-term focus for operation of NRU.
2. *Focus on Short-Term Isotope Production*: An extended outage for NRU may result in shortages in isotope supply, which makes preventative work requiring an extended outage very difficult to plan and schedule.
3. *Symptom-Based Problem Solving*: A lack of questioning attitude by staff led to problems being addressed by focusing on symptoms and not by looking for root causes and extent of condition. As a result, evidence that there was corrosion of the lower vessel was not sufficiently considered (e.g., deterioration of the $CO_2$ header at the bottom of the annulus and visual examinations of the annulus for other purposes that showed corrosion on the vessel wall).
4. *Ineffective Use of Operating Experience*: Until recently, NRU, like other research reactors, was not considered to be part of the nuclear power reactor community. Consequently, there has been little learning from power reactor organizations.
5. *Low Standards and Acceptance of Plant Operational Problems*: When repair attempts were not fully effective, and light-water leakage persisted, it was accepted as a "normal" operating condition for NRU, and the focus was on managing the light-water leakage rather than prevention.
6. *Less Than Adequate Management Oversight*: Historically CRL management did not ensure high standards for operation and that strong barriers were in place to prevent events.

000044

AECL 00028

Litigation and Solicitor-Client Privileged and Confidential

These causal factors point to certain barriers that were either non-existent or compromised, and which could have prevented the event. Having said that, the event evolved over a number of decades and the assessment is based on current standards and practices for operation. In some cases, the barriers would not have been expected to be in place at that time.

Looking at the organization, as it exists now, there have been a number of improvements introduced that address causal factors for the event. For example:

- In 2005, a Chief Nuclear Officer position was introduced and staffed to bring in utility standards and an operational focus. This has resulted in increased attention to nuclear and conventional safety, and elements of a learning organization being established.

- A Leadership Academy was implemented in 2006 to train leaders and ensure they share a common understanding of expectations and standards for operation.

- In 2007, the position of Chief Nuclear Engineer/Design Authority was created for Research and Technology Operations. This has resulted in establishing engineering programs that reflect current industry practice for supporting operations such as change control, operability evaluations, configuration management, and system/equipment health monitoring.

- Following the decision to discontinue the Dedicated Isotope Facility in 2008, the Isotope Supply Reliability Program was established to ensure that the reliability of isotope production is improved by addressing plant, process and people issues in NRU, and other facilities supporting isotope production.

- In 2008, AECL secured a trial membership in the World Association of Nuclear Operators that brings training, workshops, technical support missions, and the peer review process, all of which will help raise standards and improve practices.

- The position of Vice-President and General Manager of Operations was staffed in 2009 with an individual with broad nuclear industry experience.

The above improvements have been implemented in recent years and have been effective in addressing some, but not all aspects of the causal factors. In assessing the safety culture of today, the following organizational barriers still require further improvement:

- Accountability:  Staff and management tend to not accept responsibility and to regard "best-effort" as sufficient rather than taking responsibility for achieving results.

- Standards:  Standards for operation are not in-line with current utility industry practice.

- Technical Support:  There is a tendency to solve issues within a work group or to under value support, rather than seek input from other work groups, or beyond AECL.

- Questioning Attitude:  Staff and management can be overly optimistic, without appropriate challenging of assumptions.

Asking, "Why are these barriers weakened, or what fundamental organizational failing has these symptoms?" points to an underlying organizational cause:

*The organization's culture had evolved to being complacent and unchallenging, where "bad news" was often not communicated.*

000045

AECL 00029

Litigation and Solicitor- Client Privileged and Confidential

PROTECTED - SENSITIVE

Root Cause Analysis (RCA)

4465-00-2 Rev 3

Page 11 of 40

| Event Title | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | s.16(b) | 0 | NRU - 09 - 04289 |
| | s.16(d) | | Impact No. |
| | | | NRU-09-04289 |



RCN-NRU-09-005334.doc                    CRDOC01S - Service-LDOLLO - 11[sng/Sangeny Steeley 7 Sn nbjmagnt analyfully nrpsat neaUCn-NRU-09-005334.doc/ 2021 kn.16

000960

AECL 00044

Litigation and Solicitor- Client Privileged and Confidential

PROTECTED - SENSITIVE

## Root Cause Analysis (RCA)

4466-00-E Rev 3

Page 12 of 48

| Event Title | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | s.18(b)<br>s.18(d) | 0 | NRU - 09 - 04289 |
| | | | Impact No. |
| | | | NRU-09-04289 |



000061

AECL 00045

Litigation and Solicitor- Client Privileged and Confidential
PROTECTED - SENSITIVE

**Root Cause Analysis (RCA)**
4408-00-5 Rev 3
Page 13 of 48

| Event Title | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | s.18(b)<br>s.18(d) | 0 | NRU – 09 - 04289 |
| | | | Impact No. |
| | | | NRU-09-04289 |



**8.5        Aging Management**

CSA N286.5-95 [12] outlines requirements for plant performance monitoring (section 6.1) and chemistry control (section 7), which would be part of, in today's nomenclature, an aging management program. These requirements are typically incorporated into the design basis of a plant.



RCA-NRU-05-0408EE.doc                 OSBDOSABE-fRemake/LOOLLP-fGreat/Response Delivery T library report/nu/dd/dd/report.nu/RCLA-NRU-05-04289EE.doc/1296 Fet 36

000062

AECL 00046

Litigation and Solicitor- Client Privileged and Confidential

**PROTECTED - SENSITIVE**

## Root Cause Analysis (RCA)

4468-00-E Rev 3

Page 14 of 46

| Event Title | Rev. | RCA No. |
|---|---|---|
| Heavy Water Leak | 0 | NRU - 09 - 04289 |
| s.19(b)    s.18(d) | | Impact No.  NRU-09-04289 |



### 8.6    Inspections of J-Rod Annulus

Since approximately 1975, shortly after Vessel #2 was put into service,



RCA-NRU-09-04289.doc   C:\DOCUMENTS\...

000063

Litigation and Solicitor- Client Privileged and Confidential

**PROTECTED - SENSITIVE**

Root Cause Analysis (RCA)

4486-80-E Rev 3

Page 16 of 49

| Event Title | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | | 0 | NRU - 09 - 04289 |
| | s.18(b) | | Impact No. |
| | s.18(d) | | NRU-09-04289 |



AECL 00048

**Litigation and Solicitor- Client Privileged and Confidential**

**PROTECTED - SENSITIVE**

**Root Cause Analysis (RCA)**

4400-00-E Rev 3

Page 10 of 46

| Event TID | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | s.19(c) | 0 | NRU - 09 - 04289 |
| | s.20(1)(c) | | Impact No. |
| | | | NRU-09-04289 |



RCA-4400-00-bc3000a.doc          ...

000065

AECL 00049

Litigation and Solicitor- Client Privileged and Confidential

**PROTECTED - SENSITIVE**

**Root Cause Analysis (RCA)**
4468-00-5 Rev 3

| Event Title | Rev. | RCA No. |
|---|---|---|
| Heavy Water Leak | 0 | NRU – 09 - 04289 |
| | | Impact No. |
| | | NRU-09-04289 |

## 12.   CAUSE ANALYSIS AND CORRECTIVE ACTIONS

### 12.1   Causal Factors

**Causal Factor 1 (CF-1): Changing Future of NRU**

**Causal Factor 2 (CF-2): Focus on Short Term Isotope Production Goals**

a.18(b)
a.18(d)

**Causal Factor 3 (CF-3): Symptom Based Problem Solving**

**Causal Factor 4 (CF-4):**            Ineffective Use of OPEX

**Causal Factor 5 (CF-5): Low Standards and Acceptance of Plant Operational Problems**

000066

AECL 00050

Litigation and Solicitor- Client Privileged and Confidential

PROTECTED - SENSITIVE

## Root Cause Analysis (RCA)

4408-00-E Rev 3

Litigation and Solicitor–Client Privileged and Confidential

**PROTECTED - SENSITIVE**

## Root Cause Analysis (RCA)
4490-00-E Rev 3

Page 19 of 46

| Event Title | | Rev. | RCA No. |
|---|---|---|---|
| Heavy Water Leak | | 0 | NRU - 09 - 04289 |
| | | | Impact No. |
| | | | NRU-09-04289 |



**16.        ANALYSIS TECHNIQUES**

Event and Causal Factor Charting                         s.16(2)

Barrier Analysis                                          s.16(d)

**17.        INVESTIGATION TEAM**

T.A. Moir – RCA Lead Investigator

C. Bromley – RCA Team Mentor

G. Assenault – RCA Team Member, RCA SME

K. Sedman – RCA Team Member, Bruce Power RCA & Engineering SME

L. Lupton – RCA Team Member, Management Process SME

G Mark - RCA Team Member, Ops SME

C.W. Turner – RCA Team Member, Chemistry/Corrosion SME

AECL 00052



AECL 00063

Page(s)     000080 to / à 000085

is (are) exempted pursuant to section(s)
est(sont) exemptée(s) en vertu de(s)(l')article(s)

18(b), 18(d)

of the Access to Information Act
Loi de l'accès à l'Information

AECL 00084

Litigation and Solicitor- Client Privileged and Confidential

Root Cause Analysis (RCA)                                    PROTECTED - SENSITIVE
4468-00-E Rev 3                                                          Page 37 of 48

| Event Title | Rev. | RCA No. |
|---|---|---|
| Heavy Water Leak | 0 | NRU - 09 - 04289 |
| | | Impact No. |
| | | NRU-09-04289 |

| Consequence(s) (What Happened?) (List one at a time, need not be in sequential order) | Barrier(s) that should have Precluded Event (List all physical and administrative barriers for each consequence.) | Barrier Failure Mechanism (How the barrier failed) | Barrier Assessment (Why the Barrier(s) Failed) (Identify if the barrier was missing, weak or ineffective; and why) |
|---|---|---|---|
| | | | |

RCA-NRU-09-04289.doc

C:\DOCUME~1\book-pf\LOCALS~1\Temp\Response Planning 7 for rip.wspm2.com.pjfo\response.tm\RCA-NRU-09-04289.doc 71825.ho-36

AECL 00065



AECL 00066

Page(s)     000088 to / à 000097


is (are) exempted pursuant to section(s)
est(sont) exemptée(s) en vertu de(s)(l')article(s)


18(b), 18(d)


of the Access to Information Act
Loi de l'accès à l'information


AECL 00067

5.                    CORROSION MECHANISM

An assessment of the corrosion has been prepared based upon:

* operating experience and the investigation into the failure of the original vessel,

* analysis of water drained from the annulus at different times over the operating lives of both vessels, and

* examination of corroded components removed from the annulus.

As discussed above, the results indicate patches of vessel-wall thinning from the annulus side, with highly localized corrosion at two sites.

The available evidence suggests that the degradation is a manifestation of the nitric acid corrosion phenomenon that has been a known degradation mechanism over the lifetime of the NRU reactor. Nitric acid forms by radiolysis of nitrogen from air leaks in the presence of water. The source of the highly localized corrosion has not been determined, and could be due to changes to the wall material, making it more susceptible to corrosion, or a locally more aggressive water chemistry, for example, due to crevice conditions or the presence of impurities. In either case, the primary agent for corrosion is believed to be nitric acid.

The interim corrosion assessment has undergone third party review by two independent experts. They both agreed with the assessment of degradation broadly being due to the presence of nitric acid. They also offer possible mechanisms for enhancing the local-corrosion rate.

To further understand and potentially determine the mechanism for the localized corrosion, preparations are being made to cut out a section of reactor wall (called a coupon) where there is localized corrosion. Examinations can then be undertaken to characterize the material condition, and to characterize the chemistry and morphology of the corrosion front. The final decision on removing the wall section is predicated on there being an acceptable method for sealing the resulting hole. Development of a tool and procedure to weld a plate over the hole is being finalized.

5.1          Corrosion Coupons

Shortly after the second vessel was installed in 1974, coupons were hung in the annulus to provide information on corrosion. These coupons consisted of rods of the aluminum alloy used for the vessel, and they were suspended at three elevations (upper, middle, and lower) at various J-rod positions. Some coupons were removed in 1989 for analysis. The remainder were removed in the early to mid-1990s and stored in the fuel storage blocks as they were impeding repair and maintenance operations in the annulus.

The examination of coupons retrieved in 1989 after nine years of exposure at J-rod position 28 revealed that only the rods placed at the lower elevation had measurable wall loss. It was suggested that this corrosion was due to radiolytically produced nitric acid and that only lower rods were affected as condensing water would have collected on the lowest rods in a string.

The pedigree of the coupons removed in the early to mid 1990s is unknown. The surface layers are likely more representative of 15 years of storage. The bulk material condition is of potential interest to today's investigation. Recent examination of these corrosion rods using transmission

AECL 00083

## 8.    ORGANIZATIONAL ROOT CAUSE ANALYSIS

An organizational root cause analysis has provided AECL with valuable insight into process issues and resulting actions that will provide lasting improvements and contribute to the organization's future success. Some of these same organizational causes were identified in the Talisman Report commissioned jointly by the CNSC and AECL in 2008 June. Atomic Energy of Canada Limited's management has committed to working on these issues and is making progress in several key areas.

When reviewing the organizational root causes, it is important to recognize that a complex series of events has occurred over the years, resulting in actions that sometimes differ from common industry management practices. These events mainly include changes in public policy affecting the operation and funding of Chalk River Laboratories and the planning assumption that an extended NRU outage to address maintenance issues would be taken following the Dedicated Isotope Facility becoming operational.

The NRU reactor plays a significant role in medical isotope supply (30% globally). Delays with the DIF project and its eventual cancellation in 2008 May, placed increased operating demands on NRU.

An investigation into the causes for the event have revealed the following organizational causal factors:

1. **Changing Future of NRU:** NRU's mission and planned life have changed several times over the past two decades, which has placed NRU's maintenance and condition under pressure. In 1996, AECL informed the Atomic Energy Control Board that the NRU reactor would not be operated beyond 2005 December 31. Also in 1996 the MDS Nordion Medical Isotopes Reactor (MMIR) contract was signed to have the Dedicated Isotope Facility project in-service in accordance with its terms. This contributed to a shorter-term focus for operation of NRU.

