UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LANTHEUS MEDICAL IMAGING, INC., <br><br> Plaintiff, <br><br> v. <br><br> ZURICH AMERICAN INSURANCE COMPANY, <br><br> Defendant. | Case No. 10 Civ. 9371 (LTS) (MHD) <br><br> ECF CASE |

**DECLARATION OF BRETT HARRISON IN SUPPORT OF PLAINTIFF LANTHEUS MEDICAL IMAGING INC.'S MOTION FOR ISSUANCE OF <u>AMENDED LETTERS ROGATORY</u>**

Brett Harrison hereby declares as follows:

1. I am a member of the Law Society of Upper Canada and a partner with the law firm of McMillan LLP ("McMillan"), which serves as Canadian counsel for Lantheus Medical Imaging, Inc. ("Lantheus").

2. I served as Lantheus's lead Canadian attorney on its Application to Enforce the initial Letters Rogatory, being Court File No. CV-11-427161 ("Lantheus's Application"). The initial Letters Rogatory were issued by this Court seeking the assistance of the Ontario Superior Court of Justice ("the Ontario Court") in obtaining relevant evidence for use at trial in the above-captioned action ("the U.S. Action") from Atomic Energy of Canada Limited ("AECL"), a Canadian crown corporation.

3. Except as noted below, I am familiar with the matters set forth herein based upon my personal knowledge and make this declaration in support of Lantheus's Motion for Amended

DC: 4079939-3

Letters Rogatory seeking the assistance of the Canadian courts in obtaining evidence from AECL.

4.  I have reviewed the letters dated August 9, 2011 (the "August 9 Letter") and August 11, 2011 from counsel for AECL to this Court in which AECL seeks leave to appear specially or as an *amicus curiae*. Specifically, AECL seeks to make submissions with regard to whether this Court may properly issue letters rogatory and seek the assistance of the Ontario Court in obtaining evidence from AECL.

5.  In the August 9 Letter, AECL has alleged that the enforcement of letters rogatory by the Canadian courts against AECL would "likely implicate Canadian legislation regulating the export of nuclear information, which was enacted to implement Canada's international obligations regarding nuclear security and non-proliferation." For the reasons that follow, AECL's position is incorrect.

6.  AECL alleges that the documents sought constitute "controlled nuclear information" pursuant to the *Nuclear Non-proliferation Export and Import Control Regulations*, SOR/2000-210 (the "*Export and Import Control Regulations*") and are therefore prohibited from export without a licence issued by the Canadian Nuclear Safety Commission (the "CNSC"). Attached as Exhibit 1 is a true and correct copy of the *Export and Import Control Regulations*.

7.  A plain reading of the *Nuclear Safety and Control Act* (the "*NSCA*"), under which the *Export and Import Control Regulations* were promulgated, shows that they do not apply in this situation. Section 3 of the *NSCA* states that the purpose of the *NSCA* is to limit the disclosure of controlled information to "a reasonable level" and "in a manner that is consistent

with Canada's international obligations." Likewise, section 9 states that the purpose of the *NSCA* is to prevent "unreasonable risk to national security." Attached as Exhibit 2 is a true and correct copy of the *NSCA*.

8.   In addition, despite having requested that AECL provide details regarding any particular documents it alleges constitute "controlled nuclear information," it has failed to do so. On July 20, 2011, as part of the proceedings on Lantheus's Application before the Ontario Court, I deposed the AECL witness (Jean-Pierre Labrie) who had asserted, in an affidavit filed in support of AECL's legal position, that AECL's documents were subject to control under *Export and Import Control Regulations*. A true and correct copy of Mr. Labrie's deposition is attached as Exhibit 3. When cross-examined, Mr. Labrie conceded that he could not identify any specific documents that would engage Canada's nuclear non-proliferation export and import regime or that would raise national security issues:

> Q:   And it is fair to say that you don't know whether or not the documents being produced will engage the nuclear non-proliferation export and import regime?
>
> A:   At this time, no.
>
> Q:   It is fair to say that you don't know whether or not any of the documents that are going to be produced will raise issues of national security?
>
> A:   I do not know.

(Ex. 3 (Labrie Dep. at 13:24-14:8). AECL's assertion that the documents sought by Lantheus trigger Canada's export control regulations consists of speculation. Indeed, AECL has not, in any filings in connection with Lantheus's Application, identified any specific documents that are subject to the *Export and Import Control Regulations* or explained why such documents create an "unreasonable" risk to Canada's national security.

9.  The documents sought by Lantheus from AECL can be designated as "Confidential Material" under the Protective Order issued by this Court. As such, they "shall be used solely in connection with [this action] and may be disclosed solely in accordance with the terms" of that Protective Order. The Protective Order requires further that any such Confidential Material "be filed under seal" and that within 90 days after the conclusion of the U.S. litigation the materials must be destroyed or returned to the producing party. Designation of any documents produced by AECL as Confidential under the Protective Order would limit the disclosure of controlled information, if any is contained in documents responsive to the Amended Letters Rogatory, to "a reasonable level," complying with the *Export and Import Regulations*.

