UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LANTHEUS MEDICAL IMAGING, INC.,<br><br>               Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>               Defendant. | Case No. 10 Civ. 9371 (LTS) (MHD)<br><br>ECF CASE |

**DECLARATION OF ANNA ST. JOHN IN SUPPORT OF PLAINTIFF LANTHEUS MEDICAL IMAGING INC.'S MOTION FOR ISSUANCE OF <u>AMENDED LETTERS ROGATORY</u>**

Anna St. John hereby declares as follows:

       1.     I am an attorney admitted to practice in the District of Columbia, and am associated with the law firm of Covington & Burling LLP of Washington, D.C. My firm represents plaintiff Lantheus Medical Imaging, Inc. ("Lantheus") in the above-captioned matter.

       2.     Except as noted below, I am familiar with the matters set forth herein based upon my personal knowledge and make this declaration in support of Lantheus's Motion for Amended Letters Rogatory seeking the assistance of the Canadian courts in obtaining relevant evidence for use at trial from Atomic Energy of Canada Limited ("AECL), a Canadian crown corporation.

       3.     On May 27, 2010, I attended a meeting in Toronto with Richard Coté, Vice President, Isotopes Business for Atomic Energy of Canada Limited ("AECL"), to discuss the shutdown of the NRU Reactor owned and operated by AECL. Also present at that meeting were my colleague, William F. Greaney of Covington & Burling LLP, and Cyrille

Villeneuve, the General Manager of Lantheus's Canadian operations. Although Mr. Coté emphasized that his knowledge of the circumstances surrounding the shutdown of the NRU Reactor was based primarily on information provided by other AECL employees, he stated that he was willing to share the information he had because AECL was required to publicly disclose most of the same information to the Canadian Nuclear Safety Commission ("the CNSC").

    4. Mr. Coté told us that a carbon dioxide pumping system in the NRU Reactor, which was intended to displace air in the Annulus, was not working properly and that the drains in the Annulus were not fully functional. He stated that AECL did not consider these problems to be significant because regular water had been entering the Annulus space periodically for many years without causing the formation of nitric acid. Mr. Coté said AECL compensated for the functional problems with the carbon dioxide and drainage systems by adding unspecified chemicals to dry out the Annulus space. Mr. Coté thought that these chemicals reacted in some fashion with the water and air in the Annulus to form nitric acid. The nitric acid formed on the surface of the water near the bottom of the Annulus and attacked the NRU Reactor aluminum vessel wall at the water line.

    5. Mr. Coté did not know the rate at which nitric acid had formed in the Annulus or how quickly the damage had ensued to the vessel wall. He noted, however, that the hole in the vessel wall was not caused by ordinary corrosion or wear and tear, because (a) the chemical reactions that had occurred were unusual and unnatural from AECL's standpoint, (b) in the normal aging process, the vessel wall would not thin or degrade at all, (c) the NRU Reactor vessel is sound everywhere other than the areas that were subject to

nitric acid attack, and (d) the main internal components of a research reactor, including the vessel, are not subject to rust or corrosion in the normal course.

6. At the conclusion of our meeting, we asked Mr. Coté if we could speak with one or more AECL chemists, engineers and metallurgists who had investigated the causes of the shutdown, and who could explain in more detail the nature of the damage to the Reactor and how it had occurred. Mr. Coté responded that he was willing to set up a follow-up call or meeting, but wanted to check with AECL management first. During the course of our meeting, Mr. Coté did not express any concern that disclosure of information relating to how the loss had occurred at a commercial research reactor would implicate national security matters. To the contrary, his general view was that AECL was obliged to disclose such information to the CNSC, and that most of it would become publicly available in the normal course.

7. On multiple occasions after our May 27, 2010 meeting with Mr. Coté, my colleague, Mr. Greaney, and I called him to follow-up on his offer (described in paragraph 6 above) to have AECL technical personnel meet or speak with us concerning the results of their investigation. We were variously told that Mr. Coté was "busy," or "tied up in a meeting," or "on the other line," and that he "will call you back." Neither Mr. Coté, nor anyone else at AECL, returned our calls.

8. I also understand that on separate occasions in June, July and October 2010, Lantheus attempted to contact AECL to arrange a meeting between AECL technical personnel and Lantheus's counsel to obtain technical information about the NRU Reactor shutdown. Despite repeated efforts, and assurances from AECL that it would contact Lantheus' counsel and set up the meeting, Lantheus was unable to obtain the meeting.

3

9. On May 16, 2011, Lantheus submitted an Access to Information Request Form to the CNSC seeking information about the NRU Reactor shutdown relevant to the above-captioned matter. As of the date of this declaration, the CNSC has not produced any documents to Lantheus.

10. I have searched the CNSC website, and it appears that the documents we are seeking from AECL are not publicly available on the website.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2011

*Anna St. John*
Anna St. John