**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LANTHEUS MEDICAL IMAGING, INC.,

                         Plaintiff,

      v.

ZURICH AMERICAN INSURANCE
COMPANY,

                         Defendant.

Case No. 10 Civ. 9371 (LTS) (JLC)

ECF CASE

PLAINTIFF LANTHEUS MEDICAL IMAGING INC.'S REPLY IN FURTHER SUPPORT
OF MOTION FOR ISSUANCE OF AMENDED LETTERS ROGATORY

Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, N.Y. 10018-1405
Tel: 212.841.1097

William F. Greaney
Joanne B. Grossman
Rukesh A. Korde
Danielle M. Estrada
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Tel: 202.662.6000

ATTORNEYS FOR LANTHEUS
MEDICAL IMAGING, INC.

September 23, 2011

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.   THE FSIA DOES NOT LIMIT THE ISSUANCE OF LETTERS ROGATORY. ................. 2

   A.   The Law Clearly Permits This Court to Issue Letters Rogatory as to AECL. .................. 2

   B.   Even if the FSIA Had Any Relevance, AECL's Conduct Falls
        Within the Commercial Activity Exception. .................................................... 6

II.   AECL'S FACT-INTENSIVE ASSERTIONS SHOULD BE STRICKEN. .......................... 10

III.  COMITY ANALYSIS DOES NOT APPLY BECAUSE AECL IS NOT SUBJECT
      TO CONFLICTING LEGAL OBLIGATIONS. .................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Al-Misehal Commercial Group Ltd. v. Armored Group LLC*,
No. 2:10-cv-01303 JWS (D. Ariz.) ........................................................................3, 4

*Antares Aircraft L.P. v. Federal Republic of Nigeria*,
999 F.2d 33 (2d Cir. 1993)..........................................................................................9

*Cruise Connections Charter Mgmt., LP v. Attorney Gen. of Canada*,
600 F.3d 661 (D.C. Cir. 2010) ..............................................................................7, 10

*Danisch v. Guardian Life Ins. Co. of Am.*,
19 F.R.D. 235 (S.D.N.Y. 1956) ..................................................................................5

*E-BEAM Servs., Inc. v. AECL Technologies, Inc.*,
No. 02-2256 (D.N.J. May 14, 2003) ...................................................................4, 5, 12

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*,
No. Civ. A. 03-08554 (DCP) (JCF), 2009 WL 1055673 (S.D.N.Y. Apr. 17, 2009) .........14, 16

*Farid v. Bouey*,
554 F. Supp. 2d 301 (N.D.N.Y. 2008).......................................................................12

*First American Corp. v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir. 1998).........................................................................................14

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
602 F.3d 69 (2d Cir. 2010).......................................................................................8, 9

*Hartford Fire Ins. Co. v. California*,
509 U.S. 764 (1993)...................................................................................................15

*Mount Sinai Hosp. v. Borg-Warner Corp.*,
527 F. Supp. 922 (S.D.N.Y. 1981) ............................................................................12

*Netherby Ltd. v. Jones Apparel Group, Inc.*,
No. 04 Civ. 7028 (GEL), 2005 WL 1214345 (S.D.N.Y. May 18, 2005) ..................2

*Old Ladder Litigation Co., LLC v. Investcorp Bank B.S.C.*,
No. 08-civ-0876 (RMB) (THK), 2008 WL 224292
(S.D.N.Y. May 29, 2008)...........................................................................................14

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)...........................................................................................5, 8, 15

*Samco Global Arms, Inc. v. Arita*,
   395 F.3d 1212 (11th Cir. 2005) ............................................................9

*Seoul Semiconductor Co. v. Nichia Corp.*,
   590 F. Supp. 2d 832 (E.D. Tex. 2008)....................................................5

*Societe Nationale Industrielle Aerospatiale v. U.S. District Court
   for Southern District of Iowa*,
   482 U.S. 522 (1987)........................................................................ 13-15

*U.S. v. Lombardo*,
   639 F. Supp. 2d 1271 (D. Utah 2007)....................................................15

*UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*,
   720 F. Supp. 2d 800 (W.D. Tex. 2010)....................................................5

*United Kingdom v. United States*,
   238 F.3d 1312 (11th Cir. 2001) ...........................................................17

*Virtual Countries, Inc. v. Republic of South Africa*,
   300 F.3d 230 (2d Cir. 2002)..............................................................7, 9

*Zurich Ins. Co. v. Raymark Indus., Inc.*
   514 N.E.2d 150 (Ill. 1987) .................................................................13

