# EXHIBIT 2

# (EXCERPTED DOCUMENT)



CANADA

# House of Commons Debates

| VOLUME 142 | ● | NUMBER 035 | ● | 2nd SESSION | ● | 39th PARLIAMENT |

**OFFICIAL REPORT**
**(HANSARD)**

# Tuesday, December 11, 2007
# (Part A)

---

**Speaker: The Honourable Peter Milliken**

# HOUSE OF COMMONS

### Tuesday, December 11, 2007

The House met at 10 a.m.

---

*Prayers*

## ROUTINE PROCEEDINGS

● (1005)

[*English*]

### COMMISSION OF INQUIRY INTO THE INVESTIGATION OF THE BOMBING OF AIR INDIA FLIGHT 182

**Hon. Stockwell Day (Minister of Public Safety, CPC):** Mr. Speaker, pursuant to Standing Order 32(2), I am pleased to table, in both official languages, the first report of the Commission of Inquiry into the Investigation of the Bombing of Air India Flight 182. It is entitled "The Families Remember".

The stories here speak for themselves. They are a compelling testimony to the profound sense of loss and grief that families did experience, and continue to experience. The bombing of Air India flight 182 was a terrible tragedy, the worst act of terror in Canadian history, and a reminder that we are not immune from terrorism.

The Government of Canada launched the inquiry in order to provide answers to still unresolved questions that remain. We hope there will be a measure of closure for those who continue to grieve for the loss of their loved ones on that awful day in June of 1985.

\* \* \*

### CANADIAN NUCLEAR SAFETY COMMISSION

**Hon. Loyola Hearn (Minister of Fisheries and Oceans, CPC):** Mr. Speaker, pursuant to subsection 19(3) of the Nuclear Safety and Control Act, I have the honour to table, in both official languages, a copy of the directives to the Canadian Nuclear Safety Commission regarding the health of Canadians.

\* \* \*

### ELIMINATION OF RACIAL AND RELIGIOUS PROFILING ACT

**Mr. Bill Siksay (Burnaby—Douglas, NDP)** moved for leave to introduce Bill C-493, An Act to eliminate racial and religious profiling.

He said: Mr. Speaker, I am pleased to table, seconded by the member for Vancouver East, a private member's bill entitled "An Act to eliminate racial and religious profiling".

The bill seeks to ban racial and religious profiling by federal law enforcement agencies and officials. I and my NDP colleagues have been very moved and often angered by the experiences of racial and religious profiling shared with us by constituents and other Canadians.

The impact of this practice has been serious and costly to those who have been its victims, and to our society. Such actions by law enforcement officers and agencies are based solely on false stereotypes. It is not good public policy nor is it good law enforcement practice, plain and simple.

This is an updated version of a bill introduced by the member for Vancouver East in the last Parliament. It defines racial and religious profiling as an action undertaken for reasons of safety, security or public protection that relies on stereotypes about race, colour, ethnicity, ancestry, religion or place of origin, rather than on reasonable suspicion to single out an individual for greater scrutiny or different treatment.

The bill would require the RCMP, customs, immigration, airport screening officers, and CSIS agents to eliminate racial and religious profiling. Those agencies would report to Parliament on their progress. They would also required to have a working analysis of how racism functions in their law enforcement context. Victims of racial or religious profiling would have access to the Federal Court to seek relief or remedy.

(Motions deemed adopted, bill read the first time and printed)

\* \* \*

### CRIMINAL CODE

**Mr. Bill Siksay (Burnaby—Douglas, NDP)** moved for leave to introduce Bill C-494, An Act to amend the Criminal Code (gender identity and gender expression).

He said: Mr. Speaker, I am pleased to table, also seconded by the member for Vancouver East, a private member's bill entitled "An Act to amend the Criminal Code (gender identity and gender expression)".

The bill would add gender identity and gender expression as distinguishing characteristics protected under hate propaganda section 318 of the Criminal Code.



