# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LANTHEUS MEDICAL IMAGING, INC., :
 :
     Plaintiff, : No. 1:10-cv-09371 (LTS) (JLC)
 :
  v. : ECF CASE
 :
ZURICH AMERICAN INSURANCE COMPANY, :
 :
     Defendant. :

- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- -- X

**AMICUS CURIAE ATOMIC ENERGY OF CANADA LIMITED'S MEMORANDUM OF
LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR
<u>ISSUANCE OF AMENDED LETTERS ROGATORY</u>**

Daniel M. Krainin (DK1128)
Edward M. Grauman (EG9825)
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022-5802
Tel: (212) 702-5400
Fax: (212) 702-5450
dkrainin@bdlaw.com
egrauman@bdlaw.com

*Attorneys for Atomic Energy of
Canada Limited*

September 16, 2011

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTS AND PROCEDURAL BACKGROUND.................................................................2

ARGUMENT ........................................................................................................................3

I.  LANTHEUS SHOULD NOT BE PERMITTED TO USE LETTERS
    ROGATORY TO CIRCUMVENT THE IMMUNITY FROM DISCOVERY
    AFFORDED AECL BY THE FOREIGN SOVEREIGN IMMUNITIES ACT.................3

    A.  Letters Rogatory Do Not Permit a Party to Obtain More Discovery from a
        Non-Party Abroad Than Would Otherwise Be Available if the Non-Party
        Were Present in the United States ..............................................................................3

    B.  If AECL Were Present in the United States, It Would Be Immune from
        Non-Party Discovery Under the FSIA.......................................................................4

    C.  U.S. and Canadian Courts Do Not Routinely Issue Letters Rogatory to
        Foreign Sovereigns .....................................................................................................6

    D.  The FSIA's "Commercial Activity" Exception Does Not Apply Here Because
        AECL's Activities Have Not Had Any Direct Effect in the United States ...............7

II. ISSUANCE OF THE REQUESTED LETTERS ROGATORY WOULD BE
    INCONSISTENT WITH THE PRINCIPLES OF INTERNATIONAL COMITY...........10

    A.  Balance of National Interests ...................................................................................12

    B.  Importance of the Information Requested .................................................................15

    C.  Specificity of the Requests........................................................................................15

    D.  Origin of the Information...........................................................................................16

    E.  Alternative Means of Securing the Information .......................................................16

    F.  Hardship of Compliance ...........................................................................................18

    G.  Good Faith .................................................................................................................19

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Antares Aircraft v. Federal Republic of Nigeria,*
999 F.2d 33 (2d Cir. 1993)............................................................................................ 8

*Cruise Connections Charter Mgmt., LP v. Attorney Gen. of Can.,*
600 F.3d 661 (D.C. Cir. 2010) ................................................................................... 9, 10

*Danisch v. Guardian Life Ins. Co.,*
19 F.R.D. 235 (S.D.N.Y. 1956) ...................................................................................... 7

*Dole Food Co. v. Patrickson,*
538 U.S. 468 (2003) ...................................................................................................... 12

*EM Ltd. v. Republic of Argentina,*
473 F.3d 463 (2d Cir. 2007) ........................................................................................... 3

*First Am. Corp. v. Price Waterhouse LLP,*
154 F.3d 16 (2d Cir. 1998) ........................................................................................... 19

*Guirlando v. Ziraat Bankasi A.S.,*
602 F.3d 69 (2d Cir. 2010) ............................................................................................. 8

*Hilton v. Guyot,*
159 U.S. 113 (1895) ...................................................................................................... 10

*Kelly v. Syria Shell Petrol. Dev. B.V.,*
213 F.3d 841 (5th Cir. 2000) .......................................................................................... 3

*Madanes v. Madanes,*
186 F.R.D. 279 (S.D.N.Y. 1999) .................................................................................. 12

*Matter of Kevork,*
788 F.2d 566 (9th Cir. 1986) .......................................................................................... 7

*Milliken & Co. v. Bank of China,*
758 F. Supp. 2d 238 (S.D.N.Y. 2010)......................................................... 11, 12, 15, 16

*Minpeco, S.A. v. ContiCommodity Servs., Inc.,*
116 F.R.D. 517 (S.D.N.Y. 1987) .................................................................................. 19

*Olympic Chartering, S.A. v. Ministry of Indus. & Trade of Jordan,*
134 F. Supp. 2d 528 (S.D.N.Y. 2001)............................................................................ 3

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*,
    476 F.3d 140 (2d Cir. 2007)................................................................................ 5

*Powerex Corp. v. Reliant Energy Servs.*,
    551 U.S. 224 (2007)........................................................................................... 5

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992)........................................................................................ 8, 9

*Samco Global Arms, Inc. v. Arita*,
    395 F.3d 1212 (11th Cir. 2005) ..................................................................... 9, 10

*Seoul Semiconductor Co. v. Nichia Corp.*,
    590 F. Supp. 2d 832 (E.D. Tex. 2008)...................................................... 6, 11, 12

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
    482 U.S. 522 (1987).......................................................................... 10, 11, 13, 18

*Strauss v. Credit Lyonnais, S.A.*,
    249 F.R.D. 429 (E.D.N.Y. 2008) ...................................................................... 12

*United Kingdom v. United States*,
    238 F.3d 1312 (11th Cir. 2001) ......................................................................... 14

*United States v. Weisberg*,
    2010 U.S. Dist. LEXIS 128107 (E.D.N.Y. Dec. 3, 2010) ..................................... 3

