19EVLANC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LANTHEUS MEDICAL IMAGING,
INC.,

                    Plaintiff,

            v.                          10 CV 9371 (LTS)(JLC)

ZURICH AMERICAN INSURANCE
COMPANY,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        September 14, 2011
                                        10:37 a.m.

Before:

                    HON. JAMES L. COTT,

                                        Magistrate Judge

                          APPEARANCES


COVINGTON & BURLING
      Attorneys for Plaintiff
BY:  RUKESH A. KORDE

MOUND COTTON WOLLAN & GREENGRASS
      Attorneys for Defendant
BY:  WILLIAM D. WILSON

19EVLANC                    Conference

```
 1              (In open court)

 2              THE DEPUTY CLERK:  In the matter of Lantheus Medical

 3    Imaging v. Zurich American Insurance.

 4              Counsel, please state your name for the record.

 5              MR. KORDE:  Rukesh Korde, counsel for plaintiff,

 6    Lantheus Medical Imaging.

 7              THE COURT:  Good morning, Mr. Korde.

 8              MR. WILSON:  William D. Wilson, counsel for defendant,

 9    American Insurance Company.

10              THE COURT:  Good morning, Mr. Wilson.

11              MR. WILSON:  Zurich American Insurance Company, sorry.

12              THE COURT:  You may be seated.

13              I have various correspondence from the parties related

14    to this dispute, I guess at least as the letters outline, that

15    there are five different categories.  And before, I guess, we

16    consider each one of them one at a time, could the parties fill

17    me in as to what production has been made, if any, since the

18    time of the letters?

19              I understood from the letters that there was some

20    supplemental production intended to be made; and, if so,

21    whether any of that production has in some fashion mooted or

22    changed any of the particular documents that are still in

23    dispute.

24              MR. KORDE:  Your Honor, there was supplemental

25    production, I believe, of about 1,000 pages of documents.  It
```

1  did not obviate the need for resolution of the pending dispute.

2  Most of the materials produced were specimen policy forms.  I

3  believe there was also a six-page excerpt from a claims manual,

4  and some other materials, none of which answer the substance of

5  what's at issue today.

6          THE COURT:  All right.

7          MR. WILSON:  Judge, if I could, I do disagree with

8  that.

9          I think most of the categories here have been

10  resolved.  And if you want me to go category-by-category, I can

11  do that.  I can tell you what we produced and why we believe

12  it's resolved everything.

13          THE COURT:  Why don't I kind of steer the discussion

14  one category at a time, and I'll hear from each of you one

15  category at a time.  That may or may not be the most efficient

16  way to proceed, but we'll start that way.

17          So the first category is documents related to other

18  first-party policies Zurich has sold to Lantheus.

19          So, Mr. Korde, where are we on that?

20          MR. KORDE:  Your Honor, the principal set of documents

21  that are missing here are documents relating to a -- the policy

22  at issue in this case is a renewal policy.  And the initial

23  policy was sold to Lantheus in 2008.

24          It's our understanding that the line underwriter had

25  to get specific authorization to sell Lantheus the contingent

business interruption insurance that was attached to that

initial policy and that's now at issue with the renewal policy.

          Typically, in insurance what happens is that the bulk

of the underwriting is done when the first policy is issued,

not at the renewal stage.  So there would be, we think,

significant underwriting materials related to that initial

policy that still have not been produced.  And they reveal, we

think, what Zurich thought it was insuring when it issued that

initial policy.

          These documents, your Honor, are particularly

relevant, because Zurich is making an argument that in order

for Lantheus to obtain insurance coverage for its contingent

business interruption losses, there had to be a complete

cessation of Lantheus's business activities.

          Now, at the time that the initial policy was issued,

Zurich sold Lantheus contingent business interruption coverage

for the NRU reactor which is at issue here.  And it also sold

Lantheus contingent business interruption insurance coverage

for supply chain disruptions related to a different unrelated

Lantheus product.

          We think that that discovery of the initial

underwriting file would show that Zurich was well aware that

when it sold us the NRU contingent business interruption

insurance, that if there was a supply chain disruption related

to that, this other product would continue on and production

1    would continue with this other product.  And they sold us this

2    CBI coverage nonetheless, which would, we think, undercut their

3    argument that there needs to be a complete cessation of the

4    business, because these other products stream and continue.

5            So we think that discovery is particularly relevant to

6    an argument that's been raised by Zurich.

7            THE COURT:  Mr. Wilson, why shouldn't that be

8    produced?

9            MR. WILSON:  Sure.

10           With respect to the prior year's underwriting files,

11   I've spoken with Mr. Korde about this on two occasions, and

12   actually told him that we would produce the file, but that we

13   cannot locate it at this point.

14           What had happened was this was written through a

15   department of Zurich called the mergers and acquisitions

16   department.  In May of, I believe it was, 2009, around the time

17   that this loss occurred, the division was shut down and was

18   located in New York.

19           The policy was then moved up to Boston and

20   underwritten out of Boston.

21           What they did was when they shut down the division,

22   they just let everyone go that day.  So I have spoken to the

23   prior underwriters who have no recollection at all about

24   writing this policy, but they also have no knowledge as to what

25   happened to the files once the office was shut down.

1    At the time the office was shut down, the renewal

2    policy had already been written; so anything they needed to

3    write the renewal policy was already done, and there was a new

4    policy out there.  We just can't locate the files.

5    So while we don't think they are relevant, in the

6    interest of compromise, we did tell Mr. Korde we would produce

7    them; but as I explained to him, we are having difficulty

8    finding them.  I have been tracking down the underwriters; I've

9    been working with Zurich people to try to find out, when they

10   closed down this office, what happened to all of the files.

11   And I still haven't been able to do that.

12   THE COURT:  Well, it seems to me they are relevant,

13   and they should be produced.  But obviously if they can't be

14   found, then I'm not with any authority to order something that

15   can't be found to be produced for obvious reasons.

16   It sounds to me like otherwise essentially the parties

17   have agreement on this.  So I'm not sure you need a formal

18   ruling from the Court.

19   MR. KORDE:  If I may, your Honor.

20   The trouble I have with this is we're in an age of

21   electronic documents and emails and back-up tapes.  And it

22   seems to me problematic to say that we can't find anything.

23   It's unclear is what they can't find the hard copy files?  Have

24   they looked for the emails?  Have they looked through the

25   back-up tapes?  Have they looked through the electronic

1   documents?

2          What we'd like is -- I think, at a minimum, what we

3   are entitled to, given their conceded relevance, is some sort

4   of order indicating or requiring Zurich to make a thorough

5   diligent search of any electronic files, emails, back-up tapes,

6   where these documents might be located.

7          THE COURT:  Well, I think that makes sense.  And I'll

8   go beyond that, which is that if that takes place, Mr. Wilson,

9   and it can't be found, then I think you need to have someone

10  from Zurich prepare an affidavit which identifies precisely

11  what was searched and how it was searched so that Lantheus has

12  that, and that essentially kind of buttons the issue down, if

13  you will.

14         I will direct that Zurich make its best efforts to

15  find these documents through all logical means, which includes

16  reviewing emails, reviewing back-up tapes, reviewing any other

17  electronic means through which these materials might have been

18  either created or preserved.

19         If having done all of that they cannot be located,

20  then you need to memorialize that fact through someone at

21  Zurich swearing to that fact and the steps taken to ascertain

22  where these documents may have been, but no longer have been

23  able to be found.

24         So you'll either produce them if you can find them, or

25  if you can't produce them, you'll provide Mr. Korde an

1    affidavit along the lines I've just described.

2              MR. WILSON:  OK, your Honor.

3              THE COURT:  Next category.

4              The documents relating to the interpretation of this

5    policy.

6              MR. KORDE:  I can address that, your Honor.

7              The documents in question are claims manuals,

8    underwriting manuals, drafting history, interpretive bulletins,

9    annotated specimen policy forms.

