UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LANTHEUS MEDICAL IMAGING, INC.,    :

                     Plaintiff,    :

        -v.-    :

ZURICH AMERICAN INSURANCE CO.,    :

                     Defendant.    :
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/11/12

OPINION AND ORDER

10 Civ. 9371 (JPO) (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

      In this action, Plaintiff Lantheus Medical Imaging, Inc. ("Lantheus") seeks declaratory

relief and money damages arising from Defendant Zurich American Insurance Company's

("Zurich") alleged breach of its contractual obligation to indemnify Lantheus for financial loss

arising from the extended shutdown of a Canadian nuclear reactor that supplied a raw material

used by Lantheus in manufacturing radiopharmaceutical products. Currently before the Court is

Lantheus' Motion for Issuance of Amended Letters Rogatory that would permit Lantheus to

obtain evidence from non-party Atomic Energy of Canada Limited ("AECL"), a Canadian

Crown corporation, which operates the nuclear reactor. Lantheus contends that AECL possesses

information—in the form of documents and deposition testimony—that will demonstrate that

certain exclusions contained in Lantheus' insurance coverage policy issued by Zurich are

inapplicable. In response, AECL, as amicus curiae, contends that the Foreign Sovereign

Immunities Act and principles of international comity prohibit this Court from issuing the

amended letters rogatory. For the reasons set forth below, Lantheus' motion is granted.

USDC SDNY
DATE SCANNED 1/11/12

## I. **Background**

The central issue in this litigation is whether the contingent business interruption losses Lantheus sustained as a result of the shutdown of the nuclear reactor at Chalk River Laboratories in Ontario, Canada (the "NRU Reactor")—and for which it seeks coverage from Zurich—were caused by either "covered" or "excluded" perils. (Memorandum of Law in Support of Plaintiff's Motion for Issuance of Amended Letters Rogatory, dated August 29, 2011 ("Pl.'s Mem.") (Dkt. No. 36), at 2). The NRU Reactor, which is owned and operated by AECL, was shut down for 15 months in 2009 and 2010 because of damage to the reactor's vessel. (Id. at 2). During the shutdown, the NRU Reactor ceased production of molybdenum-99 ("Moly-99"), causing the shortage of a "critical raw ingredient" that Lantheus relies on to manufacture radiopharma-ceutical products. (Id.). To establish that its losses resulted from "covered" perils in its suit against Zurich, Lantheus seeks evidence from AECL that will clarify both the "sequence of events leading to the NRU Reactor shutdown and the causes of the damage to its aluminum alloy reactor vessel[,]" such as operator error, corrosion, or improper maintenance. (Pl.'s Mem. at 3-4; Declaration of Rukesh A. Korde in Support of Plaintiff's Motion, dated August 29, 2011 ("Korde Decl.") (Dkt. No. 37), ¶¶ 4-11 and the exhibits cited therein).[1]

Lantheus' application is the most recent of several attempts to obtain information from AECL. Beginning in as early as May, 2010, Lantheus contacted AECL in an effort to obtain discovery material from AECL informally. (Declaration of Anna St. John in Support of

---

[1]     In particular, Lantheus seeks "technical and analytical documents about the chemical attack on the aluminum alloy of the reactor vessel and documents that may show the involvement of desiccants or impurities in the damage mechanism." (Pl.'s Mem. at 3). Lantheus contends that it does not seek information that would implicate Canadian national security, such as information regarding the amounts or location of uranium used to fuel the NRU Reactor. (Id.). It further alleges that AECL has withheld primarily financial and intellectual property information, rather than data implicating national security, in its previous responses to Lantheus' efforts to obtain information prior to this application. (Id.).

Plaintiff's Motion, dated August 29, 2011 ("St. John Decl.") (Dkt. No. 39), ¶ 3). However, according to Lantheus, despite AECL's initial willingness to provide information voluntarily, Lantheus' repeated efforts to meet with AECL technical personnel or executives were futile; its requests for voluntary production ignored, or answered with mostly irrelevant or heavily redacted material; and its requests for information pursuant to Canada's Access to Information Act resisted.[2]  (Pl.'s Mem. at 4-5 & n.2).  As a result, on May 10, 2011, Lantheus filed an Unopposed Motion for Issuance of Letters Rogatory with this Court.  (Dkt. No. 24).  The Honorable Laura Taylor Swain granted the motion on May 12, 2011, resulting in the issuance of letters rogatory requesting the assistance of Canadian courts in obtaining documents and deposition testimony from AECL.  (Korde Decl. ¶ 31; Orders dated May 12, 2011 (Dkt. No. 29-30)).  On May 26, 2011, Lantheus served AECL with a Notice of Application for a July 21, 2011 hearing in the Ontario Superior Court of Justice ("Ontario Court") to enforce the letters rogatory. (Korde Decl. ¶ 32).  On June 16, 2011, AECL first asserted its position that it was immune to process within Canada and that the discovery material Lantheus sought implicated export and other "public policy" issues.  (Pl.'s Mem. at 6; Korde Decl. ¶¶ 33-36).

After additional efforts to achieve a compromise failed, the Ontario Court dismissed Lantheus' application for enforcement of the letters rogatory without prejudice in an oral decision on July 27, 2011.  (Reasons for Judgment, Lantheus Med. Imaging, Inc. v. Atomic Energy of Canada Ltd., (2011), CV-11-00427161 (Can. Ont. Super. Ct. J.) ("Ontario Court Decision"), attached to the Korde Decl. as Exhibit 26, at 10; see also Pl.'s Mem. at 6-7; Korde Decl. ¶¶ 37-55).  The Ontario Court's dismissal was premised on a concern that this Court was not a court of "competent jurisdiction," or one "with the powers to issue Letters Rogatory," as

---

[2]     The Access to Information Act, codified at Revised Statutes of Canada ("R.S.C."), 1985, c. A-1, is the Canadian analogue to the Freedom of Information Act, 5 U.S.C. § 552.

required by the Ontario Evidence Act § 60(1).  (Ontario Court Decision at 8).  According to the

Ontario Court, that question turns on the larger issue—which the Ontario Court deferred to this

Court for resolution—as to whether the U.S. Foreign Sovereign Immunities Act ("FSIA" or the

"Act"), 28 U.S.C. §§ 1330, 1602 et seq., applies to letters rogatory.  (Ontario Court Decision at

8).  The Ontario Court reasoned that if the FSIA did shield a foreign sovereign from discovery—

including discovery obtained by letters rogatory—then this Court would not be a court of

"competent jurisdiction."  Id.  The Ontario Court concluded that this Court had not considered

AECL's status as a foreign sovereign—and thus had not considered the applicability of the

FSIA—because "[t]here [wa]s nothing in the order [issuing the letters rogatory] which

indicate[d] that the court was aware of or that it considered the question of whether it had

jurisdiction to make the order that it did by reason of the provisions of the FSIA."  (Id. at 5).

Accordingly, the Ontario Court ruled that, "in deference to the U.S. Court that was not given the

opportunity to consider the issue, it [would be] improper for [it] to grant this request [to enforce

the letters rogatory] before the U.S. Court ha[d] been given the relevant information" concerning

AECL's status as a foreign sovereign.  (Id. at 10).  The Ontario Court's dismissal of Lantheus'

application was ordered "without prejudice to its rights to make a further application to [that]

court which demonstrates that the U.S. Court had the opportunity to consider the issue of the

applicability of the FSIA."  (Id. at 11).

　　　　By letter dated August 4, 2011, Lantheus requested leave from this Court to file a motion

for the issuance of amended letters rogatory, which Judge Swain granted that day.  (Dkt. No.

32).[3]  By letter dated August 9, 2011, AECL requested leave to make a special appearance or,

---

[3]　　　　Judge Swain subsequently issued an order on August 10, 2011 referring this case,
including Lantheus' motion, to Magistrate Judge Dolinger for general pre-trial supervision, and
the case was reassigned to me shortly thereafter.  (Dkt. Nos. 33, 41).  The case has since been
reassigned from Judge Swain to the Honorable J. Paul Oetken.  (Dkt. No. 55).

alternatively, to appear as amicus curiae, for the limited purpose of opposing Lantheus' motion

based on what it deemed the "threshold matter" of whether a U.S. court may issue letters

rogatory seeking evidence from a foreign sovereign. (Letter from Daniel M. Krainin to

Honorable Laura Taylor Swain, dated August 9, 2011 at 2 ("August 9 Letter"); see also Letter

from Daniel M. Krainin to Honorable Michael H. Dolinger, dated August 12, 2011).  While

Lantheus expressed a willingness to have AECL's views considered in opposition to the motion,

it opposed AECL's request to make a special appearance or appear as amicus curiae, in part

because AECL, in making a submission to this Court, would have the benefit of relying on

factual assertions that have not been tested through discovery.  (Letter from Rukesh Korde to

Honorable Michael H. Dolinger, dated August 10, 2011; Letter from Rukesh Korde to Honorable

James L. Cott, dated September 2, 2011 ("September 2 Letter")).  Lantheus argued that the only

appropriate procedure by which AECL could make factual arguments to oppose the motion

would be a motion for permissive intervention pursuant to Rule 24(b) of the Federal Rules of

Civil Procedure, which would thus enable Lantheus to obtain the discovery necessary to test the

factual underpinnings of AECL's jurisdictional claims.  (September 2 Letter at 2).

On September 7, 2011, the Court granted AECL's application for leave to appear as

amicus curiae without prejudice to an application from Lantheus challenging that status if AECL

included in its opposition papers factual material beyond the legal arguments concerning the

FSIA and the implications of the letters rogatory on Canadian law.  (Dkt. No. 42).  The Court

also reserved the right to disregard any factual material that had not been subject to discovery or,

alternatively, to give Lantheus permission to move to take limited discovery and require AECL

to move to intervene.  (Dkt. No. 42).  After the issue was fully submitted to the Court for its

consideration, by letters dated November 21 and 29, and December 1, 2011 (see Dkt. Nos. 59-

60, 62), the parties raised additional arguments to reflect recent communications with the

Canadian government concerning Lantheus' requests for information under the Access to

Information Act.  On December 9, 2011, the Court held oral argument on the motion and

reserved decision.  (See Transcript of Oral Argument, dated December 9, 2011 ("Tr.")).

