1C99LANA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------x

3    LANTHEUS MEDICAL IMAGING,
     INC.,

4
                    Plaintiff,

5
              v.                          10 CV 9371 (JPO) (JLC)

6

7    ZURICH AMERICAN INSURANCE
     COMPANY,

8
                    Defendant.

9    ------------------------------x
                                    New York, N.Y.

10                                   December 9, 2011
                                     10:40 a.m.

11

12   Before:

                        HON. JAMES L. COTT

13
                                              Magistrate Judge

14
                              APPEARANCES

15

     COVINGTON & BURLING LLP

16        Attorney for Plaintiff Lantheus Medical Imaging, Inc.
     BY:  RUKESH A. KORDE

17

     MOUND COTTON WOLLAN & GREENGRASS

18        Attorney for Defendant Zurich American Insurance Company
     BY:  BERNADETTE KELLY KIRWIN

19

20   BEVERIDGE & DIAMOND, P.C.
          Attorneys for Amicus Atomic Energy of Canada Limited

21   BY:  DANIEL MARK KRAININ
              EDWARD MAXWELL GRAUMAN

22

23

24

25

1C99LANA

1                    (In open court; case called)

2                    THE COURT:  Good morning gentlemen.

3                    Everyone can be seated.

4                    I have read all of the papers in this case actually

5     several times.  And thought that I would benefit from having

6     argument, as I think the issues are complex and worthy of

7     having the parties talk through them in this context.

8                    So, Mr. Korde, why don't I hear from you first since

9     it's your motion.

10                   MR. KORDE:  Thank you, your Honor.

11                   Your Honor, from Lantheus' perspective, this motion

12    presents one straightforward question:  Does the Foreign

13    Sovereign Immunities Act prevent this Court from issuing the

14    amended letters rogatory?

15                   Let me just briefly give the Court some background to

16    explain why we think this is the only question at issue in this

17    motion and why we think the answer to that question is that the

18    Foreign Sovereign Immunities Act does not prevent this Court

19    from issuing the amended letters rogatory.

20                   In this instance, the amended letters rogatory

21    requests the assistance of the Canadian courts in obtaining

22    information from Atomic Energy of Canada Limited, a Crown

23    corporation.

24                   The information that Lantheus seeks has to do with the

25    reasons for and the causal mechanism of the shutdown of a

1    commercial nuclear reactor, the NRU reactor, which is operated

2    by AECL.

3            The information, your Honor, is vital to the

4    plaintiffs' case.  The dispute between Lantheus and Zurich

5    turns on the application of certain insurance policy exclusions

6    related to corrosion and maintenance.  And applying those

7    requires detailed and specific information as to what exactly

8    happened to the NRU reactor.

9            Lantheus had previously sought this information by

10   letters rogatory issued by Judge Swain in May of 2011.

11           We took those letters rogatory to the Canadian courts.

12   And Justice Pollack of the Canadian Court declined to enforce

13   the letters rogatory based on an argument by AECL that this

14   court had not considered whether the Foreign Sovereign

15   Immunities Act prevents it from issuing letters rogatory as to

16   AECL because AECL is a foreign sovereign instrumentality.

17           THE COURT:  You say the Foreign Sovereign Immunities

18   Act doesn't apply here because it's a jurisdictional question

19   and the issuance of the letters rogatory really doesn't

20   implicate jurisdiction; is that right?

21           MR. KORDE:  That's exactly right, your Honor.

22           Jurisdiction --

23           THE COURT:  Well that's exactly right that I

24   understand your argument.  I don't know that it's exactly right

25   as a matter of law.  That's what I wanted to hear you address.

1C99LANA

```
 1        MR. KORDE:  Sure.

 2        Well we think that that's right for three reasons,

 3   your Honor.

 4        First of all, if you look at the rationale behind the

 5   Foreign Sovereign Immunities statute and the letters rogatory

 6   process, you can see that the rationales indicate that the

 7   Foreign Sovereign Immunities Act is a jurisdictional statute;

 8   that there's nothing in the Foreign Sovereign Immunities Act,

 9   at least for our purposes, that goes to anything other than

10   jurisdiction.  That's what the legislative history says.

11   That's what the plain text of the statute says.

12        THE COURT:  There's nothing in the plain text of the

13   statute that really sheds any light directly on the question

14   that's presented to the court, is there?

15        MR. KORDE:  Well, I would say that by omission there

16   is, your Honor.

17        Because if Congress had intended to regulate the

18   issuance of letters rogatory by the Foreign Sovereign

19   Immunities Act, it would have said so in the statute.

20        And, in fact, the legislative history says this is

21   purely a jurisdictional statute.

22        And we've put in our brief Second Circuit case law

23   which makes clear that in interpreting a statute like this you

24   just look at the plain language of the text.

25        THE COURT:  What do you make of the Restatement of the
```

1C99LANA

1    Foreign Relations Law of the United States which says,

2    "Discovery from a foreign state that is not a party to a

3    proceeding has apparently not been attempted in international

4    practice and is not provided for in either the FSIA or the

5    corresponding laws of other states.  Since sovereign immunity

6    is the rule, and amenability to judicial process an exception

7    to the rule, such discovery would seem to be precluded."

8            MR. KORDE:  I think there are two points to make

9    there, your Honor.

10           The first one is that that provision that you just

11   read makes clear that the FSIA doesn't apply to the situation

12   we're in here today.

13           But the second and more important point is that that

14   is a provision that deals with an attempt to get discovery from

15   a foreign sovereign directly using the power of this court to

16   issue a subpoena to AECL.

17           THE COURT:  Let's talk about that scenario for a

18   minute.

19           If AECL were present in the United States as a

20   nonparty but as a Crown corporation of Canada, would the

21   Foreign Sovereign Immunities Act be implicated if you served a

22   Rule 45 subpoena on them?

23           MR. KORDE:  It might be, your Honor.  But we think

24   that the commercial activities exception --

25           THE COURT:  Leave the exception to the side for the

1C99LANA

```
 1   moment and we'll come back to it.
 2             The threshold question that you've presented is
 3   whether the Foreign Sovereign Immunities Act applies.
 4             You say it doesn't, I shouldn't be concerned about it.
 5             I'm asking you not our case but a hypothetical
 6   question.  If AECL were in the United States as a Crown
 7   corporation having an office or otherwise present in the United
 8   States and you wanted discovery from them because it was
 9   relevant to your lawsuit against Zurich, would the Foreign
10   Sovereign Immunities Act apply and, therefore, prevent you from
11   getting it unless an exception applied?
12             MR. KORDE:  Yes, it would.
13             However, I think the hypothetical that your Honor is
14   suggesting is, with respect, somewhat off the mark.  Because
15   what we're talking about here is not a subpoena.  What we're
16   talking about here is simply a request.
17             THE COURT:  What's the difference between a Rule 45
18   subpoena to a nonparty in the United States and a letters
19   rogatory to a nonparty outside the United States?
20             MR. KORDE:  That's a good question, your Honor.
21             And the difference is that a Rule 45 subpoena relies
22   on this court's power to compel responses.
23             A letter request doesn't -- is not backed up by any --
24   by this court's power to compel.  There is no threat of
25   sanction from this court if AECL doesn't comply.
```

1              It's simply a request to the Canadian courts to say

2     will you help Lantheus obtain this information that's crucial

3     to the case.

4              THE COURT:  Well that makes it sound to me like you

5     think a letters rogatory and the issuance of it is recently a

6     ministerial act.

7              Is that a fair characterization from your standpoint?

8              MR. KORDE:  We think so, your Honor.

9              We think that the issuance of a letters rogatory

10    are -- it's standard procedure in transnational disputes; that

11    you get letters rogatory from your home state, from your home

12    court, and the decision as to whether or not there is an

13    enforcement and whether the failure -- the failure to comply

14    with the enforcement order, that's supervised by the foreign

15    court, in this case by the Canadian court.  So it would be the

16    Canadian court's discretion as to whether or not to enforce it.

17    And the Canadian court's application of Canadian law as to what

18    would be required to be produced.

19             THE COURT:  That's true in the normal course.

20             But let's not lose track of what's before me, which is

21    a very much more narrow, but I think problematic, set of facts

22    which is that the subject of your letters rogatory here is

23    affiliated with a foreign sovereign.  So this is not your --

24    you're not just seeking something from a Canadian company.

