1    E3S0LANC

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    LANTHEUS MEDICAL IMAGING,
     INC.,
5
                    Plaintiff,
6
            v.                                10 CV 09371
7
     ZURICH AMERICAN INSURANCE
8    COMPANY,

9                   Defendant.

10   ------------------------------x
                                              New York, N.Y.
11                                            March 28, 2014
                                              1:04 p.m.
12
     Before:
13
                    HON. KATHERINE POLK FAILLA,
14
                                              District Judge
15
                              APPEARANCES
16
     COVINGTON & BURLING, LLP
17        Attorney for Plaintiff
     BY:  RUKESH A. KORDE
18
     MOUND COTTON WOLLAN & GREENGRASS
19        Attorneys for Defendant
     BY:  PHILIP C. SILVERBERG
20        WILLIAM D. WILSON

21

22

23

24

25

1          THE DEPUTY CLERK:  All rise.

2          Lantheus Medical Imaging, Inc. vs. Zurich.  Counsel

3   identify yourselves for the record.

4          MR. KORDE:  Rukesh Korde, for plaintiff Lantheus.

5          THE COURT:  Good afternoon, sir.

6          MR. SILVERBERG:  Philip Silverberg for defendant,

7   Zurich.

8          THE COURT:  Good afternoon.

9          MR. WILSON:  William Wilson, for defendants, your

10  Honor.

11         THE COURT:  Good afternoon to you, as well.

12         Thank you for coming today.

13         I had a hope, but it is beginning to fade, that we

14  would have fewer problems with discovery with our friends in

15  Canada.

16         So, Mr. Korde, let me speak to you.

17         I am sympathetic, I am.  But on the one hand, I need

18  to understand what is going on.  On the other hand, I need to

19  understand that there will be an end at some point to this.  So

20  please tell me what has happened since your March 7 letter.

21         MR. KORDE:  Sure.  As you know, on March 7, we agreed

22  to a consent order under which AECL would make a production on

23  February 28.  That February 28 letter contained some of the

24  information we wanted, it's missing some of the information.

25  We have a deficiency letter outstanding to AECL which went out

1    shortly after we had gotten their production.

2              THE COURT:  Your letter of the 7th asks for 21 days,

3    which I think takes us through today.  So I appreciate that you

4    were hopeful, but you don't have the answers that you were

5    looking for, or do you?

6              MR. KORDE:  I do not.  And there is two reasons for

7    that.

8              THE COURT:  Okay.

9              MR. KORDE:  One, in our efficiency letter we told them

10   we were going to seek judicial relief.  At the time we were

11   hopeful we could get into superior court fairly expeditiously.

12   That turned out not to be the case for a couple of reasons, so

13   we a hearing scheduled for April 30.

14             THE COURT:  Wow, that's a lot more than 21 days.

15             MR. KORDE:  That is.  And part of the reason for that

16   is, and I think I alluded to this in my letter, that the law

17   firm that represents the AECL dissolved on February 27.  So the

18   lawyers were scrambling around looking for new homes.  And

19   courts were sympathetic to them when they said we can't show up

20   on an earlier date for the hearing.

21             THE COURT:  Other courts might have been less

22   sympathetic.  May I hear, again, please -- the date of the next

23   hearing is.

24             MR. KORDE:  April 30.

25             THE COURT:  Yeah, that is the date I thought you said.

1    But that is only a hearing, that doesn't even get you

2    documents, or resolution, or anything.

3             MR. KORDE:  That is correct.  The fact that we have

4    hearing is helping us keep their feet to the fire.  We do have

5    a two-hour conference call scheduled with AECL for next week

6    and, hopefully, we can resolve some of the issues consensually,

7    which would get us to earlier consensual production of some of

8    the information we are seeking.  But, again, that is in AECL's

9    court.

10            THE COURT:  Let me explain to you, or discuss with

11   you, a few of the things that I found interesting in your

12   letter of March 7.

13            One is exactly what you have just described for me,

14   which is my concern, which you have now substantiated, that the

15   21 days would come and go without complete resolution.

16            The second is there is a reference on the second page

17   of your letter regarding the likelihood, or your belief, that

18   it would be likely to reexamine AECL.  I presume that means you

19   wish to redepose their witness, is that correct?