2. **Focus on Short-Term Isotope Production:** An extended outage for NRU may result in shortages in isotope supply, which makes preventative work requiring an extended outage very difficult to plan and schedule.

3. **Symptom-Based Problem Solving:** A lack of questioning attitude by AECL staff led to problems being addressed by focussing on symptoms and not by looking for root causes and extent of condition. As a result, evidence that there was corrosion of the lower vessel was not sufficiently considered (e.g., deterioration of the $CO_2$ header at the bottom of the annulus and visual examinations of the annulus for other purposes that showed corrosion on the vessel wall).

4. **Ineffective Use of Operating Experience:** Until recently, NRU, like other research reactors, was not considered to be part of the nuclear power reactor community. Consequently, there has been little learning from power reactor organizations.

5. **Low Standards and Acceptance of Plant Operational Problems:** When repair attempts were not fully effective, and light-water leakage persisted, it was accepted as a "normal" operating condition for NRU, and the focus was on managing the light-water leakage rather than prevention.

AECL 00089

6. **Less Than Adequate Management Oversight:** Historically CRL management did not ensure high standards for operation and that strong barriers were in place to prevent events.

These causal factors point to certain barriers that were either non-existent or compromised, and which could have prevented the event. Having said that, the event evolved over a number of decades and the assessment is based on current standards and practices for operation. In some cases, the barriers would not have been expected to be in place at that time.

Looking at the organization, as it exists now, there have been a number of improvements introduced that address causal factors for the event. For example:

- In 2005, a Chief Nuclear Officer position was introduced and staffed to bring in utility standards and an operational focus. This has resulted in increased attention to nuclear and conventional safety, and elements of a learning organization being established.

- A Leadership Academy was implemented in 2006 to train leaders and ensure they share a common understanding of expectations and standards for operation.

- In 2007, the position of Chief Nuclear Engineer/Design Authority was created for Research and Technology Operations. This has resulted in establishing engineering programs that reflect current industry practice for supporting operations such as change control, operability evaluations, configuration management, and system/equipment health monitoring.

- Following the decision to discontinue the Dedicated Isotope Facility in 2008, the Isotope Supply Reliability Program was established to ensure that the reliability of isotope production is improved by addressing plant, process and people issues in NRU, and other facilities supporting isotope production.

- In 2008, AECL secured a trial membership in the World Association of Nuclear Operators that brings training, workshops, technical support missions, and the peer review process, all of which will help raise standards and improve practices.

- The position of Vice-President and General Manager of Operations was staffed in 2009 with an individual with broad nuclear industry experience.

The above improvements have been implemented in recent years and have been effective in addressing some, but not all aspects of the causal factors. In assessing the safety culture of today, the following organizational barriers still require further improvement:

- Accountability: Staff and management tend to not accept responsibility and to regard "best-effort" as sufficient rather than taking responsibility for achieving results.

- Standards: Standards for operation are not in-line with current utility industry practice.

- Technical Support: There is a tendency to solve issues within a work group or to under value support, rather than seek input from other work groups, or beyond AECL.

- Questioning Attitude: Staff and management can be overly optimistic, without appropriate challenging of assumptions.

AECL 00090

Asking, "Why are these barriers weakened, or what fundamental organizational failing has these symptoms?" points to an underlying organizational cause:

*The organization's culture had evolved to being complacent and unchallenging, where "bad news" was often not communicated.*

With such a culture, an organization is overly optimistic, industry standards for operation may not be followed, minor events are not reported, equipment degradation may not be noticed or challenged, and work groups tend to be insular as the need for external support is not recognized.

## 8.1   Corrective Action Plan

To address the organizational cause for the event, it is necessary to continue to effect fundamental change in the organizational culture. Successful cultural changes are based on:

- A corrective action plan that resonates with staff, and that is focused.
- A vigorous and intense leadership response. Constant reinforcement is required to drive the change, including raising standards and expectations, and increasing demands for a questioning attitude.
- Using a focal point to create a sense of urgency.
- Establishing observable behaviours that support the focused action plan.
- Senior managers up to and including the executive who clearly seek out and welcome questioning and challenge as the basis for identifying threats and areas for improvement.

With this framework, the broad corrective actions for the organizational cause are:

1. Standards in equipment reliability will be improved. This will require:
   - A strong focus on equipment reliability that applies to all Research and Technology Operations facilities.
   - Good cooperation between support and operational work groups.
   - A process to ensure that the consequences of equipment problems are understood and addressed.
   - Implementation of system and equipment health monitoring to ensure conditions that may impact equipment performance are identified and dealt with in a timely manner.

2. To ensure the effectiveness of a focus on equipment reliability, the following observable behaviours will need to be promoted and reinforced:
   - high standards,
   - high accountability,
   - questioning attitude,
   - broad organizational involvement, and
   - open two-way communications.

AECL 00091

 

Jean Boulais
Director, Access to Information and Privacy
Directeur, Accès à l'information et de la
protection des renseignements personnels

**PROTECTED-Sensitive**

AECL File Number
A-2011-0001

June 6, 2011

Mr. Brett Harrison
McMillan LLP
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON   M5J 2T3

Dear Mr. Harrison:

This is further to your email of June 1, 2011 in regards to your request received under the *Access to Information Act* by Atomic Energy of Canada Limited for the following:

**A-2011-0001** *"We act as Canadian Counsel for Lantheus Medical Imaging, Inc. Lantheus recently filed a lawsuit in the United States against its insurance company, Zurich American Insurance Company, seeking payment of losses that it sustained as a result of the shutdown of the Chalk River National Research Universal (NRU) Reactor in May 2009. Please find attached a formal access request form, whereby Lantheus requests that AECL provide it with documents and information related to the May 2009 Shutdown of the Chalk River National Research Universal reactor identified in Exhibit 1."*

Unfortunately, we will not be able to respond to your request within the thirty (30) day statutory deadline. Consequently, in accordance with paragraph *9(1)(a)* of the *Act*, we will require an extension of 90 days beyond the original statutory limit. The request is either for a larger number of records or necessitates a search through a large number of records and meeting the original deadline would unreasonably interfere with the operations of the Department.

Once the documents have been retrieved and reviewed, we may notify you that additional time is required in order to complete consultations with third parties and/or other government departments and/or to notify you of any additional fees that may be required.

Place de Ville, Tower B
112 Kent Street, Suite 501
Ottawa, Ontario
Canada   K1A 0S4
Direct: 613-782-2025
Fax: 613-782-2017
boulaisj@aecl.ca
www.aecl.ca

Place de Ville, Tour B
112 rue Kent, Bureau 501
Ottawa, (Ontario)
Canada   K1A 0S4
Ligne Directe: 613-782-2025
Fax: 613-782-2017
boulaisj@aecl.ca
www.aecl.ca 

Please be advised that you are entitled to bring a complaint regarding the time extension to the Information Commissioner of Canada within 60 days of the date of this letter. Notice of complaint should be addressed to:

> The Information Commissioner of Canada
> Place de Ville, Tower B
> 112 Kent Street, 7th Floor
> Ottawa, Ontario   K1A 1H3

Should you have any questions, please do not hesitate to contact Jacques Beaulne at (613) 782-2023 or by e-mail at beaulnej@aecl.ca.

Sincerely yours,

Jean Boulais
Director, Access to Information and Privacy

Cc: Information Commissioner of Canada

 AECL EACL

## ACCESS TO GOVERNMENT RECORDS

### Requests for Access

Extension of time limits

9. (1) The head of a government institution may extend the time limit set out in section 7 or subsection 8(1) in respect of a request under this Act for a reasonable period of time, having regard to the circumstances, if

(a) the request is for a large number of records or necessitates a search through a large number of records and meeting the original time limit would unreasonably interfere with the operations of the government institution,

(b) consultations are necessary to comply with the request that cannot reasonably be completed within the original time limit, or

(c) notice of the request is given pursuant to subsection 27(1)

by giving notice of the extension and, in the circumstances set out in paragraph (a) or (b), the length of the extension, to the person who made the request within thirty days after the request is received, which notice shall contain a statement that the person has a right to make a complaint to the Information Commissioner about the extension.

Notice of extension to Information Commissioner

(2) Where the head of a government institution extends a time limit under subsection (1) for more than thirty days, the head of the institution shall give notice of the extension to the Information Commissioner at the same time as notice is given under subs

**Richard McCluskey**

| | |
|---|---|
| **From:** | Roberts Jones, Bonnie (Heenan Blaikie) [BRobertsjones@heenan.ca] |
| **Sent:** | Monday, July 25, 2011 6:53 AM |
| **To:** | Brett Harrison |
| **Cc:** | Korde, Rukesh; Richard McCluskey; Jack, Don (Heenan Blaikie) |
| **Subject:** | RE: Answer re question on status of ATIP request |

Brett, further to your question regarding the ATIP deadlines, the following is the response we received from the ATIP office:

The ATIP office wrote to the requester in an attempt to reduce the scope of the request.  When a request to reduce the scope of a request is made, the broader request is put on hold and the clock stops until the ATIP office receives a response from the requester. That's exactly what happened for this request.

The ATIP office also advised that although its next legislative date to respond is September 9th, it will try to respond before August 9th.


Regards,

Bonnie

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately. Thank you. Ce courriel pourrait contenir des renseignements confidentiels ou privilégiés. Si vous n'êtes pas le véritable destinataire, veuillez nous en aviser immédiatement. Merci.

**From:** Brett Harrison [mailto:Brett.Harrison@mcmillan.ca]
**Sent:** Thursday, July 21, 2011 8:36 AM
**To:** Roberts Jones, Bonnie (Heenan Blaikie)
**Cc:** Korde, Rukesh; Abdel-Aziz, Ahab (Heenan Blaikie); Richard McCluskey; Jack, Don (Heenan Blaikie)
**Subject:** RE: Answer re question on status of ATIP request

Thank you for the clarification. Please let us know if you are able to obtain an explanation of the new statutory deadline.

## mcmillan

**Brett Harrison**
Partner - Commercial Litigation and Corporate Restructuring
d 416.865.7932
brett.harrison@mcmillan.ca

Assistant: Wilma Leo | 416.865.7852 | wilma.leo@mcmillan.ca

... this email, including the attachments, may contain information that is confidential and privileged. Any unauthorized ... if you are not the intended recipient, please notify us by reply email or telephone call and ...

**From:** Roberts Jones, Bonnie (Heenan Blaikie) [mailto:BRobertsjones@heenan.ca]
**Sent:** Thursday, July 21, 2011 8:33 AM
**To:** Brett Harrison
**Cc:** Korde, Rukesh; Abdel-Aziz, Ahab (Heenan Blaikie); Richard McCluskey; Jack, Don (Heenan Blaikie)
**Subject:** RE: Answer re question on status of ATIP request

The ATIP office indicated that its statutory deadline for its next response is September 7. I do not know if I will be in a position to obtain clarification of this issue prior to the hearing. Further, the ATIP office did not indicate that it would provide a full response to the ATI request by that date. It indicated that it would provide a response by that date. Your assumption that the response would be compete by that date is not warranted by a plain reading of the answer provided.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately. Thank you.
Ce courriel pourrait contenir des renseignements confidentiels ou privilégiés. Si vous n'êtes pas le véritable destinataire, veuillez nous en aviser immédiatement.
Merci.

**From:** Brett Harrison [mailto:Brett.Harrison@mcmillan.ca]
**Sent:** Thursday, July 21, 2011 8:27 AM
**To:** Roberts Jones, Bonnie (Heenan Blaikie)
**Cc:** Korde, Rukesh; Abdel-Aziz, Ahab (Heenan Blaikie); Richard McCluskey; Jack, Don (Heenan Blaikie)
**Subject:** RE: Answer re question on status of ATIP request

Thanks Bonnie. Just to clarify, Mr. Boulais' June 6, 2011 letter indicates that AECL "will require an extension of 90 days beyond the original statutory limit." The original statutory limit for the April 11, 2011 request was May 11, 2011, which makes the new statutory limit August 9, not September 7. Please confirm that this is in fact the date on which a full response to Lantheus' ATI request will be produced by the ATIP office, or if there will be an additional extension beyond that provided in the June 6, 2011 letter.

mcmillan

**Brett Harrison**
Partner - Commercial Litigation and Corporate Restructuring
d 416.865.7932
brett.harrison@mcmillan.ca

Assistant: Wilma Leo | 416.865.7852 | wilma.leo@mcmillan.ca

. . . . . . . . . . . . . . . . . may contain information this is confidential and privileged. Any unauthorized . . . . . . . . . . . . . please notify us by reply email or telephone call and . . . . . . . . . . . . . . . .

**From:** Roberts Jones, Bonnie (Heenan Blaikie) [mailto:BRobertsjones@heenan.ca]
**Sent:** Thursday, July 21, 2011 6:14 AM
**To:** Richard McCluskey
**Cc:** Brett Harrison; Korde, Rukesh; Abdel-Aziz, Ahab (Heenan Blaikie); Jack, Don (Heenan Blaikie)
**Subject:** Answer re question on status of ATIP request

Good morning Richard,

I have not had an opportunity to review the accuracy of the list of undertakings refusals and under advisements that you provided to me last night.

I can advise that I have an answer to the question asked at page 36 of Dr. Labrie's cross examination yesterday, which was to advise as to the status of the ATIP request.

The ATIP office advises that the request made by Mr. Harrison is following its normal course. As it stands presently, the ATIP office is in communication with Chalk River Nuclear Laboratories (the facilities which include NRU) to identify all of the documents that are responsive to the request. The ATIP office advises that it will be responding to the applicant by its legislative due date of September 7, 2011.

Regards,



**Bonnie Roberts Jones**
Partner
Litigation
HEENAN BLAIKIE LLP

T 416 360.3567   F 866 781.1350   brobertsjones@heenan.ca
P.O. Box 2900, 333 Bay Street, Suite 2900, Bay Adelaide Centre, Toronto, Ontario Canada   M5H 2T4 • heenanblaikie.com
Please consider the environment before printing this e-mail.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately. Thank you.
Ce courriel pourrait contenir des renseignements confidentiels ou privilégiés. Si vous n'êtes pas le véritable destinataire, veuillez nous en aviser immédiatement.
Merci.