10.  AECL has already produced a handful of documents to Zurich American Insurance Company ("Zurich") for use in this case and did not object to producing these documents on the grounds of export control. While AECL did redact portions of these documents, almost all of the redactions were based on sections 18(b) and 18(d) of the *Access to Information Act*, R.S.C., 1985, c. A-1. Those provisions permit Canadian government entities to redact from documents produced in response to an *Access to Information Act* requests, information that would interfere with its economic and commercial interests. Only two of the numerous redactions in the AECL documents produced to Zurich were based on section 16(2) of the *Access to Information Act*. That section -- unlike sections 18(b) and 18(d) -- permits Canadian government entities to redact from such documents information that would implicate Canada's national security interests. Given the very limited number of redactions to the documents produced by AECL that are based on section 16(2), AECL's objections to

producing documents appear to be financially motivated and not based on issues of national security.

11.     Further, even if some of the documents sought by Lantheus were subject to the *NSCA* regime, the *Export and Import Control Regulations* only restrict the <u>importing and exporting</u> of "controlled nuclear information" without a license. It does not restrict AECL's ability to disclose this information within Canada. Specific documents, if any, that may raise legitimate export control issues could be produced to McMillan in its Toronto, Canada offices.

12.     If, upon receipt, we determine that the documents produced by AECL require a license prior to export by virtue of the *NSCA* regime, we may either seek a licence from CNSC to export the controlled documents or may alternatively apply for an exclusion pursuant to section 7 of the *Export and Import Control Regulations*. The obligation to comply with export laws falls on McMillan, as the exporter, and AECL would not be required to obtain any additional licences from CNSC.

13.     AECL's August 9 letter to this Court also contends that the information sought by Lantheus is publicly available. As explained below, while some information may be available, the specific documents sought are not.

14.     AECL's position that the information sought by Lantheus is publicly available is based upon the affidavit of its witness, Mr. Labrie. Under cross-examination, Mr. Labrie conceded, however, that the specific *documents* in question were not available:

> Q:     You are saying "information", but it might not be the documents themselves? As opposed to the information in the documents, presentations, AECL has documents with regard to

> the shutdown of the reactor that haven't been provided to CNSC, and aren't available publicly?
>
> A:     That is possible, yes.
>
> Q:     But we don't know one way or the other until we see what documents AECL produces?
>
> A:     If you are into document production, that is one issue. If you are looking for information, that is another issue. . . .
>
> Q:     So, just to be clear, CNSC may have information but might not have the body of documents that we are requesting in this proceeding?
>
> A:     Maybe, but CNSC has access to all AECL documents.
>
> Q:     And they are publicly available?
>
> A:     No.

(Ex. 3 at 49:9-50:9.)

15.    AECL made various additional arguments to the Ontario Court opposing the enforcement of the initial Letters Rogatory unrelated to their arguments regarding the Foreign Sovereign Immunities Act. Attached as Exhibit 4 is a true and correct copy of Lantheus's reply brief in the Canadian proceedings (called a "Factum" in Canada). As explained in Lantheus's Reply Factum, those additional arguments against the enforcement of the Letters Rogatory are incorrect.

16.    This Court should also be aware that despite AECL's contention that it enjoys "crown immunity" in Canada, AECL's witness, Mr. Labrie, in fact testified that AECL is involved in numerous legal proceedings:

> Q:     You were asked questions with respect to your understanding of the relevance of the request to the U.S. litigation, and you advised that you were not an expert in U.S. law. Have you been involved in any significant way in litigation?
>
> A:     Yes, I have.

Q: Have you been involved in the process of the collection of relevant documents for the purposes of litigation in the past?

A: Yes, I have.

Q: How many documents do you think that you have been responsible for producing to counsel using a test of your understanding of relevance over the course of the years?

A: Over 300,000.

\* \* \*

Q: You have indicated on the record in reply that you have been involved with litigation and you have collected...which wasn't previously on the record . . . and that you have collected up to 300,000 documents with regard to the relevance to that litigation. That was a new issue that was raised. Just to clarify, those documents were produced in proceedings that AECL was either the plaintiff or the defendant in litigation?

A: That is correct.

Q: To clarify, I'm sorry . . . you said plaintiff and defendant, so obviously in some of those cases AECL was the defendant?

A: That is correct.

(Ex. 3 at 61:25-62:14, 62:19-63:7.)

17. Attached as Exhibit 5 is a true and correct copy of the affidavit of David Bederman, Lantheus's expert on U.S. law in the proceedings before the Ontario Court to enforce the Letters Rogatory.

18. Attached as Exhibit 6 is a true and correct copy of Professor Bederman's deposition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 29, 2011

_____
Brett Harrison