STATUTES

28 U.S.C. § 1605 ..................................................................................6

OTHER AUTHORITIES

Fed. R. Civ. P. 28(b)(1)(B) .....................................................................2

Fed. R. Civ. P. 12 ................................................................................12

Restatement (Third) of Foreign Relations Law of the United States ...................13, 14

## INTRODUCTION

AECL fails to address the central question presented by Lantheus' Motion: whether the Foreign Sovereign Immunities Act ("FSIA") prohibits this Court from issuing Letters Rogatory requesting the assistance of a foreign court in obtaining discovery from an agent of a foreign sovereign, under circumstances in which (a) the foreign court indisputably has jurisdiction over the agent subject to the discovery request, and (b) the foreign court will apply its own discovery procedures in enforcing the Letters.  Although AECL's *amicus* brief meanders through 20 pages of discourse, much of it consisting of diversionary arguments about Canadian law and factual assertions that have not been tested by discovery, it cites <u>no</u> authority for the position that the FSIA prohibits issuance of Letters Rogatory in this situation, and its failure to do so should be dispositive.  Judge Swain has already found that Lantheus seeks evidence relevant to the resolution of this insurance coverage dispute.  The Letters Rogatory process is the appropriate way to obtain evidence from a foreign third party, and the Amended Letters should issue.

AECL's blizzard of fact-intensive arguments distracts from the central issue that is before the Court, and ignores this Court's Order granting AECL *amicus* status.  That Order limited AECL's opposition to "legal arguments … regarding whether AECL … is immune from issuance of letters rogatory under the [FSIA] or whether Canadian law is implicated by some of the information requested."  (Order of Sept. 7, 2011, at 2-3.)  The Court did not give AECL permission to lard the record with affidavits and exhibits addressing its alleged operating mission, commercial activities, relationships with third parties and regulators, document collection practices and a host of other sideshows.  Such arguments and assertions should be disregarded and stricken or AECL's *amicus* status should be revoked.

1

Lantheus seeks the *same discovery* from AECL that AECL would be required to provide to any litigant in a Canadian civil action, and any discovery from AECL will take place under the supervision of the Canadian courts and under Canadian law.

## I.   THE FSIA DOES NOT LIMIT THE ISSUANCE OF LETTERS ROGATORY.

### A.   *The Law Clearly Permits This Court to Issue Letters Rogatory as to AECL.*

The law is straightforward.  "A deposition may be taken in a foreign country … under a letter of request, whether or not captioned a 'letter rogatory.'"  Fed. R. Civ. P. 28(b)(1)(B).  Such a letter "may be issued … on appropriate terms after an application and notice of it; and … *without* a showing that taking the deposition in another manner is impracticable or inconvenient."  *Id.* at 28(b)(2) (emphasis added).  "Courts routinely issue such letters where the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence."  *Netherby Ltd. v. Jones Apparel Group, Inc.*, No. 04 Civ. 7028 (GEL), 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005).  This Court, in issuing the initial Letters Rogatory, found that the evidence sought "may be material or lead to the discovery of material evidence."  While that is all that is necessary for the issuance of Letters Rogatory, the information sought here is, in fact, critical to any fair disposition of this case.  (Korde Decl. ¶¶11-16.)

In the face of this unambiguous authority, AECL asks the Court to read into the FSIA limitations not found in its plain language and unsupported by a single case.  The FSIA does not impact the Letters Rogatory process for two simple reasons.  First, Letters Rogatory are requests for assistance from a court lacking jurisdiction to the recipient court that has jurisdiction; such letters are based on the principles of reciprocity and comity, and are routinely honored.  (Mem. at 8-9 (citing cases).)  Second, the FSIA operates to regulate the coercive

jurisdiction of United States courts; it says nothing about limiting the ability of a U.S. court that lacks jurisdiction over a foreign entity to request assistance from a court that does have jurisdiction over that entity.  (*Id.* at 9-10 (citing cases and legislative history).)  Because Letters Rogatory do not involve the exercise of jurisdiction, the FSIA has no bearing on whether Letters Rogatory should issue.  Indeed, AECL has not cited a single case that even suggests that Letters Rogatory implicate the coercive powers of a court, nor a single case suggesting that the relevant provisions of the FSIA do anything besides limit the jurisdiction of a court.