CANADA

# House of Commons Debates

VOLUME 142 ● NUMBER 035 ● 2nd SESSION ● 39th PARLIAMENT

**OFFICIAL REPORT**
**(HANSARD)**

# Tuesday, December 11, 2007
# (Part B)

———

**Speaker: The Honourable Peter Milliken**

2049

# HOUSE OF COMMONS

**Tuesday, December 11, 2007**

[ *Continuation of proceedings from Part A* ]

SITTING RESUMED

(The House resumed at 7:33 p.m.)

## GOVERNMENT ORDERS

[*Translation*]

### AN ACT TO PERMIT THE RESUMPTION AND CONTINUATION OF THE OPERATION OF THE NATIONAL RESEARCH UNIVERSAL REACTOR AT CHALK RIVER

**The Deputy Speaker:** Pursuant to order made earlier today, Bill C-38, An Act to permit the resumption and continuation of the operation of the National Research Universal Reactor at Chalk River, is deemed read the second time and referred to a committee of the whole.

I do now leave the chair for the House to go into committee of the whole.

(House in committee of the whole on Bill C-38, An Act to permit the resumption and continuation of the operation of the National Research Universal Reactor at Chalk River, hon. Bill Blaikie in the chair.)

● (1930)

[*English*]

**The Chair:** Before we commence the debate on Bill C-38, I would like to ask the House's indulgence in the sense that we are doing something that has not been done for a very long time, which is having witnesses in committee of the whole. We have some logistical problems with microphones, et cetera, so I would beg the House's indulgence as we try to do this procedure that we have no experience at.

We will have witnesses in the chamber, which is something I believe has not been done since the second world war and, in respect of that, I would recognize the government House leader on a point of order with respect to admission of a new witness to the list.

● (1935)

**Hon. Peter Van Loan (Leader of the Government in the House of Commons and Minister for Democratic Reform, CPC):** Mr. Chair, earlier we considered a motion for witnesses before this committee of the whole. There is an additional witness that our witness from the Canadian Nuclear Safety Commission would like to have added. I seek the consent of the committee to add as a witness Barclay D. Howden, the director general of the Directorate of Nuclear Cycle and Facilities Regulation of the Canadian Nuclear Safety Commission.

**The Chair:** The committee has heard the request of the government House leader. Is there unanimous consent?

**Some hon. members:** Agreed.

**The Chair:** There have been discussions and what has been agreed upon, if I understand it correctly, is that we will have an opening five minute statement first by the Minister of Health, then by the Minister of Industry and then by one of the witnesses who has indicated that she would like to make a statement.

Therefore, we will have three five-minute statements and then we will proceed to 20 minute rounds beginning with the official opposition, then the Bloc Québécois, then the NDP and then the government, and we will proceed from there. Of course parties can divide their 20 minutes as they see fit, having more than one questioner or whatever, and may ask questions of either the witnesses or the minister.

**Hon. Ralph Goodale (Wascana, Lib.):** Mr. Chair, just for the sake of clarity, I think the government House leader would want to confirm that the other people we are expecting as witnesses tonight are indeed on route and will arrive during the course of the evening.

**Hon. Peter Van Loan:** Mr. Chair, I have been assured of that. They are taking a little longer than anticipated due to the inclement weather and I understand that this committee will have to adopt a motion to invite them in at the appropriate time, but at that time they will be available to make statements and be questioned.

**The Chair:** Yes, again, we have had some discussions and I understand that when the witnesses, who are making their way here in the inclement weather, arrive they will be escorted in to sit at the table. I do not think any motion or suspension of the sitting will be necessary.

Without any further adieu then, I recognize the hon. Minister of Health.

**Hon. Tony Clement (Minister of Health and Minister for the Federal Economic Development Initiative for Northern Ontario, CPC):** Mr. Chair, I am speaking today in support of the government's legislation, Bill C-38, to permit the resumption and continuation of the operation of the National Research Universal Reactor at Chalk River.