*Virtual Countries, Inc. v. Republic of South Africa*,
    300 F.3d 230 (2d Cir. 2002)........................................................................... 9, 10

**State Case**

*Petroleos Mexicanos v. Paxson*,
    786 S.W.2d 97 (Tex. App. 1990)........................................................................ 5

**Federal Statutes**

28 U.S.C. §§ 1602-11 ........................................................................................... 1

28 U.S.C. § 1603.................................................................................................. 4

## <u>TABLE OF AUTHORITIES</u>
(Continued)

<u>Page</u>

28 U.S.C. § 1604 ...................................................................................................... 4

28 U.S.C. § 1605 ...................................................................................................... 8


**<u>Federal Regulation</u>**

22 C.F.R. § 92.54 ..................................................................................................... 14


**<u>Canadian Statutes & Regulations</u>**

Access to Information Act, RSC 1985, c. A-1 ......................................................... 13

General Nuclear Safety and Control Regulations, SOR/2000-202, P.C. 2000-782 ................... 13

Nuclear Non-proliferation Import and Export Control Regulations, SOR/2000-210 ................. 13

Nuclear Safety and Control Act, SC 1997, c. 9 ....................................................... 13


**<u>Other Authorities</u>**

*Merriam-Webster's Collegiate Dictionary* (11th ed.) .............................................. 16

Restatement (Third) of Foreign Relations Law of the United States § 442 ........................... 11, 13

Restatement (Third) of Foreign Relations Law of the United States § 451 ............................... 5

Restatement (Third) of Foreign Relations Law of the United States § 473 .............................. 11

## INTRODUCTION

Atomic Energy of Canada Limited ("AECL") respectfully submits this amicus brief to address whether a U.S. court should issue letters rogatory seeking evidence from a foreign sovereign, such as AECL, under the circumstances present here.[1]  For the reasons set forth below, AECL submits that it should not.

In its motion for issuance of amended letters rogatory, Lantheus Medical Imaging, Inc. ("Lantheus") has asked this Court to execute an instrument designed to obtain documents and testimony from a Canadian federal Crown corporation whose purpose is to further Canada's interests in nuclear research and power.  If AECL were present in the United States, it would be immune from the discovery sought by Lantheus under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602-11.  This Court should not permit Lantheus to circumvent the FSIA and the principles it embodies simply because AECL happens not to have any offices or facilities in this country.

In addition, giving due respect to the sovereign interests of Canada as a matter of international comity, this Court should refrain from subjecting AECL to unnecessary, burdensome discovery on matters that implicate Canada's interest in restricting access to sensitive information about its nuclear industry—particularly where such discovery is largely available through other means.  Under the circumstances here, Lantheus's litigation interest in this private commercial dispute should not be allowed to trump the important intergovernmental

---

[1] AECL hereby expressly asserts its right to immunity from the jurisdiction of U.S. courts under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-11.  Accordingly, AECL does not intend, by filing this amicus brief or making any further filing or submission permitted by the Court, to waive its immunity under the Act.

policies expressed in the FSIA and the principle of international comity.  For these reasons,

AECL respectfully submits that Lantheus's motion should be denied.

## FACTS AND PROCEDURAL BACKGROUND

On May 10, 2011, Lantheus filed a motion for issuance of letters rogatory before Judge

Swain that was not opposed by Defendant Zurich American Insurance Company ("Zurich").

(Court Docket Entry ("Doc.") 24.)  Lantheus's motion failed to inform the Court that the target

of its requested letters was a Canadian federal Crown corporation that is subject to immunity

from jurisdiction and discovery under the FSIA.  Less than 48 hours after Lantheus filed its

motion, Judge Swain granted Lantheus's motion and signed the letters rogatory prepared by

Lantheus.  (*See* Docs. 29-30.)

On May 26, 2011, Lantheus filed an application with the Ontario Superior Court of

Justice (the "Ontario Court") seeking to enforce the letters rogatory against AECL.  On July 27,

2011, the Ontario Court denied Lantheus's application, finding that this Court ought to first have

an opportunity to fully consider whether the letters should issue in light of AECL's status as a

foreign sovereign.  *See* Reasons for Judgment, *Lantheus Medical Imaging, Inc. v. Atomic Energy

of Canada Limited*, No. CV-11-00427161 (Ontario Superior Court of Justice, July 27, 2011),

attached as Ex. 26 to Decl. of Rukesh A. Korde in Supp. of Lantheus Medical Imaging, Inc.'s

Mot. for Issuance of Am. Letters Rogatory ("Korde Decl."), executed Aug. 29, 2011 (Doc. 37).

On August 29, 2011, Lantheus filed its motion for issuance of amended letters rogatory.

(Docs. 35-40.)  On September 7, 2011, the Court granted leave for AECL to appear as amicus

curiae for the purpose of addressing the sovereign immunity and related issues raised by

Lantheus's motion.  (Doc. 42.)