10             In our view, these documents are clearly relevant.

11   Courts have routinely relied on them in interpreting insurance

12   policies, disputed provisions of insurance policies.  These are

13   documents that go to what Zurich understood the disputed terms

14   of the insurance policy at issue to mean.

15             My understanding is that Zurich's principal reason for

16   objecting to the production of these documents is that there's

17   no relevance.  And their view is, well, the policy is

18   unambiguous, so extrinsic evidence is irrelevant.

19             Your Honor, I would submit that there has been no

20   ruling that the policy at issue is unambiguous; and that

21   arguments about whether the policy is ambiguous or not are

22   really arguments for the summary judgment phase or for pretrial

23   evidentiary motions.  We're in the discovery phase.  Courts

24   have relied on this type of material to interpret policy

25   provisions.  The materials are not privileged; they should be

1    discovered.

2            THE COURT:  Unless I misheard Mr. Wilson, I thought he

3    made some reference to the fact that at least some documents in

4    this category have been produced or they intend to produce.

5            Is that not right?

6            MR. KORDE:  Your Honor, they produced some documents.

7    They produced, for example, a six-page excerpt I think from

8    their claims manual.  That's selective production.  If there's

9    a claims manual, they need to produce the claims manual.  If

10   there's an underwriting manual, they should produce the

11   underwriting manual.

12           We have not received annotated policies; we have not

13   received the drafting history.  The insurance policy at issue

14   was -- the standard form policy at issue was significantly

15   revised.  My understanding is in 2009 there would be drafting

16   history associated with those changes.  We think we are

17   entitled to that.

18           So they have produced some stuff, but they have not

19   produced the full panoply of materials to which we are

20   entitled.

21           THE COURT:  All right.

22           Mr. Wilson?

23           MR. WILSON:  Sure.

24           Judge, once again, let me start by saying we don't

25   believe any of these materials are relevant, because the policy

1    language is, in fact, clear and unambiguous.  And you don't get

2    into extrinsic evidence to interpret a policy unless and until

3    there has been a finding that the policy is ambiguous;

4    otherwise, this material has no relevance.

5           THE COURT:  Why didn't you make a summary judgment

6    motion at the outset of this case then?

7           MR. WILSON:  Because we suggested that to the judge,

8    Judge Swain, when we first went before her; we asked if she'd

9    stay discovery.  And initially Lantheus's counsel was on board

10   with that when we first started discussing a preliminary

11   pretrial order.  The parties were going to agree that all

12   discovery would be held in abeyance pending a motion for

13   summary judgment.

14          They then changed their position; we went before Judge

15   Swain; raised our argument.  She said, I'm not going to stay

16   discovery, but I'm going to let you go ahead and do your motion

17   if you want to do your motion.

18          The main claim that Lantheus is making here is that

19   there may be something in the file of this company, AECL, which

20   operated the reactor, that would show that the loss was not, in

21   fact, corrosion.  And so there's a motion before your Honor to

22   get amended letters rogatory issued to get discovery from AECL.

23          We did not file our motion yet because we want them to

24   run the ground on the AECL motion.  Everything that has been

25   produced in this case by AECL, all the publicly-available

1   information, dozens and dozens of Power Points, say the loss

2   was caused by corrosion.  And the policy excludes corrosion.

3   They are trying to come up with some theory as to corrosion

4   really wasn't corrosion, it was something else, and that's why

5   they are trying to get that discovery.

6        Before we file our motion, we want to let them run

7   that to the ground and say we've got all the documents here;

8   they all say corrosion; there's nothing out there; so we're

9   entitled to summary judgment.  That's taken longer than we had

10  hoped, obviously, because AECL is resisting any discovery,

11  although there's a mountain of documentation available publicly

12  online concerning the loss and what exactly was done in the

13  loss.  But that's why we haven't moved for summary judgment on

14  the issue so far.

15       THE COURT:  I think I understand exactly what's going

16  on here.  But it seems to me that until there's a finding that

17  the policy is unambiguous, and there's no stay, discovery

18  proceeds.

19       And the case law I'm familiar with suggests that the

20  kinds of materials Mr. Korde is looking for, which I understand

21  you think on some level is a fishing expedition, and it may

22  well be on some level, I think the law, as I understand it,

23  entitles him with some parameters -- and some of the other

24  categories we'll talk about -- but as to the categories that

25  fall into this particular group of documents that we're talking

 1    about, it seems to me are entirely appropriate and things that

 2    courts look at to determine whether policies are ambiguous or

 3    not.

 4              So it's hard for me to understand why the items that

 5    Mr. Korde just listed wouldn't be discoverable.  They may well

 6    not be admissible; they may well be extrinsic evidence that's

 7    unnecessary.  It may be you're going to make a summary judgment

 8    motion that's dispositive, and we're never going to get beyond

 9    that in this case.

10              But in the moment we're in right now, it seems to me

11    this category is appropriate for discovery.

12              MR. WILSON:  And let me just address -- there's a

13    two-step process here or two-step way in which I'd like to

14    address.  The first one is with the arguments you just

15    mentioned about the case law.

16              When I read the cases, there's at least some type of

17    *prima facie* showing or allegation that language is ambiguous.

18              Here there's no allegation.  They've never come

19    forward and said this language is ambiguous.  And that's one of

20    the problems we have.  If it is ambiguous or the claim is

21    ambiguous, what is ambiguous about it?  They never said that.

22    So we don't have a case like most of the decisions that are out

23    there, where one party says it's ambiguous; they produce some

24    case law saying there's different interpretations or something

25    like that.  We have none of that in this case.

1          So unless there's been some showing, even a minimal

2     showing, that there's certain language, they point to certain

3     language, they say we believe this language is ambiguous

4     because of this, this discovery has no relevance because

5     there's no claim of ambiguity.  As far as I read the complaint,

6     there's no claim that any language in the policy is ambiguous;

7     they are claiming that the policy language is clear.

8          So until there's been that initial showing, we don't

9     believe that they would be entitled to discovery; and we

10    believe the case law supports our position on that.  And as I

11    read the cases, typically there's some dispute between the

12    parties as to whether or not the language is clear.

13         THE COURT:  How, from your view, do they meet that

14    threshold?  What is it that you would expect them to do?

15         MR. WILSON:  At least, at a minimum, point to the

16    language that they believe is not clear.

17         For instance, there's a policy that says we exclude

18    all losses caused by corrosion.  Are they claiming that the

19    word "corrosion" is not clear?  It seems to me what they are

20    claiming is this loss was not corrosion, it was something else;

21    and for that, they need the AECL discovery.  I don't know that

22    they are claiming the policy language is unclear.  I think what

23    they are claiming is the cause of the loss is unclear.

24         THE COURT:  Mr. Korde, are you claiming the policy

25    language is unclear and ambiguous?

1              MR. KORDE:  Your Honor, I'm claiming that the policy

2    language is ambiguous on its face, and the policy language is

3    ambiguous as applied to this situation.

4              THE COURT:  Does your complaint say that?

5              MR. KORDE:  I would have to go back and look.  I

6    believe it does.  We certainly make that argument in the joint

7    preliminary pretrial statement where we point out that courts

8    have interpreted the term "corrosion" to apply only to gradual

9    natural processes, wear-and-tear type processes, not the type

10   of process that is alleged to have occurred here at the NRU

11   reactor in Canada.

12             THE COURT:  How will these manuals and other materials

13   that we've been talking about shed any light on the subject?

14             MR. KORDE:  Your Honor, if the manuals and the

15   drafting history and the interpretive bulletins indicate that

16   corrosion is a -- that Zurich is interpreting corrosion in the

17   same way that we are, as a natural process or the term only

18   applies to natural gradual decay-type processes, that would

19   support Lantheus's interpretation of the policy, and it would

20   support the view that the corrosion exclusion doesn't apply to

21   what happened at the NRU reactor.