## II.   Discussion

### A. The Parties' Positions Regarding the Application for Amended Letters Rogatory

The threshold question raised by the Ontario Court Decision—and thus by Lantheus'

renewed application for amended letters rogatory—is whether the FSIA prevents this Court from

issuing the letters rogatory.[4]  Lantheus argues that the FSIA has no bearing on the issuance of

letters rogatory.  To a large degree, Lantheus frames its argument as a matter of logic,

contrasting the FSIA, which it describes as "a jurisdictional statute which limits the authority of

U.S. courts to exercise jurisdiction over foreign governments and their instrumentalities[,]" with

letters rogatory, which it characterizes as "comity-based requests by a U.S. court for assistance

from foreign courts in obtaining documents and testimony from a non-party located in another

country."  (Pl.'s Mem. at 1 (emphasis in original)).  Additionally, Lantheus argues that because

letters rogatory are simply a request for the Canadian court to assist in a U.S. proceeding and

because AECL is subject to this discovery in Canada, issuance of the amended letters rogatory

would result in the logical finding that "an American litigant is entitled to the same non-party

discovery that a litigant in a Canadian action could obtain under the supervision and authority of

the Canadian courts."  (Id. at 8).

In opposition to Lantheus' application, AECL also relies on a logical framework.  It

reasons that if it "were present in the United States, it would be immune from the discovery

---

[4]      Lantheus does not dispute that AECL is a "foreign state" for purposes of the FSIA.  (Pl.'s
Mem. at 1 ("AECL is a 'crown corporation' wholly-owned by the Canadian federal
government.")).

sought by Lantheus under the [FSIA]" so that issuing the amended letters rogatory without

consideration of the FSIA would "permit Lantheus to circumvent the [Act] and the principles it

embodies simply because AECL happens not to have any offices or facilities in [the United

States]." (Amicus Curiae Atomic Energy of Canada Limited's Memorandum of Law in

Response to Plaintiff's Motion for Issuance of Amended Letters Rogatory, dated September 16,

2011 ("AECL Mem.") (Dkt. No. 48), at 1). AECL premises this argument on two legal

conclusions: first, that a party is entitled to obtain discovery from a foreign party using letters

rogatory only if it would be entitled to that discovery in the United States (id. at 3-4), and,

second, that the FSIA protects AECL from discovery in the United States. (Id. at 4-6). Thus,

AECL concludes, because the FSIA would protect it from Lantheus' discovery attempts were

AECL in the United States, Lantheus is not entitled to the issuance of letters rogatory to obtain

discovery in Canada. (Id. at 5-6). A determination to the contrary, AECL argues, would lead to

the illogical result that "when parties to private litigation pending in the United States wish to

seek evidence from a foreign sovereign, they have a greater right to obtain it if the foreign

sovereign is not present within the court's territorial jurisdiction than they do if the sovereign is"

and thus subject to the Court's subpoena power. (AECL's Mem. at 4 (emphasis in original)).

**B. Interplay of Letters Rogatory and the FSIA**

As the Court views the parties' respective positions, their dispute centers on the function

of letters rogatory and the effect, if any, of the FSIA on their issuance. In the interest of clarity,

the Court will therefore provide an overview of both letters rogatory and the FSIA before

considering the merits of each party's arguments.

### 1. Letters Rogatory Defined

Simply stated, a letter rogatory is a "document issued by one court to a foreign court[.]" Black's Law Dictionary 778 (9th ed. abridged 2009).[5] "In its broader sense in international practice, the term letters rogatory denotes a formal request from a court in which an action is pending, to a foreign court to perform some judicial act." 22 C.F.R. § 92.54. While letters rogatory may be utilized to "serve process on an individual or corporation within the foreign jurisdiction[,]" parties may also use letters rogatory to "take evidence from a specific person within the foreign jurisdiction." Black's Law Dictionary 778; see also Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 248 n.1 (2004) ("[A] letter rogatory is the request by a domestic court to a foreign court to take evidence from a certain witness.") (citation omitted). Both private parties, including corporations and natural persons, and governmental entities— whether in U.S. or foreign litigation—may seek the issuance of letters rogatory "for use in both underlying civil lawsuits and underlying criminal prosecutions." In re Premises Located at 840 140th Ave. NE, Bellevue, Wash., 634 F.3d 557, 562 (9th Cir. 2011) ("In re Premises") (citing Intel Corp., 542 U.S. at 246 (request by private corporation for use in underlying civil lawsuit); see In re Letter of Request from Crown Prosecution Serv. of United Kingdom, 870 F.2d 686, 687 (D.C. Cir. 1989) (request by foreign government for use in underlying criminal investigation)).

In the United States, Congress has empowered federal courts to issue and to enforce letters rogatory. Rule 28(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1781(b)(2) authorize federal courts to issue letters rogatory that enable a U.S. litigant to obtain non-party discovery from a foreign entity. See O'Donnell v. Club Mediterranee S.A., No. 05 Civ. 610 (ARR), 2008 WL 794975, at *13 (E.D.N.Y. Mar. 24, 2008); Netherby Ltd. v. Jones Apparel Group, Inc., No. 04 Civ. 7028 (GEL), 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005)

---

[5]      The term "letters rogatory" is synonymous with the term "letter of request." See id.

8

("Netherby"); DBMS Consultants Ltd. v. Computer Assocs. Int'l, Inc., 131 F.R.D. 367, 369

(D. Mass. 1990) ("It is settled that the courts have inherent authority to issue letters rogatory.")

(citation omitted).  Rule 28(b) provides that a deposition may be taken in a foreign country

pursuant to a letter rogatory issued "on appropriate terms after an application and notice of it."

Fed. R. Civ. P. 28(b)(2)(A).  Likewise, Section 1781 of Title 28, which authorizes the State

Department to accept letters rogatory issued by foreign tribunals, allows for "the transmittal of a

letter rogatory or request directly from a tribunal in the United States to the foreign or

international tribunal, officer, or agency to whom it is addressed and its return in the same

manner."  28 U.S.C. § 1781(b)(2).  See Netherby, 2005 WL 1214345, at *1 (granting motion for

issuance of letters rogatory to permit movant to take third-party discovery in Canada); see

generally 23 Am. Jur. 2d Depositions and Discovery § 17 (2011) ("Issuance and enforcement of

letter rogatory or request").  Likewise, pursuant to 28 U.S.C. § 1782, federal courts may enforce

letters rogatory issued by foreign courts "as a means of improving assistance by our courts to

participants in international litigation and encouraging foreign countries by example to provide

similar means of assistance to our courts."  See In re Application for an Order Permitting

Metallgesellschaft AG to take Discovery, 121 F.3d 77, 80 (2d Cir. 1997) ("Metallgesellschaft").

   In considering the issuance of letters rogatory, U.S. courts apply the discovery principles

contained in Rule 26.  See, e.g., Asis Internet Servs. v. Optin Global, Inc., No. C-05-05124 JCS,

2007 WL 1880369, at *3 (N.D. Cal. June 29, 2007) (explaining intersection of Rule 28(b) and

Rule 26(c)) (citing cases); see 8 Charles Alan Wright, et al., Federal Practice and Procedure

§ 2005.1 at 70 (3d ed. 2010) (district court should issue letters rogatory "whenever it is

determined on a case-by-case basis that their use will facilitate discovery").  For example, U.S.

courts have considered whether "the movant makes a reasonable showing that the evidence

sought may be material or may lead to the discovery of material evidence[,]" Netherby Ltd.,

2005 WL 1214345, at *1 (citation omitted), and other arguments as to breadth, relevance, and

the availability of the information sought from other sources. See, e.g., id.; Elliott Assocs. v.

Peru, No. 96 Civ. 7916 (RWS), 1997 WL 436493, at *2 (S.D.N.Y. Aug. 1, 1997) (granting

motion for issuance of letters rogatory over objection that testimony sought would be irrelevant

and duplicative).

 Where U.S. courts issue and then transmit letters rogatory directly to foreign courts for

enforcement, courts in the receiving country enforce the letters rogatory pursuant to domestic

statute or common law, or through bilateral treaties with the United States. See generally

Restatement (Third) of the Foreign Relations Law of the United States (1987) ("Restatement")

§ 473 Reporters' Note 1. For example, the Canada Evidence Act provides that a court outside of

Canada may serve letters rogatory upon a Canadian court. See Asis Internet Servs, 2007 WL

1880369, at *3 (citing Canada Evidence Act, R.S.C. 1985, c. C-5, § 46); In re Nat'l Energy &

Gas Transmission, Inc., Nos. 03-30459 (PM), 03-30461 (PM) through 03-30464, 03-30686 (PM)

through 03-30687 (PM), 2006 WL 5779475, at *1 (Bankr. D. Md. Jan. 4, 2006) (same). Where a

foreign litigant seeks to enforce letters rogatory in the province of Ontario, Canada, Section

60(1) of the Ontario Evidence Act also governs enforcement by the Canadian court. See Revised

Statutes of Ontario ("R.S.O.") 1990, c. E.23, § 60 (1); 2000, c. 26, Sched. A, s. 7 (2);[6] see also

---

[6] Section 60(1) of the Ontario Evidence Act, entitled "Evidence for foreign tribunals," provides: "Where it is made to appear to the Superior Court of Justice or a judge thereof, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, for a purpose for which a letter of request could be issued under the rules of court, the obtaining of the testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or

Ontario Court Decision at 3, 7 (citing parties' invocation of this provision).  This process mirrors the enforcement of letters rogatory by U.S. courts when discovery is sought in the United States for use in litigation before foreign tribunals.  See Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83-84 (2d Cir. 2004) (outlining standard applied by U.S. district courts in receipt of letters rogatory) (citations omitted).