25    You're seeking something from a Canadian company that has a

1     relationship with the Canadian government.  And that's quite

2     different, although limited.

3            So, for example, when you suggest that if the Foreign

4     Sovereign Immunities Act is otherwise implicated here, it would

5     have a detrimental effect more broadly for the issuance of

6     letters rogatory in the context of commercial disputes.  I

7     think that might be slightly overstated.  Because as we can

8     see, giving the paucity of case law that exists, it's fairly

9     rare that a letters rogatory issued to an entity affiliated

10    with a foreign company -- I haven't read a single case, and

11    maybe you can direct me to one that I missed in your papers or

12    your adversary's papers, whose facts are identical to this and

13    a court really addressed with thoughtful and thorough analysis

14    whether the Foreign Sovereign Immunities Act is implicated in

15    this context.

16            Is there such a case?

17            I mean the Arizona case, for example, both sides seem

18    to discuss it as if it's precedent.  It looks to me like a form

19    that the judge signed.  There isn't a single case cited in it.

20    So I don't really know much what to make of that, for example,

21    as the one that seems otherwise sort of closest.  But it

22    doesn't give me any guidance.

23            Are there cases that I'm missing that are like ours?

24    Or isn't this really a sui generis case?

25            MR. KORDE:  Your Honor I, think three points.

1C99LANA

```
 1          First of all, I think that the Al-Misehal case, the
 2   Arizona case, I don't believe it's just simply a form that was
 3   entered, because there is some discussion of what exactly
 4   was -- why the testimony sought from the Crown Prince of Saudi
 5   Arabia was relevant to the case at issue, albeit a
 6   paragraph-long discussion.
 7          THE COURT:  Without any case citation.
 8          MR. KORDE:  Without any case citation.
 9          THE COURT:  And it seems obvious that because he was
10   in the business of renting vehicles that, were one to have
11   drilled down and actually analyzed it, assuming the Foreign
12   Sovereign Immunities Act might have been implicated, the
13   commercial activities exception also clearly would have been
14   implicated.
15          MR. KORDE:  With respect, your Honor, what you had in
16   that case was a commercial dispute between Al-Misehal on the
17   one hand and the Armored Group LLC on the other, and the Crown
18   Prince was a third party witness to that dispute.
19          What you got here is a commercial dispute between
20   Lantheus and Zurich and the foreign sovereign entity is a third
21   party witness.
22          So I think the facts are very close.
23          And the fact that --
24          THE COURT:  But this decision didn't address the
25   Foreign Sovereign Immunities Act one way or the other.
```

1C99LANA

1          You're drawing from it that it didn't say anything

2     about it that, therefore, I don't need to think about the

3     Foreign Sovereign Immunities Act.  I'm not sure that's the

4     logical inference.

5          MR. KORDE:  Well I think, your Honor, that that's one

6     of several cases in which courts are not troubled by the fact

7     that they're issuing letters rogatory to foreign sovereign

8     instrumentalities.

9           If it were one case in which the court did -- did or

10    did not make that consideration, that would be one thing.  But

11    I think there are several other cases that we cite, the E-BEAM

12    case, the Danisch case and, running the other way, a letter

13    rogatory from the Ontario court to the United States, the

14    Kevork case, in which it's not really considered -- this notion

15    of sovereign immunity isn't really seen to intersect the letter

16    rogatory process.

17         THE COURT:  Let's step back for a minute.  Let's talk

18    about this at 30,000 feet, more generally.

19         The Foreign Sovereign Immunities Act was passed to

20    ensure that American courts are solicitous of foreign entities

21    and foreign countries when they are sued in the United States,

22    right?  And unless there are exceptions to the immunity,

23    foreign countries and those affiliated with it are immune,

24    right?

25          Isn't that right?  Is that what Foreign Sovereign

1C99LANA

1   Immunities Act stands for in broad terms?

2           MR. KORDE:  I think it would cast it somewhat

3   differently, your Honor.

4           My understanding from the legislative history is that

5   the Foreign Sovereign Immunities Act was passed so that courts

6   could make decisions about whether they had jurisdiction over

7   foreign sovereigns or not as opposed to having the state

8   department make those decisions.

9           And the purpose of that was that you wanted to have

10  some sort of transparency about when foreign sovereigns could

11  be hailed into court and when not.  That's one purpose.

12          The other purpose was that you wanted to limit the

13  ability of a court to hail a foreign sovereign and compel it to

14  submit to American jurisdiction and compel it to submit to

15  American law for actions that are taken as sovereign, sovereign

16  actions, but not when the -- not when the foreign sovereign or

17  its instrumentality is simply acting as a commercial actor.

18          So I think those are the twin aims of the FSIA.

19          THE COURT:  I guess what I'm focusing on a little bit

20  is there's a concern, as reflected in the statute, that

21  American courts be cautious and careful when the governments or

22  those affiliated with the governments of foreign countries are

23  brought before our courts.  And when there is discovery

24  implicated, it's usually jurisdictional discovery, as you

25  suggest, to evaluate whether there is a proper basis for

1    immunity to be invoked or not.

2            Why, if that's true, doesn't what follow from that

3    when a letters rogatory is being sought in an American court of

4    a foreign entity or those affiliated with a foreign entity,

5    that the American court should be similarly solicitous, if you

6    will, and take seriously the underpinning of the Foreign

7    Sovereign Immunities Act and whether any exception applies

8    before just willy-nilly signing off in an administrative and

9    perfunctory fashion on a letters rogatory?

10           MR. KORDE:  Your Honor, the -- what we are asking for

11    is -- to be clear, the Foreign Sovereign Immunities Act is a

12    act that purports to regulate this Court's authority to compel

13    a sovereign to do something.

14           When you're simply -- when you're issuing a letter

15    rogatory to the Canadian courts you're simply asking the

16    Canadian courts for assistance.

17           So, the need to be solicitous I think is substantially

18    diminished because all you're doing is saying:  Can you help

19    Lantheus get this information?  And I'm not sure --

20           THE COURT:  Well the Canadians --

21           MR. KORDE:  The upshot of AECL's argument is that they

22    are immune from a request.  And it seems to me that doesn't

23    make sense.  You can't be immune from a request.

24           You can be immune from an obligation.  You can be

25    immune from a legal requirement.  And you can be immune from a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    punishment if you don't comply with your obligations.

2             But you can't be immune from a request.  You can't be

3    immune from a court simply asking a question of a coordinate

4    court.

5             THE COURT:  The Canadian court and the statute in

6    Canada requires that the letters rogatory be issued by a court

7    of competent jurisdiction, correct?

8             MR. KORDE:  Correct.

9             THE COURT:  What does that mean?  What makes me

10   competent in that context to issue letters rogatory?

11            Am I competent without assessing whether AECL has a

12   right to invoke the Foreign Sovereign Immunities Act?

13            Or do I have to, as the Canadian court seemed to

14   suggest, at least consider it to assure it that I am a

15   competent court issuing letters rogatory because I've accounted

16   for it.

17            MR. KORDE:  Your Honor, for the purposes of the

18   Canadian provision that requires the letters rogatory be issued

19   by a court of competent jurisdiction, that is satisfied simply

20   by the fact that this court has jurisdiction over the dispute

21   between Lantheus; i.e., that this is a court that is competent

22   to decide the dispute that is at issue between Zurich and

23   Lantheus.

24            So it can't just be some administrative tribunal or

25   some arbitral panel that is saying, you know, we're issuing a

1C99LANA

1    letter rogatory.  It's got to be a court that actually has

2    jurisdiction over the dispute at issue.

3            THE COURT:  Let's go back to the issue of whether AECL

4    were in the United States for a minute.  Because I think there

5    may be an anomalous result in your analysis, unless I

6    misunderstand it.

7            If AECL were in the United States and you served it

8    with a Rule 45 subpoena, it could move to quash it on Foreign

9    Sovereign Immunities Act grounds, could it not?

10           MR. KORDE:  It could file such a motion.

11           THE COURT:  What's the difference between what it's

12   doing now and that scenario?

13           And if you were unsuccessful in opposing the motion to

14   quash, then you couldn't get from them in the United States

15   what you're telling me you think you can get from them outside

16   the United States.

17           Isn't that an anomalous result?

18           MR. KORDE:  I don't believe so, your Honor.

19           Because, I mean -- first, with respect to -- if any

20   litigant is present in the United States, then it can -- you

21   can subpoena them and they can move to quash.