20            MR. KORDE:  Your Honor, yes, it is correct.  We do

21   wish to depose their witness.

22            There are a couple of reasons for that.  One is that,

23   by holding out the prospect of a deposition, we're hopeful that

24   we can get AECL to move faster.  There may be some

25   horsetrading to be had there.

1              The second is, and I have had a discussion with

2      Mr. Wilson about this, as to how the written answers from AECL

3      come into the record here in this courthouse.  And we have been

4      holding out the possibility of a deposition, just in case.  Our

5      view would be that any written answers that AECL gives in the

6      Canadian proceedings are usable as if they were given in the

7      deposition for all purposes here.  That's the way they were

8      treated under Canadian law.  So we think that makes sense.  But

9      I need to make sure that Zurich is on the same page on that

10     one.

11             THE COURT:  Can I figure that out today.

12             Mr. Wilson, is Zurich on the same page as that one.

13     Or Mr. Silverberg.

14             MR. WILSON:  One thing is we have to check with our

15     client to get the final sign-off.  I think our position will be

16     that if there are no further depositions, then we'll accept the

17     answers as if they were from a deposition.  But if someone is

18     going to be deposed, we think it should be put in front of him

19     and say are three true and correct.  We just have not gotten a

20     final sign-off.  We should have everything early next week.

21             THE COURT:  Okay.  I know I need to talk to you about

22     your proposed motion, but let me just talk to Mr. Korde a

23     little longer.

24             Mr. Korde, have you gotten your safety analysis

25     report.

1              MR. KORDE:  No, your Honor.

2              THE COURT:  Okay.  I think there is a new issue

3    introduced into the mix, which is the possibility of, and I use

4    this term loosely, spoliation.  I am not saying that's what it

5    is.  I'm saying there may be a situation in which AECL may be

6    admitting to, or having demonstrated by someone else, that they

7    have discarded, or lost, or otherwise gotten rid of documents

8    that you might care to see.

9              What am I to do with that?

10             MR. KORDE:  Your Honor, I don't believe that there is

11   a relief in this court for spoliation.  I don't think, for

12   example, your Honor could issue a spoliation instruction to a

13   jury for a nonparty.  But I do believe that if there is

14   evidence of spoliation, it does raise a credibility issue with

15   respect to AECL.  I think that Lantheus should be entitled to

16   determine whether that happened.  And, if so, to put that fact

17   in front of the jury when the jury is assessing AECL's

18   credibility and the credibility of any AECL testimony reports.

19             THE COURT:  This I understand.  And I say this without

20   prejudging anything, but in the summary judgment motion,

21   whenever it gets filed, they are going to put forward

22   statements from AECL indicating that the cause of the incident

23   was corrosion.  What happens if you don't have anything to

24   rebut that with?  Because I mean we're saying there can be no

25   adverse inference.  Are you saying that I, as the entity person

1    reviewing the summary judgment motion should just discredit

2    anything from AECL because I know, or the parties will even

3    concede, that documents were destroyed?

4             MR. KORDE:  Your Honor, I think that if it gets tee'd

5    up in a summary judgment motion, and there is sufficient

6    evidence for you to think that a reasonable finder of fact

7    could conclude that there were questions about AECL's

8    credibility, then I think that would be a reason not to -- or

9    to deny summary judgment.

10            THE COURT:  Okay, all right.  What about the issue of

11   receiving native versions of the electronic materials, or

12   electronic versions of the materials.  Is that in the same

13   place as the safety analysis report, something that is on the

14   table and has not been resolved?

15            MR. KORDE:  It is on the table.  Canadian counsel has

16   been having discussions this past week with AECL's lawyers.

17   This, again, goes back to the dissolution of the firm.  That

18   they are telling us that their new firm doesn't have the

19   equipment to interface with the old firm.

20            THE COURT:  Lovely.

21            MR. KORDE:  Your Honor, and I share your frustration.

22   If I could have moved this case forward faster, I would have.

23            THE COURT:  Well, I understand that.

24            In a moment, I'm going to be talking to the folks at

25   the back table about their contemplated motion.  And, as you

1    know, at some point, they get to file one.  We can talk to them

2    about when, but at some point they do.