**From:** Richard McCluskey [mailto:Richard.McCluskey@mcmillan.ca]
**Sent:** Wednesday, July 20, 2011 6:26 PM
**To:** Roberts Jones, Bonnie (Heenan Blaikie)
**Cc:** Brett Harrison; Korde, Rukesh
**Subject:**

I attach a chart containing the refusals, undertakings, and under advisements provided at today at the examination of Jean-Pierre Labrie.  Please advise whether you intend to respond to any of these in advance of tomorrow's hearing.

Regards,

mcmillan

**Richard McCluskey**
Associate
d 416.865.7146 | f 416.865.7048
richard.mccluskey@mcmillan.ca

Assistant: Kinga Kmiec | 416.865.7220 | kinga.kmiec@mcmillan.ca

**McMillan LLP**
Lawyers | Patent & Trade-mark Agents
Brookfield Place, 181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3
mcmillan.ca

... may contain information that is confidential and privileged. Any unauthorized
... you are not the intended recipient, please notify us by reply e-mail or telephone call and
...

# EXHIBIT 13

 

AUG 1 7 2011

**Jean Boulais**
Director, Access to Information and Privacy
Directeur, Accès à l'information et de la
protection des renseignements personnels

PROTECTED-Sensitive

AECL File Number
A-2011-0001

August 9, 2011

Mr. Brett Harrison
McMillan LLP
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON   M5J 2T3

Dear Mr. Harrison:

This is further to your request submitted under the *Access to Information Act* by
Atomic Energy of Canada Limited for the following:

**A-2011-0001**   *"We act as Canadian Counsel for Lantheus Medical Imaging, Inc.
Lantheus recently filed a lawsuit in the United States against its insurance
company, Zurich American Insurance Company, seeking payment of losses that it
sustained as a result of the shutdown of the Chalk River National Research
Universal (NRU) Reactor in May 2009. Please find attached a formal access
request form, whereby Lantheus requests that AECL provide it with documents and
information related to the May 2009 Shutdown of the Chalk River National
Research Universal reactor identified in Exhibit 1."*

It is estimated that retrieval and preparation of the relevant documents will take 155 hours
to complete. As the *Act* stipulates that five hours will be provided free of charge, the
balance (150 hours) is an assessable fee in accordance with subsection *11(2)* of the *Act* at
$10 per hour. The total search and preparation cost is therefore $1,500.00.

If you wish to proceed with your request, please forward to the undersigned the amount
of $1,500.00, by cheque or money order payable to Atomic Energy of Canada, quoting
our file number A-2011-0001. Please note that your request is now on hold until your
search fee payment is received and must be made by September 8, 2011, after which your
request will be closed.

There may also be reproduction fees in connection with this request, although we are
unable to provide an estimate at this time. You will be advised of the estimate for these
costs as soon as it is available.

| | |
|---|---|
| Place de Ville, Tower B | Place de Ville, Tour B |
| 112 Kent Street, Suite 501 | 112 rye Kent, Bureau 501 |
| Ottawa, Ontario | Ottawa, (Ontario) |
| Canada   K1A 0S4 | Canada   K1A 0S4 |
| Direct: 613-782-2025 | Ligne Directe: 613-782-2025 |
| Fax: 613-782-2017 | Fax: 613-782-2017 |
| boulaisj@aecl.ca | boulaisj@aecl.ca |
| www.aecl.ca | www.aecl.ca |



Please be advised that you are entitled to bring a complaint regarding this search fee request to the Information Commissioner of Canada within 60 days of the date of this letter.  Notice of complaint should be addressed to:

> The Information Commissioner of Canada
> Place de Ville, Tower B
> 112 Kent Street, 7th Floor
> Ottawa, Ontario   K1A 1H3

Should you have any questions, please do not hesitate to me or Jacques Beaulne at (613) 782-2023 or by e-mail at beaulnej@aecl.ca.

Sincerely yours,

Jean Boulais
Director, Access to Information and Privacy



# AECL EACL

## ACCESS TO GOVERNMENT RECORDS

Fees

**11.** (1) Subject to this section, a person who makes a request for access to a record under this Act may be required to pay

(*a*) at the time the request is made, such application fee, not exceeding twenty-five dollars, as may be prescribed by regulation;

(*b*) before any copies are made, such fee as may be prescribed by regulation reflecting the cost of reproduction calculated in the manner prescribed by regulation; and

(*c*) before the record is converted into an alternative format or any copies are made in that format, such fee as may be prescribed by regulation reflecting the cost of the medium in which the alternative format is produced.

Additional payment

(2) The head of a government institution to which a request for access to a record is made under this Act may require, in addition to the fee payable under paragraph (1)(*a*), payment of an amount, calculated in the manner prescribed by regulation, for every hour in excess of five hours that is reasonably required to search for the record or prepare any part of it for disclosure, and may require that the payment be made before access to the record is given.

Where a record is produced from a machine readable record

(3) Where a record requested under this Act is produced as a result of the request from a machine readable record under the control of a government institution, the head of the institution may require payment of an amount calculated in the manner prescribed by regulation.

Deposit

(4) Where the head of a government institution requires payment of an amount under subsection (2) or (3) in respect of a request for a record, the head of the institution may require that a reasonable proportion of that amount be paid as a deposit before the search or production of the record is undertaken or the part of the record is prepared for disclosure.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Cefaratti, Natalie <cefarattin@aecl.ca> |
| **Sent:** | Tuesday, June 14, 2011 2:54 PM |
| **To:** | Korde, Rukesh; Abdel-Aziz, Ahab (Heenan Blaikie) |
| **Subject:** | RE: AECL/Lantheus |

**PROTECTED - SENSITIVE | PROTÉGÉ - DÉLICAT**

Good afternoon Rukesh,

Please direct all your inquiries to our outside counsel Mr. Ahab Abdel-Aziz of Heenan Blaikie LLP. I have included him on this email for your contact.

Thank you ,
Natalie

---

**From:** Korde, Rukesh [mailto:rkorde@cov.com]
**Sent:** Monday, June 13, 2011 4:07 PM
**To:** Cefaratti, Natalie
**Subject:** FW: AECL/Lantheus

Natalie,

Do you have time to talk today or tomorrow?

Thanks,
Rukesh

---

**From:** Murphy, Patrick [mailto:murphyp@aecl.ca]
**Sent:** Friday, June 10, 2011 3:52 PM
**To:** Korde, Rukesh
**Cc:** Cefaratti, Natalie
**Subject:** Re: AECL/Lantheus

AECL - OFFICIAL USE ONLY | À USAGE EXCLUSIF - EACL

Rukesh

I am forwarding this matter to Natakie Cefaratti who is handling.
Regards,

Pat
-------------------------
Sent from my BlackBerry Wireless Handheld

---

**From**: Korde, Rukesh <rkorde@cov.com>
**To**: Murphy, Patrick
**Cc**: St. John, Anna <astjohn@cov.com>; 'Brett Harrison' <Brett.Harrison@mcmillan.ca>

**Sent**: Fri Jun 10 15:48:21 2011
**Subject**: AECL/Lantheus

Dear Mr. Murphy:

Covington & Burling LLP represents Lantheus Medical Imaging, Inc. in an insurance coverage dispute pending in federal court in the United States.  As you know, Lantheus has served an Application on AECL for the purposes of taking evidence abroad.  I was hoping to discuss the status of this matter with you.  Please give me a call at your earliest convenience.

Rukesh Korde

Covington & Burling LLP
1201 Pennsylvania Ave, NW
Washington DC 20004
(202) 662-5619

CONFIDENTIAL AND PRIVILEGED INFORMATION NOTICE

This e-mail, and any attachments, may contain information that
is confidential, subject to copyright, or exempt from disclosure.
Any unauthorized review, disclosure, retransmission,
dissemination or other use of or reliance on this information
may be unlawful and is strictly prohibited.

AVIS D'INFORMATION CONFIDENTIELLE ET PRIVILÉGIÉE

Le présent courriel, et toute pièce jointe, peut contenir de
l'information qui est confidentielle, régie par les droits
d'auteur, ou interdite de divulgation. Tout examen,
divulgation, retransmission, diffusion ou autres utilisations
non autorisées de l'information ou dépendance non autorisée
envers celle-ci peut être illégale et est strictement interdite.

CONFIDENTIAL AND PRIVILEGED INFORMATION NOTICE

This e-mail, and any attachments, may contain information that
is confidential, subject to copyright, or exempt from disclosure.
Any unauthorized review, disclosure, retransmission,
dissemination or other use of or reliance on this information
may be unlawful and is strictly prohibited.

AVIS D'INFORMATION CONFIDENTIELLE ET PRIVILÉGIÉE

Le présent courriel, et toute pièce jointe, peut contenir de

l'information qui est confidentielle, régie par les droits
d'auteur, ou interdite de divulgation. Tout examen,
divulgation, retransmission, diffusion ou autres utilisations
non autorisées de l'information ou dépendance non autorisée
envers celle-ci peut être illégale et est strictement interdite.

# EXHIBIT 15



combining Lang Michener LLP and McMillan LLP

| | |
|---:|:---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | June 20, 2011 |

**E-MAIL**

Mr. Ahab Abdel-Aziz
Heenan Blaikie LLP
Bay Adelaide Centre
P.O. Box 2900
333 Bay Street, Suite 2900
Toronto, Ontario  M5H 2T4
E-mail: aabdelaziz@heenan.ca

Dear Mr. Abdel-Aziz:

**Re:  Application to Enforce Letters Rogatory**

We act as Canadian counsel for Lantheus Medical Imaging, Inc. ("Lantheus") on its Application to enforce Letters Rogatory issued by the United States District Court for the Southern District of New York compelling the production of documents and the attendance at an examination under oath of a representative of Atomic Energy of Canada Limited ("AECL").

We understand that on June 16, 2011 you spoke on the telephone with Lantheus' U.S. counsel, Rukesh Korde, and advised him that AECL objected to the Application on the basis that:

i) AECL was immune from such a proceeding; and

ii) production of the requested documents was prohibited by federal legislation.

We also understand you advised that if Lantheus continues with its Application to enforce the Letters Rogatory, you would be seeking AECL's costs in this matter.

We have reviewed the issues raised on the call and do not believe they will prevent the Ontario court from enforcing the Letters Rogatory as against AECL.  However, in order to properly assess these issues, we would appreciate receiving a written summary of your position to which we can respond.  In the interests of moving this matter forward, we would appreciate receiving that written summary by June 23, 2011.

McMillan LLP | Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 | t 416.865.7000 | f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

MBDOCS_5493827.3



June 20, 2011
Page 2

combining Lang Michener LLP and McMillan LLP

        We continue to hope that AECL and Lantheus can work together towards a common solution for both parties.  As Mr. Korde indicated, it would be helpful in doing so if AECL could provide us with an overview of the specific information it has about the May 2009 - August 2010 shutdown of the Chalk River reactor so that Lantheus can determine whether any narrowing of its document requests is warranted.


                                        Yours truly,


                                        Brett Harrison


Copy to: Danielle Estrada, Covington & Burling LLP
         Rukesh Korde, Covington & Burling LLP
         Richard McCluskey, McMillan LLP

# EXHIBIT 16

# Heenan Blaikie

**BY E-MAIL**

Of Counsel
The Right Honourable Pierre Elliott Trudeau, P.C., C.C., C.H., Q.C., FRSC (1984 - 2000)
The Right Honourable Jean Chrétien, P.C., C.C., O.M., Q.C.
The Honourable Donald J. Johnston, P.C., O.C., Q.C.
Pierre Marc Johnson, G.O.Q., FRSC
The Honourable Michel Bastarache, C.C.
The Honourable René Dussault, FRSC
The Honourable John W. Morden
Peter M. Blaikie, Q.C.
André Bureau, O.C.

June 23, 2011

Rukesh A. Korde
Covington & Burling LLP
1201 Pennsylvania Avenue NW
Washington DC 20004-2401

Our Reference:  048825-0043

**Re:   Lantheus Medical Imaging Inc. v. Zurich American Insurance, U.S. District
Court, S.D.N.Y (No. 10 Civ. 9371)
Application by Lantheus to enforce U.S. Letters Rogatory in Ontario in respect
of Atomic Energy of Canada Ltd. ("AECL")**

Dear Mr. Korde:

This letter is further to our telephone discussion of June 16 in respect of the above matter.
I have copied Brett Harrison, Lantheus's Canadian counsel in this matter, as this letter
also responds to the questions he raised in his letter to me of Monday's date.

During our discussion, we touched on the following points, among others:

- Lantheus's application to enforce the U.S. letters rogatory is fundamentally flawed,
  given the statutory immunity of AECL, a Crown corporation and Crown agent, from
  third party discovery under both U.S. and Canadian law.

- Lantheus's application seeks third party discovery from a government nuclear
  research installation, similar to U.S. government agencies such as Idaho,
  Brookhaven, and Sandia national laboratories. We could not see a U.S. court
  lending its assistance to permit such an institution to be subject to third party
  discovery in a foreign proceeding. Further, the export of nuclear information from
  Canada – particularly information about nuclear reactors – is subject to statutory and
  regulatory prohibitions and to export licensing requirements.

**Ahab Abdel-Aziz**

**T 416 643 6929**
F 1 877 268 0117
aabdelaziz@heenan.ca

Bay Adelaide Centre
333 Bay Street, Suite 2900
P.O. Box 2900
Toronto, Ontario
Canada  M5H 2T4

heenanblaikie.com

- AECL is under a duty to safeguard the immunity of the Crown, for whose purposes it exercises all its powers and mandates. Accordingly, should Lantheus persist in its application to enforce the letters rogatory, AECL will resist.

- Even were the letters rogatory to be enforced in Ontario, it is highly unlikely that Lantheus would be able to obtain thereby any information or documents that it could not otherwise obtain through its pending request under the federal *Access to Information Act* ("**ATIP request**"). In either case, the control of the disclosure and export of nuclear information would play an important role.