AECL repeatedly argues that if it had a physical presence in the United States, the FSIA would shield it from the discovery that Lantheus seeks.  While that may or may not be true (depending upon whether AECL is subject to the "commercial activity" exception to the FSIA), AECL's underlying premise is illogical.  As an agent or instrumentality of Canada, AECL obviously <u>does</u> have a presence in the United States, in the form of the Canadian Embassy and consulate offices located throughout the country.  AECL even has a wholly owned subsidiary, AECL Technologies, Inc., located in Maryland.  If a foreign state's presence in the United States was a basis for refusing to issue Letters Rogatory requesting assistance from a court in another country, no litigant in the United States could ever obtain discovery from an agency or instrumentality of any foreign state with which this country has any relations at all.  This plainly is not the law.

The cases that have addressed the issuance of Letters Rogatory to a foreign sovereign or its instrumentality support Lantheus' position.  *Al-Misehal Commercial Group Ltd. v. Armored Group LLC*, No. 2:10-cv-01303 (JWS) (D. Ariz.) (attached as Korde Decl., Ex. 29), provides a clear precedent for Letters Rogatory seeking evidence from a foreign sovereign.  There, the court issued Letters Rogatory to obtain testimony of the Crown Prince of Saudi

Arabia, a member of the governing House of Saud, in his governmental capacity (as First Deputy Prime Minister and Minister of Defense and Aviation for the Kingdom of Saudi Arabia), as he was a third party witness in a contract dispute between the plaintiff and the defendant.  The same fact pattern is presented here:  AECL is a critical third party witness to a contract dispute between Lantheus and Zurich.  AECL seeks to minimize the impact of *Al-Misehal*, suggesting the commercial activity exception to the FSIA "likely applied."  (Opp. at 7 n. 5.)  But this is another *ipse dixit*.  If the exception applied – if the Court had jurisdiction over the Saudi Crown Prince – he could have been subpoenaed directly, and there would have been no need for the Letters Rogatory.

   AECL attempts to distinguish *E-BEAM Servs., Inc. v. AECL Technologies, Inc.,* No. 02-2256 (D.N.J. May 14, 2003) (Korde Decl. Ex. 27), based on another series of unsubstantiated factual contentions.  To reiterate, all such contentions should be disregarded and stricken from the record pursuant to the Court's September 7, 2011 Order at 3.  Although AECL clearly has the *E-BEAM* case files and materials, it has withheld them from Lantheus, and it should not be allowed to cherry pick documents that it believes support its position while shielding the remainder of the file.  In any case, relying on a May 13, 2003 letter, AECL argues it consented to the issuance of the Letters Rogatory in *E-BEAM*.  (Opp. at 6; Krainin Decl., Ex. C.)  In fact, AECL *resisted* the issuance of those Letters Rogatory in that case.  Well after the letter cited by AECL, the court denied AECL's application for reconsideration of "the Court's Order permitting [E-BEAM] to invoke the letters rogatory process to conduct … depositions in Canada."  (Supplemental Declaration of Rukesh A. Korde ("Korde Supp. Decl."), Ex. 1 at 1.)  Nor does AECL's contention that the deponents in *E-BEAM* were former employees distinguish that case from this one, as the testimony sought in *E-BEAM* was of individuals who were senior

AECL officials at the time of the transaction in question.  (Mem. at 12.)  Finally, AECL contends that it waived its FSIA defense in the *E-BEAM* case by filing a counterclaim (Opp. at 6), but "no U.S. court has ever found that the mere assertion of counterclaims is an implicit waiver of sovereign immunity."  *UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 720 F. Supp. 2d 800, 803 (W.D. Tex. 2010).[1]  AECL is simply dissembling here.

AECL likewise fails to distinguish *Danisch v. Guardian Life Insurance Co. of America*, 19 F.R.D. 235 (S.D.N.Y. 1956), which granted a request for Letters Rogatory to depose agents of Poland's National Bank.  AECL contends that *Danisch* is not pertinent because the examinations in that case were to take place under the relevant foreign law, but that does not suffice to distinguish *Danisch.*  The deposition of AECL would necessarily take place pursuant to an order of the Canadian courts in an exercise of their jurisdiction, not of this Court's jurisdiction.  The fact that *Danisch* predates the FSIA is also irrelevant, as courts at that time employed the same common-law theory of foreign sovereign immunity later codified in the FSIA.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612-13 (1992).

AECL has cited a solitary case in which a court exercised its discretion to deny issuance of Letters Rogatory directed at an employee of a foreign sovereign: *Seoul Semiconductor Co. v. Nichia Corp.*, 590 F. Supp. 2d 832 (E.D. Tex. 2008).  That case does not support AECL's position that the FSIA bars issuance of the Amended Letters Rogatory, however, because it never even mentions the FSIA.

---

[1] AECL's concession that the commercial activity exception applied in the *E-BEAM* case reinforces Lantheus' point that, if the FSIA is at all relevant, AECL would likely not be immune to direct discovery by subpoena.  *See* below at 6.