*Government Orders*

**Mr. Ted Menzies:** Until your appointment at CNSC my understanding is that you were assistant deputy minister at the Department of Natural Resources when the now opposition House leader was the minister of natural resources. Is that correct?

**Some hon. members:** Oh, oh!

**The Assistant Deputy Chair:** Order, order. The hon. member asked a question. Order, please. Ms. Keen has the floor.

**Ms. Linda J. Keen:** Yes, I would like to answer this question by saying that I am an Albertan. I was born in Alberta. I never belonged to any political party in my life.

I joined the public service in fact when there was another government in power. I am saying that I am non-partisan. I serve with good behaviour. I have met every requirement of the Ethics Commissioner and I do my work on a non-partisan basis and I have no political affiliation.

**Mr. Ted Menzies:** The question I asked was, were you the deputy minister at the Department of Natural Resources when the minister of natural resources, the now opposition House leader, was the minister.

**Ms. Linda J. Keen:** Yes and I was appointed by the Public Service Commission.

**Mr. Ted Menzies:** Thank you.

The opposition House leader in fact recommended your appointment. Is that my understanding?

**Ms. Linda J. Keen:** I have no idea. I was interviewed by PMO. What they did was they went out and searched for people. I applied, I was interviewed, and I was given the appointment. I have no idea about the recommendation. I applied for the job.

**Mr. Ted Menzies:** Before you worked at natural resources were you also at the Department of Agriculture when the opposition House leader was minister of agriculture?

**Ms. Linda J. Keen:** I will have to recall because—

**Mr. Michael Ignatieff:** Mr. Chair, on a point of order. This line of questioning is essentially insinuating that political considerations are affecting the professional judgment of a public servant.

We are here, Mr. Chair, to adjudicate a dispute that AECL quite properly said was a difference of professional opinion.

This commissioner is entitled to the respect of the House and she is not receiving it.

**The Assistant Deputy Chair:** I do not think that falls under the realm of a point of order.

We will go back to the hon. Parliamentary Secretary to the Minister of Finance.

**Mr. Ted Menzies:** Mr. Chair, I think we have established what we need to know so far.

I think I will go back, if I can, to the safety issues. I was just trying to establish the fact that we have nuclear safety experts making decisions. That is my point.

The most important issue that we have to deal with tonight, as my colleague has asked: is this a safety issue? Is the safety issue resolved?

We have heard much discussions and we have heard an answer that there is no animosity between the two groups of witnesses sitting at this table. We certainly hope that is the case. There are 76,000 patients waiting for these services.

Mr. Torgerson, you had commented that you had operated with one pump prior to this and you were comfortable with the fact that it was safe at that time. Can you confirm that and tell us if that is accurate?

● (2120)

**Mr. David F. Torgerson:** Mr. Chair, we have operated the NRU reactor without either pump being hooked up to the new seismically qualified emergency power system.

I should state to everybody and repeat what our chief nuclear officer said. These pumps in the past have had two different sources of power. They have had the normal power to run the pumps and they have had an emergency source of power to run the pumps.

This is a third source. So there have been two sources operating before and we have been able to operate the plant safely with two power sources on the pump. This is adding a third.

Obviously, if we can operate a reactor safely with two power supplies on the pump, we believe that we can operate it with three power supplies on the pump. That is what we have done to pump five.

**Hon. Michael Chong (Wellington—Halton Hills, CPC):** Mr. Chair, these are both arm's length organizations and the fact that we are here on the floor of the House in committee of the whole should be an indication to both organizations that this has not worked out and that the organizations have not been operating the way in which they were originally intended to operate. The very fact that the organizations are here I think is an indication of that.

We are here because we have had to intervene in this matter as the government because of the matter between AECL and the Canadian Nuclear Safety Commission. We have assessed the risk to the hundreds of thousands of people worldwide who no longer have access to medical isotopes and the risk with respect to the operations of this medical isotope facility.