## ARGUMENT

I.   **LANTHEUS SHOULD NOT BE PERMITTED TO USE LETTERS ROGATORY TO CIRCUMVENT THE IMMUNITY FROM DISCOVERY AFFORDED AECL BY THE FOREIGN SOVEREIGN IMMUNITIES ACT**

   A.   **Letters Rogatory Do Not Permit a Party to Obtain More Discovery from a Non-Party Abroad Than Would Otherwise Be Available if the Non-Party Were Present in the United States**

A primary purpose of the FSIA is to relieve foreign governmental entities of the burdens of litigation—including discovery—in U.S. courts.  *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) (quoting *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000)) ("FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation."); *Olympic Chartering, S.A. v. Ministry of Indus. & Trade of Jordan*, 134 F. Supp. 2d 528, 530 (S.D.N.Y. 2001) ("[Sovereign] immunity provides protection both from liability and the burdens of discovery.").  Lantheus has asked this Court to execute letters rogatory for the purpose of obtaining documents and testimony to which Lantheus would have no right if AECL were present in the United States. This Court should not sanction Lantheus's efforts to execute an end-run around the FSIA and its underlying principles.

Lantheus argues, incorrectly, that the FSIA and letters rogatory "do not intersect."  Mem. of Law in Supp. of Pl. Lantheus Medical Imaging Inc.'s Mot. for Issuance of Am. Letters Rogatory ("Lantheus Mem.") at 8, Aug. 29, 2011 (Doc. 36).  They do intersect here insofar as "letters rogatory are simply a means to obtain discovery to which a party is otherwise entitled." *United States v. Weisberg*, No. 08-CR-347 (NGG) (RML), 2010 U.S. Dist. LEXIS 128107, at *6 (E.D.N.Y. Dec. 3, 2010).  If AECL were present in the United States, the FSIA would preclude Lantheus from taking discovery of AECL.  Because Lantheus would not otherwise be entitled to

take discovery from AECL via subpoena within the United States, Lantheus should not be afforded the opportunity to do so via letters rogatory outside the United States.[2]

Nevertheless, Lantheus argues that because it simply seeks letters that would ask a foreign tribunal to compel the production of discovery it seeks—rather than asking this Court to compel such discovery directly or otherwise exercise "coercive jurisdiction" over AECL— sovereign immunity issues are irrelevant. *See* Lantheus Mem. at 8-10. Thus, Lantheus's view appears to be that when parties to private litigation pending in the United States wish to seek evidence from a foreign sovereign, they have a greater right to obtain it if the foreign sovereign is <u>not</u> present within the court's territorial jurisdiction than they do if the sovereign <u>is</u>. *See id.* Lantheus's view leads to a result that undermines the very purpose of the FSIA.

**B.   If AECL Were Present in the United States, It Would Be Immune from Non-Party Discovery Under the FSIA**

If AECL had a physical presence in the United States, the FSIA would protect it from the discovery sought by Lantheus. Pursuant to the FSIA, with certain limited exceptions, foreign states are "immune from the jurisdiction of the courts of the United States . . . ." 28 U.S.C. § 1604. For purposes of the FSIA, the term "foreign state" includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" includes entities that are "an organ of a foreign state . . . or a majority of whose shares or other ownership interest is owned by a foreign state." 28 U.S.C. § 1603(b)(2).

---

[2] In its unopposed motion for issuance of the original letters rogatory, Lantheus claimed that the information it seeks is "subject to discovery by letters rogatory" *because* it "would be discoverable by a simple subpoena if AECL were subject to process within the United States." Mem. of Law in Supp. of Lantheus's Unopposed Mot. for Issuance of Letters Rogatory at 8-9. May 10, 2011 (Doc. 25). The implication of Lantheus's argument is that if that information were shielded from discovery by the FSIA (and thus not discoverable by a "simple subpoena"), it should not be discoverable by way of letters rogatory either. That is the case here.

AECL is a federal Crown corporation, all of whose shares are owned by the Canadian government.  Declaration of Ivan G. Whitehall ("Whitehall Decl."), executed Sept. 15, 2011, ¶ 4. Accordingly, AECL is an "agency of a foreign state" within the statutory definition in the FSIA. *See, e.g.*, *Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224, 227 (2007) (finding BC Hydro, a Canadian Crown corporation, to be a foreign sovereign for purposes of the FSIA).  U.S. courts therefore lack jurisdiction over disputes involving AECL unless one of the statutory exceptions in the FSIA applies.[3]

Where a federal court lacks jurisdiction over a foreign sovereign entity, it also lacks the power to issue a non-party subpoena purporting to compel discovery from such an entity.  *See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007); *see also* Restatement (Third) of Foreign Relations Law of the United States § 451 cmt. c (1987) [hereinafter "Restatement"] ("Since sovereign immunity is the rule, and amenability to judicial process an exception to that rule, such discovery [from non-party sovereigns] would seem to be precluded.").[4]  Where a court does issue a subpoena directed to a non-party foreign sovereign, the foreign sovereign entity is immune from it and it should be quashed.  *Peninsula Asset Mgmt.*, 476 F.3d at 144.

Accordingly, it is beyond dispute that if a foreign sovereign such as AECL were subject to process in the United States, a party to an action in a U.S. court would have no right to obtain

---

[3] As explained at Part I.D, *infra*, the "commercial activity" exception under the FSIA (the only exception addressed by Lantheus) does not apply in light of the undisputed facts here.

[4] *Accord Petroleos Mexicanos v. Paxson*, 786 S.W.2d 97 (Tex. App. 1990) (citing section 451 of the Restatement and quashing a subpoena issued to Petroleos Mexicanos ("Pemex") because Pemex was an agency or instrumentality of the Mexican government and the trial court was without authority to order discovery from it).

evidence from it.  That result should not change where, as here, a foreign sovereign has less of a connection to the United States and is beyond the territorial reach of its courts.