22             THE COURT:  Why do you not just need whatever the

23   manual says about corrosion?  Why do you need an entire manual?

24             MR. KORDE:  There's more than one disputed provision.

25             What we have said to Zurich is we want any

1    interpretive materials that relate to the policy language

2    that's in dispute in this case.  They've raised about a dozen

3    affirmative defenses.  We are relying on various different

4    provisions of the policy.  I believe they rely on the vapor

5    liquids exclusion, the corrosion exclusion, I believe they rely

6    on the maintenance exclusion.  All of these, we think, are the

7    sorts of exclusions that go to excluding coverage for general

8    wear-and-tear or decay-type long-term type losses.  And we

9    think that discovery of their claims manual and this other

10   information would verify that theory.

11         THE COURT:  Is it more burdensome, Mr. Wilson, to

12   parse out from your manuals and related materials the sections

13   that are germane to what's at issue in this lawsuit?

14         MR. WILSON:  Judge, when I started out, I said this is

15   kind of a two-step answer I have to give to your question.

16         We have, in fact, produced materials.  And what we did

17   was -- it's our position they are clearly not relevant, I just

18   want to be clear on that.  But what we did is we went back to

19   the policy that we have in question here, the commercial

20   policies, we got all the interpretive materials that exist,

21   produced them to Mr. Korde some time ago.

22         And what happens is he's expecting someone to have

23   handwritten notes or some kind of manual saying, oh, when you

24   see this term, you do this; when you see that, you do that.

25   Just doesn't exist.

19EVLANC                        Conference

1          What happens is the policy is a living, kind of

2     breathing document.  So I produced for him all iterations of

3     the policy, from its very first version to its final version as

4     of today, with any handwritten notations or marginalia in the

5     document itself which show what changes were made.

6          I also then went to the claims manual, and he said

7     he's got the section from the claim manual.  We produced the

8     sections on contingent business interruption losses.

9          We've also, in the underwriting manual, too, we

10     produced those sections, because that's what this is; it's a

11     contingent business interruption loss.

12          So we've produced significant material.  All the

13     interpretive materials we believe we have in our possession we

14     produced.  I've also produced the specimen policy forms; and,

15     as I said, we produced portions of manuals that we believe

16     pertain to the claim, although we don't believe it is relevant,

17     but in the interest of compromise, we did turn it over.

18          THE COURT:  Mr. Korde, given that production, what is

19     it you haven't received that you think you are entitled to?

20          MR. KORDE:  Your Honor, they produced a six-page

21     excerpt from the claim manual.

22          THE COURT:  You say that like that's de minimis; but

23     it may be all they have that's relevant to the claims in this

24     lawsuit.  And it sounds like Mr. Wilson is representing that to

25     be the case.

1          MR. KORDE:  Your Honor, it would seem to me, if they

2     produce a chapter of the claims manual, then I think the

3     situation would be slightly different.  But it is de minimis.

4          It seems to me that I am entitled to test Mr. Wilson's

5     assertion that that's all there is by looking at the claims

6     manual in its entirety.  We have an insurance coverage dispute

7     that raises questions about the interpretation of the

8     contingent business interruption provision, about the latent

9     causes exclusion about the corrosion exclusion, about the vapor

10    and liquids exclusion, about the maintenance exclusion, and

11    about the ensuing loss exceptions to those exclusions.  And to

12    say that there's just six pages in the claims manual that deal

13    with all of these topics, I think that seems to me --

14         THE COURT:  How about this, Mr. Wilson:  How about

15    Mr. Korde comes to your office; you make the manual available

16    to him in your office; he gets to review it there; and anything

17    beyond what you've produced already that he identifies to you,

18    you'll produce, unless you have some good reason not to, in

19    which case you'll get back in touch with me.

20         How about that as a compromise?

21         MR. WILSON:  I think we can do that, your Honor, as a

22    compromise.

23         THE COURT:  Let's do that.

24         MR. KORDE:  Your Honor, would that include the other

25    sections of the underwriting manual:  The drafting history, the

1    annotated policy forms, and the interpretive -- I'm happy to

2    review them at Mr. Wilson's office, but I would like to be able

3    to see the full panoply of material.

4          MR. WILSON:  I think he has all that.  The annotated

5    policy forms are produced.  There is no other interpretive

6    material concerning those policy forms or terms.  I gave him

7    everything.

8          The thing that I did not produce the whole copy of --

9    I can't remember if it was the claims or the underwriting file;

10   I know we produced one section of it which was relevant to this

11   claim.  But so if he wants to look at the complete manual,

12   certainly I can do that; but I don't think there's anything

13   else responsive to his request.

14         THE COURT:  Well, to the extent that they made

15   production and represented that's the extent of it, there's

16   nothing more for me to make available to you in his office.

17   But it sounds to me like the manual itself is something that I

18   would direct them to make available to you by your reviewing it

19   in his office.  And then if there's more material in it that

20   has not yet been produced, you can make a request of Mr. Wilson

21   to produce it, and he should, unless he has some viable

22   objection that either you'll agree to or you won't, you'll let

23   me know, and we'll have another conference on that particular

24   point.

25         MR. KORDE:  Understood, your Honor.

1          If I may, I think we'd probably want to notice up a

2    30(b)(6) deposition on this issue, see if there is drafting

3    history.

4          THE COURT:  I assume that you would do that at some

5    point along the way.  That's a little bit of a chicken and egg.

6    You could do that before this and ask what do you have and then

7    inspect, or you could inspect and then have your 30(b)(6).  I'm

8    not going to direct you to do it one way or the other.

9    Obviously you could have done a 30(b)(6) a month ago and asked

10   all the questions about what exists, and then maybe we wouldn't

11   be having this discussion.

12         So, for the moment, given what's before me, I'm

13   directing Mr. Wilson to have his client make the manual

14   available to you for your review, and he will produce to you

15   anything beyond what he has today upon your review, unless he's

16   got some objection that you all can't work out, and then you'll

17   come back to me and let me know.

18         MR. KORDE:  Thank you, your Honor.

19         THE COURT:  And then I assume you'll have a 30(b)(6)

20   deposition at some point after.

21         MR. WILSON:  And, your Honor, I had actually suggested

22   that to Mr. Korde a while ago, because when I spoke with the

23   underwriter as to what exists, they explained how they went

24   about putting together the policy, but that's not in writing,

25   that's obviously going to be someone's testimony, I did this, I

1    did this, and here's the document I created, and here is how.

2            So I think that is the best way to get at -- to the

3    extent he wants any additional drafting history.

4            THE COURT:  All right.

5            Next category is documents relating to other policy

6    claims with similar facts.

7            MR. KORDE:  Thank you, your Honor.

8            Setting aside the relevance issue, which I think we've

9    dealt with already, these documents are documents in which

10   Zurich is applying in the ordinary course of its business

11   similar policy language to facts that are similar to the facts

12   here.  That's what we are after.  And it seems to me that an

13   interpretation made by an insurance company of the relevant

14   policy language in the ordinary course of its business is

15   probative as to what it understands that policy language to

16   mean.

17           Now, Zurich has suggested that the material -- they

18   raise two objections.  One is burden, and the other is

19   confidentiality.

20           We're happy for them to redact on the confidentiality

21   issue; we're happy for them to redact financial identifying

22   information; we're happy for material to be marked as protected

23   and under the protective order.  We think that should address

24   the confidentiality issues.

25           On the burden issue, your Honor, our position is that

1    this is a burden of Zurich's own making.  They are a

2    sophisticated company; they are frequently in litigation; and

3    they apparently have set up their electronic claims files in a

4    way that you can't search for individual terms.

5         Courts have little sympathy for litigants that set up

6    their files in a fashion that's obscure or makes it impossible

7    to search.  We cite those cases in our letter.  And we think if

8    there's a burden here, it's a burden of Zurich's own making and

9    should not be permitted to use that to obstruct discovery.