     Both the issuance and enforcement of letters rogatory by U.S. and foreign courts "rest entirely upon the comity of courts toward each other, and customarily embody a promise of reciprocity."  22 C.F.R. § 92.54; see Metallgesellschaft, 121 F.3d at 79 (noting "the twin aims" of 28 U.S.C. § 1782, to "'provid[e] efficient means of assistance to participants in international litigation in our federal courts and encourag[e] foreign countries by example to provide similar means of assistance to our courts . . .'") (quoting In re Application of Malev Hungarian Airlines, 964 F.2d 97, 100 (2d Cir. 1992)); In re Premises, 634 F.3d at 563 (citations omitted) ("By providing broad assistance to foreign nations and tribunals via § 1782 the United States encourages foreign nations and tribunals to do the same, which benefits the United States government.").  The request for assistance from one court to another is made and "usually granted, by reason of the comity existing between nations in ordinary peaceful times."  Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 105 F.R.D. 435, 438 n.3 (S.D.N.Y. 1984) ("Krishna") (quoting The Signe, 37 F. Supp. 819, 820 (E.D. La. 1941)).

---

the production of a writing or other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made by the court or judge in an action pending in the court or before a judge of the court."  R.S.O. 1990, c. E.23, s. 60 (1); 2000, c. 26, Sched. A, s. 7 (2).

## 2.  The Foreign Sovereign Immunities Act

### a.  Immunity Protections Generally

The FSIA provides that a foreign sovereign shall be immune from the jurisdiction of federal and state courts, subject to the exceptions specified in the Act. 28 U.S.C. § 1604; see 28 U.S.C. §§ 1605-07 (providing exceptions to immunity).  Accordingly, unless a specified exception to the FSIA applies, a U.S. court lacks both subject-matter jurisdiction over claims against a foreign sovereign and personal jurisdiction over that sovereign.  See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 485 n.5 (1983) ("The District Court's conclusion that none of the exceptions to the Act applied therefore signified an absence of both competence [i.e., subject-matter jurisdiction] and personal jurisdiction."); see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989) (the FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country").  The exceptions to immunity provided by the FSIA codify the "restrictive theory" of sovereign immunity that developed in the mid-twentieth century, superseding the complete, or "absolute," immunity that previously existed.  See Samantar v. Yousuf, 130 S. Ct. 2278, 2284-86 (2010) (outlining evolution of foreign sovereign immunity principles).  For example, under this restrictive theory, immunity applies where a foreign sovereign acts in its public or governmental capacity but does not extend to its private or commercial acts.  See Republic of Argentina v. Weltover, 504 U.S. 607, 614 (1992) ("Weltover II") ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA.").

12

### b. The FSIA and Discovery

The FSIA's legislative history suggests that it was not meant "to deal with questions of discovery." H.R. Rep. 94-1487, at 17 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6621 ("House Report"); see also Restatement § 451 cmt. c ("Neither the Foreign Sovereign Immunities Act of the United States nor corresponding legislation in other states addresses the issue of discovery against foreign states."). One possible reason for this omission was Congress' belief that "[e]xisting law [was] adequate in this area" and could thus be used either to protect a foreign sovereign from discovery or, conversely, to compel discovery from an unwilling sovereign that was a party to litigation. House Report at 17, 1976 U.S.C.C.A.N. at 6621. "For example, if a private plaintiff sought the production of sensitive governmental documents of a foreign state, concepts of governmental privilege would apply. Or if a plaintiff sought to depose a diplomat in the United States or a high-ranking official of a foreign government, diplomatic and official immunity would apply." Id. (citation omitted). Likewise, "appropriate remedies would be available under Rule 37, F.R. Civ. P., for an unjustifiable failure to make discovery" if the foreign sovereign was obligated to engage in discovery. Id., 1976 U.S.C.C.A.N. at 6621-22. This latter principle is reflected in Comment c to § 451 of the Restatement, which provides: "[w]hen a state is party to an action in a court of another state—whether as plaintiff or as defendant—all the normal procedures associated with adjudication in that court, including discovery and requirements for posting security, are applicable[.]" Accordingly, once a U.S. court determines that it has jurisdiction over a foreign sovereign, the court's ability to compel discovery is assumed. See, e.g., Reino De Espana v. Am. Bureau of Shipping, No. 03 Civ. 3573 (LTS) (RLE), 2005 WL 1813017, at *3 (S.D.N.Y. Aug. 1, 2005) (citations omitted).

However, despite this authority that the FSIA does not provide immunity from discovery, some courts have invoked the Act to limit or deny discovery requests.  These courts reason that "the FSIA's immunity provisions aim to protect foreign sovereigns from the burdens of litigation, including the cost and aggravation of discovery."  Thai Lao Lignite (Thailand) Co., Ltd. v. Government of the Lao People's Democratic Republic, No. 10 Civ. 5256 (KMW), 2011 WL 4111504, at *3 (S.D.N.Y. Sept. 13, 2011) (citations omitted)); see also Dole Food Co. v. Patrickson, 538 U.S. 468, 479 (2003) (foreign sovereign immunity intended "to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns") (citing Verlinden B.V., 461 U.S. at 486); Robinson v. Government of Malaysia, 269 F.3d 133, 141 (2d Cir. 2001) ("Sovereign immunity under the FSIA is immunity from suit, not just from liability.") (internal quotation omitted).

For example, when a party seeks jurisdictional discovery to assess whether an exception to the FSIA exists, courts require "a delicate balancing 'between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery.'"  First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998) (quoting Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992)); see also Compania del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela, 556 F. Supp. 2d 272, 282 (S.D.N.Y. 2008) (jurisdictional discovery "must be circumscribed to account for comity concerns" or else "the discovery obligations imposed on the sovereign would ineluctably frustrate the significance and benefit of entitlement to immunity from suit") (citations and internal quotation marks omitted)).  Importantly, where courts compel jurisdictional discovery over a foreign sovereign's immunity

14

objections, there is a possibility that an exception to the FSIA exists and jurisdiction would thus

be proper, which would negate the foreign sovereign's immunity objections. See id. ("The

propriety of jurisdictional discovery may turn on whether, for example . . . the requests are

'reasonably calculated to elucidate whether an FSIA jurisdictional exception applies.'") (quoting

Millicom Int'l Cellular v. Republic of Costa Rica, No. Civ. A. 96-315 (RMU), 1997 WL 527340

(D.D.C. Aug. 18, 1997)).  In other words, the jurisdictional discovery may reveal that the foreign

sovereign is a properly named party to a lawsuit in U.S. courts, and the court thus would have

jurisdiction over the sovereign for all purposes including discovery.  See Olympic Chartering,

S.A. v. Ministry of Industry & Trade of Jordan, 134 F. Supp. 2d 528, 535 (S.D.N.Y. 2001)

("After extensive research, this Court has not found any case where discovery was permitted

once an entity was found to be immune.") (citation omitted).

In contrast, where non-party discovery is sought from a foreign sovereign—and thus the

court is not weighing discovery that may lead to an exercise of jurisdiction—the U.S. litigant's

efforts to compel discovery may prove unsuccessful.  For example, in Peninsula Asset

Management (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140, 143 (2d Cir. 2007)

("Peninsula"), the Second Circuit affirmed an order denying a motion to hold a non-party

financial services agency in contempt for failure to engage in discovery based on the court's

determination that the agency was an organ of the Republic of Korea.  The court concluded that

because "[a] district court may not issue a subpoena or impose contempt sanctions without

jurisdiction[,]" the agency as a foreign sovereign was "immune" from the subpoena.  Id. at 143-

44 (citing United States v. Morton Salt Co., 338 U.S. 632, 642 (1950) (judicial subpoena power

"is subject to those limitations inherent in the body that issues them")).

However, the Court is not aware of any decision other than the Second Circuit's in

Peninsula that has analyzed the propriety of non-party discovery where the non-party is a foreign

sovereign.  Comment c to § 451 of the Restatement goes so far as to suggest that "[d]iscovery

from a foreign state that is not a party to a proceeding has apparently not been attempted in

international practice and is not provided for in either the FSIA or the corresponding laws of

other states."[7]  The Comment nevertheless applies a similar rationale to the Second Circuit in

Peninsula to conclude that "[s]ince sovereign immunity is the rule, and amenability to judicial

process an exception to that rule, such discovery would seem to be precluded."  Restatement

§ 451 cmt. c.

### 3.  The Amended Letters Rogatory May Be Issued Without Regard to the FSIA

While these basic principles underlying the issuance of letters rogatory and the

application of the FSIA are generally well-established, their interplay in the context of non-party

discovery involving a foreign sovereign appears to be unexplored.[8]  In the absence of any clear

---

[7]  The Ontario Court Decision similarly notes that "[t]his is an unusual case where there are no cases where the issue of the applicability of sovereign immunity with respect to Letters Rogatory is addressed."  (Ontario Court Decision at 8).

[8]  In its motion papers, Lantheus cites to several instances of U.S. courts issuing letters rogatory to assist U.S. litigants obtain discovery from foreign sovereigns abroad.  In each instance, the issuing court allowed discovery from a foreign sovereign without consideration of immunity, and in each case, either an exception to the FSIA may have applied, see Danisch v. Guardian Life Insurance Co. of America, 19 F.R.D. 235 (S.D.N.Y. 1956) (unclear whether National Bank of Poland qualified as foreign sovereign, or whether commercial exception to sovereign immunity would have applied under modern theory of restrictive immunity), or the foreign sovereign was a party to the litigation and thus subject to the U.S. court's jurisdiction.  See E-Beam Servs., Inc. v. AECL Techs., Inc., No. 02-2256 (D.N.J.) (attached to the Korde Decl. as Exhibit 27) (AECL a counterclaimant thus waiving immunity).  Lantheus also cites to Al-Misehal Commercial Group Ltd. v. Armored Group, LLC, No. 2:10-cv-1303-PHX-JWS (D. Ariz. Apr. 20, 2011) (attached to the Korde Decl. as Exhibit 29), which presents the closest fact pattern to Lantheus' application.  In Al-Misehal, the court issued letters rogatory to assist a U.S. litigant obtain the deposition testimony of Saudi Arabian Crown Prince Sultan bin Abdulaziz Al-Said, a non-party witness in a contract dispute between the parties.  Id. at 2-3.  However, the

governing precedent, both Lantheus and AECL rely on a comparison of letters rogatory to U.S.

discovery devices.  While AECL likens letters rogatory to subpoenas issued under Rule 45,

Lantheus distinguishes the comity-based letters rogatory with the compulsory nature of

discovery devices available under the Federal Rules.  Considering the parties' contentions in the

light of the broader principles governing letters rogatory and the FSIA, Lantheus' argument

carries greater force.