22           If they're not in the United States, you can't

23   subpoena them.  So you have to use this letter rogatory

24   process.

25           It can't be that just because you're outside the

1C99LANA

```
 1   United States you can't be subject to the letter rogatory

 2   process.

 3           But I think the more fundamental answer to your

 4   Honor's question is that -- the anomalous result runs the other

 5   way.  Because what AECL is suggesting is that they could move

 6   to quash a request.

 7           And I make the same point that I made with immunity.

 8   You can't quash a request.  You can quash an action of a court,

 9   you know, an order of a court to compel somebody to do

10   something.  But you can't quash a request, which is just a

11   question from this court -- this court asking the Canadian

12   courts:  Will you help Lantheus do this.  That's all it is.

13           There is no -- the two are sui generis.  You can't

14   quash a request.  You can't be immune from a request.

15           THE COURT:  Let me ask you a question about the

16   commercial activities exception if we can skip to that for a

17   moment.

18           I know it's not what you think.  But let's assume for

19   argument's sake that I decide that the FSIA is implicated here,

20   if that's the right word.  And then I decide that I will look

21   at the exception.

22           It seems to me that your submission suggests that the

23   record is insufficient to allow me to determine the exception

24   applies and that jurisdictional discovery of some kind needs to

25   be taken.
```

1C99LANA

1          Why can't I decide on the information presented to me

2     that the exception is, in fact, implicated and, therefore,

3     while the Foreign Sovereign Immunities Act applies, contrary to

4     your view, nonetheless the exception also applies.

5          So you might, if I can phrase it this way, lose the

6     battle but win the war.

7          MR. KORDE:  Your Honor, I would be happy with that

8     result.

9          I think the point we were making in our brief was that

10    AECL's suggestion that the commercial activities exception

11    doesn't apply is based on a series of factual assertions that

12    have never been tested in discovery.  And if the court is

13    inclined to go down that route, our preference would be to take

14    the discovery and decide the issue on a complete record.

15         If your Honor feels that he has sufficient information

16    to rule that the commercial activity exception applies, then

17    certainly I'm happy with that result.

18         I'm always happy to win the war.

19         THE COURT:  What are your thoughts about the issues of

20    comity here and what rule, if any, they should play in the

21    Court's assessment of the issue presented?

22         MR. KORDE:  Your Honor, we think that the Aerospatiale

23    comity analysis is completely misplaced in this context.

24         That analysis is tethered to a situation in which you

25    have a party, a litigant before the court, a foreign litigant

1C99LANA

1   before the court that's subject to, on the one hand, American

2   discovery law and American discovery obligations and, on the

3   other hand, is subject to some -- the laws of its home country

4   that preclude it from complying with those American discovery

5   obligations.

6           And in that situation where you have an actual

7   conflict of law with respect to one party that's whipsawed

8   between two different competing legal systems, that's when you

9   engage in a comity analysis to resolve the legal conflict.

10          This situation arises, for example, typically in

11  situations where you've got a foreign bank that's doing

12  business in the United States and somebody tries to get

13  discovery and the foreign bank says well, at home in

14  Switzerland our banking laws prohibit -- our banking privacy

15  laws prohibit us from disclosing this information.  And then

16  you've got the bank whipsawed between the American discovery

17  obligations and the Swiss privacy rules.

18          That's not the case here.  That's not the case here.

19  AECL has not identified a conflicting set of legal obligations.

20  AECL hasn't suggested that it is subject -- they don't concede

21  they're subject to the jurisdiction of this court, which means

22  they don't concede that they're subject to legal sanction at

23  home if they comply with the court order here because their

24  position is this court can't issue an order to them here.

25          So, the whole comity analysis is just misplaced.

1C99LANA

 1   Unless you have an actual conflict of legal obligations you

 2   don't need to engage in it.

 3        THE COURT:  Well, in Aerospatiale there's language --

 4   and I realize it's broad -- that says the following, "In

 5   supervising pretrial proceedings, American courts should take

 6   care to demonstrate due respect for any special problem

 7   confronted by the foreign litigant on account of its

 8   nationality or the location of its operations and for any

 9   sovereign interest expressed by a foreign state."  And that is

10   a quote.  And that decision, it seems to me, comports with

11   traditional notions of international comity.

12        So are you suggesting I disregard that direction from

13   the Supreme Court here because there aren't the kind of

14   conflicts that you describe were implicated more specifically

15   in that case?

16        MR. KORDE:  I believe that Aerospatiale is

17   inapplicable here.

18        Your Honor, the quote you just read specifically

19   references the fact that the court should be solicitous where

20   there is a foreign litigant.

21        AECL is not a litigant in this matter.  AECL is not a

22   party in this matter.  They've strenuously resisted being

23   anything but an amicus.

24        THE COURT:  Well, you know a lot of this dispute boils

25   down to language.

1              You're correct.  They are an amicus and there's been a

2      lot of back and forth about that.

3              The word litigant can be defined pretty broadly.  If I

4      am a nonparty who is served with a Rule 45 subpoena and I want

5      to challenge it and I make a motion to quash that subpoena in

6      court, I think I'm a litigant, aren't I?

7              Now this is an unusual scenario because they are not

8      in the United States, not susceptible to a Rule 45 subpoena.

9      The way you can obtain the information you want is through a

10     letters rogatory.

11             You, I believe, agreed that they could present their

12     position to the court.  Does that not make them a litigant in

13     some definitional sense of the word?

14             I think, you know, they're doing it as an amicus.  You

15     would say well they're doing it as a friend of the court rather

16     than as a litigant.  It's semantic a little bit.

17             And I don't mean to overstate this.

18             But I'm concerned that there are, in fact, issues of

19     international comity that are implicated here.  I have a

20     Canadian court who has specifically directed that this court

21     revisit and review something that was already before this

22     court, before Judge Swain, last spring.  So, I hardly want to

23     make short work of the direction that's been given from the

24     Canadian court here.

25             Obviously, we're going to issue a decision that

1C99LANA

squarely takes on the question of the Foreign Sovereign

Immunities Act and its implications here because that's what

the Canadian court has asked us to do and the parties have

their arguments, as we're discussing.

But I guess I'm a little concerned that your position

seems to suggest I don't need to go down the road as much as I

think perhaps I do.

MR. KORDE:  I think, your Honor, the reason this court

doesn't, with respect, need to go as far down the road as

perhaps it might, on its initial review, think is that in the

Aerospatiale cases, Aerospatiale and its progeny, there is

no -- once the court rules that the foreign litigant has to do

something, there is no further protection for that foreign

litigant.  If the Swiss bank is required to produce the

documents, it's required to produce the documents.  It has no

further recourse.

By contrast, if your Honor issues a letter request,

AECL does have additional recourse and that is to oppose the,

as it did, the letters of request in the Canadian courts.

So, the comity analysis comes into play when one judge

has to balance two competing legal regimes.

Here, this court doesn't need to balance two competing

regimes.  This court needs to decide under its own laws whether

the letter request is properly issued.  And then the Canadian

courts can decide under their laws whether the letters of

1    request are properly enforced or enforceable.

2            So, there is no one person trying to balance the

3    equities between two competing legal systems.  Rather, the

4    letter of request process in and of itself handles that

5    balancing because it allocates to this court the responsibility

6    of issuing the letter of request.  And it allocates to the

7    Canadian court the responsibility of deciding whether to

8    enforce the letter request, whether to narrow it, what in its

9    discretion should or should not be done, how that enforcement

10   procedure should take place.

11           THE COURT:  Well, you know, there are a number of

12   factors that are implicated if I follow the Supreme Court's

13   guidance in terms of things along the lines related to the

14   importance of the information requested; other methods of

15   securing the information, balancing national interests, among

16   other things.

17           These are all things that the parties, or I should say

18   Lantheus and AECL have briefed to me.  So, sort of by dint of

19   your submissions alone you have kind of implicated this

20   framework even if you don't think it otherwise is necessary for

21   me to consider.  After all, you've laid out in great detail the

22   efforts that you made both informally and now formally,

23   including the spate of recent letters I got from both sides

24   about the status of all of that.  I assume you sent that to me

25   because you think it has some ramifications in some way of

1C99LANA

1     what's before me, right?

2          Well maybe I should ask it a different way.  The

3     Freedom of Information Act equivalent in Canada that you have

4     pursued, what difference, if any, does that make to the

5     issuance of letters rogatory here?