3              I have given you the 21 days.  And I fear, sir, that

4    all that you can tell me is that this will not be resolved

5    until sometime after April 30.  So I feel the need to sort of

6    set an end date here.  And I don't know what that end date is.

7    And that end date cannot be the end of this year.

8              So, what do you suggest?  And by asking this question,

9    sir, I'm not suggesting in any way you have not done your level

10   best to try and move this forward.  I understand that there are

11   forces that are outside of your control.  But, nonetheless, the

12   defendants in this case are entitled to resolution.

13             So, what do you suggest?

14   MR. KORDE:  I think before I suggest something, I

15   think it is -- I would urge the Court to remember that the

16   discovery in Canada was mired in procedural wrangling for

17   nearly two years.  There was letters rogatory from this Court.

18   They were bounced back.  Judge Cott had to undergo an extensive

19   period of briefing and argument, issuing an extensive opinion.

20   It went back to Canada, went up to the Canadian Court of

21   Appeals -- I'm sorry, the Ontario Court of Appeals before a

22   discovery order was issued.

23             Our first substantive deposition of an AECL employee

24   was in September.  So, for all practical purposes, for all

25   effective purposes, we have only had six months of discovery of

```
 1    AECL.  And I appreciate Zurich's position that the case has
 2    been pending for several years.  But the reality is,
 3    substantive discovery of AECL has only been ongoing since,
 4    effectively, fact depositions in September.
 5              And if you look at it that way, I think that there
 6    is -- extending the schedule to permit Lantheus to conclude
 7    Canadian discovery would be a fair and a reasonable thing to do
 8    in this circumstance.
 9              With respect to your Honor's question about a proposed
10    cut-off date, I think if we could reach a consensual resolution
11    of the outstanding issues in Canada, I think we could get fact
12    discovery done by the end of July.  If it is --
13              THE COURT:  Oh, that's -- yeah, that's a little later
14    than I even was thinking.
15              MR. KORDE:  The end of June, your Honor, I think would
16    be doable, but aggressive.  Again, if we reach a consensual
17    resolution, I think if there is a motion and it's stuck in a
18    Canadian court while the Canadian court decides that motion
19    while it is under advisement, that could add four to six weeks
20    onto the timetable.
21              THE COURT:  Yes, okay.  Neither suggestion is
22    satisfying, but I understand your position.
23              Will I be hearing from Mr. Wilson or Mr. Silverberg
24    today.
25              MR. SILVERBERG:  Sure, your Honor, I don't really have
```

1    too much to add beyond what was in our letter.  But, obviously,

2    no one is suggesting that Zurich has in any way stood in the

3    way of the discovery of AECL.

4            THE COURT:  No, no one.

5            MR. SILVERBERG:  Understood, completely.

6            THE COURT:  Let me talk to you, sir, about your

7    motion.

8            MR. SILVERBERG:  Sure, yeah.

9            THE COURT:  Even before I read the Covington response

10   to your motion, I was aware of the concept of the corrosion

11   exclusion.  And my understanding of it was that it exists,

12   really, as a mechanism for dealing with wear and tear, and sort

13   of long-term issues involving the degradation of something.

14           So, I do think, and perhaps you might disagree with

15   me, that perhaps you would think this clause, which was

16   structured differently -- but I would think that if there was

17   some short-term, short-lived episode that resulted in a

18   degradation of the machinery or equipment or whatnot, I'm not

19   sure that would be covered under the corrosion exclusion or at

20   least, sir, I would think there would be an issue of fact about

21   that.

22           THE COURT:  Your Honor, yeah, I -- first of all, let

23   me say I do disagree with your understanding.

24           Okay.

25           MR. KORDE:  But what is more important -- what is way

1    more important than me disagreeing is that there are cases

2    directly on point where insureds like Lantheus have gotten up

3    and said, well, this is not long-term corrosion, this is

4    different corrosion, and they've even kind of described it

5    differently, and keep the word corrosion out of the

6    description.  And the courts have rejected it.