We add further that having reviewed the materials Lantheus filed with the U.S. District Court in support of its request for the issuance of the letters rogatory, it appears that Lantheus failed to disclose to the U.S. court that AECL is an agent of a sovereign state, and equally failed to address AECL's resulting immunity under U.S. law. We invite you to explain this omission on Lantheus's part. In our client's view, AECL's agency status is patently obvious, and was in any event known to Lantheus in view of its ATIP request. Given Lantheus's proceeding in the U.S. courts without disclosure of this fact, and its proceeding in the Ontario courts without regard for this fact, AECL will rely on this letter in seeking substantial indemnity costs should its position prevail in the upcoming application in July.

During our call you requested that we inquire with our client as to the likely timeline for obtaining a response to Lantheus's pending ATIP request. We have made such inquiries, and are advised that the current timeline for the response is as set out in prior correspondence to Lantheus. It is not possible at this point to give a more precise timeline, as AECL is currently still searching for and retrieving documents responsive to Lantheus's ATIP request. Once that first stage has been completed, it may be possible to provide a better estimate of the remaining time required, as only once the responsive documents have been identified is it possible to assess the duration of the document review process – which may include, for example, consultations with affected third parties.

Further, as we advised during our call, our client is bound by a statutory process in handling the ATIP request. AECL's Access to Information Coordinator, who is responsible for carrying out AECL's responsibilities under the *Access to Information Act* and regulations, can only act within the parameters set out in that statutory framework. There is no scope under that framework for AECL to "negotiate" its disclosure obligations and exemptions, or to provide a preview of what documents or type of documents might be available. We did observe, however, that purely as a practical matter, Lantheus's ATIP request would likely proceed more quickly if the scope of documents were defined as narrowly as possible, given the inherent delays occasioned by broad ATIP requests and the concomitant demands on AECL staff to gather and review responsive documents, redact where necessary, and then approve their release.

In response to my inquiry whether you had consulted public sources of information, you indicated that Lantheus was not in possession of any information or documents relating to the NRU shutdown aside from those it obtained from AECL. For this reason I offered to point you to some public sources of information that may assist you. Upon our further review of the documents Lantheus filed with the U.S. District Court, we saw that Lantheus is in fact already in possession of considerable information from the public record, including presentations before and filings with the Canadian Nuclear Safety Commission relating to the NRU shutdown and investigation, as well as AECL public releases concerning same. Accordingly, it seems clear that Lantheus already possesses (or could easily obtain with minimal effort) a substantial amount of material relevant information on the public record, and that we cannot improve upon your efforts in this regard.

Our client invites Lantheus to withdraw its application currently pending before the Ontario courts for the reasons we discussed during our call and described in this letter. Should Lantheus do so before the end of the month, our client would consent to such withdrawal without costs. However, after that point, our client will be compelled to prepare for the hearing of the application, and will naturally incur cost in so doing.

Heenan Blaikie LLP

Ahab Abdel-Aziz

AAA/aam

Copy:      Brett Harrison
           McMillan LLP

# EXHIBIT 17



combining Lang Michener LLP and McMillan LLP

| | |
|---|---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | June 28, 2011 |

**E-MAIL**

Mr. Ahab Abdel-Aziz
Bay Adelaide Centre
P.O. Box 2900
333 Bay Street, Suite 2900
Toronto, Ontario  M5H 2T4
E-mail: aabdelaziz@heenan.ca

Dear Mr. Abdel-Aziz:

> **Re:    Application by Lantheus Medical Imaging Inc. ("Lantheus") to Enforce Letters Rogatory in respect of Atomic Energy of Canada Ltd. ("AECL")**

We are in receipt of your letter dated June 23, 2011, where you dispute the ability of the Ontario Superior Court of Justice (the "Ontario Court") to enforce Letters Rogatory issued by the United States District Court for the Southern District of New York (the "U.S. Court") as against AECL.  While we appreciate receiving a written summary of your position, you have still failed to cite any specific legal authority which would prevent the Ontario Court from enforcing the Letters Rogatory.  To the contrary, the assertions in your letter are vague and general in nature and do not provide any support for your assertion that Lantheus should withdraw its Application.

In the interests of resolving this dispute, however, we address below the legal issues which appear to be raised in your letter.

**Jurisdiction & Crown Immunity**

The Ontario Court has explicit jurisdiction over AECL in this matter, given section 21(1) of the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50 and section 17 of the *Federal Courts Act*.  Any suggestion otherwise is patently incorrect.

Further, your insistence that AECL has immunity from this proceeding is not supported by the law.  You have alleged that AECL has "statutory immunity" as a Crown corporation and Crown agent pursuant to the *Crown Liability and Proceedings Act*.  However, this legislation, which governs proceedings brought against the federal Crown, does not grant the Crown or Crown agents with immunity from proceedings.  While section 22 of the Act might

McMillan LLP  |  Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3  |  t 416.865.7000  |  f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

MBDOCS_5547534.1



prohibit a court from granting an injunction or making an order for specific performance as against the Crown (section 22(1)), the legislation specifically withdraws the protection, if any, from Crown corporations (section 35(1)). That is, Crown corporations do **not** enjoy immunity from injunctive relief and specific performance. In fact, Letters Rogatory have been enforced against AECL in the past. See *E-Beam Services Inc. v. AECL Technologies Inc.*, 2003 CarswellOnt 2371 (Sup. Ct. J.), where two employees of AECL were compelled to be examined in relation to matters in dispute in a New Jersey proceeding. AECL is subject to the jurisdiction of the Ontario Court and there is no immunity which prevents Lantheus from seeking to enforce the Letters Rogatory. Moreover, I note that AECL was advised by letter dated May 4, 2011 that Lantheus would use formal process if AECL did not cooperate with Lantheus' Access to Information request, and by letter dated May 9, 2011 that given AECL's response to date, Lantheus had "no choice but to proceed with its request for approval by the U.S. court of a letter of request to the Canadian courts to require production of the requested materials and deposition testimony by AECL". AECL did not, at those times or any other, suggest that it was immune to formal process.

Your suggestion that AECL would be immune from third-party discovery under U.S. law likewise lacks any legal support. The *Atomic Energy Act* specifically permits legal actions against operators of nuclear facilities, *e.g., Oszrczuk v. Associated Universities, Inc.*, 830 N.Y.S.2d 711 (N.Y. App. Div. 2007), and we are aware of numerous cases in which courts have exercised jurisdiction to permit discovery from the operator of Brookhaven (one of the two nuclear laboratories cited in your letter). E.g., *Sundaram v. Brookhaven National Laboratory*, No. CV-94-2330, 1996 WL 563829, *2 (E.D.N.Y. Mar. 11, 1996) (permitting discovery from Brookhaven); *Tardd v. Brookhaven National Laboratories*, No. 04-CV-3262, 2007 WL 1423642 (E.D.N.Y. May 8, 2007) (setting cases against Brookhaven for jury trial). In addition, the United States Supreme Court has rejected the notion that Sandia (the other nuclear laboratory cited in your letter) is an instrumentality of the Government. *United States v. New Mexico*, 455 U.S. 720, 740 (1982) ("Sandia … cannot be termed [a] 'constituent part' of the Federal Government"). *See also Gingrich v. Sandia Corporation*, 142 N.M. 359, 368-69 (N.M. App. 2007) (upholding order compelling production of materials from Sandia). Your suggestion that U.S. Courts would not provide reciprocal assistance if a foreign party sought discovery from the operator of an American nuclear reactor is equally mistaken. As the cases cited above make clear, such operators are subject to discovery, and hence to third-party discovery. Moreover, your attempt to analogize AECL to Sandia is misleading. Sandia's mission relates to America's nuclear weapons program; the NRU's mission is the testing of materials and the production of commercial, medical isotopes. Indeed, we understand that when asked for the basis of your analogy, you conceded that AECL is not asserting that Lantheus' information requests "engaged" any "national security interests."

**Crown Privilege (i.e. public interest immunity)**

You have also seemingly alleged that the documents within AECL's possession may be subject to privilege, whether statutory or otherwise. However, your position on the source of this privilege remains unclear as you have not cited a single statute, regulation or case.



Crown immunity from discovery has long been abolished in all Canadian jurisdictions.  In the course of litigation, the Crown is subject to the same discovery obligations as any other party.  While there is a common law rule of evidence that permits the Crown to withhold documents on the basis that disclosure would be injurious to the public interest, you have provided no evidence, explanation or suggestion as to why the information sought by Lantheus would qualify for this "public interest" immunity.  Further, AECL has made no assertions as to why any of the requested documents would be eligible for a "public interest" immunity, given that the Chalk River nuclear reactor's primary purpose was the production of medical isotopes which are sold in commerce.  Indeed, the information Lantheus seeks does **not** concern the means for weaponizing fissile materials, but rather the data gathered in determining why and how the NRU's aluminium reactor vessel failed.  Finally, no documents enjoy absolute immunity from litigation by virtue of Crown privilege.  In *Smallwood v. Sparling*, [1982] 2 S.C.R. 686, the Supreme Court of Canada made it clear that Crown privilege is not absolute but relative, involving an issue-by-issue determination by the courts of whether the claimed injury to the public interest outweighs the injury to the administration of justice caused by non-disclosure.  This issue must be raised on a document-by-document basis in front of a judge and the documents remain subject to court inspection.  If AECL intends to rely on this privilege on the Application, a detailed explanation of the documents withheld and the reason for their withholding will be required.

Further, to the extent that AECL intends to rely upon other "statutory and regulatory prohibitions" against disclosure of nuclear information, please specifically advise which statutes and regulations are being relied upon in support of this position.

**AECL's Status as a Crown Corporation was Evident to the U.S. Court**

Your letter is incorrect when it claims that Lantheus "failed to disclose" to the U.S. Court on the motion for Letters Rogatory that AECL was an "agent of a sovereign state".  To begin, the supporting papers submitted in conjunction with Lantheus' motion in the U.S. Court included Lantheus' Access to Information Request, an official "Government of Canada" form that asks the requestor to list the "Federal Government Institution" from which information is sought to which Lantheus responded "Atomic Energy of Canada Limited."  The Memorandum of Law repeatedly refers to this Access to Information Request.  It also explains that an Access to Information request is analogous to a request under the U.S. Freedom of Information Act, which is used to obtain information from the federal government.[1]  Plainly, the U.S. Court understood AECL's status.

More importantly, whether or not AECL is an "agent of a sovereign state" is irrelevant to the granting of the Letters Rogatory. As outlined above, AECL has no special status which provides it with immunity from process. Therefore, it would not be a factor to be considered by the U.S. Court in granting the Letter Rogatory.

---

[1] Your contention that my colleague Mr. Korde misled you regarding the information in Lantheus' possession is likewise incorrect.  The question posed was not whether there is public information discussing the shutdown but whether AECL has made public the underlying data from its investigation into the root cause(s) of the shutdown.  To the best of our knowledge, it has not done so, and your letter offers no further information in this regard.



combining Lang Michener LLP and McMillan LLP

**Access to Information Request**

The Application to enforce the Letters Rogatory was brought when it became clear that AECL would not be forthcoming with relevant documents pursuant to the Access to Information Request in a timely manner.

The documents which AECL has provided thus far have been heavily redacted, incomplete, and do not contain the underlying technical data and analyses related to the causes of the reactor shutdown.  Further, AECL initially requested an additional 150 day extension beyond the statutory limit to respond to the request and has indicated that more extensions may be needed.  Given AECL's delays and the importance of obtaining this information within the timelines for discovery imposed by the U.S. Court, Lantheus had no option but to obtain the Letters Rogatory.

Your position that "[t]here is no scope under that framework for AECL to "negotiate" its disclosure obligations and exemptions" is incorrect; there is no restriction in the *Access to Information Act* from ACEL entering into such discussion. The fact that you are using the Act as an excuse not to discuss the disclosure process makes it appear that ACEL is not approaching this matter in the spirit of co-operation that we had hoped and expected.

Lantheus has always been, and still remains, willing to discuss the scope of the Access to Information Request.  However, in order to consider narrowing the request Lantheus needs information from AECL with regards to the type of documents in its possession.  We invite you again to provide this information.

We remain willing to discuss our interpretation of the facts and law, as set out above.  To the extent you disagree with anything in this letter, we invite you to cite specific legal authority on these issues in order to support your position.  However, based on our current understanding of the law and your arguments, Lantheus will be proceeding with its Application to enforce the Letters Rogatory.  We do not believe that the Court will be impressed by AECL's refusal to provide Lantheus with any statutory, regulatory or case law support for its position; nor do we believe that the Court will look with favour upon AECL's refusal to participate in any discussion to narrow the requests or to explain to Lantheus the information in its possession regarding its investigations of the NRU reactor shutdown.


combining Lang Michener LLP and McMillan LLP

June 28, 2011
Page 5

If AECL continues to oppose our Application without providing any legal authority to support its position, and unnecessarily increasing the cost of this proceeding, we will have no choice but to seek costs against AECL.

Yours truly,

Brett Harrison

Copy to: Danielle Estrada, Covington & Burling LLP
        Rukesh Korde, Covington & Burling LLP
        Richard McCluskey, McMillan LLP

# EXHIBIT 18

# Heenan Blaikie

**BY E-MAIL**

Of Counsel
The Right Honourable Pierre Elliott Trudeau, P.C., C.C., C.H., Q.C., FRSC (1984 - 2000)
The Right Honourable Jean Chrétien, P.C., C.C., O.M., Q.C.
The Honourable Donald J. Johnston, P.C., O.C., Q.C.
Pierre Marc Johnson, G.O.Q., FRSC
The Honourable Michel Bastarache, C.C.
The Honourable René Dussault, FRSC
The Honourable John W. Morden
Peter M. Blaikie, Q.C.
André Bureau, O.C.