**B.**     ***Even if the FSIA Had Any Relevance, AECL's Conduct Falls Within the Commercial Activity Exception.***

For the reasons stated above, Lantheus does not believe that the FSIA has any bearing on the pending requests for Amended Letters Rogatory.  Further, Lantheus has sought Letters Rogatory as to AECL on the assumption (which has not been tested through discovery) that AECL is not otherwise subject to the subpoena jurisdiction of this Court.  To the extent that this Court permits AECL to make fact-based arguments about the applicability of the FSIA, however (as it has done in its *amicus* brief), the Court should bear in mind that: (a) the FSIA is not an absolute bar to the exercise of jurisdiction over instrumentalities of foreign sovereigns (28 U.S.C. § 1605 (exceptions to FSIA immunity)), and (b) the limited available facts do not establish that AECL enjoys FSIA immunity from direct discovery enforceable through this Court.  Rather, its activities in supplying a critical raw ingredient used in medical imaging procedures throughout the United States appear to fall within the "commercial activity exception" to FSIA immunity.  *See* 28 U.S.C. § 1605(a)(2).  If this issue is determined to be relevant, then AECL should be required to provide jurisdictional discovery before the issue is resolved.

The FSIA permits U.S. courts to exercise jurisdiction over foreign sovereign instrumentalities based "[1] upon an act outside the territory of the United States [2] in connection with a commercial activity of the foreign state elsewhere," if "that act [3] causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  AECL offers no argument that factors (1) and (2) do not apply.  AECL contends only that its operation of the NRU Reactor did not have a "direct effect" within the United States.  (Opp. at 7-10.)

The "direct effect" test imposes a limited burden on a party seeking to invoke the commercial activity exception.  "Nothing in the FSIA requires that the 'direct effect in the

United States' harm the plaintiff." *Cruise Connections Charter Mgmt., LP v. Attorney Gen. of Canada*, 600 F.3d 661, 666 (D.C. Cir. 2010). Rather, the "exception requires only that the foreign government's act outside of the territory of the United States cause a direct effect in the United States." *Id.*(quotations omitted). As the *Cruise Connections* court explained, it is "sufficient" to satisfy the direct effects test where the act complained of "led inexorably" to effects within the United States. *Id.* at 665. *Accord Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 236 (2d Cir. 2002) (direct effect test only "ensures that jurisdiction may not be predicated on *purely trivial* effects in the United States." (emphasis added)).

As AECL itself has stated in testimony before the Canadian Parliament, the "NRU is a huge producer of medical isotopes." (Korde Supp. Decl., Ex. 2 at 2067.) It supplies "a large proportion of what is required in the United States" for medical imaging procedures. (*Id.*) In 2007, the Canadian Parliament passed a law mandating the resumption of isotope production at the NRU Reactor after the Canadian Nuclear Safety Commission ("CNSC") had ordered it shut down in a regulatory dispute with AECL. The Canadian government took this action, notwithstanding any risks associated with AECL's non-compliance with CNSC directives, because "[w]e have determined … that the greater risk is in the fact that some 30,000 Canadians per week, some 400,000 Americans per week, who use medical nuclear scans no longer will have access to those scans." (Korde Supp. Decl., Ex. 2 at 2063.) According to the Society for Nuclear Medicine, 60 percent of radiopharmacies in the United States were negatively impacted by the 2009-2010 supply shortage generated by the May 2009 accident at the NRU Reactor. (Korde Supp. Decl., Ex. 3.) Critical diagnostic tests were delayed, in some cases for longer than a month. (*Id.*) Given the severity of the diseases targeted by nuclear imaging scans, "waiting even a day can severely impact care." (*Id.*) The shut-down forced

nuclear medicine specialists in the United States to "decreas[e] the dosage" used in the tests "which can lead to longer exposure and less effective imaging scans." (*Id.*) It also deprived Lantheus -- the largest seller of radiopharmaceuticals derived from molybdenum-99 manufactured by AECL -- of millions of dollars in revenue when it was unable to meet its commitments to medical providers in the United States. In such circumstances there is good reason to conclude that the shut-down may well have had a non-trivial, direct effect in the United States sufficient to trigger the commercial activity exception to the FSIA.