We have determined as a government that the greater risk is in the fact that some 30,000 Canadians per week, some 400,000 Americans per week, who use medical nuclear scans no longer will have access to those scans. Therefore, we have had to intervene and we are here today because of that.

We have determined that the risk to the health of Canadians is far greater if they do not have access to these medical isotopes than the risk is to the operations of this facility that produces these medical isotopes.

I think that I can sum up by saying that we are disappointed that it has come to this. This is not a recent matter. This has been going on for years. As a matter of fact, both organizations were called in front of the industry committee in May 2005. Ms. Keen was there. Robert Van Adel from AECL was there to explain to the government and to the opposition at the time why the relationship was not working and when it was going to be straightened out.

COMMONS DEBATES

*Government Orders*

At the time it was indicated by AECL that it was making efforts with respect to the hiring of a new regulatory officer with respect to some other internal changes, cultural changes, that were supposed to be taking place in the organization to address some of these issues between AECL and the nuclear safety regulator.

With respect to the nuclear safety regulator, similar commitments were made that the relationship was going to be improving and things were going to be put on the right track.

Here we are some three years later and things are still not where they should be, if anything. We are here today because things have not been worked out. If anything, they have gotten worse.

I would like both parties to respond to that.

● (2125)

**The Assistant Deputy Chair:** There are only a couple of minutes left. If each party could take about a minute to respond to that question.

**Ms. Linda J. Keen:** You have the microphone. You start.

**Mr. David F. Torgerson:** See, Mr. Chair, we are cooperating very well.

I would like to say that we respect our colleagues at the CNSC. I personally want to be regulated and I want to have a strong CNSC with skilled and talented people in it because that is an effective CNSC.

Perhaps, because I am basically a techie, I do not see the same sense of animosity between the CNSC staff and our staff that the member has alluded to.

On the other hand, I think it is important, as the member said, that we cooperate with the regulator. We are dependent upon the regulator. Frankly, we cannot get along without the regulator. We really have to have a regulator that we can work with and who can work with us.

**Ms. Linda J. Keen:** Mr. Chair, I would like to reinforce that because the industry has the ultimate responsibility to put together a safety organization and in fact ensure that there is good communication. The commission often asks when licences come before us what the communication situation on any particular area?

Clearly, AECL is going to be doing a root cause on this matter as to how it got a point of not having this safety area addressed. The CNSC staff have agreed that they are going to be doing a lessons learned to look at this. There was, obviously, and Mr. McGee said this in front of the commission at the commission meeting and there are transcripts to this, this understanding that was different than what happened with the CNSC.

I think that communication is important. We do have site staff now. Before we did not have this. We have put a group of people on site to make sure this happens. I think that Canadians need to see that it is important to the regulator and it is important for all of our 2,500 licensees.

**Mr. Omar Alghabra (Mississauga—Erindale, Lib.):** Mr. Chair, I have a quick question for the Minister of Natural Resources.

Just for the record, the act that is in front of us says that we will deregulate the Nation Research Universal Reactor. AECL, as a whole, will still be regulated but that reactor will no longer be regulated by the commission. Is that accurate or not?

**Hon. Gary Lunn:** Mr. Chair, I will read subclause (1), which states:

> Atomic Energy Canada Limited may resume and continue the operation of the National Research Universal Reactor at Chalk River in Ontario for a period of 120 days after the coming into force of this Act despite any conditions of its licence under the Nuclear Safety and Control Act relating to the installation of the seismically qualified motor starters on the heavy water pumps and the connection to the emergency power supply.

It is very specific that this exemption applies is to only these pumps and we have legal opinions to support that.

**Mr. Omar Alghabra:** Mr. Chair, that was a straightforward question, because subclause (2) states:

> Atomic Energy of Canada Limited may resume and continue the operation of the National Research Universal Reactor at Chalk River only if it is satisfied that it is safe to do so.