> ### C.     U.S. and Canadian Courts Do Not Routinely Issue Letters Rogatory to Foreign Sovereigns

Lantheus's claim that U.S. and Canadian courts routinely issue letters rogatory directed at foreign sovereigns is wrong.  To the contrary, U.S. courts have specifically expressed reluctance to do so.  *See, e.g.*, *Seoul Semiconductor Co. v. Nichia Corp.*, 590 F. Supp. 2d 832, 836 (E.D. Tex. 2008) (denying issuance of letters rogatory directed at foreign sovereign and noting that "[c]ompelling broad discovery from an agent or agency of a sovereign nation is not something this court would lightly undertake").  Moreover, the cases relied upon by Lantheus are readily distinguishable from the present situation.

Lantheus relies heavily on *E-BEAM Services, Inc. v. AECL Technologies, Inc.*, Civil Action No. 02-2256 (D.N.J.), for the proposition that letters rogatory have been issued against "AECL" in prior proceedings.  Lantheus Mem. at 12.  This statement is incorrect and misleading on numerous grounds.  First, in that case, AECL filed a counter-claim against the plaintiff; thus, AECL had waived any claim to sovereign immunity there.  Decl. of Daniel M. Krainin in Supp. of AECL's Response to Pl.'s Mot. for Issuance of Am. Letters Rogatory ("Krainin Decl."), executed Sept. 16, 2011, Ex. A (*E-BEAM*, AECL Answer and Counterclaims).  Second, the proceeding at issue related to a commercial lease, between the plaintiff and a subsidiary of AECL and for which AECL was the guarantor, of an electron beam accelerator located in the United States; thus, the FSIA likely did not apply due to the commercial activity exception.  Krainin Decl. Ex. B ¶¶ 7, 14 (*E-BEAM*, Amended Complaint).  Third, AECL consented to the issuance of the letters rogatory in *E-BEAM*.  Krainin Decl. Ex. C (*E-BEAM*, Letter to Court dated May 13, 2003).  Fourth, the discovery sought via letters rogatory in that action was testimony

- 6 -

from <u>former</u> AECL officials, not AECL itself.  *See* Korde Decl. Ex. 28 ¶¶ 6-9.  In sum, the

"precedent" set in *E-BEAM* is wholly irrelevant to the issues pending before this Court.

Likewise, Lantheus makes much of the Ninth Circuit's decision in *Matter of Kevork*, 788

F.2d 566 (9th Cir. 1986).  *Kevork* involved a criminal prosecution and the Foreign Intelligence

Surveillance Act ("FISA"), not the FSIA.  In that opinion, the Ninth Circuit relied on

Congressional intent in passing the FISA to permit the dissemination of surveillance information

to foreign courts for purposes of intelligence gathering and to assist foreign governments with

countering terrorism.  *See id.* at 570.  This bears no relevance to the sovereign immunity issues

under the FSIA.  Indeed, the purpose of the FISA—to facilitate sharing intelligence information

among sovereigns under appropriate circumstances—has largely the opposite purpose of the

FSIA, which is designed to protect foreign governmental entities from intrusions on their

sovereignty and the burdens of litigating in U.S. courts.[5]

> **D.      The FSIA's "Commercial Activity" Exception Does Not Apply Here Because AECL's Activities Have Not Had Any Direct Effect in the United States**

Lantheus argues that to the extent the FSIA does apply, jurisdictional discovery would be

necessary to determine whether and to what extent the "commercial activity" exception under the

FSIA applies.  In light of the undisputed facts present here, however, no such discovery would be

---

[5] Another case relied upon by Lantheus, *Al-Misehal Commercial Group Ltd. v. Armored Group LLC*, No. 2:10-cv-01303 (JWS) (D. Ariz.), is inapposite because at issue in that action was an alleged oral contract between the Crown Prince of Saudi Arabia and the plaintiff relating to the purchase of several armored luxury vehicles that were to be manufactured by the defendant in the United States.  *See* Korde Decl. Ex. 29.  As such, the commercial activity exception of the FSIA likely applied there.

Likewise, apart from being more than 50 years old and pre-dating the FSIA by 20 years, *Danisch v. Guardian Life Insurance Co.*, 19 F.R.D. 235 (S.D.N.Y. 1956), is largely irrelevant because the discovery at issue did not involve sensitive factual information.  Rather, in granting the requested letters, the court expressly held that the examination of representatives of the National Bank of Poland "must . . . be limited to the law applicable to the proposed transactions."  *Id.* at 238.

required to conclude that it does not.  Lantheus has acknowledged in its Complaint that AECL
sold raw radioactive isotopes to a third party in Ontario (Nordion, Inc.), which, in turn, processed
and refined them into finished isotopes before selling them to Lantheus.  Compl. ¶ 13, Dec. 16,
2010 (Doc. 1).  Given the intervening acts of Nordion, AECL's activities in Ontario relevant to
this litigation cannot be found to have had the "direct effect" in the United States required for the
commercial activity exception to apply.

Under the commercial activity exception, a foreign state is not immune from the
jurisdiction of courts in the United States where "the action is based . . . upon an act outside the
territory of the United States in connection with a commercial activity of the foreign state
elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  The
key issue here is whether the relevant act or acts by AECL caused a "direct effect" in the United
States.[6]

An effect is considered "direct" if it follows 'as an immediate consequence of the
defendant's . . . activity.'"  *Republic of Argentina v.  Weltover, Inc.*, 504 U.S. 607, 617 (1992)
(internal citation omitted).  "Immediate" means there is "*no 'intervening element'* . . . between
the foreign state's commercial activity and the effect"; rather, a direct effect "flows in a straight
line without deviation or interruption."  *Guirlando v. Ziraat Bankasi A.S.*, 602 F.3d 69, 74-75 (2d
Cir. 2010) (emphasis added) (internal citations omitted).  Importantly, financial loss alone is not
enough to demonstrate a direct effect in the United States.  *Antares Aircraft v. Federal Republic
of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993).  Likewise, foreseeability does not establish a direct

---

[6] AECL reserves its right to address the other elements of the commercial activity
exception should that become necessary, but does not do so here because that exception can be
easily disposed of based on the undisputed facts under the "direct effects" prong of the analysis.