10        THE COURT:  How many other claims with similar facts

11   do you really need to see?

12        MR. KORDE:  Your Honor, that's a good question.

13        We used to do it as the ten earliest, and the ten most

14   recent claims was the compromise that the parties often ended

15   up reaching.

16        More recently, there was an alternative suggested in

17   *Zurich v. American Reinsurance Company* in which Zurich had

18   actually gotten into a dispute with its reinsurer, and it asked

19   its reinsurer to produce the claims files of other

20   policyholders.

21        And what was done there was there was a 30(b)(6)

22   deposition of the person responsible for the database.  And

23   then the parties were directed to meet and confer and come up

24   with a strategy or protocol for sampling files, and coming up

25   with a sample of files that would satisfy both sides in terms

1    of burden and in terms of giving both sides what they need.

2    And that seems to me, in this age, a more reasonable compromise

3    and a more arbitrary ten and ten approach.

4              THE COURT:  Mr. Wilson?

5              MR. WILSON:  Sure, your Honor.

6              Your Honor, Mr. Korde says that this is a burden of

7    Zurich's own making; that because we do not store our files in

8    the manner in which Mr. Korde would like them to be stored, we

9    should incur all the costs.  And I've been handling insurance

10   claims for 20 years, represented all the major carriers.

11   There's no carrier I am aware of that will sort its file based

12   on the particular underlying perils, such as corrosion, or

13   faulty maintenance, or something like that.

14             Insurance companies do segregate files by cat perils

15   or catastrophes.  So, for instance, Hurricane Katrina, I can

16   pull up all my Hurricane Katrina files because it's a cat loss,

17   and the catastrophe is assigned a number.  But insurance

18   companies don't then set aside their files by perils.

19             And what I did was I went back to Zurich and I said,

20   Look, tell me, how many claims do you have?  And you have to

21   understand, Mr. Korde wants all the Zurich companies, and

22   Zurich is a big umbrella group.  There's only one company at

23   issue here, and that's Zurich American Insurance Company.

24             Zurich American Insurance Company searched its files

25   from January 1st of 2009 to June 30th of 2011.  That's

1    approximately one and-a-half years or 18 months.  We came up

2    with 17,873 claims.  And this here is just a list of claims.

3    And this page is a single line for each claim number and each

4    claim.  As you can see, there's almost 18,000 claims here.

5         Now, some of these claims are going to be a few Red

6    Wells, they were settled, they are very easy.  Some of these

7    claims are going to be massive claims where we have rooms full

8    of documents.  If I were to go through these 17,000 claims to

9    see if the word "corrosion" was mentioned anywhere within those

10   claims, it would literally take me years to go through those

11   documents.

12        Even if I assigned someone to do this 365 days a year,

13   24 hours a day, it would take years.  I can tell you from

14   claims in here that I'm particularly handling for Zurich, I

15   know, as I mentioned, some of them have a few Red Wells, some

16   of them have off-site storage because there's just so many

17   documents.

18        THE COURT:  Here's the thing, if I can interrupt you

19   for a minute.

20        I take the point about burden.

21        Let's say the language in Lantheus's policy is

22   construed completely differently by Zurich with respect to

23   another claim.  They would be entitled to know that, it seems

24   to me.  How can they learn that fact without putting you to the

25   burden that you are describing?  There has to be some way for

1    that to be ascertained.

2            MR. WILSON:  Well, Judge, why would they be entitled

3    to know that?  Maybe it may shed light on how these policies

4    are interpreted, but you only get there if the policy is

5    ambiguous, because extrinsic evidence would not be --

6            THE COURT:  Well, I know.  But now you're arguing the

7    merits, and I'm not -- for purposes of whether it's reasonably

8    calculated to lead to admissible evidence, the answer is it's

9    reasonably calculated.  It may not ultimately lead to

10   admissible evidence, but it is reasonably calculated to,

11   because Mr. Korde has to establish ambiguity here.

12           He wants to establish ambiguity by saying, Well, look,

13   Zurich interpreted the corrosion provision with respect to us

14   one way, and they interpreted it a different way with respect

15   to five other claimants.  I assume that's what he'd like to

16   find.  If he can find it, it would enhance his ability to argue

17   ambiguity.

18           So no matter how many times you tell me the policy is

19   not ambiguous, until Judge Swain says it's not ambiguous, I'm

20   looking at this sort of with tunnel vision, if you will, which

21   is is it wholly irrelevant?  No, it's not wholly irrelevant.

22   It's, in my view, reasonably calculated to lead to admissible

23   evidence.

24           Now, that doesn't end the inquiry.

25           You've identified an issue of burden.  There is a

1   tension between what you said and what Mr. Korde has said the

2   cases say, some of which I'm familiar, which is you can't kind

3   of hide your head in the sand and say, We got 18,000 claims; we

4   don't really sort them this way; you're out of luck.  That's

5   not necessarily the end of it.

6           We have to think through and talk collaboratively on

7   some level -- because you know your client's business and I

8   don't -- what is a meaningful way for there to be sampling,

9   even if it's a very small sample, which might be adequate,

10  given the burden you've identified.  So try and speak to that a

11  little bit.

12          I understand you brought, you know, a big collection

13  of documents telling me there are 18,000 claims in a year

14  and-a-half, but that doesn't really end it for me because if

15  there are ten in there that deal with a policy just like the

16  policy Lantheus has, I think for discovery purposes, Mr. Korde

17  is entitled to find out what Zurich's position was with respect

18  to those clauses that are the same or similar.

19          MR. WILSON:  Your Honor, just to step back one second,

20  just -- and not to beat a dead horse, but on the issue of

21  whether or not you can look at a claim file to see how a claim

22  was handled, to see if there's an ambiguity, that's called the

23  doctrine of latent ambiguity.  It's not recognized under New

24  York law or Massachusetts law.  So you can use other claims to

25  show that this policy is, in fact, ambiguous.  A judge first

1   has to look at the policy; the judge has to say, I find this

2   ambiguous; and then you make the next step where you go to the

3   discovery and you look at what the documents say.  So you can't

4   use it to establish ambiguity; it's only once there's been

5   ambiguity found.

6           With respect to the claims though, the issue here is,

7   well, what is a similar claim?

8           For instance, your Honor, there's been a number of

9   recent decisions that have come down involving Chinese drywall;

10  been a number of cases throughout the United States coming down

11  where the Chinese drywall has this off-gas.  And what it does

12  is it corrodes fixtures and fittings within one's house because

13  of the gas.  So there's been a lot of decisions out there as to

14  whether or not that is corrosion.

15          Now, would that type case be relevant to Lantheus's

16  position?  We would say not.

17          So then you get into the issue of, well, it's clearly

18  a corrosion case, but it's a different type of corrosion.

19          So then you have to get into, well, what type of case

20  would be similar to this case, and how do you go about

21  designating cases that are going to be similar?  And unless you

22  just say, Well, I'm going to take the first ten claims and the

23  last ten claims, there's really no way to figure out what's

24  similar, unless you say, for instance, Well, what about claims

25  involving nuclear risks or nuclear facilities.  And we'll get

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

19EVLANC                      Conference

1   into this a little bit with respect to the last request for

2   documents, but Zurich American Insurance Company doesn't insure

3   nuclear facilities or nuclear risks.  What they do is they

4   would provide CBI coverage to a company like Lantheus who gets

5   their material from a nuclear reactor, but they don't reinsure

6   the reactors themselves.

7             So how do you go about determining what's a similar

8   claim?  Is it a homeowner claim?  What about an automobile

9   claim where the automobile fails because we have corrosion in

10   some parts in the automobile?  Is that a similar claim?