At the heart of Lantheus' position is its contention that letters rogatory, by their very

terms, are used "to obtain discovery from a source of information beyond the jurisdiction of the

United States court[,]" so that their issuance necessarily involves no jurisdictional considerations

under the FSIA.  (Pl.'s Mem. at 9 (citing Krishna, 105 F.R.D. at 445)).  If the party from whom

discovery was sought was subject to the jurisdiction of the U.S. courts, Lantheus argues, letters

rogatory would be unnecessary because the court could compel discovery.  (Id. (citing Krishna,

105 F.R.D. at 445 ("[W]hen the discovery was sought from another litigant . . . the jurisdiction of

the United States court ensured that the litigant could be compelled to produce the information or

suffer sanctions under the federal rules.") (alterations added)).

Lantheus is correct that if a U.S. court has jurisdiction over the source of information

from which discovery is sought, the party seeking that discovery could obtain it using the

discovery devices provided for in the Federal Rules of Civil Procedure.  For example, "a Rule 45

subpoena is typically used to obtain the production of documents and/or testimony from a non-

party to an action . . . whereas Rules 26-37 provide simpler means for obtaining the same from a

party. . . ."  First City, Texas-Houston, N.A. v. Rafidain Bank, 197 F.R.D. 250, 255 n.5

---

court issued the letters without addressing the question of foreign sovereign immunity, id. at 1-4,
and without substantive modification to the defendant's proposed letters rogatory, thus rendering
the case of little practical guidance.  Compare id. with Text of Proposed Order Letter Rogatory,
attached to Application for Letter Rogatory for International Judicial Assistance for the Taking
of Evidence in a Civil Matter (Dkt. No. 34), 2:10-cv-1303-PHX-JWS (D. Ariz. Mar. 30, 2011).

(S.D.N.Y. 2000), aff'd, 281 F.3d 48 (2d Cir. 2002).  Therefore, if one party to a lawsuit seeks

discovery from another party (even a foreign party), a federal court may exert its "authority to

compel [the receiving] party to provide relevant discovery pursuant to the normal procedures

outlined in the federal rules, both civil and criminal, regardless of where the information is

actually located." Krishna, 105 F.R.D. at 445.  Likewise, if a party to a lawsuit seeks discovery

from a non-party who is present in the United States (even a foreign party), the party seeking the

discovery could obtain information using a subpoena pursuant to Rule 45 of the Federal Rules of

Civil Procedure.  See, e.g., Tiffany (NJ) LLC v. Qi Andrew, 276 F.R.D. 143, 147 (S.D.N.Y.

2011) (considering whether to compel non-party discovery under Rule 45 from Chinese bank

that maintains branches in United States based on consideration of New York branches' custody

and control of documents).

Lantheus is also correct that letters rogatory are typically used when the party from whom

discovery is sought is "beyond the jurisdiction" of the court and thus the party seeking the

discovery is unable to take advantage of the discovery devices provides for in Rules 26 to 37 and

45.  (Pl.'s Mem. at 9 & n.3 and the cases cited therein).  While issuing letters rogatory because a

party is beyond a U.S. court's jurisdiction may be the norm, Lantheus' reliance on this generality

does not, however, establish that letters rogatory are appropriate only where the issuing court

lacks jurisdiction over a receiving party.  This argument overlooks the cases when U.S. courts

may direct a party to obtain discovery pursuant to letters rogatory even when the targeted party

might otherwise be subject to jurisdiction.  See, e.g., Tiffany (NJ) LLC, 276 F.R.D. at 152 ("All

parties acknowledge that a request for discovery by way of the Hague Convention is potentially

an alternative means [to a Rule 45 subpoena] of securing the information at issue.").

Nevertheless, the reason underlying the trend that Lantheus cites—that parties seek, and U.S.

courts will usually issue, letters rogatory where the court otherwise lacks jurisdiction to compel

discovery—is part and parcel of the most compelling argument in its favor:  that issuance of

letters rogatory by its very nature does not require a U.S. court to have jurisdiction, meaning

coercive authority, over the non-party from whom discovery is sought.  As noted, this is in

contrast to the requirements of a Rule 45 subpoena, for which a court must have jurisdiction over

the non-party from whom discovery is sought.  See U.S. Catholic Conference v. Abortion Rights

Mobilization, Inc., 487 U.S. 72, 76 (1988) ("Federal Rule of Civil Procedure 45 grants a district

court the power to issue subpoenas as to witnesses and documents, but the subpoena power of a

court cannot be more extensive than its jurisdiction.").

The Court finds this distinction between letters rogatory and Rule 45 subpoenas to be the

key factor in resolving the question raised by the Ontario Court in Lantheus' favor.  As counsel

for Lantheus put it concisely at oral argument, letters rogatory are not "backed up by . . . this

court's power to compel.  There is no threat of sanction from this court if AECL doesn't

comply."  (Tr. 6:23-25).  Rather, letters rogatory in this instance are "simply a request to the

Canadian courts to say[,] will you help Lantheus obtain this information that's crucial to the

case[?]"  (Tr. 7:1-3).  Phrased this way, Lantheus' description of letters rogatory comports with

the definition of letters rogatory as "the medium, in effect, whereby one country, speaking

through one of its courts, requests another country, acting through its own courts and by methods

of court procedure peculiar thereto and entirely within the latter's control, to assist the

administration of justice in the former country[.]" The Signe, 37 F. Supp. at 820 (emphasis

added), a definition that has been adopted by both state and federal courts in New York.  See,

e.g., Krishna, 105 F.R.D. at 438 n.3 (quoting The Signe, 37 F. Supp. at 820); Application of

District Attorney of Queens Cnty., 505 N.Y.S.2d 293, 294 (N.Y. Sup. Ct. 1986) (applying same).

The issuing court does not need jurisdiction over the party from whom discovery is sought because it cannot compel compliance with the letters rogatory. Instead, it makes a request of the foreign court, which maintains the authority to enforce the letters rogatory or not. Cf. In re Westinghouse Elec. Corp. Uranium Contracts Litig., 563 F.2d 992, 995 (10th Cir. 1977) (noting that Supreme Court of Ontario previously denied enforcement of letters rogatory because it "would cause a violation of the Uranium Information Security Regulations"). It follows therefore that the FSIA, a statute outlining the scope and applicability of jurisdiction over foreign sovereigns, is not relevant to the Court's review of Lantheus' application for letters rogatory.

AECL's arguments in opposition to Lantheus' application do not warrant a contrary result. Relying on Peninsula and Comment c to § 451 of the Restatement, AECL seeks to prove that "[w]here a federal court lacks jurisdiction over a foreign sovereign entity, it also lacks the power to issue a non-party subpoena purporting to compel discovery from such an entity." (AECL Mem. at 5). This principle, however, is apparently not in dispute. At oral argument, Lantheus conceded this point, acknowledging that, absent a statutory exception, the FSIA would prevent Lantheus from obtaining non-party discovery from AECL in the United States if AECL were present here. (Tr. 6:12). AECL's position thus boils down to its argument that a U.S. court can issue letters rogatory to obtain discovery in a foreign country only if the party seeking the discovery would otherwise be entitled to it, meaning if the source of information was located in the United States and subject to the Court's jurisdiction. (AECL's Mem. at 3-6). This argument is premised on a single statement in a criminal case, United States v. Weisberg, No. 08-CR-347 (NGG) (RML), 2010 WL 5027537, at *2 (E.D.N.Y. Dec. 3, 2010), cited in AECL Mem. at 3, that "[l]etters rogatory are simply a means to obtain discovery to which a party is otherwise entitled." While AECL cites only to Weisberg for this rule, in Netherby, Judge Lynch applied

similar logic, examining whether the non-party from whom discovery was sought would have been subject to discovery if it was a U.S. entity.  2005 WL 1214345, at *1.  Judge Lynch supported his issuance of the letters rogatory by reasoning, "[w]ere the [non-party] a domestic company, there is no question that plaintiff would have simply subpoenaed the documents, and the subpoena would have been upheld."  Id.

On first blush, AECL's argument that U.S. courts may only issue letters rogatory under the framework outlined by Weisberg and the similar reasoning in Netherby is appealing.  Indeed, this framing of letters rogatory appears to have become so commonplace that in Lantheus' motion for issuance of the original letters rogatory, it stated that the information sought from AECL was "subject to discovery by letters rogatory" because it "would be discoverable by a simple subpoena if AECL were subject to process within the United States."  (Memorandum of Law in Support of Plaintiff's Unopposed Motion for Issuance of Letters Rogatory, dated May 10, 2011 (Dkt. No. 25), at 8-9 (citing Netherby, 2005 WL 1214345, at *1)).  However, the language in Weisberg cannot be the governing rule here because it ignores the fundamental difference between letters rogatory and a "simple subpoena."  Lantheus and AECL both acknowledge that where the FSIA applies, a U.S. court lacks jurisdiction to "compel[]" the foreign sovereign "to produce the information or suffer sanctions under the federal rules."  Krishna, 105 F.R.D. at 445.  Yet, in the context of letters rogatory, the U.S. court is neither compelling discovery nor threatening the imposition of sanctions.  If the U.S. court could compel discovery from the foreign sovereign, it would have no need for the foreign court, which, in the context of letters rogatory, maintains the ultimate "control" as to whether and how it will "assist the administration of justice" sought by the U.S. courts.  The Signe, 37 F. Supp. at 820.  Thus, what distinguishes letters rogatory from subpoenas and other discovery devices obtained under the Federal Rules is

21

also what proves Weisberg's limitation. For all of these reasons, the Court concludes that it may issue the amended letters rogatory without regard to the applicability of the FSIA.[9]

## C. Commercial Activity Under the FSIA

As an alternative argument in support of its application for issuance of the amended letters rogatory, Lantheus contends that even if the FSIA applied here, "the limited available facts do not establish that AECL enjoys FSIA immunity from direct discovery enforceable through this Court[,]" because "its activities in supplying a critical raw ingredient used in medical imaging procedures throughout the United States appear to fall within the 'commercial activity exception' to FSIA immunity." (Plaintiff's Reply in Further Support of Motion for Issuance of Amended Letters Rogatory ("Pl.'s Reply Mem.") (Dkt. No. 52), at 6). Because the Ontario Court specifically framed the issue as "whether [this Court] had jurisdiction to [issue the amended letters rogatory] by reason of the provisions of the FSIA" (Ontario Court Decision at 5), the Court addresses that question and concludes that AECL's conduct falls within the FSIA's commercial activity exception. Thus, this exception provides an additional basis for granting Lantheus' application and issuing the amended letters rogatory.