6          MR. KORDE:  Your Honor, I don't believe it does.

7          May I approach?  I need to supplement the record

8     somewhat.  There's a subsequent communication on the access to

9     information request that I should draw to the Court's

10    attention.  I didn't want to spark another letter-writing

11    campaign when I knew we were having oral argument.

12         THE COURT:  You've given a copy of this to --

13         MR. KORDE:  Yes.

14         MR. KRAININ:  Yes.

15         MR. KORDE:  This is a letter from the information

16    office, back from Mr. McCluskey.

17         The information commissioner says, or the staff person

18    says the results of the investigation are that your complaint

19    is well founded.  He does go on to say that your complaint is

20    resolved as AECL has provided a reasonable work plan and

21    commitment date of February 1, 2011 to respond to your request.

22    I assume he means 2012.

23         But again I would point out here -- this is, again,

24    part of the factual dispute is, you know -- there is no

25    evidence in the record that AECL is taking meaningful steps to

1C99LANA

gather and locate documents.  There is no evidence in the

record as to what they're going to produce.  There is no

evidence in the record as to whether the stuff is going to be

as substantially and horribly redacted as the stuff we

initially got.

So I think the ATI request doesn't really have a

substantial bearing on this.  For that reason, and for the more

important reason that the -- I think this is really the

fundamental issue.  The ATI request doesn't allow Lantheus to

obtain testimony.  And that's crucial here.  Because they say

well we'll stipulate the documents are authentic.  That really

doesn't do it.  I can show authentic documents to the jurors

all day long and they're not going to understand them because

these are technical documents.  They're chemical analyses.

They're data analyses.  They're raw data.  So without

testimony, foundational testimony from someone to put these

documents into context, the jury is never going to understand

them.

And, along this same lines, because these are

documents that deal with engineering tests and chemical tests

and data analysis, Lantheus needs to be able to ask AECL to put

the documents into context and to, you know, inquire about the

documents.

You ran this test.  Did you account for this

possibility of systematic error?  This possibility of

1C99LANA

1   nonsystematic error?  Why did you run this test as opposed to

2   that test?  Why did you look at this parameter?  Did you

3   control for this variable?

4        We need to be able to ask those sorts of questions

5   that are based on the documents but that go beyond the

6   documents in order to understand what the information is and

7   what the data is.

8        So, I don't think the ATI request answers the -- what

9   we need.

10       THE COURT:  Isn't everything you've just said really

11  an argument to be made to the Canadian court more than to me?

12       MR. KORDE:  Absolutely, your Honor.

13       THE COURT:  So why is all of that before me?

14       MR. KORDE:  Your Honor, they raised it.  I felt I had

15  to respond to it.

16       Our position is, I think, as I said at the outset,

17  this a straightforward question.

18       Does the FSIA apply or not?  We think it doesn't

19  apply.  So we think the letters rogatory can issue.

20       THE COURT:  Let me -- I'm sorry to skip around a

21  little bit, but I was looking at some of the notes I made and

22  issues that I wanted to cover with you.

23       I wanted to go back to the exception to the statute

24  for a minute.

25       MR. KORDE:  Sure.

1            THE COURT:  With respect to direct effects, do you

2      think that financial loss alone is sufficient to demonstrate a

3      direct effect if I go down that path and find that the act

4      applies but that the exception may apply?  Would it apply if

5      the financial loss that's been described is something in the

6      record sufficient for me to find that?  Or is there more that

7      needs to be there?

8            MR. KORDE:  Your Honor, I don't think you need to

9      answer that question because I think there is more in the

10      record as to direct effects.

11            There's, in addition to the financial loss that

12      Lantheus suffered, there is the inability of Lantheus to

13      produce its product, the inability of Lantheus to meet its

14      customer commitments as a result of the NRU shutdown, the

15      inability of Lantheus to fulfill customer contracts.  That's

16      one set of direct effects.

17            And then you've got a second set of direct effects

18      which we also talk about which is the fact that you've got

19      hundreds of thousands of American patients per week who can't

20      have critical diagnostic procedures.  We're not talking about

21      strep throat swabs.  We're talking about tests for coronary

22      heart disease.

23            So these are important medical procedures.  Hundreds

24      of thousands of Americans per week are being deprived of them

25      or were deprived of them.  That we think is also a substantial

1C99LANA

1     direct effect.

2             And just to follow through on that thought, it's that

3     direct effect that the Canadian government itself cited back in

4     2007, when the reactor was shut down for regulatory reasons, in

5     restarting the reactor.  They said we need to restart this

6     reactor because, among other things, 400,000 Americans per week

7     are being impacted by the shutdown.

8             So we think that's -- there's more here than just a

9     simple financial loss.  So I don't think you need to address

10    the question of whether a simple financial loss would be

11    sufficient.

12            THE COURT:  All right.

13            Why don't I -- I've had you up here for a while.  I'll

14    let you certainly have a right of reply.  But let me hear from

15    counsel for AECL at this point.

16            MR. KORDE:  Thank you, your Honor.

17            MR. KRAININ:  Thank you, your Honor.

18            Daniel Krainin on behalf of AECL.

19            THE COURT:  Yes, Mr. Krainin.

20            MR. KRAININ:  And I'd like to beginning by thanking

21    the court for allowing AECL to have the opportunity to be heard

22    today on these important issues of foreign sovereign immunity.

23    We would agree with the court's opening remarks and disagree

24    with Lantheus that the Foreign Sovereign Immunities Act and the

25    issues presented here do raise a number of complex issues.

1C99LANA

1   Lantheus would have the court believe that it doesn't, and that

2   this is simply ministerial, and that the court can and should

3   issue letters rogatory to any foreign sovereign under any

4   circumstances whatsoever and simply let the foreign sovereign's

5   home court sort it out.

6           In contrast, we believe that the policy provisions

7   underlying both the Foreign Sovereign Immunities Act, the

8   principles of foreign sovereign immunity, and the principles of

9   international comity dictate that the letters should not issue

10  in this case.

11          First of all, AECL is a Crown corporation, fully owned

12  by the Canadian government, as the Court knows.

13          AECL and Canada have strong sovereign interests with

14  respect to the information that Lantheus seeks in this case.

15          THE COURT:  Well let me interrupt for a second.

16          The information that's sought is still, if the letters

17  rogatory are issued, going to be the subject of the Canadian

18  court's scrutiny so that, if I can analogize again to the Rule

19  45 scenario, if you are in the United States and this subpoena

20  was served on you, and you made a motion to quash, the motion

21  to quash could be both on sovereign immunity grounds and also

22  because of the scope of it and the security issues implicated

23  alike.

24          Here, those questions, as I understand it, by dint of

25  the fact that we're talking about letters rogatory, will all be

1C99LANA

1   before the Canadian court, not before this court; isn't that

2   right?

3              MR. KRAININ:  That's correct to a certain extent, your

4   Honor.

5              Certainly AECL, should this court issue letters

6   rogatory, AECL will have an opportunity to object and certainly

7   will object to their enforcement in Canada.

8              However, the question that's before this court is

9   whether the issuance of the letters themselves is proper under

10  these circumstances.  And the answer is no under the dictates

11  of the principles of foreign sovereign immunity and the

12  principles of international comity, specifically the foreign

13  sovereign immunity principle that foreign sovereigns should be

14  free from the burdens of litigation and discovery from U.S.

15  courts.

16             Lantheus -- first of all, the sovereign interest at

17  stake here, Lantheus likes to characterize as simply a

18  commercial dispute relating to the radioactive isotopes that

19  Lantheus ultimately receives after further processing from an

20  intermediary in Canada and uses in its commercial equipment.

21             The information they seek, and the interests that are

22  at issue for AECL relate to the national research -- nuclear

23  research universal reactor in Chalk River, Ontario.

24             The NRU reactor is a national nuclear research

25  facility.

1C99LANA

          1          The incident at issue that was the cause of the

          2     shutdown relates to the design and operation of that reactor.

          3     And that national nuclear reactor and facility raise a whole

          4     host of national security and public interest issues that are

          5     very important to AECL.  And AECL is charged with protecting

          6     them by the Canadian government.

          7          THE COURT:  Aren't those issues for the Canadian court

          8     and not for this court?

          9          MR. KRAININ:  Well, your Honor, it is for this court

         10     to consider whether it would be appropriate to ask a Canadian

         11     court to enforce the discovery requests under these

         12     circumstances.