7            I'm not talking about minority courts or some court in

8    some far-flung state.  I don't know if there is such a thing as

9    a far-flung state.  And, again, we didn't want to set out, not

10   that we're hiding it.  But, rest assured, your Honor, that

11   those cases dealing with those arguments exist, and they very

12   much so support where we're coming from.  Putting aside the

13   fact issue.  And we're not conceding, for what it's worth on

14   the fact issue, that this was some sort of short-term thing.

15           THE COURT:  And I'm not suggesting you are.

16           MR. SILVERBERG:  That's not getting resolved today, in

17   any event.  But there are cases directly on point, your Honor,

18   that absolutely address the very concept that you are talking

19   about.

20           THE COURT:  But isn't it, I suppose it depended on

21   several things.  And one would be the language of the policy.

22   And I have read the language that you are kind enough to

23   include with your letter.  And it seemed to me the way it was

24   written, it sort of suggested, again, a longer term outlook.  I

25   appreciate that other courts, other judges might differ.  And

1    maybe I, myself, will be persuaded.  But I'm just, at the

2    moment, the way the facts of this case are unfolding, it does

3    seem that if there isn't today a genuine issue of material

4    fact, and there might not be, there is at least a very robust

5    argument for 56D.  And if it turns out that that is what

6    plaintiff presents to me that they are waiting for this

7    information, and this information is going to affect their

8    ability to answer, and it will actually be meaningful to their

9    answer, why do I want to rush things.

10          MR. SILVERBERG:  Again, your Honor, I understand the

11   delay, it is also important to understand that we do have a lot

12   of AECL discovery.  We have final reports; we have got

13   thousands of pages; we have got testimony.  And I think, as

14   your Honor said, you know, I feel the need to set an end date,

15   I think were your words.  And we obviously feel the same way.

16   And we also, I think it goes without saying, feel the sooner

17   the better.  Because it has been four years.  Again, getting

18   back to the cases, this is corrosion.  And the only thing that

19   we're talking about here is some potential argument about what

20   caused the corrosion.  There is no question it's corrosion.

21   That is the reports, that's the photographs, that's everything.

22   And that's been out there, really, from the outset.

23          Now, if the problem or the issue is, as well, it

24   depends on the type of corrosion, because I think the exclusion

25   may not apply if it's a certain type of corrosion.  What I'm

1   representing to the Court is that the case law and Courts who

2   have dealt with this issue, time and again, have found that it

3   does not matter.

4          So, you know, we think it is ripe, it has been ripe

5   quite frankly for quite a bit of time.  But we recognize that

6   Lantheus wanted to take this discovery.  We didn't stand in the

7   way.  And there has been a good deal of discovery.  Can one

8   come back and say, well, I want more, well I need another

9   witness, I suppose.  And, in fact, that is what we're hearing.

10  But what we're saying, what we're submitting, is there has been

11  a lot of discovery.  What you are going to get from the AECL

12  you have gotten.  And there is a lot of it.  They have their

13  expert.  He has poured through this stuff.  And it is time, now

14  to, you know, we say it is ripe for summary judgment.

15         MR. WILSON:  If I may make two quick points.

16         Number one, when we are talking about corrosion and

17  whether it occurred rapidly or over a long period of time, the

18  AECL concluded it occurred over a period of 30 years.  So the

19  AECL's conclusion here is that this corrosion started to occur

20  once they started up the reactor in the 1970s.  The reactors

21  were shut down in the 1970s because of corrosion, because these

22  reactors are prone to corrosion.  They started it up in the

23  70s, they monitored the corrosion.  They used something called

24  corrosion coupons that hang inside, because they know corrosion

25  is occurring, and they monitor it, and they watch it.  What we

are talking about is what was the straw that broke the camel's

back, what was the last piece of metal that blew out that

caused this leak over a period of 30 years.  That's the

discovery they are getting at.  So this is not short-term

corrosion, this is not rapid corrosion.  According to the AECL,

it occurred over decades.

THE COURT:  So my concern is this.  I know no one at

the AECL.  But at the moment, I'm not necessarily taking much

stock in what they are telling you, because they have not told

you -- not everything has been produced.  And, apparently, some

things may never be produced.  So I want to believe them.  And

I want to understand that this is -- I appreciate that that is

what they have said to you.  I just, what I am being told by

your adversary is that there is more out there.  And that the

more out there is going to undercut those very statements.  And

that is the concern that I have.