June 30, 2011

Brett Harrison
McMillan LLP
Brookfield Place, 181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Our Reference:  048825-0043
**Re:      Application by Lantheus to enforce U.S. Letters Rogatory in Ontario in
            respect of Atomic Energy of Canada Ltd. ("AECL")**

Dear Mr. Harrison:

I am in receipt of your letter of June 28. Suffice to say that my client agrees with neither the legal nor factual assertions contained therein. Nor do I accept your characterization of the statements I made to Mr. Korde during our conversation, which I note took place at his express request; in particular, I reject your suggestion that I made any admission or concession with respect to the nature of the information Lantheus seeks.

**Ahab Abdel-Aziz**

**T 416 643 6929**
F 1 877 268 0117
aabdelaziz@heenan.ca

Bay Adelaide Centre
333 Bay Street, Suite 2900
P.O. Box 2900
Toronto, Ontario
Canada  M5H 2T4

heenanblaikie.com

It appears from your letter that your client is committed to proceeding with its application. Accordingly, my client will provide its substantive response to your client's arguments in due course, as part of the legal proceedings. However, I must emphasize that your assertions regarding Lantheus's Access to Information requests and the access procedure, and your attempt to link your client's access requests and its pending application, flatly disregard the statutory scheme. The *Access to Information Act* and accompanying regulations establish a complete code governing our client's access obligations and the procedure for fulfilling those obligations. Any concerns your client has regarding the procedure or any documents obtained should be addressed through the proper channels.

Given the factual and legal issues raised in our respective correspondence, it is evident that argument on the application will require more than 2 hours. As you are aware, the practice direction requires that applications requiring more than 2 hours of argument be

arranged through the Motions Scheduling Court, and that parties submit for approval a timetable for all steps required prior to the hearing of the application.

I understand that you are currently away on a two week vacation in Europe, and will not be returning until July 8. For my part, I too must travel to Europe for seven to ten days, for both business and personal reasons, shortly after your return to Canada. Accordingly, in an effort to move matters forward efficiently, I have proposed a tentative timetable below.

- Service of applicant's application record: July 30

- Service of our client's responding record, if any: August 10

- Cross-examinations on each party's affidavit(s): week of August 15

- Service of applicant's factum: 2 weeks before hearing date

- Service of respondent's factum: 1 week before hearing date

Please let me know whether you are in agreement with the suggested timetable, or whether you would propose any changes or amendments. In addition, please advise when you would be available for the hearing of the application, and how long you anticipate your client would require for its oral argument. At this point, I anticipate that our client will require between 2 and 3 hours of argument.

Finally, I would ask that you confirm that your office will contact the Civil Scheduling Unit to adjourn the existing July 21 hearing date.

I look forward to your prompt reply.

Yours very truly,

Heenan Blaikie LLP

Ahab Abdel-Aziz

# EXHIBIT 19



combining Lang Michener LLP and McMillan LLP

| | |
|---|---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | July 4, 2011 |

**E-MAIL**

Mr. Ahab Abdel-Aziz
Bay Adelaide Centre
P.O. Box 2900
333 Bay Street, Suite 2900
Toronto, Ontario  M5H 2T4
E-mail: aabdelaziz@heenan.ca

Dear Mr. Abdel-Aziz:

> **Re:** **Application by Lantheus Medical Imaging Inc. ("Lantheus") to Enforce Letters Rogatory in respect of Atomic Energy of Canada Ltd. ("AECL")**

We are in receipt of your letter dated June 30, 2011, requesting an adjournment of the July 21, 2011 hearing on the above-referenced application to mid or late September. As we have previously advised your client, Lantheus is subject to court-imposed deadlines in *Lantheus Medical Imaging, Inc. v. Zurich American Insurance Company* ("the U.S. Action"). One of those deadlines is the filing of expert reports by October 31, 2011. In order for Lantheus' expert to complete his report, he requires the information being requested from AECL with sufficient time to review and analyze it, and to prepare the report. In addition, the parties are subject to court-ordered mediation in the U.S. Action, in connection with which, mediation briefs are to be filed by September 12, 2011. Information in the possession of AECL is required to facilitate the mediation process. As a result, it is critical that the documents be provided by no later than August 15, 2011, and the examination be completed no later than September 1, 2011.

As you know, your client has been aware that Lantheus intended to bring this application since May 9, 2011.  On May 26, 2011 your client was served with the Notice of Application for the July 21, 2011 hearing. That same day in-house counsel for your client, Patrick Murphy, contacted counsel for Lantheus and began discussions regarding a form of consent order. At no time did your client indicate that there was any issue with the timing of the July 21 hearing, or that AECL would be opposing the application. Following the initial discussions with Mr. Murphy, however, AECL did not respond to Lantheus' repeated attempts to contact AECL's in-house counsel until June 14. It was not until your discussion with Mr. Korde on June 16 that any objection was raised by your client with regard to the relief being sought, and it was not until June 30 that you first raised the issue of an adjournment.

McMillan LLP | Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 | t 416.865.7000 | f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

MBDOCS_5556439.3



July 4, 2011
Page 2

        Given AECL's refusal to provide any legal support for the arguments that you
have articulated in the correspondence to date, we do not believe that this matter will take more
than two hours presently scheduled for July 21. As a result, we would propose the following
timetable:

        1.      Service of applicant's application record: July 5

        2.      Service of your client's responding record, if any: July 12

        3.      Cross-examinations on each party's affidavit(s): July 13

        4.      Service of applicant's factum: on or before Noon, July 18

        5.      Service of respondent's factum: on or before Noon, July 20

We look forward to hearing from you.


                                Yours truly,


                                Brett Harrison


Copy to: Danielle Estrada, Covington & Burling LLP
         Rukesh Korde, Covington & Burling LLP
         Richard McCluskey, McMillan LLP

# EXHIBIT 20

# Heenan Blaikie

**BY E-MAIL**

Of Counsel
The Right Honourable Pierre Elliott Trudeau, P.C., C.C., C.H., Q.C., FRSC (1984 - 2000)
The Right Honourable Jean Chrétien, P.C., C.C., O.M., Q.C.
The Honourable Donald J. Johnston, P.C., O.C., Q.C.
Pierre Marc Johnson, G.O.Q., FRSC
The Honourable Michel Bastarache, C.C.
The Honourable René Dussault, FRSC
The Honourable John W. Morden
Peter M. Blaikie, Q.C.
André Bureau, O.C.

July 5, 2011

Brett Harrison
McMillan LLP
Brookfield Place, 181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Our Reference:  048825-0043
Re:     **Application by Lantheus to enforce U.S. Letters Rogatory in Ontario in
        respect of Atomic Energy of Canada Ltd. ("AECL")
        Ontario Court File No. CV-11-427161**

        <u>**Change to Application Return Date and Timetable for Proceeding**</u>

Dear Mr. Harrison:

**Ahab Abdel-Aziz**

**T 416 643 6929**
F 1 877 268 0117
aabdelaziz@heenan.ca

Bay Adelaide Centre
333 Bay Street, Suite 2900
P.O. Box 2900
Toronto, Ontario
Canada  M5H 2T4

heenanblaikie.com

I write further to your letter of July 4, responding to my letter of June 30.

You purport both to estimate the time required for my client's argument, and to impose a return date for your client's application unilaterally, without consultation with my client or counsel. Your approach is contrary to the *Practice Direction for Civil Applications, Motions and Other Matters in the Toronto Region*, which governs your application.

In my letter of June 30, I estimated that my client will require between 2 and 3 hours for its responding oral argument. Your attempt to override that estimate misapprehends the *Practice Direction*. Each party is entitled to estimate the time it requires, particularly since it is expected to adhere to its estimate. Your time estimate for the hearing was made without consulting me or my client. Your opinion of my client's position on the merits is, with respect, not relevant to scheduling.

Similarly, the *Practice Direction* requires that you obtain my client's consent to your proposed hearing date of July 21. You have not sought that consent from us or, prior to our retainer, from our client.

The *Practice Direction*, states, in relevant part, as follows:

> Applications and motions that require two hours or less for all parties to argue are considered short. Applications and motions that require more than two hours for all parties to argue are considered long. […]
>
> **Parties must consult with each other to select a return date** [for short applications] **convenient to all parties** and which will permit all parties to file all necessary materials and conduct any examinations before the return date. At the time of booking, **a realistic estimate of the time required by all parties for argument must be provided**. […]
>
> [T]he Confirmation Form for motions and applications must be filed by the applicant or moving party with the registrar not later than 2 p.m. three days […] before the hearing date. Parties must confer as to the time required before sending in the Confirmation Form. **Estimated time must not exceed time booked. Parties are expected to adhere to the time requested.**                                        [emphasis added]

I also do not accept that the matter can be ready for hearing in the available time frame. It is apparent from your letter that your client has intended to bring this application since May 9 – almost 2 full months ago. Yet your client has still not served the affidavit referred to in its notice of application, despite that it manifestly could have done so concurrently with the application had the timelines you now raise in your letter been of significance.

Further, as you are aware from my previous letter, I will be travelling overseas shortly. The hearing date that you have chosen is unworkable in my schedule, given that every step required to ready the application for hearing has yet to be taken. We appreciate that this delay in readying the matter for hearing must be due in some measure to your having been in Europe for two weeks on holiday. That, however, can hardly justify either the schedule or the manner in which you now propose to proceed.

Consistent with the *Practice Direction*, the Civil Scheduling Unit must be advised that the July 21 date was obtained on the basis of assumptions on your part that you have now been advised are incorrect. As you aware, long applications, such as the present one, must be scheduled through an attendance at Motions Scheduling Court. Kindly consult with us before scheduling such an attendance, since as noted, I will also be travelling in the near future.

Page 3

We remain amenable to establishing a reasonable timetable with you, as well as a mutually convenient date for the hearing.

Yours very truly,

Heenan Blaikie LLP

Ahab Abdel-Aziz

# EXHIBIT 21

# Heenan Blaikie

**BY E-MAIL**

Of Counsel
The Right Honourable Pierre Elliott Trudeau, P.C., C.C., C.H., Q.C., FRSC (1984 - 2000)
The Right Honourable Jean Chrétien, P.C., C.C., O.M., Q.C.
The Honourable Donald J. Johnston, P.C., O.C., Q.C.
Pierre Marc Johnson, G.O.Q., FRSC
The Honourable Michel Bastarache, C.C.
The Honourable René Dussault, FRSC
The Honourable John W. Morden
Peter M. Blaikie, Q.C.
André Bureau, O.C.

July 7, 2011

Civil Scheduling Unit
Ontario Superior Court of Justice
393 University Avenue, 10th Floor
Toronto, Ontario M5G 1E6
e-mail: jus.g.mag.csd.civilmotionsscheduling@ontario.ca and
MotionsSchedulingCourt@ontario.ca

Our Reference:  048825-0043

**Re:**   **Application by Lantheus to enforce U.S. Letters Rogatory in Ontario in respect of Atomic Energy of Canada Ltd. ("AECL")**
**Ontario Court File No. CV-11-427161**

**<u>Change to Return Date / Requisition for Motions Scheduling Court</u>**

**Ahab Abdel-Aziz**

**T 416 643 6929**
F 1 877 268 0117
aabdelaziz@heenan.ca

Bay Adelaide Centre
333 Bay Street, Suite 2900
P.O. Box 2900
Toronto, Ontario
Canada  M5H 2T4

heenanblaikie.com

To the Civil Scheduling Unit:

I am counsel for the respondent AECL in the proceeding referred to above. I understand the return date for the application is currently scheduled for July 21, to be heard as a short application.

Please be advised that counsel for the applicant selected the July 21 date, and estimated the time necessary for the hearing, without consent from or consultation with either my client or counsel, as required by the *Practice Direction for Civil Applications, Motions and Other Matters in the Toronto Region*. I have informed opposing counsel that my client neither consents to the date proposed nor agrees with the estimate of the time required for the hearing, that the July 21 return date must be struck, and a new return date selected that is convenient to both parties.

Further, I have indicated to opposing counsel that in my estimation, my client will require more than two hours to present its oral argument. Consequently, the parties must in any event attend at Motions Scheduling Court to obtain a return date for a long application. Attached please find the necessary requisition.

Page 2

I also ask that you please confirm to me and applicant's counsel, by letter or e-mail, that the currently scheduled July 21 return date has been struck.

Yours very truly,

Heenan Blaikie LLP

Ahab Abdel-Aziz

Attachment

Copy:          Brett Harrison
               McMillan LLP
               Counsel to the Applicant, Lantheus Medical Imaging Inc.

HBdocs - 10714417v1

# EXHIBIT 22



combining Lang Michener LLP and McMillan LLP

|  |  |
|---|---|
| **Reply to the Attention of** | Brett Harrison |
| **Direct Line** | 416.865.7932 |
| **Direct Fax** | 647.722.6756 |
| **Email Address** | brett.harrison@mcmillan.ca |
| **Our File No.** | 202043 |
| **Date** | July 8, 2011 |

**EMAIL**

Civil Scheduling Unit
Superior Court of Justice
393 University Avenue, 10th Fl.
Toronto, ON  M5G 1E6

Dear Sir or Madam:

> **Re:** **Lantheus Medical Imaging, Inc. v.**
> **Atomic Energy of Canada Limited**
> **Court File No.: CV-11-427161**

We act as Canadian counsel for Lantheus Medical Imaging Inc. ("Lantheus") on its Application to enforce Letters Rogatory issued by the United States District Court for the Southern of New York (the "U.S. Court") compelling the production of documents and the attendance at an examination under oath of a representative of Atomic Energy of Canada Limited ("AECL").  The Application is scheduled to be heard on July 21, 2011.

We understand that the Civil Scheduling Unit was contacted on July 7, 2011 by counsel for AECL with a request to strike the currently scheduled July 21 return date and to require an appearance at Motions Scheduling Court to set a new return date.  Lantheus denies the allegations as laid out in AECL's letter to the Civil Scheduling Unit and further denies that such an adjournment is necessary or appropriate.  A prompt hearing on Lantheus' Application is imperative for the reasons stated below.