Indeed, AECL's Opposition is devoid of any explanation as to what non-commercial, regulatory or governmental function AECL performs in manufacturing isotopes for commercial use that would entitle it to governmental immunity. *Weltover*, 504 U.S. 607, 614 (1992) (government entities entitled to FSIA protection when they act "as regulator of a market" not when they act "in the manner of a private player within it"). Indeed, given that AECL has produced hundreds of thousands of pages of documents in civil litigation as both a plaintiff and as a defendant, the notion that it is anything but a commercial actor lacks credibility. (Harrison Decl., Ex. C at 62:19-63:7.)

AECL argues that because it sells molybdenum-99 to Lantheus through an intermediary, Nordion (formerly a division of AECL that was privatized in 1991), its actions had no direct effect in the United States. (Opp. at 7-8.)[2] The Second Circuit, however, has held that the "requisite immediacy" of the direct effects test is lacking only where "the alleged effect depend[s] crucially on variables independent of the conduct of the foreign state." *Guirlando v.*

---

[2] The notion that an entity engaged in the commercial production of isotopes used in thousands of medical procedures every day within the United States can sidestep the commercial activity exception by privatizing a division and setting it up as an intermediate processor is a clear elevation of form over substance.

*T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1475 (2011).

AECL has failed to explain how any of the widespread effects of the NRU shutdown in the

United States depended in any way on Nordion's conduct independent of AECL; that is, it has

not identified *any* acts or omissions of Nordion that resulted in *any way* in the adverse effects of

the shutdown described above that were felt in the United States.[3]  Moreover, AECL would have

to introduce a factual foundation for such assertions which, again, should be subject to

jurisdictional discovery before they can be entertained by the Court.

      The cases relied upon by AECL (Opp. at 7-10) involved effects in the United

States far more attenuated than those at issue here.  The "direct effect" in those cases was based

solely on the fact that the plaintiff was American.  *Guirlando*, 602 F.3d at 79-80 (while in

Turkey American plaintiff defrauded by employees of a Turkish government bank; no other

connection to the United States); *Antares Aircraft L.P. v. Federal Republic of Nigeria*, 999 F.2d

33, 36 (2d Cir. 1993) (American partnership complained of damage to and conversion of aircraft

while in Nigeria; aircraft registered in Nigeria and not used in substantial commerce with the

United States); *Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1218 (11th Cir. 2005) (Florida

company brought suit regarding contract between Panamanian company and Honduras, which

was negotiated and executed in Honduras, involved goods manufactured outside the United

States, required performance by Honduras only within its territory, and made no reference to the

United States).

---

[3] This case cannot be compared to *Virtual Countries*.  There, the plaintiff argued that he was
damaged by a press release of the South African government.  300 F.3d at 237.  But the impact
of the press release was generated principally by intervening actions of (1) reporters who wrote
about the release, and (2) the plaintiff's investors who then formed independent opinions about
the plaintiff's business based on those articles.  *Id.*  Unlike *Virtual Countries*, AECL has not
identified actions taken by Nordion that exacerbated the effects of the shut-down of the NRU
Reactor.

Finally, AECL's attempt to explain away *Cruise Connections, supra,* also fails. In that case, a Canadian government agency, the RCMP, allegedly reneged on a contract with a U.S. company to pay for housing security personnel on ships during the Vancouver Olympics. The plaintiff alleged that as a result of the RCMP's actions in Canada, it lost substantial revenues on separate contracts it had negotiated with a travel agency and shipping lines in the United States. 600 F.3d at 662-63. In holding that the "direct effect" test had been satisfied, the D.C. Circuit focused on the fact that the RCMP's actions in Canada "led inexorably to the loss of revenues under the [plaintiff's] third-party agreements" in the U.S. -- just as AECL's operational practices that caused the Reactor shutdown in Canada led "inexorably" to Lantheus' lost revenues and the reduced availability of critical diagnostic procedures when it was unable to meet its supply commitments to medical providers throughout the United States. *Id.* at 665. The court neither stated nor implied that privity of contract between a U.S. resident and a foreign agency was a *sine qua non* for applying the "direct effect" test.

Given Lantheus' *prima facie* showing of commercial activity by AECL, the Court should either reject outright AECL's contention that it enjoys FSIA immunity or require AECL to provide jurisdictional discovery.

## II.   AECL'S FACT-INTENSIVE ASSERTIONS SHOULD BE STRICKEN.

This Court expressly reserved the right to "disregard any factual material that has not been subject to discovery … should it be offered in opposition to" Lantheus' Motion for Amended Letters Rogatory. (Order of Sept. 7, 2011, at 3.) Because AECL has disregarded the Court's admonition and laced its brief with unsubstantiated factual assertions, Lantheus requests that the portions of AECL's papers incorporating those factual pronouncements be disregarded and stricken from the record. Alternatively, AECL's *amicus* status should be revoked, and

AECL should be required to intervene and subject its untested factual assertions to discovery. (*Id.* at 2-3.)