It does not talk about the pump. In my opinion, and I want the minister to confirm this, the regulator is not regulating this reactor according to the act. If this act receives royal recommendation, the regulator will not have regulation over that nuclear reactor?

**Hon. Gary Lunn:** Mr. Chair, we disagree with that interpretation. Our interpretation is very clear from all of the advice that we have received. It is specific only to these two pumps and that the Canadian Nuclear Safety Commission would have complete jurisdiction over all other aspects with respect to regulating the reactor at Chalk River.

● (2130)

**Mr. Omar Alghabra:** Mr. Chair, I hope the minister can table for us the legal opinion that he is using as guidance.

My next question is for Mr. McGee. Mr. McGee, do you accept and recognize that there is, and I know it was said earlier, the need for a regulator, the authority and responsibility of a regulator, over all nuclear reactors?

**Mr. Brian McGee:** Yes, I absolutely do.

I would also like to say, though, and I believe it is something that has been said earlier this evening, the operator, me, my staff and my team are ultimately responsible for the safe operation. Our goal is not compliance. Our goal is safety well beyond compliance.

**Mr. Omar Alghabra:** Mr. McGee, do you accept the fact that AECL had accepted the recommendations of the commission 16 months ago during the licence and that it needed six or seven recommendations in order for them to be in compliance with the licence? Is that accurate? Did AECL accept those recommendations to be in compliance?

**Mr. Brian McGee:** I want to be more specific than that. The seven upgrades, the situation we are in now goes right back to 1993, so that is the reason the commissioner mentioned that there would be root cause investigation, and that is part of what we need to understand. It is part of that root cause investigation. It would be premature for me at this point to try to predict its outcome. However, clearly something occurred between 1993 and 2005 within the organization's understanding of what the scope of those upgrades were.

*Government Orders*

In 2005, we signed off saying that those upgrades were complete, and we did that, to the best of our knowledge, in the belief that they were.

At that time there were also communications back and forth that indicated this particular work, which was seen by the organization to be not part of the scope of the upgrades but enhancements, was also recognized and openly identified as not being done. That is the documentation I referred to earlier.

**Mr. Omar Alghabra:** Mr. Chair, my purpose here is not to assess blame at all. My purpose here is to show that the regulator has a role to play and that in fact occasional mistakes t happen, which is why this is very important. History will tell us a lot about what needs to be done and the importance of the regulator.

I want to be very specific because all of us here want the nuclear reactor to be up as quickly as possible. In my opinion, this legislation will set an unusual precedent and in fact a dangerous precedent. We need to find a way to get it working as quickly as possible without this act and see what the difference is, and see if it is worth taking this unusual precedent.

I know you talked about the safety case, but how quickly can you get the safety case application up to standard to what the commission is expecting you to give them?

**Mr. Brian McGee:** One of the things about safety analysis is, and I do not want to get into a lot of technical detail about it either, but safety analysis is built around calculations, assumptions, uncertainty allowances and a number of different things.

We believe that to respond to the concerns that CNSC staff have about the safety case that we presented, our best case scenario would be at the end of the day Thursday, but we would expect out of that, based on experience, there would be discussions and further discussions about what that analysis meant. My best timeline for you is that we can probably, best case, complete our work at the end of the day Thursday but without certainty that it will satisfy the needs.

**Mr. Omar Alghabra:** Ms. Keen, if you receive the safety case by Thursday, how quickly will the commission be able to adjudicate that case and make a judgment?

● (2135)

**Mr. Barclay D. Howden:** Mr. Chair, what we focus on is the due diligence that has to be executed to ensure the safety case is up to nuclear standards and that all the professional expectations are put in place and we have a process in place to meet that.

Our focus is to ensure that the detailed safety assessments provided by AECL demonstrate that the risk posed meets regulatory requirements. If the case comes in robust, we would expect it would take a couple of days, two or three days, to review that.