- 8 -

effect.  *See, e.g.*, *Weltover*, 504 U.S. at 618; *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 238 n.6 (2d Cir. 2002).

For example, in a case brought by a U.S.-based arms dealer against an instrumentality of a foreign sovereign, the court found that because (i) the contract at issue was executed outside the United States, (ii) the contract did not provide for the payment of money or delivery of goods within the United States, and (iii) no transactions arising out of the contract were to be performed in the United States, the commercial activity at issue did not have a direct effect in the United States.  *See Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005).  Likewise, the Second Circuit emphasized the immediacy requirement in finding no direct effect where the owner of an internet domain name filed a declaratory judgment action based upon a sovereign government's representations that it intended to challenge the plaintiff's right to own the domain name.  *See Virtual Countries*, 300 F.3d at 236.

Curiously, at the same time that it concedes that foreseeability does not establish directness, Lantheus argues that because AECL likely was aware (i.e., could foresee) that the shutdown of its reactor would cause disruption in the radiopharmaceutical industry, its activities "plainly [are] sufficient to show a 'direct effect' in the United States."  Lantheus Mem. at 16.  Lantheus's dubious logic is not supported by the case that it relies upon, *Cruise Connections Charter Management, LP v. Attorney General of Canada*, 600 F.3d 661 (D.C. Cir. 2010).  In *Cruise Connections*, the plaintiff was a party to a contract with the foreign sovereign at issue, the Royal Canadian Mounted Police ("RCMP"), which cancelled the contract and caused the plaintiff to lose revenues it was due under third-party contracts.  *Id.* at 665.  Here, however, Lantheus's position is analogous to that of the third-party contractees in *Cruise Connections*, not the plaintiff (which, being in privity of contract with the foreign sovereign, is analogous to

Nordion here).  Nothing in *Cruise Connections* suggests that parties (e.g., third-party contractees or Lantheus) one-step removed from the act at issue by the foreign sovereign (e.g., RCMP or AECL) can establish a "direct effect" under the commercial activity exception.

In sum, ==in light of the intervening role played by Nordion, the existing and undisputed record easily establishes that AECL's acts outside the United States did not cause any effect in the United States that could qualify as "direct" under the FSIA.==  Rather, as with the defendants in *Samco Global Arms* and *Virtual Countries*, *supra*, ==any relevant actions by AECL here had at most an indirect effect in the United States.==

## II.   ISSUANCE OF THE REQUESTED LETTERS ROGATORY WOULD BE INCONSISTENT WITH THE PRINCIPLES OF INTERNATIONAL COMITY

Apart from the protection afforded to, and intended for, sovereigns such as AECL under the FSIA, Lantheus's request should also be denied because the issuance of letters rogatory here would be inconsistent with the principles of international comity.[7]  Comity requires a court to "demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987).  Issuing the requested letters rogatory would undermine the sovereign interests of Canada and ==unnecessarily subject AECL, a non-party, to the potential burden of complying with unduly broad discovery requests seeking information that is otherwise==

---

[7] "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987).  "[I]t is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  *Id.* (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)).

available to Lantheus.  AECL already has cooperated with Lantheus's efforts to obtain information through the procedure established by the Canadian government and is producing a substantial amount of responsive information.  Respectfully, it should not be asked to do more.

A court deciding whether to issue letters rogatory (also called "letters of request") must consider five factors identified by the Supreme Court as relevant to a comity analysis.  *See Seoul Semiconductor*, 590 F. Supp. 2d at 834; Restatement § 473 Reporters Note 5 (1987) ("[A] court in the United States issuing a letter of request for foreign discovery must consider the [comity factors] listed in § 442(1)(c) . . . .").  Those factors are:

> (1) the importance to the . . . litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information; and
>
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aerospatiale*, 482 U.S. at 544 n.28 (quoting Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent. Draft No. 7, 1986), *subsequently adopted as* Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c)).  Courts in the Second Circuit also consider two additional factors: "any hardship the responding party would suffer if it complied with the discovery demands and whether the responding party has proceeded in good faith."  *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 245 (S.D.N.Y. 2010) (Francis, M.J.), *adopted in relevant part by* 758 F. Supp. 2d 238 (S.D.N.Y. 2010) (McKenna, J.).  These

factors make clear that, as a matter of comity, this Court should decline to issue the letters rogatory requested by Lantheus.

### A.    Balance of National Interests

Of the comity factors identified by the Supreme Court, "'[t]he fifth . . . factor—the balancing of national interests—is the most important, as it directly addresses the relations between sovereign nations.'"  *Milliken*, 758 F. Supp. 2d at 245 (quoting *Madanes v. Madanes*, 186 F.R.D. 279, 286 (S.D.N.Y. 1999)).  Canada's interests in preventing disclosure of the requested documents and information (at least, outside the Access to Information Act ("ATI Act") request procedure already initiated by Lantheus in Canada) far outweigh any countervailing interest the United States may have in disclosure of the information.  The United States has virtually no interest in this wholly commercial dispute between two private parties. The most that could arguably be said in favor of requiring disclosure from AECL here is that the United States has a generalized "'interest in fully and fairly adjudicating matters before its courts.'"  *Id.* at 247 (quoting *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443 (E.D.N.Y. 2008)).  That concern, however, is eclipsed here in several ways.