11            At this point, Mr. Korde has not proposed any

12   solutions or compromises as to how we go about that.  He just

13   said give me all your claims, and not just for Zurich American

14   Insurance Company, but give them to me for all the various

15   Zurich entities.

16            THE COURT:  Mr. Korde, how do we identify what truly

17   is a similar claim?

18            MR. KORDE:  Your Honor, I think the way to do that is

19   to go back to your Honor's earlier suggestion about working

20   collaboratively and coming up with some protocol for sampling.

21   In this day and age, insurance companies handle claims

22   electronically; the documents are stored -- for example,

23   Zurich, I believe, uses a system called Z Notes.  And it seems

24   to me even if Zurich can't itself search their Z Notes database

25   for the word "corrosion," there are outside vendors that can do

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   so.  And if there is a file that uses the word "corrosion"

2   once, and then there's another file that uses the word

3   "corrosion" 17 times, we know that the latter file is probably

4   the one we want to look at.

5            And then if there is --

6            THE COURT:  Well, what if the one that uses

7   "corrosion" 17 times has to do with some automobile claim or

8   something that's far afield of your case?

9            MR. KORDE:  I believe it's the same solution, your

10  Honor.  You can say "search for corrosion," but exclude any

11  hits that have to do with automobiles or Chinese drywall or

12  what have you.

13           THE COURT:  How expensive is the process you're

14  talking about?

15           MR. KORDE:  I believe it can be done for a reasonable

16  amount of money, given the amount of money involved in this

17  case, your Honor.

18           THE COURT:  How much money is involved in this case?

19           MR. KORDE:  We believe it's a policy limits case,

20  which would make it $70,000,000.

21           THE COURT:  Well, when you say it's reasonable for

22  them to retain a vendor, how much are we talking about

23  ballpark?  Have you done something like this before?

24           MR. KORDE:  We have, your Honor.  I believe -- we had

25  to do something in terms -- in similar terms for our own

1    production.  We pulled the electronic documents, and then we

2    gathered the electronic documents, and we said, All right.

3    Let's find the ones that say AECL or corrosion or the policy.

4    And then we pulled those.

5              THE COURT:  In the world of large-firm litigation,

6    "reasonable" means different things to different people.  If

7    you're talking about $5,000, that's different from $50,000, for

8    example.

9              Are we closer to five or closer to 50?

10             MR. KORDE:  I think we're probably closer to the 50.

11             THE COURT:  Well, that's a fair amount of money, it

12   seems to me, even in a highly complex commercial case of this

13   kind.  So I'm not sure that's the right solution necessarily,

14   because not to demean your absolute right to conduct meaningful

15   discovery, but you're going on a bit of a fishing expedition

16   here.  And I'm not sure I'm comfortable having Zurich finance

17   it to the tune of tens of thousands of dollars.  Maybe there's

18   some other scenario.

19             What about, for example, is there a 30(b)(6) witness

20   who could be provided where you could really understand better

21   than you do, or maybe you understand it sufficiently now -- you

22   seem to be familiar to some extent with the way they maintain

23   their files -- maybe a 30(b)(6) deposition should be taken

24   where you can ask questions about how files are maintained

25   sufficient for you to be able to identify how Mr. Wilson and

1    his client can go about creating protocol for some sampling, or

2    do you feel as you stand here in a position to all know how to

3    do that?

4            MR. KORDE:  I would be happy to take a 30(b)(6)

5    deposition to come up with a protocol for sampling.  My

6    suggestion would be, to facilitate it, Mr. Wilson provide us

7    with a declaration explaining how the files are kept, and that

8    would provide us with then a basis for a more specific 30(b)(6)

9    deposition that they could get us more detail and more

10   specificity so that we could come up with a protocol that was

11   both narrowly tailored and as inexpensive as possible.

12           THE COURT:  Mr. Wilson, what's your view?

13           MR. WILSON:  I think that the 30(b)(6) witness is

14   possibly the best route to go to step through it.  If he wants

15   a declaration, too, I could have someone put together something

16   that would organize it, but that seems duplicative of the

17   30(b)(6).

18           THE COURT:  If I understand what Mr. Korde is

19   suggesting, if you give him this declaration in advance of the

20   deposition, it will help him focus on the right questions to

21   ask and make his deposition more efficient and more meaningful.

22           Is that essentially it?

23           MR. KORDE:  Yes, your Honor, that's it.

24           THE COURT:  So I'm not sure it's duplicative.  On some

25   level it will be, because he's going to be asking the 30(b)(6)

witness, who I assume likely will be the declarant, what

certain things mean that that person has said and the like.

But I think you can't avoid that.  And to some extent, if you

want to avoid what could potentially be a fairly substantial

cost, what I'm trying to do is sort of force the parties into a

meet-and-confer that's more informed by greater information.

And I think this is the better way to proceed.  It may be an

interim step, but not the ultimate resolution here.  I haven't

quite decided whether the burden that's been articulated

outweighs the legitimacy of the claim.  So I'd rather see if

the parties can try and narrow it.  It seems to me the best way

to do that is through a 30(b)(6) deposition.  And I think the

request for a declaration in advance of it is a legitimate one.

So I'll direct, Mr. Wilson, your client to provide a

declaration, presumably of the 30(b)(6) witness or, if not,

someone who is equally well-versed, to Mr. Korde in advance of

the 30(b)(6) deposition.  And then you proceed accordingly;

and, hopefully, as a result of a deposition, you'll all be able

to work out how to do sampling here.  Because my expectation is

not that Mr. Korde should have or even necessarily wants

hundreds of claim files, but I think he wants to have, you

know, at least a snapshot, if I can use that word, of how

Zurich may have construed this or similar language.  And that

is more likely achievable, it seems to me, if he has a better

understanding of how the files are maintained than he may have

1    now.

2              So let's resolve this one this way for now, again,

3    leaving it open to the extent you aren't ultimately able to

4    resolve it to both of your satisfaction.

5              MR. WILSON:  Sure, your Honor.

6              THE COURT:  If I can move on to the fourth one, and

7    maybe cut through it a little bit.  Because if I understood,

8    Mr. Wilson, your letter, on page four of your letter to Judge

9    Dolinger of the letter dated August 15th, it says in footnote

10   one, "The only information that even would be arguably relevant

11   would be documents concerning substantive communications

12   between Zurich and its reinsurers regarding a particular claim

13   at issue.  Zurich can confirm that no such documents exist."

14             Mr. Korde, if no such documents exist, what are you

15   looking for?

16             MR. KORDE:  Your Honor, substance is in the eye of the

17   beholder.  It sounds like there are communications back and

18   forth.  I think I'm entitled to take a look at those and see

19   what exactly they mean when they say "no substantive documents

20   exist."  It seems to me that this is not a burdensome request.

21   If the documents are minimal and nonsubstantive, then let us

22   take a look through them.  I'm happy to do that, for example,

23   at the same time that I'm inspecting the claims manual.  It

24   would just give me an opportunity to verify that the

25   decision --

1          THE COURT:  You're looking for documents that Zurich

2     may have exchanged with its reinsurer and which it in some way

3     construes these terms in a way that would advance your

4     arguments as to their ambiguity?

5          MR. KORDE:  Exactly.

6          THE COURT:  What about making them available when he

7     otherwise comes to visit your office?

8          MR. WILSON:  There are no documents, your Honor.  I

9     tried to be clear in my letter, but I guess Mr. Korde is trying

10    to pierce out the language a little bit.

11         Basically, what happens is when you have reinsurance,

12    there's two types of reinsurance:  There's something called

13    facultative reinsurance, and there's something called treaty

14    reinsurance, which is probably more than most people need to

15    know.

16         Facultative reinsurance is per risk.  So if Zurich

17    says, I have this new insured Lantheus coming in, I want

18    reinsurance.  Can you give me reinsurance for Lantheus?  That

19    would be facultative.