### 1. Necessity of Jurisdictional Discovery

In its September 7, 2011 Order (Dkt. No. 42), the Court granted AECL's application for leave to appear as amicus curiae to file papers in opposition to Lantheus' motion for issuance of

---

[9]    The Ontario Court questioned whether this Court satisfied the Ontario Evidence Act's requirement that it be a court of "competent jurisdiction," meaning that it "had jurisdiction to" issue the letters rogatory. (Ontario Court Decision at 3, 5). While this Court does not purport to construe the Ontario Evidence Act, the Court does have subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and thus has authority to issue letters rogatory pursuant to 28 U.S.C. § 1781 as it is a recognized "tribunal" under the statute. Compare O'Donnell, 2008 WL 794975, at *13 (federal court with jurisdiction under § 1332 may issue letters rogatory under § 1781) with United States v. Toyota Motor Corp., 569 F. Supp. 1158, 1163 (D.C. Cal. 1983) (U.S. Internal Revenue Service not a "tribunal" empowered to issue letters rogatory). Moreover, as the Court has found, the FSIA is not an impediment to its competence to issue the amended letters rogatory.

letters rogatory, but it did so without prejudice to Lantheus challenging this status or moving to take jurisdictional discovery and require AECL to move to intervene.  In addition, the Court reserved the right to disregard any factual material that has not been subject to discovery.  (Id.). Invoking this language, Lantheus had requested that, "if the Court for some reason were to find that the FSIA is implicated here," it order jurisdictional discovery to determine whether AECL's operations trigger the commercial activity exception.  (Pl.'s Mem. at 8).  However, at oral argument, counsel for Lantheus stated that if the Court determines there is "sufficient information [in the record] to rule that the commercial activity exception applies," then no further discovery would be necessary.  (Tr.: 16:15-16).  Likewise, counsel for AECL offered its "view . . . that the record is more than sufficient to reach a conclusion based on the nature of AECL's reactor and the operation of it in Canada as well as the existence of the intermediary Nordion which is undisputed. . . . [W]e don't believe it would be fruitful for discovery.  The court has the information it needs to determine whether the commercial activity exception applies here."  (Tr.: 41:11-22).

Given these statements by the parties, and given that the Court finds that AECL has not raised any untested factual arguments in support of its arguments that have any bearing on the Court's opinion (AECL Mem. at 8),[10] the Court considers the applicability of the commercial activity exception to the FSIA without the need for the jurisdictional discovery Lantheus had originally sought.  See APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) ("district court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction'") (quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C.

---

[10]      For example, one of AECL's key points as to why the commercial activity exception to the FSIA does not apply relies on a fact Lantheus alleges in its complaint, that AECL "sold raw radioactive isotopes to a third party in Ontario (Nordion, Inc.), which, in turn, processed and refined them into finished isotopes before selling them to Lantheus."  (AECL Mem. at 8 (citing Complaint, dated December 16, 2010 ("Compl.") (Dkt. No. 1), ¶ 13)).

Cir. 2000)); accord LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999) (court's discretion includes "power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits").

## 2.  The "Commercial Activity Exception" Defined

The FSIA states, in relevant part, that a foreign state is not immune where the action is based upon either: (1) "a commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Of the three clauses that provide the basis for the commercial activity exception, only the third is relevant to AECL's operations of the NRU Reactor in Ontario, Canada. For the Court to find that issuance of the amended letters rogatory as to AECL is proper, assuming the FSIA otherwise applies, this third factor requires the Court to determine both that AECL's conduct in Canada was commercial in nature and that it caused a direct effect in the United States.

## a.  The "Activity" Underlying the "Commercial Activity" Inquiry

The Court begins its "commercial activity" inquiry "by identifying the particular conduct on which" Lantheus' claim that the commercial activity exception applies is based. Saudi Arabia v. Nelson, 507 U.S. 349, 356-57 (1993) (citing Texas Trading & Milling Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981)). "In denoting conduct that forms the 'basis,' or 'foundation,' for a claim, the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Id. at 357 (citing authority); see also Hanil Bank v. PT. Bank Negara Indonesia (Persero), 148 F.3d 127, 131 (2d

24

Cir. 1998) (acts of foreign sovereign deemed "in connection with" commercial activity when there is "substantive connection" or "causal link" between acts and commercial activity). In the more typical context in which a U.S. litigant seeks to establish the applicability of the commercial activity exception, the court would consider the foreign sovereign's activity giving rise to the U.S. litigant's cause of action, meaning the elements of that claim that, "if proven, would entitle [plaintiff] to relief under [its] theory of the case." Nelson, 507 U.S. at 357; see also Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 150 (2d Cir. 1991) ("Weltover I") (noting that courts must "isolate the specific conduct that underlies the suit, rather than focusing on 'the broad program or policy of which the individual transaction is a part'" and warning that under an "overbroad" definition of relevant conduct, "the activity would almost inevitably be characterized as sovereign in nature") (citation omitted), aff'd, Weltover II, 504 U.S. 607 (1992).

While this more common application of the commercial activity exception looks to the conduct of the foreign sovereign giving rise to a cause of action, Lantheus' lawsuit is brought against Zurich, not AECL, and the facts underlying Lantheus' claims involve Zurich's refusal to pay its insurance claim. (Compl. ¶¶ 3-4). By way of analogy then, the Court here looks to the conduct that underlies the letters rogatory. (See Request to Take Evidence Abroad of Atomic Energy of Canada Limited (Letters Rogatory) (the "Requests") (Dkt. No. 35-1 at 3-8)). The Requests correspond to Lantheus' factual allegations as to the cause of the heavy water leak at the NRU Reactor on May 15, 2009. Id. This leak, Lantheus alleges, prompted AECL to "suspend operations for an extended period[,]" (Compl. ¶ 20), with the shutdown "result[ing] in a global disruption in the supply of Moly-99," which in turn caused Lantheus to sustain significant financial losses. (Id. ¶¶ 22-24). Lantheus sought insurance coverage from Zurich to indemnify it for these losses, but Zurich denied coverage to Lantheus based on its determination

that the leak that compelled the NRU Reactor's shutdown was a result of corrosion, which

Zurich deemed "an excluded cause of loss" under Lantheus' insurance policy.  (Id. ¶¶ 26-27).

Lantheus seeks issuance of letters rogatory to obtain discovery from AECL that would establish

the cause of the water leak, including, for example, information as to the effect of radiation on

the aluminum alloy in the vessel, nitric acid, water drainage, and air leaks, as well as certain

reports or images analyzing or depicting the events giving rise to the shutdown.  (See Requests).

Thus, the Court will consider whether AECL's operation and shutdown of the NRU Reactor was

commercial in nature.

### b.  The Commercial Nature of AECL's Operation of the NRU Reactor

Under the FSIA, "[t]he commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than by

reference to its purpose."  28 U.S.C. § 1603(d).  The reasoning underlying this exception—and

thus informing the Court's inquiry—is that a foreign sovereign has forfeited its immunity if it

has "act[ed], not as regulator of a market, but in the manner of a private player within it."

Weltover II, 504 U.S. at 614.  Accordingly, "the question is not whether the foreign government

is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.

Rather, the issue is whether the particular actions that the foreign state performs (whatever the

motive behind them) are the type of actions by which a private party engages in 'trade and traffic

or commerce.'"  Id. (citations omitted) (emphasis in original).  For example, "a foreign

government's issuance of regulations limiting foreign currency exchange is a sovereign activity,

because such authoritative control of commerce cannot be exercised by a private party; whereas

a contract to buy army boots or even bullets is a 'commercial' activity, because private

companies can similarly use sales contracts to acquire goods."  Id.; see also Harris v. VAO

26

Intourist, Moscow, 481 F. Supp. 1056, 1064 (E.D.N.Y. 1979) ("'[C]ommercial activity' is meant to distinguish activity which results from what in our society would be termed governmental, public or sovereign enterprises e.g., running police departments or parks from those resulting from the acts of foreign state agencies or instrumentalities acting in what we would deem a commercial capacity e.g., operating hotels or cruise ships.") (citation omitted).

Weltover provides a useful illustration of the distinction between the commercial nature of an act (the operative consideration) and the sovereign purpose for engaging in that act (which is not dispositive). In Weltover, Argentina had issued certain bonds to refinance debts the nation incurred in an effort to stabilize its currency. Affirming the Second Circuit's decision, the U.S. Supreme Court held that this bond issuance constituted a "commercial activity" under the FSIA and that Argentina was not immune from suit for failure to make timely payments on the bonds, underscoring that there was "nothing about the issuance of the [bonds] (except perhaps its purpose) that is not analogous to a private commercial transaction." 504 U.S. at 615-16. Under Weltover, the Court should examine whether the specific act—rather than the governmental mandate that prompted the act—is commercial in nature.