         13          And specifically, responding to one of the points that

         14     your Honor made in the discussion with counsel for Lantheus, I

         15     would certainly agree that there is absolutely no case law on

         16     point that finds that it would be -- that analyzes the issue

         17     and then finds that it would be proper to serve letters

         18     rogatory in a circumstance such as this.

         19          There is, however, one case directly on point that

         20     does analyze the issue and finds that it would be improper to

         21     serve letters rogatory to a foreign sovereign; that's namely

         22     the Seoul Semiconductor case.  And the Seoul Semiconductor case

         23     does precisely what the Aerospatiale, Supreme Court said in

         24     Aerospatiale.  It reviews the five principles of international

         25     comity.  And be it not only -- I understand Lantheus' point

1    that Aerospatiale was decided in a different context.  However,

2    the Restatement of Foreign Relations Law, Section 473

3    Reporters' Notes 5, specifically addresses the context we have

4    here in this court, the dispute before you today.  And that

5    part of the Restatement says that the court must analyze the

6    comity principles set forth in Aerospatiale.

7         That's precisely what the Seoul Semiconductor case

8    did; and in so doing, came to the conclusion that it would be

9    inappropriate, that it would infringe upon the principles of

10   foreign sovereign immunity and international comity to issue

11   the letters and to ask a foreign tribunal to enforce them.

12        THE COURT:  Let me go back to first principles with

13   you as well.

14        Have I been asked to assert jurisdiction over AECL by

15   Lantheus' application to this court for the issuance of letters

16   rogatory?

17        MR. KRAININ:  Your Honor, I believe that this court is

18   most likely without power to assert jurisdiction over an entity

19   that is not within this court's territorial jurisdiction.

20        However, the issuance of the letters rogatory

21   themselves is tantamount to an assertion in exercise of

22   jurisdiction insofar as it is a request, it is -- it would be

23   asking another tribunal in a foreign nation to exert

24   jurisdiction on behalf of this court and for the purpose solely

25   of the commercial dispute between Lantheus and Zurich that's

1   pending before this court.

2           THE COURT:  Well, that's sort of the nub of

3   everything.

4           I mean you said it's tantamount to.  And really,

5   again, not to be overly analytical about language, but it boils

6   down to whether, in fact, it is, to use your phrase, tantamount

7   to or not, doesn't it?

8           MR. KRAININ:  Your Honor, we would certainly argue

9   that because it is tantamount to the exercise of jurisdiction

10  that the Foreign Sovereign Immunities Act and the principles

11  underlying it apply.

12          However, if the court disagrees with that, then it's

13  clear that the principles of international comity ought to be

14  applied within the Court's discretion as to how those

15  principles shake out and what that dictates here.

16          But certainly, again, the Restatement and the Seoul

17  Semiconductor case show that that's what a court can and should

18  do in these circumstances if it reaches -- if it finds that the

19  answer is unclear under the Foreign Sovereign Immunities Act

20  itself.

21          THE COURT:  Well there is nothing in the Foreign

22  Sovereign Immunities Act itself that addresses the issue before

23  me, right?

24          MR. KRAININ:  Correct.

25          THE COURT:  There's nothing in the legislative history

1C99LANA

1    that addresses it, right?

2          MR. KRAININ:  Correct.

3          THE COURT:  Indeed, arguably the legislative history

4    seems to suggest that they didn't intend to deal with discovery

5    issues in the context of the Foreign Sovereign Immunities Act

6    and left that for the Federal Rules of Civil Procedure or

7    otherwise.

8          MR. KRAININ:  I think it's safe to say that the

9    language of the Foreign Sovereign Immunities Act itself does

10   not address the situation before the court today.

11         However, I think it's also clear to say that the

12   interpretation of the Foreign Sovereign Immunities Act by the

13   Supreme Court, for example in the Dole Foods case in which the

14   Court said that a fundamental principle underlying that or one

15   of the fundamental principles was to protect foreign states

16   from the inconvenience of suit as a gesture of comity between

17   the United States and other sovereigns.

18         Likewise, the Second Circuit in the EM Limited case

19   has explained that the Foreign Sovereign Immunities Act is

20   intended to provide immunity not only from liability but also

21   from the burdens of litigation, including discovery.

22         And so Lantheus -- in Lantheus' view we would have the

23   anomalous result that the Court alluded to earlier which would

24   be that they could not hail AECL into court here if AECL had a

25   presence in the United States either as a party to the action

1C99LANA

         or as a third party through a Rule 45 subpoena for discovery.
   2     But because AECL is further removed from the United States and
   3     from this Court's jurisdiction, Lantheus seems to think it
   4     should have greater rights and should have the opportunity to
   5     ask this court to do what it could not do within the United
   6     States domestically by reaching out to a foreign tribunal and
   7     asking that tribunal to exercise jurisdiction on behalf of this
   8     court.

   9          And the principles set forth in the U.S. v. Weisberg
   10    case is directly on point here, which said that letters
   11    rogatory are simply a means to obtain information or to obtain
   12    something to which parties are otherwise entitled.

   13         In this case Lantheus is not otherwise entitled to the
   14    information it seeks.  It would not be entitled to it if AECL
   15    had presence in the United States.  And so Lantheus should not
   16    have a greater right to the information for a party that's
   17    further removed.

   18         If we took the logical extension of Lantheus'
   19    position, not only could and should courts always simply sign
   20    as the court -- your Honor alluded to in the Al-Misehal case,
   21    simply sign the form or agree -- there was no objection in that
   22    case to the issuance of the letters rogatory.  It was signed as
   23    a ministerial act.  And Lantheus would argue that that should
   24    happen all the time in any circumstances with any foreign
   25    sovereign.

1C99LANA

1          And beyond that, Lantheus makes the point in its

2     papers that AECL does have a presence in the United States in

3     the form of the Canadian embassy and consulates.  Well if

4     that's right, then all foreign sovereigns have a presence

5     within the United States and any discovery that is sought of a

6     foreign sovereign, there would never be a need for a Rule 45

7     subpoena or to implicate the Foreign Sovereign Immunities Act.

8     One could always get around that by simply asking the court for

9     letters rogatory, which again on Lantheus' view the court

10    should simply sign off on without further thought and then

11    proceed in the foreign tribunal to obtain the discovery sought

12    for purposes of an action in U.S. courts.

13          THE COURT:  Is it correct that AECL is not immune from

14    discovery enforced by a Canadian court?

15          MR. KRAININ:  That is correct as a general principle,

16    yes, your Honor.

17          However, there are certainly a number of limitations

18    on information and discovery that AECL can divulge.

19          THE WITNESS:  Let's stay at ground level for a minute.

20          MR. KRAININ:  Certainly.

21          THE COURT:  If that's true, then how can AECL be

22    immune from discovery that's being enforced by a Canadian court

23    using its own powers and in response to a letters rogatory

24    issued by this court?

25          MR. KRAININ:  Again, your Honor, that would be a

1    fact-specific inquiry that a Canadian court would have to

2    undertake in terms of whether the information sought here is

3    discoverable given that it relates to a national nuclear

4    research reactor and the design and operation of that reactor.

5           The question for this court is whether it's

6    appropriate to even ask a foreign tribunal to enforce those

7    letters or to ask a foreign sovereign to be subject to

8    discovery for purposes of an action pending here in the U.S.

9           THE COURT:  Let's go back to the Weisberg case for a

10   minute that you mentioned earlier.

11          In that case, as I recall and my notes suggest, they

12   say that a letters rogatory is a means to obtain discovery to

13   which a party is otherwise entitled.

14          MR. KRAININ:  Correct.

15          THE COURT:  And you say they're not otherwise entitled

16   here because if you were in the United States the Foreign

17   Sovereign Immunities Act would apply and, therefore, you would

18   be immune from having to produce it, correct?

19          MR. KRAININ:  Yes.

20          THE COURT:  Let's talk about the exception to the Act.

21          Tell me why the direct effects, the commercial

22   exception doesn't apply here from your standpoint.

23          MR. KRAININ:  Certainly.  Two main reasons, your

24   Honor.

25          First of all, again, the information that Lantheus

1C99LANA

1    seeks here is not commercial in nature.  It relates to design

2    and operation and maintenance of a nuclear research reactor and

3    vessel within that reactor in Canada.