MR. WILSON:  We certainly appreciate that concern,

your Honor.  I think mentioned, what we said the last time we

were here is we think we are at the point where we're scraping

the bottom of the barrel here.

We do have all of the final reports, we do have all of

the test data, we do have all of the videos, we do have all of

the pictures.  There is some minor issues out there as to

whether or not they added water, whether they added a certain

chemical to the reactors.  What they did.  But that doesn't

1   change the fact of what the final conclusions were.

2           Also, my partner, Mr. Silverberg, mentioned a little

3   over 20 years ago, we both handled the case in Nevada.  It was

4   called Pioneer Chlor Alkali.  And it was in the district court,

5   District of Nevada.  And I want to say it was '93, '94 when the

6   Court issued a decision.  And, basically, the argument there

7   was, well, no, this is rapid corrosion, because it was

8   sulphuric acid, it was an acid attack.  What happened was when

9   chlorine gas mixes with water, it forms sulphuric acid, and it

10  just eats steel away.  So this is something that happens in a

11  matter of hours.

12          So the district court judge there said, no, corrosion

13  is corrosion.  Corrosion is a wearing a way of metal.  Doesn't

14  matter if it is rapid, it's slow, whatever, corrosion is

15  corrosion.

16          So these arguments have been out there.  And I point

17  out that case, because that was 27 years ago.  The exact same

18  arguments being advanced here were rejected.  And every case

19  since then has rejected similar argument.

20          THE COURT:  I want to stop you there, sir.  My

21  interest is peaked by your choice of the word "every."  You are

22  telling me that there is not a case out there in which a Court

23  has construed this particular exclusion, using -- and

24  particularly an exclusion using this language, in a manner

25  differently than you are now presenting it to me.

1          MR. WILSON:  There has not been a case since the early

2     1990s.  And I can tell, your Honor, back in the eighties and

3     maybe even the seventies, there were a series of cases

4     involving boiler and machinery coverage.  Different type of

5     coverage.  And in the boiler and machinery coverage, you have

6     coverage for an accident to an object.  And the policy says an

7     accident does not include corrosion.  So there are cases out

8     there interpreting that language in the boiler machinery

9     context, but not in the context of the all-risk policy, which

10    is what we're dealing with.

11         THE COURT:  Let me ask you this, sir -- or perhaps Mr.

12    Silverberg will answer, matters not to me.  Someday you are

13    going to file your motion.  And your adversary is going to

14    incant 56D to me.  To resolve the 56D issue, aren't I

15    effectively resolving the summary judgment motion, because the

16    56D issue requires him to say that the stuff that he can

17    identify, and he'll identify something, is actually going to

18    bear on this issue.

19         So, by saying -- if I am to conclude that it doesn't

20    bear on this issue, aren't I effectively saying, you know,

21    granting your summary judgment motion?

22         I ask this, sir, because I don't really want to do

23    this multiple times.  Perhaps you wish to brief this at length,

24    and there are reasons, you know, I mean, look, if you want to

25    brief it a number of times, that's great for you, perhaps less

1    great for your clients.  I want to do it once.  So do you.  But

2    I want it to be with the best record it can.

3          I appreciate, sir, what you are telling me, which is

4    that the evidence that they are seeking is not going to bear on

5    this issue.  And Mr. Korde is going tell me in a moment why he

6    believes you to be incorrect.  But please understand where I'm

7    coming from, which is I don't want to do this, have you write a

8    very lovely submission and then deny it without prejudice until

9    the conclusion of whatever it is they are expecting to get from

10   Canada.

11         So, let me hear what you propose in response to his

12   suggestion of a June 30 cut-off.

13         MR. WILSON:  Sure, your Honor, we agree.  We don't

14   want to brief the issue multiple times.  In fact, that's why we

15   have taken a back seat in letting this discovery go forward.

16   We are just concerned that it is continuing on and on.

17         What we would propose is that we file our motion by

18   the end of April to give them time to go for their hearing.