**First**, as demonstrated in the Affidavit of Anna St. John (enclosed in the materials provided to AECL's counsel on July 7, 2011 and enclosed herewith), Lantheus' Application to enforce the Letters Rogatory was only brought after Lantheus' repeated efforts over the past 14 months to obtain the requested information from AECL voluntarily were frustrated by AECL's refusal to cooperate.  These efforts include numerous phone calls to various AECL employees, including its General Counsel, a letter to its General Counsel and a Request under the *Access to Information Act*.

**Second**, AECL's contention that the return date was selected without consultation with AECL is misleading.  Lantheus advised AECL's General Counsel in March 2010 that, due to scheduling deadlines in the U.S. Court, Lantheus would be forced to invoke formal process in

McMillan LLP | Brookfield Place, 181 Bay Street, Suite 4400, Toronto, Ontario, Canada M5J 2T3 | t 416.865.7000 | f 416.865.7048
Lawyers | Patent & Trade-mark Agents | Avocats | Agents de brevets et de marques de commerce
Vancouver | Calgary | Toronto | Ottawa | Montréal | Hong Kong | mcmillan.ca

MBDOCS_5564186.2



combining Lang Michener LLP and McMillan LLP

the absence of cooperation with its voluntary requests for information and with its *Access to Information Act* Request. Lantheus did not receive a response to that letter, nor a response to a follow-up phone call to AECL's General Counsel. As a result of AECL's failure to cooperate, it was impossible to secure an "agreed" upon return date for the Application. It would be unreasonable to now allow AECL to use its decision to ignore Lantheus' repeated communications as an excuse for an adjournment.

**Third**, although AECL in-house counsel, Mr. Patrick Murphy, did finally contact Lantheus' counsel on May 26, 2011 *after* the Notice of the Application was served, Mr. Murphy did not at that time or in a subsequent discussion on June 1, 2011, indicate that AECL had any objection to the July 21, 2011 return date. Indeed, AECL has been aware of the July 21 return date for the past six weeks and has implicitly consented to the July 21 return date.

Lantheus is subject to court-ordered deadlines imposed by the U.S. Court. Information in the possession of AECL is required to meet deadlines for the filing of expert reports and mediation briefs, and an adjournment would jeopardize Lantheus' ability to successfully meet these deadlines. Moreover, granting an adjournment would benefit AECL -- which has been non-cooperative and dilatory -- to the detriment of Lantheus -- which has diligently and persistently been attempting to obtain the information at issue for more than a year.

It is highly improper for AECL to unilaterally demand that the Civil Scheduling Unit strike a scheduled hearing. Therefore, Lantheus asks that the hearing remain scheduled for July 21 and that the issue of the adjournment, if any, be dealt with in the required and appropriate fashion.

Yours truly,

Brett Harrison

/Attach.
Copy to:  Ahab Abdel-Aziz, Heenan Blaikie LLP
          Alejandro Manevich, Heenan Blaikie LLP
          Danielle Estrada, Covington & Burling LLP
          Rukesh Korde, Covington & Burling LLP
          Steven Stieber, Stieber Berlach LLP
          William D. Wilson, Mound Cotton Wollan & Greengrass
          Philip Silverberg, Mound Cotton Wollan & Greengrass
          Richard McCluskey, McMillan LLP

# EXHIBIT 23

586

# Heenan Blaikie

**BY E-MAIL**

Of Counsel
The Right Honourable Pierre Elliott Trudeau, P.C., C.C., C.H., Q.C., FRSC (1984 - 2000)
The Right Honourable Jean Chrétien, P.C., C.C., O.M., Q.C.
The Honourable Donald J. Johnston, P.C., O.C., Q.C.
Pierre Marc Johnson, G.O.Q., FRSC
The Honourable Michel Bastarache, C.C.
The Honourable René Dussault, FRSC
The Honourable John W. Morden
Peter M. Blaikie, Q.C.
André Bureau, O.C.

July 11, 2011

Brett Harrison
McMillan LLP
Brookfield Place, 181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

William Wilson
Mound Cotton Wollan & Greengrass
One Batter Park Plaza
9th Floor
New York, NY 10004

Ahab Abdel-Aziz

T 416 643 6929
F 1 877 268 0117
aabdelaziz@heenan.ca

Bay Adelaide Centre
333 Bay Street, Suite 2900
P.O. Box 2900
Toronto, Ontario
Canada M5H 2T4

heenanblaikie.com

Our Reference:  048825-0043

**Re:**   **Application by Lantheus to enforce U.S. Letters Rogatory in Ontario in**
    **respect of Atomic Energy of Canada Ltd. ("AECL")**
    **Ontario Court File No. CV-11-427161**

Dear Mr. Harrison and Mr. Wilson:

In anticipation of the upcoming application to enforce Letters Rogatory in Ontario, are
your respective clients willing to release AECL from any claims either of them may make

Page 2

against AECL in relation to the shutdown of the NRU?

Yours very truly,

Heenan Blaikie LLP

Ahab Abdel-Aziz

c. Daniel MacDonald

HBdocs - 10745772v1

Heenan Blaikie

# EXHIBIT 24

**From:** Korde, Rukesh
**Sent:** Tuesday, July 19, 2011 9:36 AM
**To:** Jack, Don (Heenan Blaikie)
**Cc:** Brett Harrison

**CONFIDENTIAL SETTLEMENT COMMUNICATION
WITHOUT PREJUDICE**

Dear Don;

I write to follow-up on the discussions that we had with you yesterday regarding Lantheus' application to enforce its letter of request, *Lantheus Medical Imaging, Inc.* v. *Atomic Energy of Canada, Limited*.  Thank you for taking the time to talk with us.

On the condition that AECL agrees to consent to an order of the Superior Court of Justice enforcing the Letter of Request ("LoR"), Lantheus is prepared to agree to the following:

1.      Lantheus will agree (i) to withdraw the following requests set forth in Schedule A of the  LoR:  1, 2, 12, 15-19 and 23; (ii) to narrow requests nos. 3-8, 13 and 14 to seek only "The documents which AECL considered or generated" rather than "The documents which AECL considered or reviewed;" and (iii) to limit request no. 21 to those documents that are not publicly available on the CNSC or AECL websites, provided that AECL provides the specific link to where the requested documents it considers publicly available are located.

2.      Lantheus will agree that any specific documents that AECL believes are subject to export control regulations would be separately identified by AECL **and** produced to the McMillan law firm, which is registered with the Controlled Goods Directorate (Registration Number 16872; expiry date 2012/03/06) and has a Security Plan in place.  McMillan would handle and maintain such documents pursuant to its understanding of the requirements of the *Nuclear Non-proliferation Import* and the *Export Control Regulations*.  In the event McMillan concludes that any such documents may be used as evidence in the U.S. Action without violating Canadian law, it will so advise Lantheus.

3.      Lantheus will agree that AECL has standing under the Protective Order entered in *Lantheus Medical Imaging, Inc. v. Zurich American Ins. Co.* to enforce the provisions of that order with respect to any materials that AECL produces and designates as "Confidential Material" under that order; and would make a good faith effort to obtain a similar agreement from Zurich.  Any disagreement over whether materials have been properly designated as "Confidential" would be resolved by the U.S. District Court.

4.      Lantheus will reimburse AECL at the rate of $150/hour for actual time spent gathering responsive documents subject to the following conditions:  (a) AECL will provide unredacted copies of the documents previously produced to Lantheus and addressing the May 2009 shutdown within five (5) days; (b) AECL will advise us of the location(s) of responsive documents, the format or medium in which they are maintained (e.g., whether they are electronically available, whether they have been or can be scanned, whether they are available on disk), the approximate volume of such documents, and the estimated time it will take to produce them; and (c) AECL will advise Lantheus if and when costs reach a multiple of $10,000.

5.      As we have explained, Lantheus has no current intention to assert any negligence claims against AECL; that is why Lantheus is seeking coverage for its contingent business interruption losses resulting from the events

of May 2009 from its first-party property insurer.  However, Lantheus is not in a position to release hypothetical claims that Zurich might independently decide to pursue as subrogee in the event it pays Lantheus' claim under the relevant Policy.  Any such action by Lantheus may be viewed by Zurich as a breach of Lantheus' obligations under the Policy, and it is unreasonable to condition Lantheus' access to probative evidence on action that could jeopardize its contract claim against Zurich.  Lantheus has requested the documents set forth in Schedule A because they are directly relevant to the insurance coverage issues between Lantheus and Zurich, and the Protective Order in the U.S. Action (which is a contract action against Zurich, not a negligence action against AECL) provides (at ¶6) that "Confidential Material shall be used solely in connection with" the U.S. Action.

6.  AECL will also have to agree to produce documents on a rolling basis and to complete its production of responsive documents by no later than August 26, 2011.

Rukesh Korde
Covington & Burling LLP
1201 Pennsylvania Ave, NW
Washington, DC 20004
202-662-5619

# EXHIBIT 25

| | |
|---|---|
| **From:** | Brett Harrison <Brett.Harrison@mcmillan.ca> |
| **Sent:** | Tuesday, July 26, 2011 4:47 PM |
| **To:** | Yurka, Dale |
| **Cc:** | Roberts Jones, Bonnie (Heenan Blaikie); Jack, Don (Heenan Blaikie); Lovell, Karen; Kellerman, Joanne; Korde, Rukesh; Richard McCluskey |
| **Subject:** | RE: Lantheus Medical Imaging, Inc v. AECL - Application under s.60 of the Evidence Act |
| **Attachments:** | Supplementary Factum of Lantheus (application ret. July 27, 2011).doc; Brief of Authorities of Lantheus (Application ret. July 21, 2011).PDF; Factum of Lantheus_Covington (Application ret. July 21, 2011).PDF; Reply Factum of Lantheus (Application ret. July 21, 2011).PDF |

Thanks Dale. As discussed, I am providing you with Lantheus':

1. Factum
2. Brief of Authorities
3. Reply Factum
4. Reply Brief of Authorities (under cover of separate email)
5. Supplementary Factum
6. Supplementary Brief of Authorities (under cover of separate email)

In particular, we would bring your attention to the E-Beam case is our Brief of Authorities. I am currently seeking instructions, but given the timing pressure that we are under it is most likely that we will be opposing your request for an adjournment.



**Brett Harrison**
Partner - Commercial Litigation and Corporate Restructuring
d 416.865.7932
brett.harrison@mcmillan.ca

Assistant: Wilma Leo | 416.865.7852 | wilma.leo@mcmillan.ca

*CONFIDENTIALITY NOTICE: This email, including any attachments, may contain information that is confidential and privileged. Any unauthorized disclosure, copying or use of this email is prohibited. If you are not the intended recipient, please notify us by reply email or telephone call and permanently delete this email and any copies immediately.*

Please consider the environment before printing this e-mail.

**From:** Yurka, Dale [mailto:Dale.Yurka@justice.gc.ca]
**Sent:** Tuesday, July 26, 2011 4:06 PM
**To:** Brett Harrison; Jack, Don (Heenan Blaikie)
**Cc:** Roberts Jones, Bonnie (Heenan Blaikie); Lovell, Karen; Kellerman, Joanne
**Subject:** Lantheus Medical Imaging, Inc v. AECL - Application under s.60 of the Evidence Act

Dear Mr. Harrison

As I advised you in our telephone conversation, the Lantheus application was brought to Justice's attention by AECL because of the issues relating to state immunity.  I will be attending in court tomorrow to ask the

presiding judge for an adjournment to give the Attorney General an opportunity to decide if he wishes to seek leave to intervene in the application on the limited issue of state immunity.

Yours truly

Dale Yurka
General Counsel\Advocate principale
Department of Justice Canada\Ministère de la Justice Canada
Ontario Regional Office\Bureau régional de l'Ontario
Exchange Tower\la tour Exchange
130 King St. W, suite 3400, box 36\130, rue King ouest, pièce 3400, cp 36
Toronto, Ontario M5X 1K6
Tel: 416 954-8110
Cell: 647 248-0512
Fax: 416 973-5004
email: dale.yurka@justice.gc.ca

# EXHIBIT 26

(ONTARIO)

SUPERIOR COURT OF JUSTICE

Court File No. CV-11-00427161

BETWEEN:

LANTHEUS MEDICAL IMAGING, INC.

Applicant

- and -

ATOMIC ENERGY OF CANADA LIMITED

Respondent

Before THE HONOURABLE MADAM JUSTICE POLLAK,

at 393 University Avenue, Toronto, Ontario,

on Wednesday, the 27th day of July, 2011.

-----------------------

REASONS FOR JUDGMENT

-----------------------

A P P E A R A N C E S:

| | |
|---|---|
| BRETT HARRISON | For the Applicant |
| RICHARD MCCLUSKEY | |
| | |
| DON JACK | For the Respondent |
| BONNIE ROBERTS JONES | |
| KARA SMITH | |
| | |
| R. RICHLER | For Zurich American Insurance |
| | |
| DALE YURKA | For Department of Justice |

REASONS FOR JUDGMENT

WEDNESDAY, JULY 27TH, 2011

5     ---    Court resumes at 3.00 p.m.

           THE COURT:  The Applicant, Lantheus

Medical Imaging Inc. ("Lantheus"), requests an order

10 giving effect to Letters Rogatory issued by the

United States District Court for the Southern

District of New York City ("U.S. Court") compelling

the production of certain documents and the

15 attendance at an examination under oath of a

representative of the Respondent, Atomic Energy of

Canada Limited ("AECL"), for use in an insurance

20 coverage action pending before the U.S. Court under

the title of Lantheus Medical Imaging Inc. v. Zurich

American Insurance Company.

           Although the parties generally agree

25 on the requirements set out by the Supreme Court of

Canada in the Ontario Court of Appeal for the court

to grant the order requested, they do not agree on

30 the scope and interpretation of these requirements.

Reasons for Judgment                                        3
Pollak, J.