For example, the extensive factual statements in AECL's Opposition concerning the effect of the shutdown of the NRU Reactor in the United States are plainly improper and should be stricken from the record.[4]  AECL has not provided any discovery as to the impact of the shut-down of the NRU Reactor in the United States.  Given the limited available evidence, AECL should not be permitted to disingenuously assert, as a matter of fact, that "AECL's act outside the United States did not cause any effect in the United States that could qualify as 'direct' under the FSIA."  (Opp. at 10.)

AECL likewise has not provided any discovery as to its supposed efforts to comply with Lantheus' ATI Request.  It should not be permitted to assert as matters of fact that "AECL … is producing a substantial amount of responsive information" (Opp. at 11), that "much of the information Lantheus seeks is available through its pending ATI Act Request … as well as publicly available documents" (Opp. at 15-16) or that "Lantheus' request 'may well extend to … large number[s]'" of documents that would be "time consuming and onerous for AECL to identify, review and ultimately produce."  (Opp. at 16).  Nor should the Court permit the extended, narrative affidavit of an AECL employee, Jean-Pierre Labrie, to remain in the record.  AECL contends that a short deposition of Mr. Labrie conducted under Canadian rules provided Lantheus with sufficient discovery about the ATI Request and the Labrie affidavit. (Opp. at 13 n. 8.)  But Mr. Labrie admitted that he lacked any personal knowledge of the status and processing of Lantheus' ATI Request and had made no inquiries in that regard despite the

---

[4]  Opp. at 7-8 (referring to "undisputed facts" relating to effects in the U.S.); *id.* at 8 (referring to alleged "intervening acts" of Nordion); *id.* at 10 (referring to the "existing and undisputed record").

plain requirement in his deposition notice that he do so.  (*See* Harrison Decl., Ex. 3, at 11:22-14:21.) Moreover, AECL's counsel repeatedly instructed him not to answer key questions.  (*Id.* at 11:22-14:21, 8:5-6, 8:13-14, 38:23-24; 39:9; 143:5-12, 44:23, 45:2, 45:9.)

AECL has not provided Lantheus with any opportunity to take discovery, under U.S. standards of relevance, as to the contents of documents that allegedly engage Canada's economic and national security interests (Opp. at 1), or why Canadian export regulations supposedly would forbid the disclosure of documents pertaining to the cause of holes in an aluminum vessel.  Absent such discovery, this Court should strike AECL's factual hyperbole that the disclosure would "permit AECL's foreign competitors to appropriate the fruits of Canada's … research and development" (Opp. at 13-14), would "create a risk to [the] public interest and national security" (Opp. at 14) and would "lead to a loss of competitiveness" (*id.*).[5]  Likewise, AECL has not produced its files for the *E-BEAM* case, and it should not be permitted to make factual statements about the history of that case (Opp. at 6).

Federal Rule of Civil Procedure 12 permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  *See Mount Sinai Hosp. v. Borg-Warner Corp.*, 527 F. Supp. 922, 926 (S.D.N.Y. 1981) (Fed. R. Civ. P. 12(f) "encompasses briefs, affidavits or any document submitted to [the court]").  In addition, this Court has the inherent authority to strike inappropriate material from pleadings.  *See Farid v. Bouey*, 554 F. Supp. 2d 301, 313 (N.D.N.Y. 2008) (considering motion to strike because the "request[ed] relief … squarely lies within the inherent authority of the court").  AECL's extensive factual statements exceed the permission it was given to file an *amicus* brief in this

---

[5] AECL's statements that the disclosure would impair its "competitiveness" and benefit its "competitors" further reinforces its status as a wholly commercial entity.

12

case.[6]  They should be disregarded and stricken from the record, or AECL's status as an *amicus* withdrawn.

## III.    COMITY ANALYSIS DOES NOT APPLY BECAUSE AECL IS NOT SUBJECT TO CONFLICTING LEGAL OBLIGATIONS.

AECL argues that *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for Southern District of Iowa*, 482 U.S. 522 (1987) and § 442 of the Restatement (Third) of Foreign Relations Law of the United States ("the Restatement") require this Court to engage in an extended, multi-factored comity analysis before it can issue Amended Letters Rogatory. (Opp. at 10-11.)  That argument rests on a fundamental misapprehension of *Aerospatiale*.