As Mr. McGee has stated, we have been in constant contact at our level and at the staff level to try to ensure that everyone understands each other's position.

**Ms. Linda J. Keen:** It is because this is outside its licence that it applied for and received in August 2006, that the tribunal would be required, under the law, the law that the law would have to meet, but we have talked to our members and they would be prepared to

meet in 24 hours to get this done, assuming that it is a good safety case and that the staff recommends it, and we would move this forward.

It really depends on AECL to supply the safety case. We do not have a formal application for a licence amendment but it should not be a big problem to get that done.

**Mr. Omar Alghabra:** We are getting somewhere, Mr. Chair. By Thursday you can have the safety case completed and we are hearing from the commission that it will take a day or so to assess it and then another day to get the tribunal set up.

Is it safe to assume that the commission has an idea? Apparently, AECL had submitted something that was incomplete so I am assuming that it should not take as long for the safety case to be examined since you have some of the information already available and all you need is some of the information that is missing.

Could this be expedited? What we need to understand today is whether we can get this done as quickly as possible without, in my opinion, the necessity for this unusual precedent.

**Mr. Barclay D. Howden:** At the moment, the process we are following is expedited. We are going as fast as we can.

Safety cases are not simple things. There is a lot of complexity. There are things like thermal hydraulics and reliability, reactor physics and looking at very important things. Our expectation is that AECL will produce the information to support its rationales, and we have communicated on what those are and have shared them back and forth. The expectation, if that comes in as robust, the two to three days that I stated is expedited because we must ensure that nuclear standards are met and that professional judgment can be exercised, and people need time to be able to do that.

**Mr. Omar Alghabra:** Mr. Chair, I have another question for the commission.

Before I follow up on what I was asking, what kind of affect would this act have on our international obligations? The nuclear safety act says that one of the reasons the commission was established was for us to comply with a lot of international obligations and treaties. What kind of impact will this act have on international treaties?

**Ms. Linda J. Keen:** Mr. Chair, the requirement under international standards are for a convention on nuclear safety, which is a peer review group on various areas.

A month ago, I chaired the first meeting ever on the code of conduct for research reactors in Australia. What we have found up to now is that these are voluntary standards for research reactors. I think licensees and regulators themselves are very interested in benchmarking themselves, so there would not be a direct impact on international standards in that we would be violating a treaty or things like that.

**Mr. Omar Alghabra:** Mr. Chair, my question is for the AECL.

If this act passes and this reactor is no longer under the regulation of the commission, will this have any impact on your insurance?

*Government Orders*

**Mr. Brian McGee:** Mr. Chair, our opinion is that we will not be operating outside the regulatory framework. I do not want to put words in the minister's mouth, but our understanding is that it only applies to the situation and there will be no impact on any insurance. We would still be accountable to the regulator, we believe.

●(2140)

**Mr. Omar Alghabra:** Mr. Chair, I am not sure why we need this act then. Does AECL need this act for the reactor to start up as quickly as possible?

**Mr. Brian McGee:** Yes.

**Mr. Omar Alghabra:** Mr. McGee, you said that you could have the safety case by Thursday. Is that correct?

**Mr. Brian McGee:** Mr. Chair, what I said is that the best case scenario, based on what we understand of staff concerns to this point, is that we would have the case by end of day Thursday.

I think it is important to go back though. We believe we have submitted an adequate safety case. We believe that we have the right to go before the commission at that time. Our understanding is that it was not staff's decision whether or not we went before the commission. We submitted a case that we felt was adequate for commission decision making.

I guess I also need to emphasize what I said earlier because it has been mentioned a couple of times that we are in violation of the licence. Based on the factual documentation that we have, both ours and CNSC staff, we do not believe that we are in violation of the licence.