First, AECL's status as a Canadian federal Crown corporation implicates the United States' own countervailing interest, as a matter of comity, in "giv[ing] foreign states and their instrumentalities some protection from the inconvenience of suit."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003).  As discussed above, that same principle extends to protecting foreign sovereigns from the burden of discovery.  *See supra* Part I.A; *see, e.g.*, *Seoul Semiconductor*, 590 F. Supp. 2d at 836 ("Compelling broad discovery from an agent or agency of a sovereign nation is not something this court would lightly undertake.").  Issuance of the requested letters rogatory would impose such a burden on AECL.

- 12 -

Second, the government of Canada has, through its laws, made clear the importance to its national interests of controlling the disclosure of nuclear information such as that requested by Lantheus. *See Aerospatiale*, 482 U.S. at 544 n.29 (holding that foreign statutes can "identify the nature of the sovereign interests in nondisclosure of specific kinds of material"); Restatement § 442 cmt. c (courts assessing foreign interests look, inter alia, "to the significance of disclosure in the regulation by the foreign state of the activity in question"). Because of the strategic and economic importance of nuclear technology, the possession, use, and export of nuclear information is highly regulated under various Canadian statutes and regulations, including the Nuclear Safety and Control Act, SC 1997, c. 9, the Nuclear Non-proliferation Import and Export Control Regulations, SOR/2000-210, and the General Nuclear Safety and Control Regulations, SOR/2000-202, P.C. 2000-782.  Affidavit of Jean-Pierre Labrie  ("Labrie Aff."), sworn July 15, 2011, ¶ 7, attached as Ex. D to Krainin Decl.;[8] Whitehall Decl. ¶¶ 6-7.  In addition, the Canadian government has prescribed a procedure for providing public access to government records, subject to certain limitations, in the Access to Information Act, RSC 1985, c. A-1.  Labrie Aff. ¶¶ 7, 9, 11; Whitehall Decl. ¶ 8.

As AECL manager Jean-Pierre Labrie has testified, disclosure of information relating to AECL's nuclear technology, "other than in strict accordance with the controls established by applicable Canadian law and policy, could: (a) permit AECL's foreign competitors to appropriate the fruits of Canada's investment in the research and development of nuclear

---

[8] Dr. Labrie, who holds the title of Manager, Reactor Physics and Systems Behaviour with the Office of the Chief Engineer at AECL, Labrie Aff. ¶ 2, submitted this same affidavit in the Ontario action and was subject to cross-examination by Lantheus, *see* Decl. of Brett Harrison in Supp. of Pl. Lantheus Medical Imaging, Inc.'s Mot. for Issuance of Am. Letters Rogatory ("Harrison Decl."), executed Aug. 29, 2011, Ex. 3 (Doc. 38).  AECL thus respectfully submits that Dr. Labrie's affidavit does not constitute "factual material that has not been subject to discovery" under the Court's Order of September 7, 2011.

technology; (b) create a risk to [the] public interest and national security; and/or (c) lead to a loss of competitiveness obtained from significant investment in research and development potentially resulting in significant economic losses to Canada."  Labrie Aff. ¶ 8.  With respect to Lantheus's particular requests, Dr. Labrie has testified that "some of the information sought . . . will likely be subject to export restrictions, rendering it inappropriate to send to the United States."[9]  *Id.* ¶ 43.

Finally, comity dictates that a U.S. court ought not seek assistance from a foreign court that it might not be able to provide to foreign litigants under similar circumstances.  *See* 22 C.F.R. § 92.54 (requests contained in letters rogatory "customarily embody a promise of reciprocity").  That is the situation here.  The U.S. government has taken the position that it is immune from enforcement of foreign letters rogatory seeking non-party discovery from the government or its instrumentalities.  *See United Kingdom v. United States*, 238 F.3d 1312, 1324 n.12 (11th Cir. 2001).  There is substantial uncertainty, then, about whether this Court could provide a Canadian litigant the equivalent assistance that Lantheus would have this Court request from its Canadian counterpart.  In the absence of such assurances, the letters rogatory should not issue.

In short, the balance of sovereign interests—the paramount factor in the comity analysis—weighs heavily against issuance of the requested letters rogatory.

---

[9] Mischaracterizing Dr. Labrie's testimony, Lantheus claims that he "could not identify a single document" sought by Lantheus "that was actually subject to Canadian export regulations." Lantheus Mem. at 18.  As Lantheus knows, the reason for that is that Dr. Labrie *had not reviewed* the documents in question at the time of his deposition.  Harrison Decl. Ex. 3 at 13:19-23, 61:11-21.  Nevertheless, Dr. Labrie reiterated that, based on the scope and subject matter of Lantheus's requests, they would "likely" be subject to those regulations.  *Id.* at 61:22-24.

**B.     Importance of the Information Requested**

In a comity analysis, the importance of the information requested is a matter of degree: the court must determine "where it falls on the spectrum between merely relevant at one end and crucial at the other."  *Milliken*, 758 F. Supp. 2d at 246.  By that measure, the information sought by Lantheus's requests—much of which would be cumulative of information already in Lantheus's possession—is far from crucial to this litigation.