20         Treaty would be, I'm Zurich American Insurance

21    Company; I have a lot of risk.  You're going to provide me for

22    reinsurance for any losses over X dollars.  And the reinsurers

23    say, Fine.  They don't know the particular risks though.  But

24    when a loss comes in and Zurich pays, they then say, Hey, we

25    paid this loss; now you pay us under the reinsurance.

 1              And that's the type of arrangement you have here.  You

 2     have treaty reinsurance.  So it's not facultative; it's treaty.

 3     So there have been no communications with the reinsurers

 4     because no amounts have been paid.  There is, in fact, a claim,

 5     but nothing has been paid out yet.  We don't know if we'll ever

 6     need our reinsurance; we don't know if we'll ever have -- even

 7     if we do pay something, we don't know that it will come up to

 8     the reinsurance.

 9              So there has been no communication.  There's nothing

10     that's gone between reinsurers saying, Here's Lantheus; they

11     have this claim.  Here's the policy; here's the language.

12     There's just no documents at all.

13              MR. KORDE:  Your Honor, if he is representing to the

14     Court that there are no reinsurance communications whatsoever,

15     then I think the request is moot.

16              THE COURT:  All right.

17              I think that's the representation I'm hearing.

18              So let's move on to the last one, which, frankly, is a

19     little mystifying to me.  I may not understand it.  So why

20     don't you speak to that.  At least it's described in the letter

21     as documents reflecting loss prevention or safety inspections

22     of nuclear-related risks.

23              MR. KORDE:  Sure.

24              What we are after here, your Honor, are manuals or

25     guidelines that would tell Zurich's risk engineers how to

1   inspect nuclear-related risks and what to look for.

2           Just as background, the reason insurance companies

3   conduct risk engineering inspections or loss control

4   inspections is, among other things, to prevent covered claims.

5   It's a benefit to the insurance company if there are fewer

6   covered claims, because the risk inspector says, Oh, that

7   wiring is faulty; you should fix that.  And it's a benefit to

8   the policyholder, as well.

9           What the inspectors are looking for though are covered

10  claims.  If the manual says, Go forth and look for fire risks,

11  that supports the inference that Zurich believes its policy

12  covers fire losses.  Similarly, if the manuals talk about, Go

13  forth and look for conditions at nuclear reactors in which

14  nitric acid could attack the nuclear reactor vessel, that would

15  support the inference that Zurich thought that type of loss was

16  covered.

17          So we think those sorts of manuals would provide us

18  with inferential evidence as to what Zurich understood its

19  policies to cover.

20          THE COURT:  Well, Mr. Wilson, since Mr. Korde is

21  coming to your office anyway to look at manuals, why doesn't he

22  look at these manuals, too.

23          MR. WILSON:  Your Honor, I don't believe there are any

24  such manuals from Zurich American Insurance Company.

25          He's talking about Zurich Risk Engineering, which is a

1  different company.  And Zurich Risk Engineering will be

2  retained sometimes by insureds, by companies, to go out and

3  take a look at their risk, and tell them ways they can improve

4  safety and other things that are also used not just by Zurich

5  insurance companies, but by other companies, too, to use those

6  services.

7       But Zurich American Insurance Company does not insure

8  nuclear-related risk.  And that's what I mentioned a few

9  minutes ago, that they don't insure those type of loss; and

10  they certainly have no documents talking about nuclear risks.

11       Also to address Mr. Korde's point, the reactor in this

12  case, which is based up in Canada, is a very specific type of

13  reactor.  We don't have those in the United States.  The way

14  it's designed, they have it in Canada, I think there's one in

15  South Africa.  There's just a few places in the world where you

16  have these particular types of reactors, and they are

17  essentially all the same.

18       So even if we did have documents or some subsidiary or

19  affiliated company of Zurich, had documents concerning nuclear

20  reactors, they would not pertain to this type of particular

21  reactor at issue.

22       But getting back to -- from what I understand, Zurich

23  American Insurance Company does not insure nuclear risk; they

24  have no documents pertaining to inspections of nuclear risk, or

25  doing anything with nuclear risk.

1          They do, however, issue contingent business

2    interruption coverage, where sometimes then you're dealing with

3    a nuclear risk indirectly, and that's what happened here.  But

4    because it's a third-party risk that's out there, Zurich

5    traditionally has no control over that risk, and they are not

6    able to inspect or do anything with that risk because it's not

7    owned by the insured, and Zurich has no control over it.

8          Here, there was a little bit.  When the policy

9    renewed, Zurich tried to put it as a condition of renewal that

10   they be able to go out and inspect the Chalk River reactor in

11   this particular case.  And in subsequent policy years, that's

12   what they've done.  And I understand the parties are still

13   trying to get the AECL agreement to let them in there.  As far

14   as I'm aware, Zurich has no documents that would address

15   nuclear-related risk.

16         And by "Zurich," I mean Zurich American Insurance

17   Company.

18         THE COURT:  I understand.

19         MR. KORDE:  Your Honor, I think the law on this point

20   is fairly clear.

21         If the documents are held by a subsidiary or an

22   affiliate, they're still discoverable.  So the fact that Zurich

23   Risk Engineering is a separate corporation from the Zurich

24   entity that's involved in this litigation doesn't preclude me

25   from getting those documents.  And I'm happy to brief that

1    issue and provide the Court with case law on this.

2              But the case law is fairly well-developed and fairly

3    consistent that if the documents are within an affiliate, a

4    subsidiary, or even a parent, we're entitled to them.

5              THE COURT:  Well, I'm familiar with at least some of

6    that case law.  I'm hopeful that we are going to try and

7    resolve everything today without more briefing.  But we'll come

8    back to that if I think we need briefing.

9              Mr. Wilson, what about that point?

10             MR. WILSON:  Sure.

11             Your Honor, I would take issue with that point.  I

12   don't think that because you sue one company, you're entitled

13   to discovery from all its subsidiaries, related companies, or

14   other entities.  Just doesn't work that way where you can kind

15   of go on a fishing expedition not just with the company you

16   sued, but other companies that may potentially be related.  The

17   fact remains that Zurich American Insurance Company does not

18   insure this type of risk.

19             If there is some other related Zurich company that

20   does insure that type risk and issues a policy, how would that

21   have an impact on Lantheus's claim?  They did not get insurance

22   from that company.  And presumably if you insure a nuclear

23   risk, you treat things differently or you look at different

24   aspects of it.  And the decision was made by Zurich American

25   Insurance Company not to do that.

1          THE COURT:  Well, but Zurich American did insure this

2     plaintiff with these circumstances.  So I'm a little bit

3     confused by trying to take Zurich American entirely out of the

4     realm of Zurich as an entity, as a whole, and the insurance it

5     provides with respect to nuclear risks.

6          MR. WILSON:  Sure.

7          Because what we are talking about here, Judge, is

8     contingent business interruption coverage.  And that says when

9     the third party that is not related to the insured or is not

10    insured by Zurich sustains a loss, and that third party

11    happened to be a supplier, distributor, or customer of our

12    insured, we'll provide you coverage for the loss that you

13    sustained.

14         So what happens is we don't go out -- we don't go to

15    AECL or the Chalk River reactor; we don't inspect them; we

16    don't do anything with that.  We look at Lantheus.  We look at

17    their books; we go to Lantheus's facility.  And, in fact, we

18    did do an inspection of Lantheus's facility and looked around

19    and made certain recommendations about handling materials and

20    stuff like that.

21         But we don't insure the reactor itself; we insure

22    Lantheus.

23         THE COURT:  Well, Mr. Korde, what if I were going to

24    make available to you something beyond Zurich American, but

25    some subsidiary.  What use are you ultimately going to put to

1    that information?