Whether AECL operated the NRU Reactor as an exercise of its uniquely sovereign power or as a traditionally commercial endeavor thus raises the question of whether operating a nuclear reactor under circumstances such as these is inherently a sovereign function. This is an issue that courts have dealt with only indirectly. The seminal case is MOL, Inc. v. People's Republic of Bangladesh, 736 F.2d 1326, 1329 (9th Cir. 1984) ("MOL"). In MOL, the Ninth Circuit determined that Bangladesh's grant of a license to a U.S. company to capture and export rhesus monkeys for scientific experimentation was not a commercial activity because the agreement at issue in the litigation "concerned Bangladesh's right to regulate its natural resources, . . . a

uniquely sovereign function." 736 F.2d at 1329. Several cases have adopted MOL for the

proposition that a state's regulation or exploitation of a natural resource is an inherently

sovereign function. See, e.g., RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 399 (S.D.N.Y.

2009) (former deputy prime minister of Grenada acted in official capacity as sovereign agent in

denying plaintiffs' application for license to conduct oil and gas exploration off coast of

Grenada); Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d 574, 578 (7th

Cir. 1989) ("[A] contract whereby a foreign state grants a private party a license to exploit the

state's natural resources is not a commercial activity [under the FSIA], since natural resources, to

the extent they are 'affected with a public interest,' are goods in which only the sovereign may

deal.") (emphasis in original).

However, other cases have distinguished MOL and its progeny by limiting MOL's

holding to the narrow issue of commercial export and import regulation, which they concede is

an inherently sovereign function. In Globe Nuclear Services and Supply (GNSS), Ltd. v. AO

Techsnabexport, for example, the Fourth Circuit read MOL and the cases adopting it "to stand

not for the overly broad proposition that all contracts involving 'natural resources' or their

derivative products constitute sovereign activity, but for the narrower and much sounder

principle that the grant of a license to operate within sovereign territory and to extract natural

resources from within that territory is sovereign activity." 376 F.3d 282, 291 (4th Cir. 2004)

("Globe"). See also Honduras Aircraft Registry Ltd. v. Gov't of Honduras, 119 F.3d 1530, 1537

(11th Cir. 1997) ("The basis of [MOL] was not the alleged breach of the government contract for

the sale of monkeys, but its revocation of the export license. That was part of the sovereign's

right to regulate its exports and was therefore immune.").

28

In Globe, the plaintiff, a U.S. corporation, sought an injunction that would require a Russian company wholly owned by the Russian Federation to perform under a contract to supply the plaintiff with uranium hexafluoride extracted from nuclear weapons. The Fourth Circuit determined that the Russian company's activities fell within the commercial activity exception, even though (1) the Russian Federation created the company to implement an agreement with the United States concerning the disposition of highly-enriched uranium extracted from nuclear weapons; (2) the uranium hexafluoride market was a heavily-regulated industry; and (3) the contract involved a natural resource of the Russian Federation. 376 F.3d at 289-91. In support of its conclusion, the Fourth Circuit reasoned that uranium hexafluoride was not a substance to which the Russian Federation had exclusive ownership, that private parties engaged in commerce involving uranium hexafluoride under the same regulatory scheme as the Russian company, and that the contract concerned derivative products of already-extracted Russian natural resources. Id. In so ruling, the court determined that the Russian company was not entitled to the immunity protections of the FSIA because the commercial activity exception applied. Id. at 291.

Likewise, in Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 263-64 (5th Cir. 2002) (Dennis, J. concurring in result), a concurring opinion differentiated the activity of the defendant, the Republic of Congo, from Bangladesh's conduct in regulating the export of monkeys in MOL by noting:

> Unlike the situation in MOL, . . . the Congo's actions did not stop with its initial action as sovereign, in the regulation of its natural resources, to open them to exploitation and development. The Congo went on to step down from its sovereign status and engage in a typical commercial activity, a joint venture contract with oil companies for the exploration, production, and sale on the world market of oil and gas. This is not something that only a sovereign can do. Even if the Congo's initial action in exposing its minerals to development was sovereign and regulatory, "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA.

Id. at 264 (citing Weltover II, 504 U.S. at 607; Weltover I, 941 F.2d at 151 ("[O]nce a sovereign

enters the marketplace as a commercial actor, it should be subject to all the rules of the

marketplace.")).

As these courts have acknowledged, a sovereign entity's control of a natural resource like

uranium is a sovereign function only to the extent it governs the ability of other actors to use that

resource, as in the context of regulating export and import procedures.  AECL has marketed

itself as a leader in research and development of nuclear energy, and as a commercial enterprise

that supplies a large portion of the worldwide need for medical isotopes.  (See Excerpt of the

Official Report of the December 11, 2007 Canadian House of Commons Debate, attached as

Exhibit 2 to Supplemental Declaration of Rukesh A. Korde in Further Support of Plaintiff's

Motion for Issuance of Amended Letters Rogatory (Dkt. No. 53-2) ("House Debate"), at 2067,

Testimony of Mr. David F. Torgerson ("NRU is a huge producer of medical isotopes. . . . People

in the early days of Chalk River developed the [medical isotope] business, which is now a

worldwide business.")).[11]  The most relevant of AECL's activities is its operation of the NRU

Reactor to create medical isotopes for sale throughout North America.  This activity was so vital

to the worldwide supply of Moly-99 that the Canadian House of Commons intervened in the

Canadian Nuclear Safety Commission's regulation of AECL after the May, 2009 shutdown to

---

[11]     The Court also takes judicial notice of AECL's description of the diverse functions of the
NRU Reactor on its website.  See Muller-Paisner v. TIAA, 289 Fed. App'x 461, 466 n.5 (2d Cir.
2008) (summary order) (taking judicial notice of website publication).  In a publication available
on its website, entitled "National Research Universal Profile," AECL describes the NRU Reactor
as intended: "to be a supplier of industrial and medical radioisotopes used for the diagnosis and
treatment of life-threatening diseases; to be a major Canadian facility for neutron physics
research; and to provide engineering research and development support for CANDU® power
reactors."  Atomic Energy Canada Limited, Homepage, Programs, National Research Universal
Profile, available at http://www.nrucanada.ca/en/home/insidenru/nruwhatdoesitdo.aspx (last
visited January 10, 2012).

resolve an apparent discord between the agencies, and to ensure that AECL could resume its

operations and production of Moly-99. (Id. at 2063, Testimony of Hon. Michael Chong).

   The debate between AECL and a Canadian regulatory body demonstrates that AECL was

subject to nuclear safety regulations just as a company in the private sector would be, and that it

did not receive preferential treatment because of its status as a sovereign entity but, instead, drew

legislative attention because of its importance as a commercial supplier in meeting the needs of

the medical community in Canada and elsewhere. (Id. at 2067, Testimony of Mr. David F.

Torgerson ("I am confident that when we are operating again, we can supply all the isotope that

is required in Canada and a lot of the isotope that is required in the United States.")). Moreover,

testimony on behalf of AECL before the House of Commons indicates that AECL's contractual

obligations would determine the supply of medical isotopes once they became available to

enable Canadian and U.S. medical providers alike to request orders for the product. (See id. at

2066-67, Testimony of Hon. Tony Clement). This activity resembles the conduct of a private

entity operating in the marketplace, which determines its allotment of a commodity based on

contractual obligations rather than national interest, as opposed to the conduct of a sovereign

entity, operating in a uniquely governmental capacity. Accordingly, the Court finds AECL's

operation of the NRU Reactor to be commercial in nature. Under the FSIA, the next inquiry is

whether this conduct had a "direct effect" in the United States.

### c.  The Direct Effect of AECL's Operation of the NRU Reactor

   To be "direct," an activity need not be substantial or foreseeable, but it must follow "'as

an immediate consequence'" of the foreign sovereign's activity. Weltover II, 504 U.S. at 617-18

(quoting Weltover I, 941 F.2d at 152). The immediacy requirement "ensures that jurisdiction

may not be predicated on purely trivial effects in the United States." Id. at 618; see Pons v.

People's Republic of China, 666 F. Supp. 2d 406, 412 (S.D.N.Y. 2009) ("'Congress did not

intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage

eventually to reach the shores of the United States.'") (quoting United World Trade, Inc. v.

Mangyshlakneft Oil Prod. Ass'n, 33 F.3d 1232, 1238 (10th Cir. 1994)).  The Second Circuit has

defined "immediate" to mean that, "between the foreign state's commercial activity and the

effect, there was no 'intervening element.'"  Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69,

74 (2d Cir. 2010) (quoting Weltover I, 941 F.2d at 152); see also Martin v. Republic of South

Africa, 836 F.2d 91, 95 (2d Cir. 1987) ("The common sense interpretation of a 'direct effect' . . .

is one which has no intervening element, but, rather, flows in a straight line without deviation or

interruption.") (citation omitted); cf. Morris v. People's Republic of China, 478 F. Supp. 2d 561,

568-69 (S.D.N.Y. 2007) ("[P]laintiff's act of purchasing the bonds many decades after default

likewise is an intervening act breaking the causal relationship.  The 'direct effect' from the

legally significant acts, the breaching of the terms of the bonds, was felt in 1939 and 1960, not in

2000 when plaintiff purchased and the defaulted bonds in a 'collectibles' market.").  As such,

"the requisite immediacy" is deemed lacking where the alleged effect "depend[s] crucially on

variables independent of" the conduct of the foreign state.  Virtual Countries, Inc. v. Republic of

South Africa, 300 F.3d 230, 238 (2d Cir. 2002).

On this point, AECL argues that because it sold raw radioactive isotopes to third party

Ontario-based Nordion, Inc., and then Nordion processed and refined the raw isotopes into

finished isotopes before sale, the effect that AECL's operations had on Lantheus in the United

States is not direct.  (AECL's Mem. at 7-8.)  However, although Nordion may have changed the

nature of the isotopes (and its involvement would perhaps be relevant if Lantheus had brought

suit against AECL for a flaw in the isotope's composition or failure to function that Nordion may

have caused), in this instance, Nordion played no role in the detrimental effect that AECL's
operation and ultimate shutdown of the NRU Reactor had in the United States. In other words,
the extent of financial losses Lantheus suffered as a result of the shutdown did not "depend[]
crucially" on any action by Nordion. Virtual Countries, 300 F.3d at 238. Rather, the causal link
between AECL's decision to shut down the NRU Reactor and the lack of available Moly-99 was
direct, and the detrimental effect immediate. Thus, AECL's conduct had a "direct effect" in the
United States. Consequently, the Court must now determine whether that direct effect is
sufficient to meet the Second Circuit's "legally significant act" test.