4           THE COURT:  Well that I think is somewhat -- I don't

5    want to use a pejorative word but I'm going to say a somewhat

6    cramped view of what I think they're seeking.  That may be part

7    of what they're seeking, but I think they're seeking a lot of

8    different things as they've articulated it.  And it's not for

9    this court to assess the scope of their request per se other

10   than, I think, to evaluate it in the context of the application

11   of the exception potentially.

12          But go ahead.

13          MR. KRAININ:  I would certainly agree, your Honor.

14   They are seeking a lot of things.  And that's yet another

15   problem with the letters rogatory.  They're extremely broad and

16   lacking in specificity and because --

17          THE COURT:  But the broadness and lack of specificity

18   is for the Canadian court and not for me, isn't it?

19          You don't not issue a letters rogatory because it's

20   too broad.

21          MR. KRAININ:  Actually the lack of specificity is one

22   of the factors set forth in Aerospatiale and the Restatement

23   that the Court ought to consider --

24          THE COURT:  Well Aerospatiale wasn't a case like this

25   one.

1          MR. KRAININ:  It was not.

2          THE COURT:  I understand you want me to borrow from

3     that case and there are good reasons why I should take it

4     seriously.  But you know what's difficult about this case, and

5     one of the reasons I wanted to have the argument, is I think

6     we're making law in this case and I want to be careful how we

7     do that and give everybody an opportunity to make a full record

8     so that I can understand what you all think about all of these

9     issues.

10          But anyway I'm sorry I interrupted you.

11          MR. KRAININ:  Certainly.  Just to address that point.

12     Again, to refer the court to the Restatement of Foreign

13     Relations Laws Section 473 Reporters' Notes 5 which says "A

14     court in the United States issuing a letter of request for

15     foreign discovery must consider the matters listed in Section

16     442(1)(c)" which are the Aerospatiale factors, which

17     includes -- it specifically identifies the specificity of the

18     request, the origin of the information, and the importance of

19     that.

20          THE COURT:  Did you cite that provision in your brief?

21          MR. KRAININ:  We did, Your Honor.  I don't recall

22     exactly where or to what extent but it is in there.

23          MR. KORDE:  That's fine.  I know the Restatement has

24     been cited.  I just didn't remember the particular provision

25     that you were just identifying.

1        MR. KRAININ:  It's cited at page eleven.

2        THE COURT:  Yes.  I see that in your brief.

3        MR. KRAININ:  Returning to the commercial activity

4    exception and the question that the court asked regarding

5    direct effects.  First and foremost, the information sought, at

6    least part of the information sought by Lantheus, again, is not

7    commercial in nature.  It goes to a national nuclear research

8    facility reactor design and operation which is used not only in

9    the context of refining highly enriched uranium into

10   radioactive isotopes which are then sold to a party in Canada,

11   Nordion, which further processes them and prepares the

12   radioactive isotopes that Lantheus uses in its commercial

13   equipment.  That's only one purpose of the reactor.  The

14   reactor is also used for research purposes.  It's also used to

15   support the nuclear power industry in Canada and has important

16   noncommercial applications there.  That's issue number one.

17       Issue number two is the existence of the intermediary.

18   The direct effect case law is the quite clear that in order for

19   that to apply, the effect must be immediate and direct.  I

20   believe it's the Guirlando case in which the Second Circuit

21   said that direct effect means an immediate consequence, no

22   intervening element, the effect flows in a straight line

23   without deviation or interruption.

24       And we have an intervening element here, namely the

25   actor Nordion which takes the material it obtains from AECL and

1    it further processes it, refines it and creates the product

2    that Lantheus purchases.

3            THE COURT:  Well what role did Nordion play, if any,

4    in the ultimate shutdown of the reactor?

5            None?  Right?

6            MR. KRAININ:  Correct.

7            THE COURT:  So I understand they are an intermediary.

8    But isn't the key nexus between the shutdown, which is AECL's

9    responsibility, and its impact on Lantheus?

10           MR. KRAININ:  Well, that would take us back to my

11   original point which is the shutdown of the reactor itself is a

12   much broader -- is much broader than a commercial act with a

13   direct effect in the United States.  It has many effects within

14   Canada that are noncommercial in nature.

15           THE COURT:  Well but as long as it has an impact that

16   has a commercial effect in the United States, why then isn't

17   that sufficient for the exception to be implicated and applied?

18           MR. KRAININ:  Well, the case law interpreting the

19   direct effect language under the commercial activity exception

20   is clear that the effect must be direct and immediate.  And the

21   cases typically arise in the context of contracts.

22           Both parties have cited the Cruise Connections case in

23   which the plaintiff there, which owned a cruise ship business,

24   had obtained ships and had contracted with the Royal Canadian

25   mounted police to make them available in Canada in connection

1C99LANA

1    with the Vancouver Olympics.  There was a breach of contract

2    there.  But that was -- the foreign sovereign, the Royal

3    Canadian mounted police, were a party to that contract.  And

4    their alleged breach naturally had a direct effect in the

5    United States with respect to the entity it contracted with,

6    the performance of the contract, a number of activities that

7    relate directly to the facts specifically there between the

8    parties and including the foreign sovereign.

9         Here, Lantheus is not in privity of contract with

10   AECL.  There is no direction connection.  AECL is under no

11   contractual obligation to produce these radioactive isotopes or

12   to process them.  It could stop at any time and that would be

13   well within its right.

14        THE COURT:  Do you think there has to be a contractual

15   relationship for the direct effects test to apply there?

16        MR. KRAININ:  Not necessarily, although the majority

17   of the case law does involve contracts, breaches of contracts,

18   and those kinds of direct effects.

19        Here it's much more attenuated given the multiplicity

20   of purposes of the reactor, the extent to which that is within

21   the control of the Canadian government.  And it's simply a

22   tangential effect that after -- because of a shutdown of the

23   reactor, a breach of a vessel within the reactor, that AECL was

24   unable to produce isotopes which are sent to a third party for

25   further processing, further refining before they are sent to

1C99LANA

 1    Lantheus here in the United States.

 2          THE COURT:  Let me ask you what I asked Mr. Korde,

 3    which is hypothetically speaking, let's say I agree with you

 4    that the Foreign Sovereign Immunities Act is implicated far

 5    more significantly than Lantheus counsel thinks it is and so I,

 6    therefore, look to whether any exception applies.

 7          Is it your view that the record before the court at

 8    present is sufficient for me to be able to decide that

 9    question, or is there something more that needs to be in the

10    record on that point?

11          MR. KRAININ:  No, your Honor.  Our view is that the

12    record is more than sufficient to reach a conclusion based on

13    the nature of AECL's reactor and the operation of it in Canada

14    as well as the existence of the intermediary Nordion which is

15    undisputed.  It's alleged -- we cited to Lantheus' complaint

16    for that particular fact.  And we don't think anyone disputes

17    that Nordion is involved in the chain of distribution and an

18    intermediary between AECL and Lantheus.  And, thereafter, we

19    don't believe there's any -- we don't believe it would be

20    fruitful for discovery.  The court has the information it needs

21    to determine whether the commercial activity exception applies

22    here.

23          THE COURT:  We've looked at a lot of cases but are

24    there any cases that analyze the direct effects test in the

25    context of nonparty discovery from a foreign sovereign?

1C99LANA

1          MR. KRAININ:  Not that I'm aware of, your Honor.

2          THE COURT:  As I've said before, I think this case

3     raises a lot of novel questions, that being yet another one, I

4     suspect.

5          MR. KRAININ:  Yes, indeed.

6          Again, the Seoul Semiconductor case analyzes the issue

7     of nonparty discovery from a foreign sovereign.  It does not,

8     however, address the direct effects or commercial activity

9     exception.

10          THE COURT:  Do you have other arguments?

11          MR. KRAININ:  Only to emphasize, your Honor, that,

12     first of all, AECL takes very seriously the sovereignty

13     interests that are implicated by this request for discovery and

14     also that the process is underway in Canada.  There are

15     alternative means for Lantheus to obtain the same basic

16     information that it seeks here; namely, the access to

17     information process which is nearing completion now.  It's the

18     equivalent of our Freedom of Information Act process.

19          Lantheus has, if it's not satisfied with the

20     information it obtains through that process, it has a right to

21     judicial review or to appeal, to challenge.  As you've seen

22     from some of the recent correspondence and submissions, it's

23     making its complaints known to authorities in Canada.  And it

24     has a further right, if it's unsatisfied with what it receives

25     from that process, to judicial review and appeal what AECL

1C99LANA

1     provides for that process.