19   They can then have 30 days to file their opposition, which

20   would then give them until May.  It would then, the motion

21   would be submitted to the Court, probably mid May.  Maybe mid

22   June would be the final briefing with the reply briefs.  And by

23   that time, we should at least know where we stand with the

24   AECL.

25         And I think one of the issues, as you mentioned that

1   will come forward is, well, what does this evidence have to do

2   with corrosion.  If this loss was caused by corrosion, and I

3   have anticoncurrent cause language in my policy, I don't care

4   what happened before the corrosion, all I care about is what

5   happened after.  And we know what happened after.

6           So whether or not there was some operator error, or

7   whether or not someone added extra water, or extra chemicals,

8   we are still dealing with corrosion.  And corrosion is the

9   mechanism that caused the shutdown of the reactor.

10          If Mr. Korde could point out something saying that,

11  no, the failure of the reactor wasn't corrosion, other than the

12  fact to say that it happened rapidly, or that it was an acid

13  attack or something like that.

14          THE COURT:  What is the interplay, sir, between the

15  corrosion inclusion and language in the policy regarding

16  breakdown of machinery.

17          MR. WILSON:  Sure.

18          The breakdown of machinery language gives you form of

19  boiler machinery type coverage if you have equipment breakdown.

20  But I think what the key point is, and we addressed this in our

21  papers through the policy language, the language cited in the

22  policy language.

23          THE COURT:  What page, sir?

24          MR. WILSON:  This is in the attachment to our

25  March 11, 2014 letter.

1            THE COURT:  Yes, I have it before me.

2            MR. WILSON:  The last page of the policy that we cite,

3    and up top it says, Covered Cause Of Loss.  And there is a

4    little asterisk next to it.

5            THE COURT:  Yes.

6            MR. WILSON:  If you read that, it says, Covered cause

7    of loss means all risk of direct physical loss of, or damage,

8    parentheses, including machinery breakdown -- which is what we

9    are talking about.  Then it says, From any external cause

10   unless excluded.

11           Corrosion is an excluded cause.  So if I have

12   mechanical breakdown from an excluded cause, I have no

13   coverage.  So if you call this an-all risk loss, if you call it

14   a mechanical breakdown loss, you still have to have a covered

15   cause of loss, which we don't have here.

16           Now, we could get into the fact that this is not a

17   mechanical breakdown loss, or machinery breakdown loss, because

18   of the policy, but we don't need to get there.

19           THE COURT:  You also were telling me that in a

20   footnote they did not, in fact, cease operations.  And that was

21   also necessary.

22           Perhaps I'm misreading your footnote.

23           MR. WILSON:  That's actually a different issue.  If

24   you have a contingent business interruption loss.  You have to

25   show a necessary suspension of your operations.  And unless you

```
1    have a complete cessation of activities, you don't have any
2    coverage under the policy.
3            And there was a rather interesting or fortuitous, one
4    way or the other, if you look at it, it is Judge Swain had
5    issued a decision in Madison saying the law in New York is
6    clear, you have to show a total cessation of operations in
7    order to have recovery.
8            Now Lantheus, here, they had a number of products they
9    sold.  Certainly the inability to get the Moly-99 impacted one
10   product, and it didn't impact their other products, so they
11   continued.
12           THE COURT:  M-O-L-Y, dash, 99.
13           Mr. Wilson, thank you very much.  Let me hear, please,
14   from your adversary.
15           MR. KORDE:  Thank you, your Honor.
16           THE COURT:  Can you begin by disputing, if you can,
17   his -- the statement of the folks at the back table that all of
18   the judges, in all of the places that not far-flung, have in
19   fact agreed with their construction of the corrosion exclusion?
20           MR. KORDE:  I can.  And I think the important point
21   there is when you ask that question, counsel, his response was
22   all cases that are not in the boiler room machinery context
23   says that.  But Lantheus' policy includes boiler machinery
24   coverage.  So it is outside of the, I think, the palings that
25   he has drawn.
```

1          And I think that is important for two reasons.  Your

2   Honor pointed out the fact that there is machinery and

3   breakdown coverage in the policy.  One reason is, there are

4   courts that have held that machinery breakdown coverage applies

5   even if the cause of the breakdown is wear and tear, or

6   deterioration, or one of these other types of categories of

7   risk that fall within the alleged corrosion exclusion.