AECL submits that Section 60(1) of the
Ontario Evidence Act requires this court to
determine as a matter of substantive U.S. law
whether the U.S. Court had jurisdiction to issue
these Letters Rogatory which seek to obtain the
evidence from AECL.  AECL submits that this
application for the enforcement of the Letters
Rogatory had no foundation because the issuing court
in the U.S. was not a court of "competent
jurisdiction" for the purpose of issuing a Letter of
Request against AECL.  AECL is a Crown agent of the
Government of Canada.  AECL relies on its expert
evidence that pursuant to the U.S. Foreign Sovereign
Immunity Act (FSIA), the U.S. Court has no power to
compel evidence from AECL.  Specifically, its expert
evidence is that when a foreign state is involved, a
court is required to consider the applicability of
sovereign immunity and must raise and determine the
issue of the state's immunity on its own motion even
if the state entity does not appear.  This, it is
submitted, was not done by the U.S. Court as
Lantheus, the applicant in that case, did not bring
the sovereignty facts and issue to the U.S. Court's

attention.  AECL was not put on notice of the motion
before the U.S. Court or provided with copies of the
motion material.

5           Lantheus submits that the fact that
AECL was a Crown corporation and affiliated with the
Canadian Federal Government was obvious to the
court.  It alleges that the material submitted to
10  the U.S. Court made this fact apparent on their face
that AECL was a Crown corporation.  It relies on the
declaration of Danielle Astrada (sic) which was
submitted to the U.S. court on the motion (which was
15  made over the counter and in writing) to obtain the
Letters Rogatory and it attaches Lantheus's access
to information request.  The access to information
20  request is a Government of Canada form on which AECL
is clearly identified as a Federal Government
institution.  Further, it is submitted that in
addition the memorandum of law submitted to the U.S.
25  Court by Lantheus repeatedly refers to this request
and explains that the request is the same as or
analogus to a request under the U.S. Freedom of
30  Information Act which is used to obtain documents
and information from the U.S. Federal Government and

Reasons for Judgment                                    5
Pollak, J.

its agencies. It is, therefore, submitted on this

basis that the U.S. Court clearly understood AECL's

status as a Crown corporation.

I do not accept this submission.

There is nothing in the order which indicates that

the court was aware of or that it considered the

question of whether it had jurisdiction to make the

order that it did by reason of the provisions of the

FSIA.

Both of the legal experts in this case

agree that if none of the exceptions under the FSIA

applied, that the U.S. Court did not have

jurisdiction to issue a subpoena against AECL if it

had been in its jurisdiction.

Doctor Bederman did not agree,

however, that the U.S. Court did not have

jurisdiction to issue the order it made because the

compulsion to AECL to produce the documents would be

coming from the Canadian Court. He could not,

however, provide any U.S. cases where the U.S. Court

had issued Letters Rogatory against a foreign

sovereign or its agent.

Reasons for Judgment                                          6
Pollak, J.

Doctor Bederman did not address the

critical issue that Doctor Stewart (AECL's expert)

did, namely, Doctor Stewart was of the opinion that

if the U.S. Court had been made aware that AECL was

a Crown corporation, the court would not have

granted the order requested by Lantheus.   This

evidence is of critical importance.

What is also critical here is an

acknowledgement by both experts that these are

relevant issues for the U.S. Court to have

considered.   We do not know what the result would

have been, but we do know that the U.S. Court was

not given this information by Lantheus, the only

party to the proceeding making submissions.

Lantheus submits that the statutory

requirement that the requesting court be of

"competent jurisdiction" is satisfied if the U.S.

Court had jurisdiction to adjudicate the civil

dispute between the parties before it (Lantheus and

Zurich).   No one, it is alleged, in this case

disputes that these requirements had been made.

They submit that there is nothing in either the

statute or the principles of comity underlying the

Reasons for Judgment                                                7
Pollak, J.

enforcement of the Letter of Request to suggest that

this court receiving such a request must engage

itself in an analysis of foreign law and second

guess whether or not the requesting court properly

exercise its jurisdiction in issuing the specific

Letters of Request.  It is submitted that all that

is needed to interpret Section 60 of the Evidence

Act is for the court to examine whether the U.S.

Court was authorized as a matter of U.S. law to seek

the assistance of this Canadian Court and submits

that the role of this court should not be acting in

the role of a U.S. Appellate Court and subvert the

principles of international comity that already are

set out in the Letters of Request.

        The difficulty in this case is that

the U.S. Court was not given the proper information

to consider the issue of the applicability of the

FSIA.  In deference to that U.S. Court, I agree that

it would be highly improper for this court to embark

on that analysis when the U.S. Court was not given

that opportunity to do so itself.

        Lantheus urges this court to apply the

test set out in the jurisprudence relied on by both

parties and specifically to conclude that the

meaning of "competent jurisdiction" as set out in

the Evidence Act is only to establish that the U.S.

Court is a court with powers to issue Letters

Rogatory and to ignore the fact that the U.S. Court

made its decision without relevant evidence and

relevant submissions regarding the applicability of

the FSIA.  I do not agree that it is proper for this

court to do so in light of the fact that the expert

evidence does disclose that these are relevant facts

and issues which were not before the court.  It

would not serve the interest of justice for this

court to ignore these facts and proceed without

giving the U.S. Court the opportunity of considering

the issue.  This is an unusual case where there are

no cases where the issue of the applicability of

sovereign immunity with respect to Letters Rogatory

is addressed.  Further, it was within Lantheus's

control to either put AECL on notice of this motion

in writing to the court or, alternatively, to

specifically bring to the U.S. Court's attention

that AECL is a Crown agency.  The disputes which

Reasons for Judgment                                          9
Pollak, J.

arose under this application may in such case then

have become unnecessary.

As I have stated, I do not agree that

5  the fact that the words "Crown agency" were on some

of the documents in the written submissions to the

U.S. Court were enough to alert the court to the

issues of the possible applicability of the FSIA.

10  I agree, as I have mentioned earlier,

that it would be highly improper for this court to

embark on that analysis of the applicability of the

FSIA when the U.S. Court was not given that

15  opportunity.

On the basis of the expert evidence

before me that (1) both experts agree that a

20  consideration of whether the FSIA, if no exception

were to apply, would lead the U.S. Court to conclude

that it had no jurisdiction to issue a subpoena

against AECL if AECL had been in the jurisdiction;

25  and (2) the expert evidence from Doctor Stewart that

the provisions of the FSIA should have been

considered by the court even on its own motion, and

30  his opinion that if the U.S. Court would have been

aware of that issue, it would not have granted

Lantheus's request, it is obvious that the U.S.

Court did not have relevant information before it.

I am, therefore, of the opinion that

in deference to the U.S. Court that was not given

the opportunity to consider the issue, it is

improper for this court to grant this request before

the U.S. Court has been given the relevant

information.  I cannot, on the basis of the

materials filed, grant the order requested by

Lantheus as this court is not satisfied that

relevant questions of fact and law that should have

been put to the U.S. Court were.

The request to enforce the Letters

Rogatory raised many serious issues which must be

dealt with after this court is satisfied that the

U.S. Court had all of the relevant information

before it.  What makes this case so unique is that

the experts agree that the issue of the

applicability of the FSIA is a relevant issue which

could have had applicability to AECL and, mostly

importantly, that the U.S. Court was not given the

opportunity to consider it.

Reasons for Judgment                                              11
Pollak, J.

        In these circumstances, although I

dismiss Lantheus's application, I do so without

prejudice to its rights to make a further

5  application to this court which demonstrates that

the U.S. Court had the opportunity to consider the

issue of the applicability of the FSIA.  The

application is, therefore, dismissed.

10        THE COURT:  Now that obviously, Madam

Government, means that I do not have to rule on your

request to adjourn, so I am not going to give you

any ruling on that.

15         MS. YURKA:  Thank you.

        THE COURT:  With respect to the

costs, the parties have agreed that the successful

20  party in this application will be awarded the amount

of $40,000.  As AECL has been the successful party,

I award a cost of $40,000 to be paid by Lantheus.

        And then just to conclude to make it

25  clear, I have reserved and given Lantheus the right

to re-apply, but that does not mean ..... I am not

seized of this.  I have issued my decision and

30  that's my decision.  Thank you.  Counsel for .....

        MR. HARRISON:  I just .....

Reasons for Judgment                                    12
Pollak, J.

THE COURT:     ..... is in disbelief

over there, but anyway go ahead.

MR. HARRISON:   So just to clarify, so

we would now go back .....

THE COURT:   You do whatever you like.

MR. HARRISON:   Right, okay, but you

are not seized, so .....

THE COURT:   No.

MR. HARRISON:    ..... we would just

start the process again afresh?

THE COURT:   Yeah.  All I have said is

that I can't grant the application.  The application

is dismissed and you can file another application if

you like and I am not seized.

MR. HARRISON:   And I guess I just

have one submission that you stay seized so that we

don't have to spend another $70,000 coming back.

Just to conserve judicial resources if for no other

reason, we would ask Your Honour to consider staying

seized of this matter so that when we do get the

order which we expect to get in short order, we can

come back and not re-argue what you see before you

today.

THE COURT:   Okay, but you would be

stuck with my scheduling, you understand that?

MR. HARRISON:   We understand that,

5  but we believe that it would be ..... we've actually

in the interim found that we might be able to apply

for a clarification in short order in the next two

to three weeks from Her Honour, from Justice .....

10  (inaudible), and we would be able to be back up here

in two to three weeks.  If you are available, we

could re-submit all the paperwork again .....

THE COURT:   I could tell you that I

15  won't be just so you know.

MR. HARRISON:   Right, no, no, right,

but just to be .....

20  THE COURT:   I won't be in ..... I'll

be in her jurisdiction, not ours.

MR. HARRISON:   All right, fair

enough.  We can re-file everything and we can re-

25  submit all the expert evidence again .....

MR. JACK:   My friend and I should

just speak to the motion scheduling court about

30  this.  I am dubious about the two to three weeks.  I

don't have any objection to you hearing it, but I

0087 (12/94)

think we'll have to deal with it as it comes up,

Your Honour.

        THE COURT:   Okay, well, let's put it

this way.   I think that counsel for AECL is correct

in the sense that you don't know what ..... quite

know what the ramifications are of that, but there

is nothing stopping you from going to motion

scheduling court and saying, "Look, the motion is

going to be heard on this, you know, in the States.

This is what's going to happen."  And I am putting

it on the record that I am open obviously to hearing

it, okay, but I don't want to make a decision

because I don't know what's going to happen, but

there's nothing to prevent you from saying, "Look,

Justice Pollak issued this decision.  Here is the

Reasons and this is all going on the record and it

would be much more efficient, all the law has been

done, everything has been in there, but there was

this one point.", and then you can do that.  I just

can't do it now because I don't know what's going to

happen, but I think that's a perfectly valid

solution.

Reasons for Judgment                                     15
Pollak, J.

    MR. HARRISON: Okay, so we can come

back and .....

    MR. JACK: So we would just address

that at motion scheduling court I think.

5

    THE COURT: Yeah, and the motion

scheduling court might well say, "Well, you are

going to have to go in front of her and see if she

10 wants it.", which is fair enough, that's fine.

    MR. HARRISON: Right, it's just for

timing purposes rather than have to go through what

we've already been through .....

15

    THE COURT: I am sure that AECL

doesn't want to spend all that money either again

and ..... and now all you have to do is hope that

20 Madame in the back doesn't come and throw a monkey

wrench into your wheels.

    MR. HARRISON: So, okay, we were

where we were.  We've gone no further.

25

    THE COURT: That's right.  You've got

a decision of the court which I understand you

urgently require.  I mean, this is why I tried to do

this because I knew that that's what ..... so I

30 apologize it's not very elegant.

Reasons for Judgment                                        16
Pollak, J.

MR. HARRISON:    The other issues then

will not be dealt with today, and when we come back

again, the other issues will be dealt with?

THE COURT:    The other issues being

what?

MR. HARRISON:    Well, my friends

raised about half a dozen issues, right, saying

immunity and ..... all those other issues would be

dealt with on another day?

THE COURT:    Yes.  As I said, you can

re-submit the application.  I haven't given .....

there's been no judicial decision with respect to

all of those other arguments.  The only thing that's

been considered is what I've said in my decision.  I

basically said I am not going to enforce an order of

a court when on the basis of the expert evidence in

front of me, they are both saying that, "Yeah,

there's something relevant there that the court

would have liked to consider and didn't get a chance

to consider.", that's the only thing I've said.  And

I have said, "Too bad on everything else.  I am not

going to go through that until I give the U.S. Court

Reasons for Judgment                                    17
Pollak, J.

a chance to consider it.  Then everything is fair

game again."

             MR. HARRISON:   And when we said we

5  agreed to costs, obviously at the time I said that

we wanted to make submissions on costs, but you

didn't want to hear them.  Our submissions obviously

if there's split success, there shouldn't be any

10 costs, but that's ..... you didn't ask for us to

make .....

             THE COURT:   Well, no, because I

guess, I am sorry, I consider that it's not split.

15            MR. HARRISON:   Okay.

             THE COURT:   I consider that .....

             MR. HARRISON:   There's only one

20 determination, one issue of five.

             THE COURT:   Yeah.

             MR. JACK:   Thank you, Your Honour.

We appreciate the speed with which you dealt with

25 it.

             THE COURT:   I forgot to endorse the

record, sorry about that.  Just to clarify so you

30 understand on the costs, my decision is made as a

decision, not the application is dismissed.  I did

Reasons for Judgment                                    18
Pollak, J.

not remain seized.  You asked for me to remain

seized and I am happy to hear it and you can argue

that, so that is why I awarded $40,000 in costs even

5  though all of the issues hadn't been dealt with.  I

had to dismiss the application.  That's why.

            MR. HARRISON:   And obviously when we

come back and find ..... if we find out that the

10  U.S. Court would have granted ..... it's likely

we'll deal with the costs and ask that it be

reversed, so that's .....

            THE COURT:   For sure.

15          MR. HARRISON:   Yeah.

            THE COURT:   Everything is open to

you.  Nothing is cut off.

20          You can have a copy of this

endorsement.  Thank you.


25  ---   Court adjourns at 3.30 p.m.


30

Reasons for Judgment                                                    19
Pollak, J.

This is to certify that the above is a true and
accurate transcript of the proceedings to the best
of my skill and ability.