The issue in *Aerospatiale* was whether "a federal district court must employ the procedure set forth in the [Hague Convention] when litigants seek" discovery from a foreign adversary "*over whom the court has personal jurisdiction.*"  482 U.S. at 524 (emphasis added). The case involved the not uncommon situation in which the materials sought from the foreign party-litigant were discoverable under the Federal Rules of Civil Procedure but were not discoverable under the foreign law of the party's home jurisdiction (France).  The Court concluded that courts should resolve such conflicting discovery obligations on a case-by-case basis using considerations of comity.  *Id.* at 542.  The cases following *Aerospatiale* have likewise dealt with situations where discovery was sought from a foreign party to U.S. litigation facing

---

[6] Exhibit 7 to the Korde Supplemental Declaration indicates the portions of AECL's Opposition that contain factual assertions that Lantheus requests be disregarded or stricken.  Exhibits 8 and 9 thereto are similarly highlighted versions of the Krainin and Whitehall Declarations indicating the portions of those documents that Lantheus requests be disregarded or stricken.  In addition, Lantheus requests that Exhibits A through D of the Krainin Declaration be stricken in their entirety.  *See, e.g., Zurich Ins. Co. v. Raymark Indus., Inc.* 514 N.E.2d 150, 167 (Ill. 1987) (striking materials appended to and referenced in *amicus* briefs that were not properly offered and received in evidence).

conflicting legal obligations in its own country, and only after a demonstration of an actual

conflict of laws.  *E.g., Old Ladder Litig. Co. v. Investcorp Bank B.S.C.*, No. 08-civ-0876 (RMB)

(THK), 2008 WL 2224292, at *3-6 (S.D.N.Y. May 29, 2008) (determining whether conflict of

law exists before considering whether comity towards foreign laws trumps domestic discovery

obligations); *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, No. Civ. A. 03-

08554 (DCP) (JCF), 2009 WL 1055673 (S.D.N.Y. Apr. 17, 2009) (refusing to permit party to

escape its domestic discovery obligations because, among other things, there was no conflict

with law of the party's home jurisdiction).  Even *Milliken & Co. v. Bank of China*, upon which

AECL relies heavily, involved a party-litigant that purported to be whipsawed between

conflicting legal obligations.  758 F. Supp. 2d 238, 249-250 (S.D.N.Y. 2010).[7]

      Likewise, the comity analysis set forth in § 442 of the Restatement only applies

when discovery is sought from "a person subject to" the jurisdiction of a United States court.

*See* Restatement (Third) of Foreign Relations Law § 442(1)(a) (1987).  *See also id.* §

442(1)(c)(comity analysis invoked "[i]n deciding whether to issue an *order* directing production

of information located abroad…" (emphasis added)).

      Thus, the factors set forth in *Aerospatiale* and § 442 of the Restatement apply

only when a court must resolve a conflict between a foreign party's obligations under American

law and its obligations under the law of its home country.  No such conflict exists here.  The

Canadian courts ultimately will decide if and how to enforce any Amended Letters Rogatory

---

[7] Courts have extended *Aerospatiale* to cases in which a non-party was potentially subject to
conflicting legal obligations under United States law and the law of its home country.  *E.g.*, *First
American Corp. v. Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998).  But the Amended Letters
Rogatory would not subject AECL to any such conflicting legal obligations, as the Canadian
court would be the ultimate arbiter of the scope of discovery, based on its own view of comity
and reciprocity.

based on the intersection between Canadian discovery rules and considerations of comity toward U.S. courts.  In this case, there is neither a conflict of laws nor the potential for AECL to be subject to inconsistent obligations.  The comity analysis of *Aerospatiale* should not be invoked in a fashion wholly untethered to the procedural posture of that case.

With the FSIA, Congress enacted "a comprehensive framework for determining whether a court in this country … may exercise jurisdiction over a foreign state."  *Weltover*, 504 U.S. at 610.  As discussed above, nothing in that statute limits the ability of federal courts to issue Letters Rogatory to a foreign court requesting assistance in obtaining discovery from foreign sovereigns.  Where, as here, Congress did not insert any express limitations in the FSIA on the ability of federal courts to issue Letters Rogatory seeking discovery assistance from foreign judicial tribunals, there is no legal basis for inferring from the FSIA an implied intention to radically alter or limit the established standards for the issuance of Letters Rogatory merely because the foreign court is being asked to obtain discovery from its own government.  Nor is there any basis for reading a multi-factored comity analysis into the statute as another implied limitation.  *U.S. v. Lombardo*, 639 F. Supp. 2d, 1271, 1289 (D. Utah 2007) (comity analysis unnecessary given clear statutory guidance); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting) (comity "includes the *choice-of-law* principles that *in the absence of contrary congressional direction*, are assumed to be incorporated into our substantive laws having extraterritorial reach") (emphases added)).