**Mr. Omar Alghabra:** Mr. McGee, I think we could spend a lifetime arguing this point with you but I do not want to do that. I want to move forward.

This is a very serious scenario and you are aware of the health consequences to Canadians. We need this safety case to be put together as quickly as possible. You are telling me that you can get it done by Thursday. Is that correct, given the circumstances that we are facing?

**Mr. Brian McGee:** Mr. Chair, based on what we know and CNSC staff concerns about the safety case that we have already submitted, which we believe is adequate, we believe that it will take us, best case, end of day Thursday, but safety analysis is not an exact science. To answer the questions we need to determine exactly what is required. The best case is end of day Thursday.

**Mr. Omar Alghabra:** Mr. Chair, I would like to know from Mr. McGee when the reactor can be up and running, assuming the safety case were acceptable to the commission. I just want to have a visual understanding as to what day the reactor could be up and running if the safety case were submitted on Thursday.

**Ms. Linda J. Keen:** Mr. Chair, what we are talking about is the date the licence amendment would be given. At that point, AECL would then return to start the reactor up. It is AECL's responsibility once it gets the licence amendment. If it were allowed now to have one pump under the current licence, we would not need a licence amendment. It is absolutely clear that we need a licence amendment. It is clear that if it operated with one pump it would not be within the current licence.

AECL needs to start this up once it has a licence amendment.

**Mr. Omar Alghabra:** Mr. Chair, I need help. What we are saying is we really do not want to suspend the regulation, but at the same time we want the nuclear reactor to be up and running quickly. It sounds like it is just a matter of paperwork that is not being done. Why are we not getting that paperwork done quickly?

They both are willing to do it as quickly as possible. I do not see why we should suspend the regulator when all that is needed is to have the paperwork done.

What I am hearing here today is that this matter could be resolved within four to five days and if it meets the requirements, the licence could be issued. Unless there are other issues beyond that safety case, this licence could be issued within five days. I think it would take us as much time to get this law passed through the Senate and receive royal assent and it would be setting a very dangerous and unusual precedent.

This is perplexing to me and to many Canadians, and it is unacceptable. This has to be resolved today. I need a commitment from AECL and the commission to work together. I have seen a letter from AECL to both ministers saying that they are working on it. I do not see why we need this law. But I still have not seen any reasons why they cannot work together.

That is it, Mr. Chair.

●(2145)

**The Deputy Chair:** There are two and a half minutes left for the official opposition.

The hon. member for St. Paul's.

**Hon. Carolyn Bennett (St. Paul's, Lib.):** Mr. Chair, I want to talk about the patients who are waiting. I want to know what the minister's assessment of that will be. The Canadian Society of Nuclear Medicine says that 50,000 Canadians' treatment is delayed a month and the CMA says it is 30,000 a week.

I would like to know whether the minister has an assessment. Seeing that these coming weeks tend to be the weeks when hospitals do not do surgeries and tests, what would be his assessment for the weeks of December 17, 24 and 31? Would he be able to provide the provinces and territories with extra funds to run overtime to get rid of the backlog of patients who have been waiting too long?

**Hon. Tony Clement:** Mr. Chair, right now, because there are no isotopes being produced, the wait times are being extended. But of course they are not expending for the isotopes because they do not exist, so I am not sure how that fits in.

The way I would like to answer the question, though—

**Hon. Carolyn Bennett:** When it comes back.

COMMONS DEBATES

*Government Orders*

**Hon. Tony Clement:** When this comes back, they are going to have to rev up, that is absolutely right.

**Hon. Carolyn Bennett:** And they are going to need money to do it.

**Hon. Tony Clement:** Mr. Chair, they get lots of money from us, I would say to the hon. member.

In terms of the instant issue, which is what clearly we should be seized with, I can say to the hon. member that across the country, right now, not tomorrow or the next day, there is, depending upon the province, depending upon the jurisdiction, a 40% to 60% reduction in the availability of services, whether they be diagnostic services or treatment services. Of course they are triaging to do as much treatment as possible, but now treatment is starting to be affected.