Lantheus claims that resolution of its dispute with Zurich "requires detailed evidence about the sequence of events leading to the NRU Reactor shutdown and the causes of the damage to its aluminum alloy reactor vessel."  Lantheus Mem. at 2-3.  Yet Lantheus already has in its possession AECL's Detailed Report regarding the shutdown, which sets out in considerable detail the conclusions of AECL's "Cause Analysis," including information regarding the technical and organizational causes of the shutdown.  Labrie Aff. ¶ 26 & Ex. F.  Moreover, as discussed below, much of the information Lantheus seeks is available through its pending ATI Act request (the "ATI Request")—through which it asked for the same documents that it seeks here—as well as publicly-available documents.  *See infra* Part II.E.  Lantheus has not shown that any additional information it might obtain by way of letters rogatory (if even any such information were discoverable) would be anything more than "merely relevant" to this litigation. As such, this factor provides little or no support for issuance of the requested letters rogatory.

**C.     Specificity of the Requests**

Further, Lantheus's document requests are not the sort of "narrowly tailored" requests that typically support the issuance of letters rogatory.  *See Milliken*, 758 F. Supp. 2d at 246. Rather, many of the requests broadly call for all documents that AECL "considered or generated" in relation to a wide variety of issues related to the reactor shutdown.  *See* Proposed Order, Schedule A, Request Nos. 1-6, 10-11.  According to Dr. Labrie, who has substantial

experience responding to document requests, Labrie Aff. ¶ 10, Lantheus's requests "may well extend to a large number of reports, memoranda, e-mails, data sources, analyses, etc., which would be time consuming and onerous for AECL to identify, review and ultimately produce with needed redactions."[10]  Labrie Aff. ¶ 37.  This factor also weighs against issuance of the requested letters rogatory.

### D. Origin of the Information

It is undisputed that the documents and information sought by Lantheus are located in Canada.  As this factor "'only addresses the physical location of the documents,'" it clearly weighs against issuance of the requested letters rogatory.  *Milliken*, 758 F. Supp. 2d at 246 (quoting *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458, 2010 U.S. Dist. LEXIS 20834, 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010)).

### E. Alternative Means of Securing the Information

Also weighing against Lantheus's request is the fact that much of the information it seeks can be "easily obtained" through alternative means—namely, its ATI Request and publicly-available documents.  *See Milliken*, 758 F. Supp. 2d at 246.  Lantheus's complaint that AECL has "resisted producing any substantive information in response to the ATI Request," Lantheus Mem. at 5, lacks any basis.  In fact, AECL has diligently endeavored to respond to Lantheus's

---

[10] Although Dr. Labrie was responding to Lantheus's original set of document requests, his conclusion applies equally to Lantheus's amended requests.  Aside from abandoning a number of the original requests that were irrelevant to Lantheus's stated reasons for obtaining letters rogatory, *see* Labrie Aff. ¶ 39, the amended requests differ from the original ones primarily in that those that once called for all documents "considered or reviewed" by AECL now call for all documents "considered or generated" instead.  The distinction between "considering" and "reviewing" a document is so vanishingly small that the deletion of the latter does not reduce the scope of the requests.  *Compare Merriam-Webster's Collegiate Dictionary* (11th ed.) (defining "consider" as "to think about carefully"), *with id.* (defining "review" as "to go over or examine critically or deliberately").  Indeed, if anything, the substitution of "generated" for "reviewed" serves to expand the scope of the requests.

request and has produced approximately 2,200 pages of materials, Lantheus Mem. at 5 n.2, including its Detailed Report, which provides specific information regarding the causes of the reactor shutdown, *see supra* Part II.B.[11]   Indeed, Lantheus's adversary, Zurich, received only a subset of those in response to its own ATI Act request, and has expressed satisfaction with that response.  Labrie Aff. ¶¶ 23-27.   To the extent AECL has redacted "financially sensitive information" from its response, as permitted by the ATI Act, *see* Lantheus Mem. at 18, Lantheus has not explained why such information (as opposed to information about the causes of the shutdown) is relevant to this litigation.

Moreover, the process of responding to the ATI Request is not yet complete.  Insofar as Lantheus is dissatisfied with the pace of that response, the responsibility for any perceived delay rests squarely on its own shoulders.  Made aware by AECL's Access to Information and Privacy Director that responding to the ATI Request would "require a very large amount of work, time and resources," Korde Decl. Ex. 10 at 1, Lantheus steadfastly refused to narrow its scope, Labrie Aff. ¶ 19.  Further delay is attributable to the fact that Lantheus waited at least two weeks in August 2011 to pay the required ATI Act search fee, during which time its request was placed on hold.  *See* Korde Decl. Ex. 13 (Aug. 9, 2011 letter requesting payment of fee); Korde Decl. ¶ 29 (Lantheus's counsel received fee request on Aug. 17, 2011); Krainin Decl. Ex. E (Letter from B. Harrison to J. Boulais (Aug. 30, 2011) (enclosing fee)).

---

[11] Given the breadth of Lantheus's ATI Request, its complaint that many of the documents did not directly "deal with" the 2009 NRU Reactor shutdown rings hollow.  *See* Lantheus Mem. at 5 n.2.  For example, one of Lantheus's requests sought "[d]ocuments reporting on the results of inspections and scans of the NRU reactor vessel conducted in 2004, 2005, 2009, 2010 and 2011."  Korde Decl. Ex. 5 at 4 (Request No. 9).  Other requests sought all documents "considered or reviewed" with respect to various issues (Request Nos. 3-8, 13-14, and a number pertained to conditions "during the period prior to" the reactor shutdown (Request Nos. 5, 6, 14, 18).  *Id.* at 3-5.  To the extent Lantheus believes AECL's response has been overly inclusive, it has only its own overbroad requests to blame.