2            MR. KORDE:  As I said, your Honor, if, for example,

3    the loss inspection manuals say, you know, make sure that the

4    nuclear reactor doesn't have conditions in which nitric acid

5    can form, then what we do is put that in front of either the

6    judge or the jury, the finder of fact, and say this supports

7    the inference that they believe that these sorts of conditions

8    would cover.  That's the type of use we would ultimately make

9    of it at trial or at summary judgment proceedings.

10           THE COURT:  Mr. Wilson, what's your response to that?

11           MR. WILSON:  I just don't see any type of connection

12   there.  I think that it's really stretching out in terms of

13   relevance how you get from the fact that they have a continued

14   business interruption loss that resulted from corrosion as to

15   whether or not the nitric acid is formed when operating the

16   reactor.

17           And I can tell you just looking on the Internet that

18   that's a known problem with the AECL reactor, is the formation

19   of nitric acid.  They've been dealing with it since the 1950s;

20   and it's something they monitor for; they know it's there.

21           But by stretching it out, how do you then take --

22   someone has some kind of document somewhere, some company, some

23   unknown company, we don't know, that somehow has a relationship

24   with Zurich, may have a document that talks about looking for

25   nitric acid.  How does that come into play as to whether or not

1    the corrosion exclusion applies in this case?

2              THE COURT:  Is there anything that would narrow the

3    request that would make it less objectionable in the sense of

4    overbreadth from your standpoint, Mr. Wilson?

5              MR. WILSON:  You know, just trying to come up with

6    some -- it's difficult for me to imagine how anything like that

7    would be relevant, since it's a third-party risk.

8              THE COURT:  Well, you heard how Mr. Korde articulated

9    he would use it before the fact-finder either on a motion or a

10   trial.  That's his legal position.  I mean obviously you

11   disagree with it, but it's how he is intending to use any

12   information, if he were to find it.

13             So I'm just trying to think if you have any way of

14   being more amenable if it were a narrowed request or,

15   Mr. Korde, you want to propose narrowing it in some fashion.

16             MR. KORDE:  Your Honor, I think I can propose

17   narrowing it.

18             I mean it seems to me Zurich -- we're not asking

19   Zurich to search every single Zurich entity.  It seems to me

20   Zurich knows which of its subsidiaries or affiliates engage in

21   risk engineering and loss inspections.  And it sounds to me

22   like there's only one entity, Zurich Risk Engineering.  There

23   may be others, but I don't -- I assume they don't have 50

24   companies doing it; I assume it's one or two or three companies

25   that are doing this.  And those are the companies they need to

1    poll.

2           So we're not asking him to go and do a search of every

3    Zurich writing insurance company in the world.  We're saying,

4    Look at your affiliates that do risk engineering.  That, it

5    seems to me, is not burdensome.  Presumably these are risk

6    engineers; they are going out there all the time; these are

7    documents that are used in the ordinary course of business,

8    they should be readily available.

9           THE COURT:  Well, you're speaking to burden; I'm

10   really talking to the scope of the request.

11          I mean you just said you think there are just a few

12   documents or some finite universe of documents.  Is that, in

13   fact, so, Mr. Wilson, from your perspective?  Do you know?

14          MR. WILSON:  I'm not aware of any documents, Judge.

15   And I just went to Zurich American Insurance Company; I haven't

16   gone beyond them.  So it is possible someone else could have

17   documents, but I haven't looked at that.

18          THE COURT:  Well, I mean I read both of your letters

19   on this subject.  And my reaction then is, I think, my reaction

20   now, which is that I think this particular request seeks

21   information that is attenuated enough from what the core

22   dispute is here that I am not in a position nor have I been

23   persuaded by what Mr. Korde has said sufficient to order that

24   Zurich go beyond Zurich American to look for the documents that

25   Mr. Korde has identified.

1          I do think it's a bit far afield of what this dispute

2     is about.  And I think, given the other materials that we

3     either agree will be produced or that may well end up being

4     produced, that that's sort of what this case is about; and that

5     this is the closest to the fishing expedition, if you will, of

6     all.  And I'm not prepared, based on at least everything that

7     I've heard today, to direct Zurich to make production with

8     respect to this.

9          So I'm going to deny the application.

10         But I'll do so without prejudice, Mr. Korde, such that

11    if you want to renew it further down the road when other

12    discovery has transpired where this may come into greater

13    clarity, I'll entertain a further request.

14         So let's leave that one there for the time being.

15         Let me ask the following question:

16         Have the parties talked to each other at all about the

17    possibility of settling this dispute?  And, if not, when are

18    the parties going to talk about trying to settle this dispute?

19    And, in any event, how, if at all, can the Court provide

20    assistance to the parties in that regard?

21         MR. KORDE:  Your Honor, if I may, that was one of the

22    issues we were going to bring up today.

23         The scheduling order issued by Judge Swain

24    contemplates that the parties would begin meeting with a

25    third-party mediator by October 5th.

1          One of the reasons that date was chosen was that we

2     were hoping we could get the discovery from AECL, and that it

3     would inform the mediation.  As your Honor knows, we are facing

4     significant challenges getting that discovery.

5          And so what we would like to do -- and I believe

6     Mr. Wilson consents to this -- is to adjourn the October 5th

7     mediation until we have greater clarity, both from this Court

8     and, if necessary, from the Canadian courts, as to whether and

9     when we're going to --

10         THE COURT:  Well, October 5th was just a date that you

11    agreed to with Judge Swain at the Rule 16 conference, at which

12    time you would start heading toward that.

13         You don't have a scheduled date, do you?

14         MR. KORDE:  No.  The pretrial schedule requires us to

15    meet with a third-party mediator by that date.

16         THE COURT:  I see.

17         MR. KORDE:  So we would ask for a consent to

18    adjournment of that schedule.

19         THE COURT:  Well, given what I know where the case is

20    now, that certainly makes sense.  And since I have the case now

21    for general pretrial supervision, I have the authority to, and

22    I will, since the parties consent to it, agree that that date

23    shall be adjourned.

24         Do you want to propose when you think it should be

25    adjourned until?  I know it's a little bit contingent on you

1   all briefing the issue, my resolving it, whether someone goes

2   to Judge Swain or not about it, going to Canada about it, some

3   or all of that potentially could take a little bit of time.

4          MR. KORDE:  Your Honor, I'm informed by Canadian

5   counsel that if the motion is well-taken, the earliest we can

6   get in under the Ontario court's regular orders for a hearing

7   to enforce any amended letters rogatory would be March or

8   April.

9          THE COURT:  March or April of next year?

10         MR. KORDE:  Of next year, which is -- there is

11  significant congestion in the Canadian courts.

12         There are procedural avenues in Canada for getting an

13  earlier hearing.  And we certainly will pursue those

14  aggressively, but there are no guarantees there.

15         And what I would propose to do is that we would hold

16  off on providing the Court with an amended schedule until we

17  have a little better clarity, both from this Court and from the

18  Canadian court, as to when we're going to get heard.  And then

19  once we have that, I could talk to my colleague and we can work

20  out hopefully a consented-to schedule.

21         THE COURT:  Remind me, because I didn't review it

22  before I came to court today, what is the current discovery

23  cutoff date for this case?

24         MR. KORDE:  December 30, 2011.

25         THE COURT:  So that obviously would potentially need

1   to be moved, as well, in light of what you're telling me.

2          But let me just ask you this:  Are you saying that

3   without the information from the Canadian company you're not

4   going to be in a position to have meaningful settlement

5   discussions?

6          MR. KORDE:  Your Honor, we think it would not be

7   particularly productive to talk settlement until we have that

8   information.

9          THE COURT:  Even though -- I mean let me be naive a

10  little bit for the moment.

11         There's a lot of material, or so I'm told, about what

12  happened on the Internet or otherwise publicly available.  What

13  is it that the letters rogatory are going to provide to

14  Lantheus that are going to go beyond what's already in the

15  public record?