### d. The "Legally Significant Act" Test

The Second Circuit has articulated something of a heightened "direct effect" test, which
has been termed the "legally significant act" test and is designed to assess "whether the direct
impact of a foreign state's foreign commercial activity was felt 'in the United States.'"
Guirlando, 602 F.3d at 75. This inquiry is intended to confirm not only that the commercial
activity of a foreign sovereign had a direct impact—as opposed to an incidental or ancillary
one—but also that the impact was felt within the United States, meaning the location of the
impact was the United States. See id. at 75-79 (dismissing claim that U.S. citizen brought
against Turkish bank for misrepresentations and for permitting improper withdrawals by Turkish
citizen from Turkish bank account located in Turkey). The test thus seeks to differentiate
between a direct effect felt in the United States and a scenario in which "a foreign state's
commercial activity outside of the United States caused physical or financial injury to a United
States citizen[.]" Id. at 78.

To assess the location of the effect, courts first identify the "legally significant act,"
meaning the act that gave rise to the lawsuit. See Gosain v. State Bank of India, 414 Fed. App'x

33

311, 313 (2d Cir. 2011) (summary order) ("[T]he requisite 'direct effect' may be established if the plaintiff's cause of action is based upon a denial of payment to be made in the United States[.]"); Virtual Countries, Inc., 300 F.3d at 241 ("[E]ven if the complaint detailed legally significant acts, the district court would have been correct to dismiss the complaint based on the plaintiff's failure to show a causal connection between those acts and the alleged injury it sustained."). For example, had Lantheus brought an action against AECL for breach of contract, the Court would consider the "place of performance." See Weltover II, 504 U.S. at 618-19 (where bondholders designated their accounts in New York as place of payment on bonds, New York became place of performance for Argentina's contractual obligations in satisfaction of direct effects test). Importantly though, courts considering the location of the legally significant act must be mindful not to conflate the third prong of the commercial activity exception—that involving a claim "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States" 28 U.S.C. § 1605(a)(2)—with the first and second prongs of § 1605(a)(2) that account for conduct of the foreign sovereign within the United States. Guirlando, 602 F.3d at 76.

Further complicating the application of the legally significant test in this case is the fact that Lantheus is only seeking discovery from AECL, a non-party, not legal redress as if AECL was a named defendant. Given that every apparent application of the "legally significant act" test involves an action against a foreign sovereign, no courts appear to have considered whether a foreign sovereign's conduct was legally significant in the context of non-party discovery. With no guiding precedent as to how the legally significant test would be applied under these circumstances, the Court will consider by analogy the actions giving rise to Lantheus' need for discovery and the lawsuit against Zurich: AECL's operation of, and decision to shut down, the

34

NRU Reactor.[12]  Characterizing this conduct as the legally significant act and considering the facts already contained in the record, the Court concludes that AECL's operation and shutdown of the NRU Reactor had a direct impact that was directly felt in the United States.  Beyond the effect that the NRU Reactor's shutdown had on Lantheus' business in the United States, the shutdown led to a massive shortage of medical isotopes that resulted in "some 400,000 Americans per week" going without access to the necessary "medical nuclear scans" manufactured using those isotopes.  (House Debate at 2063, Testimony of Hon. Michael Chong). This factor, when examined with the other factors relevant to § 1605(a)(2), establishes conclusively that AECL's operation of the NRU Reactor falls within the commercial exception to the FSIA.  Following this analysis, the Court thus has jurisdiction under the FSIA—were such jurisdiction needed—to issue the amended letters rogatory.

### D.  Considerations of Canadian Law and Comity

While concluding that issuance of letters rogatory does not require consideration of the FSIA in the first instance, and alternatively that the commercial activity exception to the FSIA applies here, the Court is nonetheless mindful of the comity issues raised by Lantheus' application.  The Court therefore follows the directive of the Reporters' Note 5 to § 473 of the Restatement, which instructs U.S. courts "issuing a letter of request for foreign discovery [to] consider the matters listed in Section 442(1)(c)" of the Restatement, which provides the following:

> In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into

---

[12]     Lantheus does not allege that it had a contract with AECL for the purchase of Moly-99, but instead suggests that AECL's operation of the NRU Reactor was negligent.  (Pl.'s Mem. at 16).  However, the characterization of AECL's activity as either rooted in contract or in tort is not dispositive of the direct effect inquiry here because the Court's FSIA inquiry only concerns the events giving rise to a need for discovery rather than the existence of subject-matter jurisdiction over a contract or tort claim.

account [1] the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c).  In Societe Nationale Industrielle Aerospatiale v. U.S. District Court for Southern District of Iowa, the U.S. Supreme Court adopted the consideration of these factors and cautioned that "in supervising pretrial proceedings . . . American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."  482 U.S. 522, 544 n.28, 546 (1987) (citing Tent. Draft No. 7 of the Restatement, 1986) (approved May 14, 1986)) ("Aerospatiale").  While the Aerospatiale Court recognized that the five factors contained within the Restatement "may not represent a consensus of international views on the scope of the district court's power to order foreign discovery in the face of objections by foreign states," it nevertheless found the factors "relevant to any comity analysis[.]" Id. at 544 n.28 (conducting comity analysis in relation to U.S. litigant's invocation of Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, T.I.A.S. No. 7444 ("Hague Convention")); see also Hilton v. Guyot, 159 U.S. 113, 163-64 (1895) (defining "comity" as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws"); see, e.g., Seoul Semiconductor Co. Ltd. v. Nichia Corp., 590 F. Supp. 2d 832, 834 (E.D. Tex. 2008) (acknowledging the need to "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position") (quoting Aerospatiale, 482 U.S. at 546).  These comity

considerations are particularly appropriate where, as here, the party seeking protection from discovery is a foreign sovereign.

### 1. Importance of the Information Requested

Central to the determination that comity favors the issuance of letters rogatory is the first factor, the importance of the information requested. Although there is some dispute as to whether the information must be "vital" to the litigation or simply "relevant," Milliken & Co. v. Bank of China, 758 F. Supp. 2d 238, 246-47 (S.D.N.Y. 2010) (citations omitted), the Court need not make a determination on this point because the information Lantheus seeks is vital. Here, the cause of the water leak that prompted AECL to shut down the NRU Reactor is a significant, if not the determining, factor in Lantheus' ability to obtain insurance coverage from Zurich. AECL, as the operator of the reactor and therefore the party best suited to investigate that cause, can thus uniquely provide the information Lantheus needs to prove its case against Zurich. (See Korde Decl. ¶¶ 4-16 (and exhibits cited therein)).

### 2. Specificity of the Requests

The second factor, concerning the specificity of Lantheus' Requests, supports the application as well. The Requests are tailored to the specific theories of the water leak in the NRU Reactor that Lantheus will need to prove or disprove. In particular, the Requests seek information as to the possible external causes for the water leak (Requests, Schedule A (Revised) (Dkt. No. 35-1 at 6-8) ¶ 1 (radiation); ¶¶ 2-3 (nitric acid); ¶¶ 4-5 (carbon dioxide); ¶ 10 (defective fuel); ¶ 11 (chemicals, desiccants, or impurities)); as well as the specific investigations that were conducted or the reports that were issued after the leak. (Id. ¶ 8 (coupon tests); ¶¶ 9, 12 (depictions of specific damage at time of shutdown); ¶ 14 (metallurgical or chemical analysis)). Moreover, several of the Requests are tailored to a particular location within, or component of,

37

the reactor.  (Id. ¶¶ 2-6, 11 (Annulus); ¶¶ 7, 9 (reactor vessel); ¶ 8 (Annulus and reactor vessel);

¶ 14 (wall of reactor vessel or Annulus).  Finally, where applicable, the Requests specify that

they seek only information that is not otherwise available in unredacted form on the AECL or

Canadian Nuclear Safety Commission websites.  (Id. ¶ 13).

### 3.   Origin of the Information

The documents Lantheus seeks are located in Canada.  (See Requests (Dkt. No. 35-1 at

4).  This consideration thus weighs in favor of AECL.  However, where "the information cannot

be easily obtained through alternative means," the origin of the information can be

"counterbalance[d]" by the inability to obtain the information through an alternative means, thus

favoring disclosure.  Gucci Am., Inc. v. Curveal Fashion, No. 09 Civ. 8458 (RJS) (THK), 2010

WL 808639, at *3, (S.D.N.Y. Mar. 8, 2010) (citations omitted) (emphasis in original).

### 4.   Alternative Methods of Securing Information

In weighing this factor, courts note that "the mere fact [of] an alternative method for

obtaining the documents is not proof that it is necessarily an effective, or efficient, method for

doing so in this case."  In re Air Cargo Shipping Servs. Antitrust Litig., --- F.R.D. ---, No. 06

MD 1775, 2010 WL 1189341, at *2 (E.D.N.Y. Mar. 29, 2010); see also In re Air Cargo Shipping

Servs. Antitrust Litig., No. 06 MD 1775, 2010 WL 2976220, at *2 (E.D.N.Y. July 23, 2010)

(finding no viable alternative means of discovery where response to request under Hague

Convention dependant on approval from ministry of foreign state); see, e.g., Milliken, 758 F.