2          So, we think it would be -- it's unnecessary here;

3     that Lantheus is going to obtain whatever information it's

4     entitled to under Canadian law pursuant to that ATI process.

5     And the Court need not take the extraordinary step of issuing

6     letters rogatory to a foreign sovereign which would

7     essentially, at the end of the day, be largely duplicative and

8     would simply require the sovereign to engage in enforcement

9     proceedings and object and defend and litigate over the same

10    basic information that Lantheus will receive to the extent it's

11    entitled to it.

12         THE COURT:  All right.  Thank you.

13         MR. KRAININ:  Thank you.

14         THE COURT:  Mr. Korde, what did you -- well, counsel,

15    do you want to be heard before Mr. Korde speaks?

16         MS. KIRWIN:  Just very briefly, your Honor.

17         On behalf of Zurich, I mean at the conclusion of the

18    argument, the only point that we wanted to make was to the

19    extent that the court does issue the letters rogatory we would

20    like it to be mentioned in the letters rogatory that Zurich

21    would also have the right to obtain copies of any documents

22    that are received and to participate in any discovery as well.

23    I mean it may be an academic point that I'm making but we

24    wanted to make sure it was included in the letters rogatory.

25         THE COURT:  If I do rule that the letters rogatory

1C99LANA

should be issued then I assume when they are finally submitted
to the court that such language could be included in there but
we're not there yet.

MS. KIRWIN:  Okay.  And I didn't mean to cutoff
Mr. Korde.

THE COURT:  That's all right.

Mr. Korde, what did you hear from counsel that
requires a response.

MR. KORDE:  Your Honor, I think that just a couple of
points very quickly.

I heard Mr. Krainin say a couple of times that the
issue before the court was whether it's even appropriate for
this court to ask the Canadian courts for assistance.  And it
seems to me that that's really the nub of the issue.  Is it
even appropriate for this court to ask the Canadian courts for
assistance?

And it seems to me the answer to that question has to
be of course it's appropriate.  I mean it's -- what AECL is
suggesting is that it's not appropriate for this court to make
a request.  But there's nothing in any of the cases that either
party has cited, there's nothing in the text of the FSIA that
says it's not appropriate to make a request.

THE COURT:  Well the Canadian court essentially
redirected this to this court to determine what the
implications of the Foreign Sovereign Immunities Act are.

1C99LANA

1          One of the implications could be that it applies, no

2     exception applies, and therefore the letters shouldn't issue.

3     That's a scenario.

4          I'm not suggesting that the Canadian court

5     contemplated that result.  I don't think anything in the

6     Canadian court's decision suggested what the Canadian court

7     ultimately thought other than it was deferring to this court to

8     assess the implication in the first instance.

9          But if that were a scenario, then the letters wouldn't

10    issue, right?  And that's presumably what the Canadian court

11    wanted this court to at least consider.

12          MR. KORDE:  I certainly agree that that's what the

13    Canadian court wanted this court to consider.

14          But it seems to me at the conclusion of the

15    consideration, to adopt AECL's position that it's inappropriate

16    to even ask the question would be a ruling that would, we

17    think, would be far afield from what little case law there is

18    and what little statutory guidance there is, particularly in

19    this case because the documents and information that Lantheus

20    is seeking are critical, they're vital to this case.  They're

21    vital to this case.

22          THE COURT:  How do you respond to what Mr. Krainin

23    said about the ATI process and if you don't get satisfaction in

24    that process you can seek judicial review of that as one can in

25    this country as well with respect to a FOIA request and that

1C99LANA

1    you would be litigating that issue anyway independent and apart

2    from the letters rogatory process?

3            MR. KORDE:  Your Honor, I think that's incorrect.  I

4    think Mr. Krainin's argument misses the mark.

5            THE COURT:  There isn't judicial review of --

6            MR. KORDE:  No.  There is judicial review.  But it's

7    unclear whether the judicial review would unfold in any

8    timeframe meaningful to the schedule in this case.

9            I mean we're talking about, first of all, appealing

10   the information commissioner's decision and then going through

11   multiple levels of judicial review.  For that to unfold before

12   we get our documents means that this case schedule is stopped.

13           THE COURT:  Well let's say I issue letters rogatory

14   this month or next, and then you take them and you go to the

15   Canadian court.  You've heard that AECL is going to litigate

16   that in some fashion.  That could also take a substantial

17   amount of time for multiple levels of judicial review, could it

18   not?

19           MR. KORDE:  Your Honor, it could.  And I think that

20   Mr. Krainin's concern was well there's some sort of duplication

21   here.

22           Lantheus is not trying to be unreasonable.  If the

23   court issues the letters of request and AECL produces documents

24   that are responsive and unredacted to our ATI request and we

25   get everything we want, then obviously we're not going to

 1    continue to pursue an unnecessary duplicative proceeding.

 2          But given the history of the ATI process to date, to

 3    forestall issuing the letters rogatory on the basis of the ATI

 4    I think would be problematic.  AECL has routinely given

 5    themselves extensions when the deadline for response comes

 6    around.  They have cumulative extensions now of nine months.

 7    They have -- when they do produce documents, the documents are

 8    redacted of all substantial information so they're not

 9    particularly useful in this case.

10          So, the history here is that the ATI process has

11    proved completely unfruitful

12          THE COURT:  Let me ask something in light of sort of

13    the history here.  I think I can assume the answer but one

14    should never assume.

15          Is there any possibility at this juncture of this

16    proceeding and the history that's been recounted today of any

17    sort of a negotiated resolution of this dispute, or are we past

18    that possibility?

19          MR. KORDE:  Your Honor, we attempted to reach a

20    negotiated resolution of this dispute over the summer when the

21    first enforcement proceeding was playing out and Lantheus made

22    a -- and it's in the record, a quite detailed and specific

23    proposal, part of which included narrowing the document

24    requests.  And that -- the narrow document requests are

25    reflected in the amended letters rogatory.  So, we've

1   unilaterally done what we said we would do as part of the

2   negotiated settlement.

3           We also proposed various mechanisms to deal with their

4   national security concerns and their confidentiality concerns

5   and their concerns about the cost of producing these documents.

6           We're certainly happy to continue negotiating.  We're

7   certainly happy to engage in further discussion with AECL but I

8   think that's where the matters stand.

9           THE COURT:  You never received a meaningful response

10  to that proposal?

11          MR. KORDE:  I don't want to speak out of school, your

12  Honor.  My proposal is my document so I can waive the

13  settlement privilege.

14          THE COURT:  All right.  That's fine.  I don't want

15  anyone compromising anything.

16          But suffice to say that at the moment anyway there's

17  nothing I should know that would suggest that I should forebear

18  from undertaking issuing a decision because the parties may

19  need a decision to help them work through these issues.  Is

20  that a fair statement?

21          MR. KORDE:  That is a fair statement, your Honor.

22          THE COURT:  All right.  Did you want to say anything

23  about that, Mr. Krainin?

24          MR. KRAININ:  I'm not fully privy to any negotiations

25  that have gone on in Canada.

1C99LANA

1          The only thing I did want to say with respect to your

2     last comment is that it might be productive to wait and see --

3     the deadline is now a final deadline with respect to the ATI

4     process is February 2, less than two months away.  And Lantheus

5     may or may not be satisfied with documents it receives at that

6     point.  But that would be one thing that I would suggest that

7     the court might want to consider waiting to see.

8          THE COURT:  My best guess is Mr. Korde doesn't want to

9     wait.  And the Court schedule permitting, I certainly am going

10    to try to get a decision out before February 2.

11         MR. KORDE:  Just to address that point, your Honor.

12    Part of the issue of waiting is that once we get the letters

13    rogatory we need to go back to the Canadian courts to get a

14    hearing date, and certainly to try and get an expedited hearing

15    date, but the Canadian courts are significantly congested.  So

16    you wait two months, it may mean a lot more delay.

17         THE COURT:  Did the judge who heard this matter

18    initially retain jurisdiction over it in any way?

19         MR. KORDE:  She did not.  She did not.

20         THE COURT:  All right.  Is there anything further?

21         MR. KORDE:  The only sort of minor point so that

22    silence was not viewed as assent was I think there was some

23    mention if AECL were subject -- were in this country and there

24    was a Rule 45 subpoena issued it would not be enforceable.  For

25    reasons that I'm sure your Honor is aware, namely the

1C99LANA

 1   commercial activities exception, we disagree.  If AECL was

 2   present, we think a subpoena would be pursued.