8          As long as the loss --

9          THE COURT:  Stop for a moment.  Please understand that

10  neither court reporter, nor I, are as conversant in these

11  topics as you, so please be quite precise vice in what you are

12  saying, so she can understand it, and I can, too.

13         Thank you.

14         MR. KORDE:  You're welcome.

15         As long as it falls within a boiler room machinery

16  clause, as long as the when, where, and how of the breakdown is

17  unexpected from the policyholders' point of view.  And I think

18  that's what we have here.  And that's part of what we are

19  trying to get evidence to show.

20         And I think another point that I think is responsive

21  to what counsel for Zurich said, is that -- I think he used the

22  phrase, *the straw that broke the camel's back*.  We pointed in

23  our letter to an exception to the corrosion exclusion that says

24  if there is some other event, there's some other covered cause

25  of loss that follows the corrosion, then you have coverage

1    again.  And that's exactly what we are looking for information

2    for.  We cited the information in my letter about the potential

3    for a pressure transient.  A rapid increase in pressure, within

4    the reactor vessel, could have ruptured the vessel and that

5    would have showed there is machinery breakdown, there's

6    subsequent covered cause of loss that followed the alleged

7    corrosion.  That would bring it within the language of the

8    exception and restore the coverage.  So that information that

9    we are seeking, information about the vessel's internal

10   pressure, its temperature, the mechanics of the pumping system,

11   the relative elevations of the pump and the vessel, all of that

12   sort of information goes to whether or not there was a pressure

13   transient.  And that would allow us to bring the case within

14   one of the exceptions.

15          THE COURT:  Was there deposition testimony?  Because I

16   don't know all of the discovery that has been taken in this

17   case, from anyone at Lantheus, or anyone at Zurich regarding

18   their understanding, to the extent that matters, of the

19   language in the policy.

20          And perhaps, sir, I should ask a preliminary question,

21   excuse me.  And that is, is this policy just sort of a, you

22   know, an off-the-shelf policy that didn't require any special

23   tailoring for Lantheus, or was it something that was the

24   product of particularized negotiations between Lantheus and

25   Zurich.

1           MR. KORDE:  It is a standard form policy, with one

2    important exception, and that is an endorsement to the policy

3    that Lantheus purchased to specifically provide coverage for a

4    shutdown of the NRU reactor.

5           Lantheus bought this policy to protect it from a

6    catastrophic failure in its supply chain.  We think that is

7    exactly what happened here.  And we think the intent of the

8    policy is, for that reason, to cover this loss.

9           THE COURT:  Okay.  All right, you can finish your

10   thought.  Go ahead.

11          MR. KORDE:  Sure.

12          The one other point I wanted to make, your Honor, is I

13   think your Honor hit the nail exactly on the head in terms of

14   judicial efficiency that, really, it would not make sense to

15   hear this motion twice.  And I believe if Zurich files a

16   summary judgment motion, there would be good reason to deny it

17   on 56D grounds.  And I assume that if that happens, Zurich

18   would want to file it again at some subsequent date.  And that

19   would mean your Honor would have to go through the work twice.

20   That seems to be inefficient.  I think we're all better off,

21   both in terms of the costs imposed on our clients, and the

22   costs imposed on the Court to resolve the motion on a full

23   record, after Lantheus has had a chance to get this information

24   from AECL.

25          THE COURT:  If and when I do set a schedule for

1    summary judgment, how long does Lantheus need to respond?

2    Because I'm understanding, from the folks at the back table,

3    that they need about 30 days to get their papers together,

4    because they were suggesting to me an end of April date.

5         Do you, similarly, need 30 days to get your response

6    together?

7         MR. KORDE:  Once we have all of the AECL information,

8    your Honor, I think we could put a response together in 30

9    days.

10        THE COURT:  Okay.  All right, thank you.

11        Mr. Wilson, Mr. Silverberg, is there anything else you

12   want to add?  This is your request for a motion, so if you want

13   to get the last word with respect to it, I will listen to you

14   now.