5

*[signature]*

10   _____

Grace Cheung
Official Court Reporter

15

20

25

30

0087 (12/94)

# EXHIBIT 27

RECEIVED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

2003 MAY 14  A 10: 42

E-BEAM SERVICES, INC.,
a New Jersey corporation,

                     :       **Civil Action No. 02-2256**

         Plaintiff,         :

      vs.                     :    **The Honorable Faith S. Hochberg**

AECL TECHNOLOGIES, INC.,    :
a Delaware corporation, et al.,

         Defendants.      :

---

## ORDER ALLOWING ISSUANCE OF LETTERS ROGATORY

Pursuant to Fed. R. Civ. P. 28(b), Plaintiff E-BEAM Services, Inc. has moved that four

separate Letters Rogatory to the Appropriate Judicial Authority in Canada issue in order to compel

the oral testimony of Norbert Drewell, William Hancox, A.D. Hink, and Yaphen Chang for use in

these proceedings.  This motion is supported by the Certification of John B. Pinney, and the Court

finds, based on the pleadings on file herein and said Certification, that said witnesses reside in

Canada, that their testimony is likely to be relevant to the fair and just resolution of the issues in

these proceedings, and that without issuance of such Letters their evidence cannot be obtained. *and the
Court having been advised that the defendants do not oppose this motion*

Now therefore, IT IS ORDERED that the Clerk forthwith issue the tendered Letters Rogatory

for said witnesses and deliver same to Plaintiff's counsel for transmittal and presentment to the

appropriate court in Canada.

Entered on this 13th day of May, 2003, at Newark, New Jersey.

MAY 14 2003

                            _Patty Shwartz_
                            Patty Schwartz
                            United States Magistrate Judge

*The parties are reminded that trial in this matter
shall commence on July 1, 2003 regardless of ~~...~~
of the status of the collection of this foreign evidence and hence the
parties shall move forthwith to facilitate the collection of same.*

# EXHIBIT 28

SILLS CUMMIS RADIN TISCHMAN
    EPSTEIN & GROSS, P.A.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
JG 9805
*Attorneys for Plaintiff E-BEAM Services, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **E-BEAM SERVICES, INC.,**<br>a New Jersey corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**AECL TECHNOLOGIES, INC.,**<br>a Delaware corporation; and<br>**ATOMIC ENERGY OF CANADA**<br>**LIMITED,** a Canadian corporation,<br><br>Defendants. | Civil Action No. 02-2256 (FSH)<br><br>The Honorable Faith S. Hochberg<br><br><br>**CERTIFICATION OF**<br>**JOHN B. PINNEY** |

John B. Pinney of full age hereby states and certifies as follows:

1.      I am a member of the Ohio and Kentucky Bars and a partner in the law firm of Graydon Head & Ritchey LLP, which has its principal offices located at Cincinnati, Ohio. I make this certification upon my personal knowledge and from my review of the evidence produced in this case.

2.      I am one of the lawyers for the Plaintiff E-BEAM Services, Inc. ("E-BEAM") in this litigation, having been admitted *pro hac vice* by the Court in this case. This certification is submitted in support of Plaintiff's motion for issuance of letters rogatory.

1

3.      The parties have worked cooperatively to arrange for the depositions of a large number of witnesses whose testimony appears to be relevant to the issues in this case. However, on Friday, May 9, 2003, counsel for AECL, informed the undersigned in a telephone conference that four Canadian witnesses that Plaintiff wished to depose would not voluntarily appear in New York, Newark or in Canada to give testimony.

4.      Prior to that time, I had understood that AECL or its counsel expected to be able to make reasonable arrangements with such witnesses for their appearance at a deposition.

5.      On behalf of Plaintiff, I have arranged with Toronto counsel to assist in obtaining the issuance of compulsory process by the Ontario Superior Court, which I am told is the appropriate judicial authority in Canada to secure the appearance of the witnesses for purposes of being examined.

6.      The witnesses for whom Plaintiff requests issuance of the Letters Rogatory are as follows:      William Hancox, [street address unknown], Oakville, ON L6H 6K5, Canada (Telephone No. 905-339-2815)

A.D. Hink, 1193 Woodview Dr., Oakville, ON L6H 6K5, Canada

Norbert Drewel, 115 Hansen Ave., Kanata, ON K2K 2M2, Canada

Yahphen Chang, BMO Nesbitt Burns, P.O. Box 150, One 1st Canadian Place, 4th Floor, Toronto, ON M5X 1A1, Canada

7.      The testimony and evidence of Mr. Hancox is required for the full and fair hearing of the issues in this litigation and in the interests of justice. Mr. Hancox is a former senior official of AECL and that during his tenure from approximately 1996 to 1998 he had responsibilities on behalf of AECL for the shut down of its accelerators business unit and implementation of the Lease on behalf of AECL and AECLT, had frequent oral and written communications with Plaintiff, and had

2

entered into negotiations with Plaintiff regarding a proposed early termination of the Lease and allegations of AECL's failure to perform its obligations as Lessor.

8.      The testimony and evidence of Mr. Hink also is required for the full and fair hearing of the issues in this litigation and in the interests of justice. Mr. Hink, like Mr. Hancox, is a former senior official of AECL and that during his tenure from approximately 1998 to 2001 he had responsibilities on behalf of AECL for the shut down and/or sale of its accelerators business unit and implementation of the Lease on behalf of AECL and AECLT, had frequent oral and written communications with Plaintiff, and had entered into negotiations with Plaintiff regarding a proposed early termination of the Lease and allegations of AECL's failure to perform its obligations as Lessor.

9.      The testimony and evidence of Mr. Drewell is also required for the full and fair hearing of the issues in this litigation and in the interests of justice. Mr. Drewell, like Mr. Hink and Hancox, is a former senior manager of AECL and that during his tenure from approximately 1990 to 1998 he had responsibilities on behalf of AECL for certain operations of its accelerators business unit and implementation of the Lease on behalf of AECL and AECLT, had frequent oral and written communications with Plaintiff, and had entered into discussions with Plaintiff regarding a proposed early termination of the Lease and allegations of AECL's failure to perform its obligations as Lessor.

10.      The testimony and evidence of Ms. Chang is also required for the full and fair hearing of the issues in this litigation and in the interests of justice. Ms. Chang Witness is an employee and manager with the investment banking firm of Nesbitt Burns in Toronto and that from approximately 1996 through 2001 she was the person acting for Nesbitt Burns with respect to an engagement by AECL to sell the business and assets of the accelerators business unit of AECL, and that she was

3

directly involved in the transactions between AECL and Iotron in 2000 and 2001 which are the

subject of Plaintiff's claims of breach of contract and breach of duty by AECL and AECLT as well

as the subject of its claims for tortious interference against Iotron.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on May 12, 2003

John B. Pinney

CN_LIB:334918.1

4

# EXHIBIT 29



RECEIVED    LODGED
COPY

APR 2 1 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY          S DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AL-Misehal Commercial Group, Ltd.,<br><br>Plaintiff,<br><br>v.<br><br>The Armored Group, LLC,<br><br>Defendant. | No. 2:10-cv-1303-PHX-JWS<br><br>**LETTER ROGATORY REQUESTING INTERNATIONAL JUDICIAL ASSISTANCE FOR THE TAKING OF EVIDENCE IN A CIVIL MATTER** |

The United States District Court for the District of Arizona presents its compliments to the **General Court of Riyadh in the Kingdom of Saudi Arabia**, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. A trial in this matter will be held in Phoenix, Arizona, United States of America.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the General Court of Riyadh compel the appearance of the following person for the purpose of giving testimony by deposition relating to the above-captioned matter:

1

HRH Crown Prince Sultan bin Abdulaziz Al-Saud
First Deputy Prime Minister, Minister of Defense and Aviation,
Kingdom of Saudi Arabia
Ministry of Defense and Aviation
Airport Road, Riyadh 11165
SAUDI ARABIA

**Relevant Facts**

The case pending before this Court concerns a dispute over a contract to provide armored luxury vehicles to the palace of the Crown Prince. Attorneys for Al-Misehal Commercial Group, Ltd. have informed this Court that an American with long-standing business ties to the Kingdom of Saudi Arabia will testify as to the ordinary business practices of the Crown Prince.

In addition, Adil Al-Misihal, the chairman of Al-Misehal Commercial Group, Ltd. claims to have spoken directly with the Crown Prince regarding the purchase of the armored vehicles in dispute. Under the laws of the United States and the State of Arizona, in order to prevail Al-Misehal Commercial Group, Ltd. will need to prove that it had an oral agreement with the Crown Prince and that Al-Misehal Commercial Group, Ltd. received terms from the Crown Prince that are much more favorable than are typical in business transactions between the United States Government and private contractors.

**Matters to be Addressed in Deposition**

Should the General Court of Riyadh kindly grant this request for judicial assistance, the deposition would address the following matters:

2

• Did Crown Prince Sultan form an oral contract with Al-Misehal Commercial Group, Ltd. for the purchase of luxury vehicles? If so, what were the terms of the agreement?

• Did Crown Prince Sultan agree to permit Al-Misehal Commercial Group, Ltd. to mark up the price of the vehicles for a profit margin of 30 percent?

• Did Crown Prince Sultan speak directly with Adil Al-Misihal, chairman of the Al-Misehal Commercial Group, Ltd., regarding the progress of the assembly of the armored vehicles? If so, what was the content of that conversation?

In addition, this Court respectfully requests that attorneys for The Armored Group, LLC be permitted to attend the deposition, to ask questions, and to make stenographic and videotaped recordings of the deposition.

This Court requests that attorneys for Al-Misehal Commercial Group, Ltd. be given notice of the issuance of an order enforcing this letter rogatory at the following addresses:

James S. McNeill
Gary K. Brucker, Jr.
McKenna Long & Aldridge LLP
4435 Eastgate Mall, Suite 400
San Diego, CA 92121
USA

Theresa S. Thayer
Thayer & Thayer, P.C.
2800 North Central Avenue, Suite 1100
Phoenix, AZ 85004-1043
USA

Thomas M. Quigley
Sherman & Howard L.L.C.
2800 North Central Avenue, Suite 1100
Phoenix, AZ 85004-1043
USA

3

**Reciprocity**

This Court, in making this request for international assistance from the General Court of Riyadh, is willing to provide similar assistance to the judicial authorities of the Kingdom of Saudi Arabia.

**Reimbursement of Costs**

This Court, in making this request for international assistance, has ordered The Armored Group, LLC, the requesting party, to reimburse General Court of Riyadh for any costs incurred in executing this letter rogatory.

DATED this 20th day of April 2011.

H. RUSSEL HOLLAND
UNITED STATES DISTRICT COURT JUDGE

SEAL OF THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

# EXHIBIT 30



2003 CarswellOnt 2371,

2003 CarswellOnt 2371

E-Beam Services Inc. v. AECL Technologies Inc.

Re: E-Beam Services, Inc. and AECL Technologies, Inc. Atomic Energy of Canada Limited and Iotron Industries
Canada Inc.

Ontario Superior Court of Justice

Siegel J.

Judgment: June 16, 2003
Docket: 03-CV-249081CMI

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Christine Jonathan*, for Applicant

*Glenn Smith*, for Proposed Witnesses

*Burton Tait, Q.C.*, for AECL Technologies Inc., Atomic Energy of Canada Limited

Subject: Evidence; International

Evidence --- Taking evidence before trial — Letters rogatory and commission evidence in civil matters — Letters
rogatory.

**Cases considered by *Siegel J.*:**

> *Friction Division Products Inc. v. E.I. DuPont de Nemours & Co.* (1986), 12 C.P.C. (2d) 221, 12 C.P.R. (3d) 2, 10
> C.I.P.R. 97, 56 O.R. (2d) 722, 32 D.L.R. (4th) 105, 1986 CarswellOnt 439 (Ont. H.C.) — followed

*Siegel J.*:

**Endorsement**

1   In this motion the applicant seeks an order giving effect to Letters Rogatory dated May 14, 2003 issued by the
United States District Court in the District of New Jersey ordering four individuals to appear in Toronto for an ex-
amination in relation to matters in issue in the New Jersey proceeding.

2   The relevant criteria are set out in the decision of *Friction Division Products Inc. v. E.I. DuPont de Nemours & Co.*
(1986), 56 O.R. (2d) 722 (Ont. H.C.), at 732. After hearing submissions the Court has made the following findings:

> 1. the evidence sought from each of the four individuals is relevant;

2003 CarswellOnt 2371,

 2. the evidence sought is necessary for trial and will be adduced at trial if relevant;

 3. the order sought is not contrary to public policy;

 4. the order sought would not be unduly burdensome provided the applicant delivers releases in favour of each individual as agreed to between counsel.

As there is no documentary production sought in respect of the witnesses, the fifth criteria in *Friction Division Products Inc.* is not applicable.

3   The remaining issue is whether the evidence is not otherwise obtainable. Despite suggestions made in argument before the Court, the evidence of the defendants, principally the declaration of Andrew Tomback, does not support a conclusion that the evidence sought can be obtained from other officers or former officers of the defendants.

4   However, Mr. Hancox and Dr. Hink advised through their counsel that they are now prepared to attend personally at the trial in New Jersey. Accordingly, with respect to these two individuals, the evidence sought from them is otherwise obtainable in the form of oral testimony in court. The motion with respect to these two individuals will therefore be dismissed subject to leave in favour of the applicant to seek an order *ex parte* forthwith if either fails to appear in court after receiving a proper summons to appear from the United States District Court and executed releases in their favour as contemplated above. If an *ex parte* order were required subsequently to compel an examination pursuant to the Letters Rogatory, costs could be awarded against such individuals.

5   As Ms. Chang and Dr. Drewell are not prepared to attend at the trial in New Jersey, the evidence sought from them is not otherwise obtainable. Accordingly, an order should issue enforcing the Letters Rogatory against each of them subject only to delivery to them of the executed releases in their favour contemplated above. Each is hereby ordered to appear as contemplated in the Letters Rogatory relating to them at a time to be agreed upon with the applicant during the week of June 16, 2003.

6   More detailed written reasons will be released shortly.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. Govt. Works