Even if considerations of comity were at all relevant to the resolution of this motion, such considerations favor Lantheus.  **First**, Canada's national interests are not implicated here because (a) AECL has not identified a single specific document relating to the cause of the accidental shutdown, the disclosure of which would endanger Canada's national

15

security; and (b) the nuclear export regulations AECL relies on only prohibit export of information related to nuclear substances, nuclear weapons or the transportation and security of such materials, not to information about holes in an aluminum container involved in an industrial accident.  (Whitehall Decl., Ex. D §21(1).)  **Second**, Lantheus has no alternative means of securing the documents and testimony sought – crucial to any trial of this action (Korde Decl., ¶¶11-16) – given AECL's repeated delays in responding to Lantheus' ATI Request (Korde Decl. ¶¶ 20-29; Korde Supp. Decl., Ex. 4), and its massive redaction of the very limited materials produced to date (*see* Korde Supp. Decl., Ex. 5 at 55-56, 59-62; Ex. 6 at 63-67).[8]  **Third**, AECL misstates the "hardship" standard.  The issue is not whether production would be burdensome but rather whether *compliance with U.S. discovery obligations* would expose a party to legal penalties or liability in its home jurisdiction.  *E.g., Asia Pulp & Paper Co.*, 2009 WL 1055673, at *4 (evaluating hardship based on foreign penalties for producing documents sought).  AECL faces no such "hardship."   In any case, AECL faces no more burden than it would face in responding to Canadian discovery under Canadian law.  In that respect, AECL has routinely produced hundreds of thousands of pages of documents in other civil lawsuits, and its burden claims are entirely unsubstantiated by any evidence.  (Harrison Decl., Ex. 3 at 62:11-63:7.) **Fourth,** while AECL argues (again with no support) that U.S. courts would not offer reciprocal assistance and tries to distinguish *Matter of Kevork* (which enforced Canadian Letters Rogatory seeking testimony from the FBI), the bottom line is that the Ninth Circuit has enforced Letters

---

[8] AECL argues that a foundation for the admission of documents (which Lantheus understands include graphs, photographs and test results) can be establish by AECL's certification.  But if Zurich objected to the admission of the documents at trial, Lantheus would have no admissible foundational testimony to offer, and would be left without recourse.

Rogatory from Canadian courts against the United States government.  788 F.2d 566, 568 (9th Cir. 1986).[9]

       **Finally**, the history of this case demonstrates AECL has not acted in good faith. AECL has refused to produce any documents responsive to the original Letters Rogatory unless Lantheus and Zurich release AECL from claims arising out of the shutdown of the NRU Reactor. (Korde Decl. ¶¶47-49.)  AECL is holding hostage evidence that is critical to the trial of this case in order to extract a release for any potential liability arising out of its operation of the NRU Reactor, a critical source of medical isotopes used in imaging procedures for 400,000 United States residents per week.  Moreover, the handful of documents AECL made available in response to an ATI request from Zurich are so heavily redacted that they are virtually meaningless.  These actions are the antithesis of good faith.  *See also* Korde Decl. ¶¶17-29, 39-49 (detailing AECL's obstruction, delays and refusal to cooperate).

---

[9]  The U.S. government's statement that it *might* at some future time invoke domestic sovereign immunity in response to Letters Rogatory from abroad, found in a footnote in *United Kingdom v. United States*, 238 F.3d 1312, 1324 n. 12 (11th Cir. 2001) does not help AECL.  Those statements merely confirm that government agencies do not like third-party discovery any more than private litigants do, but they are hardly equivalent to a judicial holding.  Moreover, AECL will have the opportunity to invoke its own domestic sovereign immunity argument (which Lantheus' Canadian counsel considers baseless) before the Canadian courts.

DATED:  September 23, 2011                    Respectfully submitted,


                                                s/Danielle M. Estrada        
                                              COVINGTON & BURLING LLP
                                              Andrew A. Ruffino
                                              The New York Times Building
                                              620 Eighth Avenue
                                              New York, N.Y. 10018-1405
                                              Tel: 212.841.1097

                                              William F. Greaney
                                              Joanne B. Grossman
                                              Rukesh A. Korde
                                              Danielle M. Estrada
                                              1201 Pennsylvania Avenue, N.W.
                                              Washington, D.C.  20004-2401
                                              Tel: 202.662.6000

                                              ATTORNEYS FOR PLAINTIFF
                                              LANTHEUS MEDICAL IMAGING, INC.

18