I would draw to the hon. member's attention that the Canadian Medical Association had a very cogent letter to Ms. Keen which says, and this is signed by Dr. Brian Day, the President of the Canadian Medical Association, "The Canadian Medical Association joins the"—

**Hon. Carolyn Bennett:** Mr. Chair, I would like to now—

**The Deputy Chair:** The hon. member for St. Paul's, please. The time slot is now complete.

I now recognize the hon. member for Brossard—La Prairie.

*[Translation]*

**Mr. Marcel Lussier (Brossard—La Prairie, BQ):** Mr. Chair, the minister will have an opportunity to continue his response.

When there is a shortage of isotopes, who decides how they are distributed? It was mentioned previously that there are Canadian clients and 400,000 American clients, but who makes the decisions about distribution when there is a shortage?

Is there a policy on giving priority to Canadians' needs before sending isotopes to the United States?

**Hon. Tony Clement:** Mr. Chair, of course, this is not our decision. The decision is made by the hospitals, doctors and specialists. If a patient needs treatment, they have the responsibility to get that isotope.

*[English]*

There is no national triage system in place. What I can say to the hon. member is that in terms of the coordination among nuclear specialists today in Canada, there is an unprecedented degree of cooperation and coordination among all of the medical specialists to ensure to the best of their ability that those who need the treatment the most are first in line to get the treatment.

My only caveat and warning to this chamber is that as medical isotopes become rarer and rarer each and every day, the ability of medical specialists to triage successfully declines and declines. That was the point I was trying to make.

● (2150)

*[Translation]*

**Mr. Marcel Lussier:** Mr. Chair, since the product is in short supply, when Chalk River resumes production, will Canadians or

Americans get priority? Who will decide to supply Canadian hospitals before American hospitals?

**Hon. Tony Clement:** Mr. Speaker, I have already said that if there is a contract between Atomic Energy of Canada and a hospital, when there is a request, it will be the responsibility of Nordion or Atomic Energy of Canada to set in motion a process to respond to that request.

*[English]*

That is the decision. If there is a need in Canada, if there is a contract in place with a Canadian hospital, that contract will be supplied.

*[Translation]*

**Mr. Marcel Lussier:** Mr. Chair, Mr. McGee has control over the distribution of isotopes, right?

How does he decide which client gets priority? Is it Canadians or Americans? Do the contracts determine who gets priority?

*[English]*

**Mr. David F. Torgerson:** Mr. Chair, I just want to go back to something that I said earlier and that is that NRU is a huge producer of medical isotopes. When we are running, we can supply all the isotope that is required in Canada and a large proportion of what is required in the United States. We have at times gone up in production, much higher than our normal production, when there have been shortages in the United States from other suppliers.

I am confident that when we are operating again, we can supply all the isotope that is required in Canada and a lot of the isotope that is required in the United States.

*[Translation]*

**Mr. Marcel Lussier:** Mr. Chair, I have another question for Mr. McGee.

It was mentioned that Chalk River has existed for 50 years. How long have isotopes been produced there?

*[English]*

**The Deputy Chair:** For the sake of clarity, the gentleman who is replying to the questions is not Mr. McGee but Mr. Torgerson.

**Mr. David F. Torgerson:** Mr. Chair, first of all, the use of medical isotopes and the isotope business is an area that was in fact pioneered in Chalk River. People in the early days of Chalk River developed the business, which is now a worldwide business.

We have been producing isotopes currently in production since the early 1970s. I believe since 1971 we have produced medical isotopes for Nordion and now what is called MDS Nordion.

*[Translation]*

**Mr. Marcel Lussier:** Mr. Chair, it was mentioned earlier that the Chalk River reactor has frequently been shut down, but for short durations. I believe three or four day periods were mentioned.

How often do these three or four day stoppages occur?