In addition, much of the information sought by Lantheus is publicly available from the Canadian Nuclear Safety Commission ("CNSC"). Labrie Aff. ¶¶ 44-48. Lantheus's only retort is to mischaracterize the testimony of Dr. Labrie, claiming that he "admitted that the *documents* sought by Lantheus are *not* publicly available." Lantheus Mem. at 18. In fact, Dr. Labrie only testified that it was "possible" that certain documents sought by Lantheus might not be publicly available through the CNSC. Harrison Decl. Ex. 3 at 49:15. Lantheus does not, however, dispute Dr. Labrie's testimony that the *information* sought by Lantheus is "largely publicly available." *Id.* at 49:22-24. As Lantheus can already obtain the information it needs through public sources, AECL should not be put to the burden of providing cumulative documentation of that information.[12] *See Aerospatiale*, 482 U.S. at 544 n.28 (relevant question is "the availability of alternative means of securing the *information*" requested (emphasis added)). This factor weighs heavily against issuance of the requested letters rogatory.

## F.  Hardship of Compliance

Compliance with the proposed letters rogatory would constitute an unacceptable hardship for AECL. Responding to Lantheus's exceedingly broad requests would entail a highly burdensome review and production process. *See* Labrie Aff. ¶ 37; *supra* Parts II.C, E. It also could damage AECL's commercial interests by "permit[ting] AECL's foreign competitors to appropriate the fruits of Canada's investment in the research and development of nuclear technology." Labrie Aff. ¶ 8. Moreover, AECL's status as a non-party to this litigation means

---

[12] AECL concedes that the ATI Act process would not provide the deposition testimony that Lantheus claims it would need "to fill in informational gaps" or "establish a foundation for admissibility of documents." Lantheus Mem. at 18. Lantheus's first concern is purely speculative, and hardly sufficient to significantly impact the comity analysis given the wealth of information to which Lantheus does have access. The second does not require a deposition as AECL is willing to certify the authenticity of the documents at issue and, where appropriate, certify that they are business records or otherwise verify their origin.

that the hardship of compliance should "weigh more heavily in the balance" of comity factors. *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 116 F.R.D. 517, 526 (S.D.N.Y. 1987); *see also First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir. 1998) (noting that "non-party status is a consideration in the comity analysis"). Accordingly, this factor cuts substantially against issuance of the requested letters rogatory.

### G.     Good Faith

AECL has acted in good faith with respect to Lantheus's attempts to obtain the documents it is now requesting. To the extent Lantheus's brief suggests otherwise, it is off the mark. For example, Lantheus complains that AECL has "resisted producing any substantive information in response to the ATI Request." Lantheus Mem. at 5. As explained above, however, that is wrong: AECL has produced such information and continues to collect and review additional potentially responsive information. *See supra* Part II.E.

Lantheus also insinuates that AECL was dilatory for not asserting any objection to the issuance of letters rogatory until June 16, 2011, "more than a year after Lantheus had sought AECL's cooperation in making evidence available." Lantheus Mem. at 6. This is a red herring. AECL raised its objections only three weeks after the Court issued the letters on an application about which AECL was not notified and to which it did not have the opportunity to respond. Lantheus's counsel attempts to divine some significance from the fact that "[a]t no point during the ATI Request process prior to the issuance of the initial letters rogatory did AECL indicate that it wanted to be notified if Lantheus asked this Court to issue letters rogatory." Korde Decl. ¶ 30. That is a curious place, to say the least, to put the burden of learning about such an application. In any event, the salient fact is that AECL raised its objections promptly upon being informed of the issuance of the letters rogatory. Nor would there have been any need for AECL to raise such objections earlier, as its grounds for objecting to the issuance of the letters rogatory

- 19 -

were entirely irrelevant to the ATI Act request process in which it had been engaged with Lantheus.  As AECL has proceeded in good faith, this factor does not weigh in favor of issuing the requested letters rogatory.

*      *      *

In sum, five of the seven comity factors—the balance of national interests, the specificity of the requests, the origin of the information, the availability of alternative means of securing the information, and the hardship of compliance—weigh clearly against issuance of the letters rogatory.  One factor—AECL's good faith—provides no support for issuance of the letters, and the final factor—the importance of the information requested—provides minimal support at best. Weighing all of these factors, it is evident that this Court should decline Lantheus's request.

## CONCLUSION

For all the aforementioned reasons, Atomic Energy of Canada Limited, as amicus curiae, respectfully urges the Court to deny Lantheus's motion for issuance of amended letters rogatory.

New York, New York
Dated: September 16, 2011                           Respectfully submitted,

                                    s/ Daniel M. Krainin
                                    Daniel M. Krainin (DK1128)
                                    Edward M. Grauman (EG9825)
                                    BEVERIDGE & DIAMOND, P.C.
                                    477 Madison Avenue, 15th Floor
                                    New York, NY 10022-5802
                                    Tel: (212) 702-5400
                                    Fax: (212) 702-5450
                                    dkrainin@bdlaw.com
                                    egrauman@bdlaw.com

                                    *Attorneys for Atomic Energy of
                                    Canada Limited*