16         MR. KORDE:  Your Honor, a couple of things:

17         One, there's very little -- in fact, there's nothing

18  in the public record about the time frame over which the damage

19  occurred.  And one of Lantheus's arguments is that corrosion,

20  as the term is used in the policy, doesn't apply to rapid or

21  accelerated attack on metals.  So the corrosion exclusion only

22  applies if there is gradual metallic decay.

23         And so one thing we need to determine and nail down is

24  how quickly the damage occurred and what the chain of events

25  was that led from what we think was the failure of the various

1    systems that are designed to prevent the corrosion, to the

2    actual physical damage itself.  That's one thing that we would

3    need to have.

4         The other thing we need to have is there are

5    suggestions that additional chemicals or materials were added

6    to what's called the annulus, that is, the empty area

7    surrounding the nuclear reactor where the water collected and

8    the corrosion or the metallic attack occurred.  And we had very

9    limited information as to what those additional chemicals are

10   and how they could have impacted the failure of the vessel.

11   And what we'd like to do is get information about that, about

12   the specific causal mechanism that -- specific damage mechanism

13   that led to the shutdown.

14        So there are those two categories of documents that

15   would be very helpful.

16        THE COURT:  Am I right, Mr. Wilson, your client really

17   is standing aside with respect to the letters rogatory issue?

18        MR. WILSON:  That's correct, your Honor.

19        THE COURT:  You don't take any position with it?

20        MR. WILSON:  We think there is sufficient information

21   out there, but we are not going to stand in their way to get

22   more -- the exclusion, which we cite in our papers and went to

23   the Court, I guess to Magistrate Dolinger first, basically say

24   that if corrosion plays any role, it doesn't matter what else

25   happened in any sequence contributed to it, aggravated, did

1   anything.  So his whole theory about if other chemicals came

2   in, other things, it doesn't matter because ultimately it was

3   corrosion of a vessel that caused a leak which caused the

4   shutdown.

5              THE COURT:  What about the timing issue?

6              MR. WILSON:  The case law, I think, is fairly clear on

7   that.  The lead case is a pioneer chloralkali case; it's a case

8   I handled in Nevada federal court back in 1994.  And the court

9   said there corrosion doesn't have a temporal element.  Whether

10  it occurs in a matter of seconds or occurs over many years,

11  it's still corrosion.  And that's kind of the leading case, and

12  still is, on that.

13             And when you look at the other cases, they talk about

14  that.  And we cited it in some of our papers here, too, about a

15  rapid corrosion, an accelerated corrosion.  For instance, an

16  acid attack.  If I take sulfuric acid and I pour it on the

17  table, it's a wearing away of atoms, which is corrosion.  So

18  all the cases I'm aware of have said it's corrosion in the

19  first-party context, at least.  And that's what we're dealing

20  with, the first-party --

21             THE COURT:  Well, obviously I understand what you both

22  are saying.  I mean for purposes of settlement, obviously, the

23  parties can assume certain things, which the evidence will

24  either bear out or not bear out, and the law will either apply

25  a certain way or not a certain way.  It depends a little bit on

19EVLANC                    Conference

1    how eager your client is to spend money and have delay with

2    respect to litigation as opposed to wanting to try and resolve

3    litigation sooner at less expense.

4           If you're telling me your client really is not in a

5    position to assess its ultimate risk or not, and can't, and far

6    be it for me in an insurance case to tell an insurance company

7    and/or an insured when it should be assessing its risk, but by

8    the timeline you're talking about, it sounds to me like a

9    meaningful mediation isn't going to take place until the next

10   spring or summer at the earliest, unless both sides decide that

11   they want to move more quickly toward a potential resolution.

12          Have you given thought to all of what I'm saying?

13          MR. KORDE:  Your Honor, we have given some thought.

14          I should also back up a little bit and mention the

15   other element that I think would inform settlement discussions

16   is the discovery we hope to get from Zurich.

17          I'm certainly happy to revisit this with my client,

18   that our client's current posture is that it wants -- it's

19   always ready to entertain and discuss settlement; but that to

20   move forward with settlement on a realistic valuation of the

21   case, the parties need to have done their homework and need to

22   understand what the amounts at issue are and what the risks

23   are.

24          And so currently my client's position is that it would

25   need that information.  I'm certainly happy to revisit this

1   issue with my client.

2           THE COURT:  I'm not trying to force you to do

3   anything, obviously.  When settlement conferences or the

4   mediations take place, they should always take place at the

5   right time; and you don't want to have it too soon.

6           But, on the other hand, you don't want to have it too

7   late, because parties aren't thinking about the timing and the

8   cost and the expense and the delay and the uncertainty when the

9   whole purpose of settlement, as you both well know, is to

10  control the outcome and get to closure.

11          So are you contemplating, by way of a third-party

12  mediation, a court, a private mediator, a court mediation

13  program?  Have you given any thought to that?

14          MR. KORDE:  We have retained a private mediator, John

15  Bickerman.

16          MR. WILSON:  And the parties went back and forth with

17  names, and we agreed.  So we to Bickerman.

18          The session was all set to go, that Mr. Korde said we

19  are all ready.  And I think it was actually next week was going

20  to be the session, right?

21          MR. KORDE:  No, the session is October 5.  We had

22  mediation briefs that would have been due, I believe --

23          MR. WILSON:  But so we do have someone out there.

24          MR. KORDE:  And we have been talking about this, and

25  we have been working toward mediation.

1          And this is not something that's on the back burner.

2          THE COURT:  OK.  So for purposes of a schedule right

3     now, you simply want to adjourn the October 5th date, *sine die*,

4     is that right?

5          MR. KORDE:  That's right.

6          THE COURT:  Because of the uncertainty with respect to

7     the letters rogatory.

8          Do you have any objections to that?

9          MR. WILSON:  We do not, your Honor.

10         THE COURT:  I'm willing to do that, but I don't want

11    it to just kind of float out there indefinitely.  So I'll

12    adjourn the October 5th date, but it seems to me that -- and

13    obviously I have some control over some aspect of this, because

14    once the motion is fully submitted, I'll try and adjudicate it

15    as promptly as possible, and then I'll know when that will have

16    transpired.

17         So why don't we say this:  30 days after the motion

18    has been adjudicated, the parties should advise me what they

19    propose by way of a renewed date for mediation.  And that can

20    include continuing it to be without date for whatever reasons

21    you think it should be, as in, from what you said, Mr. Korde,

22    letting the whole letters rogatory run its course in Canada,

23    which may entail waiting until 2012 for that to happen.

24         But I want to at least be able to keep track of what's

25    going on here.  And so why don't we say that 30 days from when

1    the motion is adjudicated the parties will report to the Court

2    on what it proposes by way of a new date for mediation.  And I

3    guess concomitant with that, any extension of the discovery

4    cutoff date, which, for the moment, we'll keep in place, but

5    may need to move in light of these other things we talked

6    about.

7                    MR. KORDE:  Certainly, your Honor.

8                    we can submit a proposed order.

9                    THE COURT:  That would be helpful.  Sure.

10                   Anything else you want to raise today?

11                   MR. KORDE:  No, your Honor.

12                   THE COURT:  Mr. Wilson, anything?

13                   MR. WILSON:  No other issues, your Honor.

14                   THE COURT:  All right.

15             So I think we've resolved everything in the

16   correspondence with respect to discovery.  And I'll rely on the

17   transcript for the rulings for the parties, to the extent you

18   need that, that's why I asked the court reporter to come, to

19   transcribe the proceedings today.

20             And as soon as the letters rogatory matter is briefed,

21   we'll turn our attention to it as soon as we can, given the

22   constraints we have with respect to other business we have.

23             So we'll deal with that as soon as we can.

24                   MR. KORDE:  Thank you, your Honor.

25                   THE COURT:  Have a good day.

19EVLANC                         Conference

1             MR. WILSON:  You, too.

2             MR. KORDE:  You, too, your Honor.

3                              *    *    *