Supp. 2d at 248 (finding in favor of requesting party where its "requests would not necessarily be

honored, but would only be taken 'seriously' by Chinese authorities"); Gucci Am., Inc., 2010

WL 808639, at *5 (finding in favor of requesting party where "the only alternative means by

which [the p]laintiffs might receive the bank records . . . is the commencement of an action in

Malaysian courts against [the defendant] and securing a judgment, in order to" obtain discovery). Lantheus' efforts to obtain discovery without resort to seeking issuance of amended letters rogatory began as early as May, 2010 with counsel for Lantheus seeking to obtain information from AECL through informal requests (which were largely unsuccessful) before seeking to obtain information through Canada's Access to Information Act (which have led to the production of documents that are alleged to be largely nonresponsive or heavily redacted and incomplete). (St. John Decl. ¶¶ 3-9; Korde Decl. ¶¶ 17-30, and the exhibits cited therein). The most recent correspondence between the Office of the Information Commissioner of Canada—the body governing requests pursuant to the Access to Information Act—and counsel for Lantheus acknowledges AECL's delay in responding to Lantheus' requests under the Access to Information Act as well as that office's inability to compel a responsive production from AECL. (See Letters to the Court from Rukesh Korde, dated November 21, 2011 (Dkt. No. 59) and December 1, 2011 (Dkt. No. 62), and the exhibits cited therein). Accordingly, although other means exist to obtain the information Lantheus seeks, these options do not provide the "easy" access contemplated by a comity analysis that would weigh in favor of AECL.

### 5. Balance of National Interests

AECL relies heavily on the fifth factor, which requires the Court to balance the interests of Canada against the interests of the United States. (AECL Mem. at 12-14). It asserts three main arguments in opposition to Lantheus' motion: (1) comity favors protecting foreign sovereigns from the burden of discovery; (2) the Canadian government has a national interest in controlling the disclosure of nuclear information; and (3) the United States may not reciprocate the request for information sought by Lantheus' proposed amended letters rogatory. (Id.). The Court has already considered the first of these arguments in determining that it may issue letters

rogatory, a discovery device rooted in comity, and alternatively that AECL's conduct falls within the commercial activity exception to the FSIA, a statute which created "a comprehensive framework for determining whether a court in this country . . . may exercise jurisdiction over a foreign state." Weltover II, 504 U.S. at 610. According to this framework, a foreign sovereign has forfeited its immunity protections—including its interest in avoiding the burdens of foreign discovery—when it engages in commercial activity. Id. at 610-11.

   As to AECL's second argument concerning Canada's interest in controlling the disclosure of nuclear information (AECL Mem. at 13-14), the exceptional nature of letters rogatory provide the foreign litigant with the protections that the foreign sovereign lacks when an American court compels it to engage in jurisdictional discovery as a would-be defendant. Just as an American court enforcing letters rogatory issued in a foreign court may limit enforcement of the order, see In re Premises, 634 F.3d at 563, foreign courts charged with enforcing letters rogatory may limit enforcement of the discovery device where appropriate. See, e.g., SEC v. Tourre, No. 10 Civ. 3229 (BSJ) (MHD), 2011 WL 350286, at *1 (S.D.N.Y. Jan. 31, 2011) ("Suffice it to say, we leave to the German authorities the decision whether to honor all, some or none of these requests.") (citing Aerospatiale, 482 U.S. at 544 n.29, 545 (discussing the "demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation")); Metso Minerals v. Powerscreen Int'l Distrib. Ltd., No. CV 06-1446 (ADS) (ETB), 2007 WL 1875560, at *3 (E.D.N.Y. June 25, 2007) ("Whether the Letter of Request will ultimately be executed in light of the United Kingdom's reservation under Article 23 [of the Hague Convention] . . . is unknown. Such a decision is best left to the judicial authorities in the United Kingdom.") (citations omitted). The Ontario Court Decision indicated as much in advising Lantheus that the Ontario Court's dismissal was without prejudice, noting

"there's been no judicial decision with respect to all of those other arguments. . . . I am not going to go through that until I give the U.S. Court a chance to consider it.  Then everything is fair game again."  (Ontario Court Decision at 16-17).  Whether Canadian law would limit enforcement of the amended letters rogatory, in whole or in part, is a determination for the Ontario Court.

AECL's final argument as to the competing national interests between Canada and the United States raises the question of whether the U.S. government would, as a matter of reciprocity, provide discovery sought via letters rogatory to a Canadian commercial entity. (AECL Mem. at 14).  AECL relies on United Kingdom v. United States, 238 F.3d 1312, 1324 n.12 (11th Cir. 2001), for the proposition that the U.S. government has unequivocally "taken the position that it is immune from enforcement of foreign letters rogatory seeking non-party discovery from the government or its instrumentalities."  (AECL Mem. at 14).  Lantheus, in turn, relies on the case Matter of Kevork, 788 F.2d 566, 568 (9th Cir. 1986), as an example of a U.S. court granting the "sort[] of transnational request[]" that has become "routine in light of the growing reach of international commerce."  (Pl.'s Mem. at 13).  While Lantheus may well be correct that transnational discovery requests are increasing due to the global nature of "international commerce," Kevork does not state that fact as much as it focuses on the Foreign Intelligence Surveillance Act ("FISA"), a statute aimed at combating crime, which is certainly not at issue here or central to litigation regarding "international commerce" generally.  788 F.2d at 567-68 (considering whether "FISA prohibits use or disclosure of evidence, obtained pursuant to its requirements, in a foreign criminal prosecution").

United Kingdom is no more persuasive of the point for which AECL cites it than Kevork is for the proposition for which Lantheus cites that decision.  In United Kingdom, the Eleventh

41

Circuit recognized that "[t]he applicability of sovereign immunity principles to proceedings under § 1782 [concerning the enforcement of letters rogatory issued by a foreign court] is a substantial and largely unexplored question that has not been sufficiently briefed by the parties." 238 F.3d at 1324 n.12.  Accordingly, the Court does not read United Kingdom to stand for the proposition that U.S. courts would necessarily deny enforcement of letters rogatory issued by a foreign court in a hypothetical scenario so as to prohibit any attempt to seek reciprocal enforcement here.  Weighed against the interest of the United States in "'fully and fairly adjudicating matters before its courts[,]'" Milliken, 758 F. Supp. 2d at 248 (citing Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429, 443 (E.D.N.Y. 2008)), the Court is therefore not persuaded that the interests of the Canadian government so outweigh those of the U.S. government as to bar the issuance of amended letters rogatory here.

### 6.  Additional Factors of Hardship and Good Faith

District courts in the Second Circuit have considered, and AECL has emphasized, two additional factors to a comity inquiry under Aerospatiale:  "any hardship the responding party would suffer if it complied with the discovery demands" and "whether the responding party has proceeded in good faith."  Milliken & Co., 758 F. Supp. 2d at 246; see, e.g., In re Grand Jury Subpoena dated August 9, 2000, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002), aff'd, 318 F.3d 379 (2d Cir. 2003); see generally Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 522 (S.D.N.Y. 1987) (explaining that additional factors were product of international comity inquiry adopted by Second Circuit, which was "derived from Section 40 of the Restatement (Second) of the Foreign Relations Law of the United States (1965)") (citation omitted).  For the sake of completeness, this Court considers these factors but ultimately finds that they do not dictate a different result.

42

As to the first additional factor in the context of a comity analysis, the "hardship" that courts seek to avoid is the hardship posed by ordering "'the production of information or documents located abroad where such production would violate the law of the state in which the documents are located.'"  Minpeco, 116 F.R.D. at 522 (quoting United States v. Davis, 767 F.2d 1025, 1033-34 (2d Cir. 1985) (citing subpoena cases)).  In enforcing the amended letters rogatory, the Ontario Court—which, as noted, is the judicial body in the best position to determine the reach of Canadian laws that may restrict AECL's production—may limit the enforcement of the letters rogatory to those Requests that do not violate Canadian law.  Likewise, the Federal Rules of Civil Procedure permit Lantheus to seek a protective order from this Court as to any "trade secret or other confidential research, development, or commercial information." Fed. R. Civ. 26(c)(1)(G).  Thus, the hardship prong does not weigh against issuing the letters rogatory nor does it change the Court's application of the Aerospatiale factors.

Finally, Lantheus and AECL disagree as to the good faith that AECL has shown in considering Lantheus' discovery attempts.  Although Lantheus characterizes its attempts to obtain the information it seeks over the past year and a half as being largely unsuccessful due to "AECL's obstruction, delays and refusal to cooperate" (Pl.'s Reply Mem. at 17 (citing Korde Decl. ¶¶ 17-29, 39-49)), AECL contends that this argument is "off the mark."  (AECL's Mem. at 19).  However, AECL objects only to one instance of delay Lantheus cites, specifically the delay in contesting the issuance of letters rogatory in June, 2011.  (Id. (citing Pl.'s Mem. at 6)).  Additionally, AECL misreads Lantheus' reference to this delay.  Lantheus described AECL's delay not in terms of the three weeks that passed between the Court's issuance of the letters rogatory in May, 2011 and AECL's objection in June, 2011; rather, Lantheus notes that AECL did not raise its concerns as to the protection of foreign sovereign immunity for more than a year

after Lantheus first sought informal discovery. (Pl.'s Mem. at 6 (citing Korde Decl. ¶ 36)). This delay—coupled with AECL's failure to engage with counsel for Lantheus over several months (Pl.'s Mem. at 4-5 (and citations therein))—does not support AECL's position, whether it is characterized as evidence of bad faith or not. Reviewing this factor with the other <u>Aerospatiale</u> factors, the Court is unconvinced that comity considerations demand a reversal of its earlier findings that the amended letters rogatory should issue.

### III. <u>Conclusion</u>

For all of these reasons, Lantheus' motion for the issuance of amended letters rogatory is granted. In accordance with this Opinion, the Court shall issue the amended letters rogatory seeking the assistance of the Canadian courts in obtaining the production of the documents from AECL and in taking the deposition testimony upon oral examination of AECL as a witness in this action. Lantheus shall promptly submit for Court approval a proposed order and the appropriate forms of the amended letters rogatory that are consistent with this Opinion, and that also provide that Zurich will have the right to obtain copies of any documents that are produced and to participate in any discovery that is permitted by the Canadian courts.

**SO ORDERED.**

Dated: January 11, 2012
      New York, New York

JAMES L. COTT
United States Magistrate Judge

**Copies of this Opinion and Order have been sent to counsel by ECF.**