 3            THE COURT:  Let's just take a short recess.

 4            Off the record.

 5            (Discussion off the record)

 6            (Recess)

 7            THE COURT:  Please be seated everyone.

 8            Mr. Korde, I wanted to ask you what your views are

 9   about the Weisberg case; and in particular, that's the Eastern

10   District case, the language in Weisberg that talks about

11   "letters rogatory are simply a means to obtain discovery to

12   which party is otherwise entitled," and what do you think that

13   means?

14            MR. KORDE:  Your Honor, I think that means that if --

15   if we came into this court and asked you to issue letters

16   rogatory to a party completely unconnected to this litigation,

17   you would say no.  There has to be some -- and I think this is,

18   the Netherby case stands for the same thing, that the materials

19   requested need to be relevant to the dispute at issue.

20            I think Netherby says something similar that the

21   material needs to be discoverable under Rule 45.

22            THE COURT:  Well what Judge Lynch says in Netherby,

23   among other things, is were the sub-licensee a domestic

24   company, there is no question that plaintiff would have simply

25   subpoenaed the documents and the subpoena would have been

1C99LANA

1    upheld.

2           But here if AECL were in the United States, the

3    Foreign Sovereign Immunities Act would be implicated at least

4    in the context of a Rule 45 subpoena, right?

5           MR. KORDE:  It would be implicated but I don't think

6    it would be a bar because the conduct at issue falls squarely

7    within the commercial activities exception.

8           THE COURT:  Let me sort of to this point ask you about

9    something that was in AECL's brief quoting your original

10   motion.  This is footnote two of page four.  I meant to ask you

11   about this earlier.

12          In your unopposed motion you claim that the

13   information that Lantheus was seeking is "Subject to discovery

14   by letters rogatory because it would be discoverable by a

15   simple subpoena if AECL were subject to process within the

16   United States."

17          And then AECL says, "The implication of Lantheus'

18   argument is that if information were shielded from discovery by

19   the FSIA and thus not discoverable by a simple subpoena, it

20   should not be discoverable by way of letters rogatory either.

21   That is the case here."

22          How do you respond to that?

23          MR. KORDE:  Your Honor if you could just give me one

24   second to look at the quote.

25          The language you're quoting from, my recollection

1C99LANA

 1    is -- I don't have it in front of me.  My recollection is that

 2    the quote is taken somewhat out of context.

 3           I think the point is that -- I don't think the point

 4    that or the implication that Lantheus was suggesting was that

 5    the information should be -- if it's shielded from discovery by

 6    the FSIA then it should not be discoverable by letters

 7    rogatory.

 8           I think the point was does -- the point that I think

 9    Lantheus was making in the original papers was does AECL have a

10    presence here.  And I think at that point the question in front

11    of the court was we'd like to get the letters rogatory because

12    it appeared to us at that point that AECL did not have a

13    physical presence in the United States.

14           THE COURT:  Okay.

15           Mr. Krainin let me ask you one last question, if I

16    can.

17           MR. KRAININ:  Certainly, your Honor.

18           THE COURT:  From a policy perspective, to the extent I

19    should think about that at all, let's say that I conclude that

20    you're right that the Foreign Sovereign Immunities Act is

21    implicated in this fashion such that a letters rogatory can't

22    be a work-around, if you will.  And let's say I were to find

23    that the commercial activities exception didn't apply.

24           From a policy standpoint is that the right result?

25           In other words, an American company who has the claims

1     as Lantheus does here essentially runs into a wall if those who

2     have information that's central to at least some aspect of its

3     litigation here in the United States can preclude any access to

4     it through the shield of the Foreign Sovereign Immunities Act.

5              Is that the right result from a policy standpoint?

6              Do you understand what I'm asking and why I'm asking

7     you?

8              MR. KRAININ:  I do understand the question, and I

9     believe the answer is yes.  And that is exactly the policy that

10    underlies the Foreign Sovereign Immunities Act itself and the

11    case law interpreting it.

12             And the reason is with respect to a sovereign, because

13    of the principles of international comity, one needs to -- it's

14    not simply just a commercial entity in a foreign nation.  And

15    there are ways to obtain information that is discoverable from

16    foreign national governments, specifically the access to

17    information request that Lantheus is employing.

18             And, therefore, that's the proper channel and the

19    proper vehicle and the means to obtain discoverable information

20    while still respecting the sovereignty of a foreign national

21    entity and, therefore, firmly say that it is the right result

22    from a policy standpoint.

23             THE COURT:  Do you agree that if I were to rule in

24    your favor it would in effect be a narrow ruling, or do you

25    agree with Mr. Korde that, at least as he's put it, it will

have ramifications beyond the narrow set of facts here in some

way that could adversely impact the way commercial cases

implicating a foreign entity, sovereign or otherwise, are

affected?

MR. KRAININ:  Your Honor, I believe that would most

likely depend upon the scope and language of your opinion and

order in so ruling.  I think there could be ways to reach that

result here that would be closely tied to the facts of this

case.

There are certainly other ways, if the court were to

find, for example, that the Foreign Sovereign Immunities Act

provides an absolute bar in immunity, that that would have

broad reach.

If the court looks a little bit beyond that into some

of the international comity factors and how they apply here, as

the Seoul Semiconductor case did, that would be a more limited

and narrow way to reach the same result.

With the court's indulgence, while the court was

consulting with its colleague I did the same with mine and I

would be remiss if I didn't point out one thing from the Seoul

Semiconductor case which cites, relies on the Aerospatiale case

to say that the Supreme Court's policy as articulated in

Aerospatiale favors placing the burden on the party requesting

discovery when requesting burdensome discovery from a French

citizen, as was the case in Aerospatiale and likewise in Seoul

Semiconductor, the requester not only should show why the

request is relevant but also why it is not unduly burdensome to

a foreign party.  I would simply ask that the court keep these

principles in mind with respect to the extremely broad requests

that Lantheus has put forward here both in terms of the breadth

of the document request and the deposition essentially of AECL

without any limitation, no designated issues or anything.  It's

an extremely broad and burdensome request, and the burden is on

Lantheus to justify it, and we would submit they have not

carried that burden here.

             THE COURT:  All right.  Thank you, Mr. Krainin.

             Mr. Korde, was there anything else you wanted to put

on the record?

             MR. KORDE:  Your Honor, briefly.  Two points.

             One, on the Seoul Semiconductor case that my colleague

just mentioned, I think it's important that the court in that

case was considering whether or not, or viewed itself as

considering rightly or wrongly whether or not it should be

"compelling broad discovery" from an agent of a foreign

sovereign nation.  That's 590 F.Supp. 2d 832.

             We're not asking this court to compel AECL to do

anything.  We're asking this court to make a request to the

Canadian courts.

             The other point to your Honor's question about policy.

This is in -- the Milligan case makes this point quite clearly,

1C99LANA

```
 1    that -- this is Milligan, 758 F.Supp. 2d at 238, "For

 2    international commerce to operate efficiently, business

 3    obligations must be subject to enforcement and the resulting

 4    judgment subject to collection.  The fair adjudication of

 5    commercial interests in turn requires full discovery."

 6          AECL made a decision to sell radioisotopes in the

 7    stream of international commerce and that has had a certain

 8    effect on international commerce and resulted in a commercial

 9    dispute.

10          And we think that the discovery that we now seek is

11    crucial, it's vital to Lantheus' ability to prove up its case

12    and resolve this commercial dispute.

13          THE COURT:  Well, is that an argument not that the

14    FSIA doesn't apply but that the exception does apply?

15          MR. KORDE:  If your Honor wants to go down the road of

16    the FSIA, I think that's exactly the argument.

17          THE COURT:  Anything else?

18          MR. KORDE:  No, sir.

19          THE COURT:  All right.

20          Are the parties going to order this transcript?

21          MR. KRAININ:  Yes, your Honor.

22          THE COURT:  All right.  Very well.

23          Well, I thank you all for coming in.  It was a very

24    helpful argument from the court's standpoint and your briefs

25    also have been helpful to the court.
```

1C99LANA

1          I'm going to reserve decision and I hope to get a

2    decision out in the near future.

3          Thank you all.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25