15        MR. SILVERBERG:  Two things, your Honor.

16        We most definitely don't want to make this motion

17   twice, we don't want the Court to have to deal it twice.  As

18   Mr. Wilson said, that's why we're going through this process

19   and to try to get it all wrapped up.  There does have to be an

20   end date, I think, to this.  And we're prepared to -- I think

21   what Mr. Wilson suggested seemed to make sense.  I mean if your

22   Honor wants to slide it another 30 days to give every benefit

23   of the doubt on the AECL discovery, that's fine.  I mean we can

24   make it the end of April, we can make it the end of May.  We

25   would like to have it done sooner, rather than later.

1          I will respond very briefly to counsel's comments

2     about the ensuing losses exception, which is noted in footnote

3     two.  I think what you heard, and what happened here, is the

4     corrosion event occurred.  And the reactor was shut down.

5     Nothing happened after that.  It was corrosion.  The reactor

6     was shut down.  And that's what this claim is about.  The

7     reactor was shut down.  The income loss, as a result of the

8     reactor being shut down, was the reactor shut down because of

9     the corrosion event.  And that's really, in sum and substance,

10    what our motion goes to.

11         And we look forward to the opportunity to arguing the

12    law, all of the cases, from far-flung jurisdictions and

13    otherwise, that your Honor wants to question us about.

14         THE COURT:  All right, thank you very much.

15         Mr. Silverberg, you are a wise man.  I'm sure you knew

16    that already.  But I appreciate very much your concession that

17    perhaps this could go another month, but -- and perhaps I am

18    less wise here, because I'm going to let it go a little

19    further.

20         I would like your motion to be filed on the 30th of

21    June.  As you can tell from sort of the two strands that have

22    been joined together in this particular proceeding, I care

23    about the end of discovery and I care about having a meaningful

24    motion practice.  And I think this is the best way of doing it.

25         So I'm going to ask for your motion on the 30th of

```
1    June.  I will ask for Lantheus' response -- oh, you know,

2    perhaps we can refrain from wrecking their July 4th.  Let's

3    make it July 8th.  Oh, I'm sorry I have already -- thank you.

4    This is what happens when I don't look at my calendar.  That

5    would be funny, that's giving them a week and a half.  That's

6    sweet.  Let's do this the fourth of August.  That makes a

7    little bit more sense.  And then how many weeks do you need to

8    respond, Mr. Silverberg, two?  I could give you three, see how

9    nice I feel.

10              MR. SILVERBERG:  We'll take three, your Honor, thank

11   you.

12              THE COURT:  Okay, that gets us to the 25th of August.

13         I imagine that the parties will want oral argument.

14   Suffice it to say, I'll let you know if and when I need it.

15   Everyone asks for it.  And I will have it when it is helpful,

16   and it may well be helpful here.

17         Mr. Korde, again, I began and will end this conference

18   being sympathetic to your efforts to try and get things.

19         At some point we have to move forward.  So I'm going

20   to ask you, please, to do all that you can to get this

21   information.  In a way, I have given you through August to get

22   it.  So you get to even your less aggressive schedule.

23         The parties here are so -- they are so much better

24   than many of the counsel that I see before me -- and that's two

25   compliments you get today, Mr. Silverberg -- that I am almost
```

```
1    embarrassed to ask you to do this.  I am going to ask you,

2    please, to make sure that you are aware of, and compliant with,

3    Rule 56, the local Rule 56.1 and my own individual rules of

4    practice.  Because you would be surprised how many folks sort

5    of unload documents on me without making any effort to see that

6    they are admissible.  Or give me pieces and parts of

7    depositions where I -- I really just need the whole deposition.

8              So I will ask you, please, to keep that in mind.

9    Again, I anticipate no problems with this crew, but I do want

10   to raise it.

11             And is there anything else that I should be addressing

12   in this discussion?

13             MR. KORDE:  No, not from Lantheus.

14             MR. SILVERBERG:  Nothing, your Honor, thank you.

15             THE COURT:  Thank you very much for coming in.  I

16   appreciate, very much, the premotion argument.

17             MR. WILSON:  Thank you your Honor.

18             MR. KORDE:  Thank you, your Honor.

19             (Adjourned)

20

21

22

23

24

25
```