UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X
                                                :
LANTHEUS MEDICAL IMAGING, INC.,                 :
                                                :
                              Plaintiff,        :        10 Civ. 9371 (KPF)
                                                :
              v.                                :        REDACTED OPINION
                                                :            AND ORDER
ZURICH AMERICAN INS. CO.,                       :
                                                :
                              Defendant.        :
                                                :
------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: April 28, 2015 |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Lantheus Medical Imaging, Inc. ("Lantheus") initiated this action

against Zurich American Insurance Company ("Zurich") on December 16, 2010.

The lawsuit challenges Zurich's denial of coverage, under a commercial

property insurance policy purchased by Lantheus, for business income loss

related to a 15-month shutdown of the nuclear reactor at Chalk River

Laboratories in Ontario, Canada (the "NRU Reactor"). The NRU Reactor

supplied a radioactive isotope used in Lantheus's diagnostic medical imaging

products, and Lantheus alleges that it incurred more than $70 million in losses

as a result of the shutdown. Zurich contends that Lantheus's losses are not

covered under the policy because (i) Lantheus did not experience a total

cessation of business activity, and (ii) the shutdown was caused in whole or in

part by the excluded peril of corrosion. Zurich now moves for summary

judgment on these two grounds. For the reasons set forth in this Opinion,

Zurich's motion is granted.

## BACKGROUND[1]

### A.  Factual Background

#### 1.  Lantheus and the NRU Reactor

Lantheus is a specialty pharmaceutical company that manufactures and distributes, among other things, diagnostic medical imaging products.  (Def. 56.1 ¶ 1).  Molybdenum-99 ("Moly-99"), a radioactive isotope resulting from the fission of uranium-235 in a nuclear reactor, is a key component in one of Lantheus's products, the TechneLite Generator.  (*Id.* at ¶ 2).  Prior to May 2009, Lantheus obtained Moly-99 from Nordion, Inc. ("Nordion"), which in turn was supplied by the NRU Reactor.  (*Id.* at ¶ 4).  The NRU Reactor is operated by Atomic Energy of Canada Limited ("AECL").  (*Id.* at ¶ 6).  As of May 2009, the NRU Reactor supplied approximately 40% of the world's medical isotopes.  (*Id.* at ¶ 5).

#### 2.  The Policy

Zurich issued to Lantheus an all-risk property insurance policy (the "Policy")[2] that was in effect from January 8, 2009, through January 8, 2010.

---

[1]     The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including Defendant's 56.1 Statement ("Def. 56.1"), and Plaintiff's responses thereto ("Pl. 56.1 Response"); Plaintiff's 56.1 Counterstatement ("Pl. 56.1"), and Defendant's responses thereto ("Def. 56.1 Reply"); and the declarations ("[Name] Decl.") and exhibits thereto submitted with the parties' briefs.  Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  For convenience, Defendant's opening brief will be referred to as "Def. Br"; Plaintiff's opposition brief as "Pl. Opp."; and Defendant's reply brief as "Def. Reply."  Many of these documents were filed under seal, and will be refiled in redacted form pursuant to the Court's instructions.

[2]     Such a policy is distinguished from a "named peril" policy.  *See generally TAG 380, LLC* v. *ComMet 380, Inc.*, 10 N.Y.3d 507, 513 (2008) ("'Named-perils' covers only specifically enumerated risks, whereas an 'all-risk' agreement generally covers all risks of physical loss, except for those perils specifically excluded.").

(Def. 56.1 ¶ 23).  Of particular relevance to the instant motion, the Policy

covers Lantheus's "Contingent Business Income Loss" ("CBI") according to the

following specifications:

> We will pay for the actual Business Income Loss you
> sustain and necessary Extra Expense you incur
> resulting from the *necessary suspension of your
> business activities* occurring at a premises described in
> the Declarations Schedule if the suspension is caused
> by direct physical loss of or damage caused by a covered
> cause of loss to a Contingent Property (of the type
> insured) not owned, occupied, leased or rented by you
> or insured under this Policy and that property is located
> within the Covered Territory.  We will pay no more than
> the applicable sub-limit of insurance.

(Silverberg Decl., Ex. G at 28 (emphasis added)).  Lantheus's Billerica,

Massachusetts facility where TechneLite Generators are produced (the

"Billerica Facility") is one of the premises described in the Declarations

Schedule.  (*Id.* at 18).

The Policy defines "Contingent Property" to include "[a] property from

which you or others on your account receive the delivery of manufactured

materials or services if those materials or services are essential for the

continuation of your business activities."  (Silverberg Decl., Ex. G at 28).

Endorsement 6, in turn, amends the Policy to provide a $70 million sub-limit of

insurance for "Contingent Time Element f[ro]m [AECL] — Chalk River Reactor

as a supplier of … Nordion."  (*Id.* at 76).[3]  "Extra Expenses" are covered under

---

[3]     The Court notes that "[t]he word 'contingent' is something of a misnomer; it simply
means that the insured's business interruption loss resulted from damage to a third
party's property."  *Pentair, Inc.* v. *Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613, 615 n.3
(8th Cir. 2005).  The parties do not dispute that the NRU Reactor constitutes
Contingent Property under the Policy.

the CBI provision beginning on the date of the loss, and continuing "during the period of restoration to resume and continue as nearly as practicable your normal business activities at [the] premises[.]"  (*Id.* at 28).

The Policy distinguishes between "covered" causes of loss and "excluded" causes of loss.  "Covered Cause of Loss" is defined broadly, to include "all risks of direct physical loss of or damage (including machinery breakdown) from any external cause unless excluded." (Silverberg Decl., Ex. G at 50).  Conversely, exclusions are detailed in "Causes of Loss Not Covered," with corrosion being the exclusion relevant to the instant dispute:

> We will not pay for loss or damage resulting from any of the following; such loss or damages is excluded regardless of any cause or event that contributes concurrently or in any sequence to the loss or damage, except as specifically provided.
>
> ***
>
> 5.    Developing, Latent and Other Causes
>
> The effects or cause of:
>
> ***
>
> b.    Deterioration, depletion, rust, *corrosion*, erosion, loss of weight, evaporation[,] or wear and tear[.]
>
> ***
>
> But if any of these results in a covered cause of loss, this exclusion does not apply to the loss or damage caused by the covered cause of loss.

(*Id.* at 24-25 (emphasis added)).  The corrosion exclusion is bookended by two provisions that bear separate mention.  First, the Policy contains a so-called "anti-concurrent cause" provision, which bars coverage where a claimed loss is

caused by a combination of covered and excluded perils.  Second, the Policy contains an "ensuing loss" exception, which provides coverage if an excluded peril causes a second, covered peril to occur; in that eventuality, coverage is provided only for the loss or damage that proximately results from the covered peril.

### 3. The Structure of the NRU Reactor and the Weakening of the Vessel Wall

The NRU Reactor consists of a cylindrical aluminum alloy reactor vessel and light water reflector, uranium fuel rods, and a cooling system.  (Pl. 56.1 ¶ 36).  The light water reflector surrounds the reactor vessel, and a gas-filled space of about six inches, called an "annulus," separates the two.  (*Id.* at ¶¶ 37-38).  Within the reactor vessel, uranium undergoes nuclear fission, producing up to 135 megawatts of mechanical power in the form of heat.  (*Id.* at ¶ 45).  Pumps, ordinarily powered by the electrical grid, drive "heavy water" through the vessel and into a series of heat exchangers to cool the uranium fuel rods.  (*Id.* at ¶¶ 39-43).[4]

As of May 2009, the wall separating the annulus and reactor vessel was weakening (or thinning) to varying degrees in several places.  The parties agree on this fact, but disagree on the types and causes of this weakening; for purposes of this motion, the Court will focus on the Plaintiff's account of the

---

[4]    "Heavy water," or $D_2O$, is distinguished from "light water," or $H_2O$, because it "contain[s] significantly more than the natural proportions (one in 6,500) of heavy hydrogen (deuterium, D) atoms to ordinary hydrogen atoms."  Heavy Water, U.S. Nuclear Regulatory Commission, http://www.nrc.gov/reading-rm/basic-ref/glossary/heavy-water-d2o.html (last visited Mar. 24, 2015).

weakening.  (*See* Pl. 56.1 ¶¶ 47-53).  The first manner of weakening is referred to by both parties as corrosion, and, solely to avoid confusion, the Court will use Plaintiff's term for this form of thinning: "General Corrosion."  (*Id.* at ¶ 53; *see also* St. Pierre Decl., Ex. 1 at 11 (describing the "general slow corrosion rate thinning of the reactor vessel on the annulus side")).  This General Corrosion caused solids to accumulate near the base of the annulus.  (Pl. 56.1 ¶ 53; *see also* St. Pierre Decl., Ex. 1 at 11 ("The spongy solids that built up at the bottom of the annulus included [redacted].")).  The second form of thinning to the wall was a highly localized pitting or weakening (referred to by Plaintiff as "[redacted] Penetration") that occurred approximately four centimeters above the base.  (Pl. 56.1 ¶ 49; *see also* St. Pierre Decl., Ex. 1 at 11 (describing the thinning as "a highly localized attack in the form of [redacted]")).[5]

### 4.    The May 2009 Shutdown

On May 14, 2009, the NRU Reactor lost power.  (Pl. 56.1 ¶ 63).[6] [Redacted].  (*Id.* at ¶¶ 66-67).  AECL acted to [redacted].  (*See id.* at ¶¶ 66-70). When the vessel was refilled, the vessel wall failed where the [redacted] Penetration had occurred, causing a through-wall breach.  (*Id.* at ¶¶ 72-75). Heavy water containing a radioactive substance called tritium was released within the NRU Reactor facility, which caused AECL to take the NRU Reactor

---

[5]    The parties appear to dispute whether this "highly localized, [redacted]" thinning occurred in one location or in multiple locations (*compare* Pl. 56.1 ¶ 50, *with* Def. 56.1 Reply ¶ 50), but the dispute is irrelevant to the instant motion.

[6]    The parties dispute whether the cause of the power outage was a lightning strike (*see* Def. 56.1 Reply ¶ 64), but this, too, is irrelevant to resolution of the instant motion.

out of service until it could investigate the source of the leak and complete repairs.  (Def. 56.1 ¶ 8).  The shutdown lasted for approximately 15 months.

Both sides offer expert testimony concerning the cause of the through-wall breach.  Again, given the current procedural posture, the Court focuses on the evidence submitted by the non-movant.  Lantheus offers opinions from two expert witnesses, metallurgist George R. St. Pierre and nuclear engineer John H. Bickel.  The witnesses make clear that their reports are to be read in tandem.  (*See, e.g.*, Bickel Decl., Ex. 1 at 5 (noting that the cause of the weakening in the vessel wall "will be explained by another expert")).[7]

St. Pierre considered the metallurgic properties of the aluminum reactor vessel and the changes in that metal that allowed it to be susceptible to a breach.  He focuses on a confluence of chemical processes in the annulus that led to the [redacted] Penetration, which he claims to be a causal factor in the breach and — perhaps more significantly for Plaintiff's coverage arguments — which he seeks to distinguish from General Corrosion.  Specifically, St. Pierre links the formation of the [redacted] Penetration to an "electrochemical cell" (alternately referred to as a "differential aeration cell" or an "aeration cell") that resulted from the interaction of waters with two different electric potentials at the base of the NRU Reactor.  (Pl. 56.1 ¶ 52; *see generally* St. Pierre Decl., Ex. 1 at 11-15)).[8]  Water flowing down the side of the light water reflector to the

---

[7]     Zurich offers various challenges to Lantheus's expert testimony in its reply brief and its supplemental letter brief.  (*See* Def. Reply 1-5; Dkt. #137).  While these challenges are not without merit, for purposes of this motion, the Court accepts the expert testimony.

[8]     St. Pierre opined that the process by which the aeration caused a degradation of the aluminum vessel wall differed from General Corrosion in that (i) it proceeded at a rate

base of the reactor vessel became trapped in the insoluble materials that had accumulated near the base of the annulus during the General Corrosion process and remained aerated; water flowing down the reactor wall in the annulus became de-aerated.  (Pl. 56.1 ¶¶ 54-55; *see also* St. Pierre Decl., Ex. 1 at 14-15).  An electrochemical cell formed at the base of the vessel, where the de-aerated water flowing down the reactor wall (which was electrically charged) contacted the aerated water (which had a different electrical charge) that had commingled with the corrosion by-products.  (Pl. 56.1 ¶ 56; *see also* St. Pierre Decl., Ex. 1 at 14).

According to St. Pierre, the electrochemical cell caused the aluminum wall of the vessel to thin at a rate greater than that caused elsewhere by General Corrosion.  (*See* Pl. 56.1 ¶¶ 57-58; *see also* St. Pierre Decl., Ex. 1 at 2, 18).  While "well-known corrosion mechanisms," including nitric acid, could result in metal loss of 0.03 millimeters per year (St. Pierre Decl., Ex. 1 at 11), the thinning rate at the water line of the annulus "could be more than 10 millimeters per year" (*id.* at 18).  Ultimately, St. Pierre opines that the rate of thinning at the areas of [redacted] Penetration "took place at a rate in excess of 100 [millimeters per year] as a result of the formation of an electrochemical differential aeration cell" (*id.*), which would have penetrated through the 8 millimeter reactor vessel wall in less than one month.  St. Pierre cautions,

---

"orders of magnitude greater than the rate of the processes that cause general corrosion" (St. Pierre Decl., Ex. 1 at 2); (ii) "it require[d] special conditions of water contact with the aluminum reactor wall" (*id.*); and (iii) the damage was not caused by "acidic action" involving the metal, but rather an electrical current (*id.* at 15).

however, that the thinning of the wall was not the sole cause of the breach; rather, he opines, "[t]hinned metal at the base of the [redacted] [was] ruptured by internal pressure surges that were felt on May 14, 2009," [redacted]. (*Id.* at 3; *see also id.* at 18 (concluding "to a reasonable degree of scientific certainty that [a rapid increase in hydrostatic pressure at the failure location from [redacted] pounds per square inch to at least [redacted] pounds per square inch over a two-minute period] ruptured the highly-localized, [redacted] sites in the vessel wall")).

Bickel, for his part, focuses on the NRU Reactor in opining on the cause of the May 2009 shutdown. Ultimately, he concludes that a "transient hydraulic event that beg[a]n when light[n]ing caused a loss of power at the NRU facility resulted in a through-wall breach of the vessel ... at locations where the vessel had already been thinned by other causes." (Bickel Decl., Ex. 1 at 5). Bickel claims to "offer no opinions on matters of 'corrosion or materials,' or 'materials strength/stress analyses,'" matters he understands are being addressed by Lantheus's other experts. (*Id.* at 6). However, later on in his report, he opines that corrosion by nitric acid (the conclusion of AECL as to the cause of the breach) could not be the sole cause of the shutdown of the NRU Reactor without some other "triggering event." (*Id.* at 22).

Bickel then considers what triggering event could have acted concurrently with the degradation of the aluminum vessel wall to cause the shutdown. After raising and refuting various triggering events, including core power surges and seismic events, Bickel concludes that a rapid change in

9

pressure within the reactor vessel — a "pressure transient" — was the likely cause. (Bickel Decl., Ex. 1 at 24-66). Bickel reasons from the fact that abnormal tritium leakage was not detected by AECL until the week of the May 14, 2009 incident, that there were no pre-existing breaches in the vessel wall. (*Id.* at 49). Instead, Bickel concludes "that the through-wall reactor vessel failure was a direct result of a combination of a 'pre-weakened' condition and a 'triggering event' that came together following the May 14th, 2009 Loss of Class IV Power at the NRU facility." (*Id.* at 67; *see also id.* at 5 ("I conclude, to a reasonable degree of scientific certainty, that a hydraulic transient failed the NRU Reactor vessel at locations where the vessel wall had already been thinned due to other causes.")).

### 5.    Lantheus's Decrease in Production

Lantheus asserts that the NRU Reactor shutdown forced its Billerica Facility to cancel numerous production runs for TechneLite Generators, including four production runs in May 2009, eight production runs in June 2009, fourteen production runs in July 2009, twelve production runs in August 2009, and nine production runs in September 2009. (Pl. 56.1 ¶¶ 85-90; *see also* Pl. Opp. 2).

As of May 2009, Lantheus manufactured TechneLite Generators on weekdays and on weekends, with the largest production runs occurring on the weekends. (Pl. 56.1 ¶¶ 91-92). The weekend production runs began on Saturday evenings between 6:30 p.m. and 7:30 p.m., and concluded on Sunday mornings between 6:30 a.m. and 7:30 a.m. (*Id.* at ¶¶ 94-95).

Lantheus did not manufacture other products during the weekend.  (*Id.* at ¶ 93).  Prior to the NRU Reactor shutdown, Lantheus produced approximately 410 TechneLite Generators during its weekend production runs.  (*Id.* at ¶ 96).  This number dropped following the NRU Reactor shutdown, and, by August 2009, Lantheus was producing an average of 216 TechneLite Generators during its weekend production runs.  (*Id.* at ¶¶ 97-100).

Because Lantheus received less Moly-99 and produced fewer TechneLite Generators during its weekend production runs while the NRU Reactor was offline, it halted its production activities on Sundays one to three hours earlier than it otherwise would have.  (Pl. 56.1 ¶ 103).  Put another way, instead of producing TechneLite Generators for approximately twelve hours each weekend, Lantheus produced TechneLite Generators for nine to eleven hours each weekend.  (*See id.*).  Nothing in the records suggests that production runs for TechneLite Generators — or any other product — scheduled during weekdays were affected as a result of the NRU Reactor shutdown.

As a result of the NRU Reactor shutdown, Lantheus asserts it lost revenue and incurred extra expense in obtaining an alternate supply of Moly-99.  (Def. 56.1 ¶ 18).  Lantheus has estimated its financial losses to be greater than the Policy's $70 million sub-limit for CBI losses provided by Endorsement 6.  (*Id.* at ¶ 19).

### 6.    Zurich's Denial of the Claim

Zurich denied coverage to Lantheus by latter dated March 22, 2010.  (Pl. 56.1 ¶ 155).  The letter explained that, "[i]nasmuch as all of the available

information indicates that the shutdown of the NRU Reactor was because of corrosion, an excluded cause of loss, Lantheus's Contingent Business Income Loss and Extra Expense claim is not covered." (Sutton Decl., Ex. Z at 4).

## B.    The Instant Litigation

Plaintiff initiated this action on December 16, 2010, seeking a declaratory judgment that its losses were covered by the Policy, and relatedly claiming breach of contract under the terms of the Policy.  (Dkt. #1).  Despite the diligent efforts of the parties, discovery in this case persisted for several years because of difficulties and delays conducting foreign discovery.  On January 11, 2012, the Honorable James L. Cott, United States Magistrate Judge — to whom the case had been assigned for general pretrial purposes — issued an Opinion and Order granting Lantheus's request for the issuance of letters rogatory seeking documents and deposition testimony from AECL.  *Lantheus Med. Imaging, Inc.* v. *Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769 (S.D.N.Y. 2012).

On June 19, 2013, the action was reassigned to this Court.  (Dkt. #82). As discovery pressed forward, Lantheus diligently pursued documents from abroad, but continued to have difficulties in obtaining what it considered to be a complete set of discovery from AECL.  (*See* Dkt. #85, 87, 90).  Zurich's position, as expressed in its pre-motion conference letter of March 11, 2014, to this Court, was that the remaining discovery was largely irrelevant because any loss was subject to the corrosion exclusion, and because Lantheus did not suffer a "necessary suspension" of its operations.  (Dkt. #91 at 3 & n.4).  Zurich

12

indicated that these bases for a summary judgment motion would exist regardless of what additional discovery revealed.  (*Id.* at 1).  Lantheus disagreed, and contended that "[e]ach new production of information from AECL support[ed] Lantheus'[s] position, and [that] Zurich want[ed] to turn the spigot off … before more damaging information emerge[d]."  (Dkt. #93 at 3).  In light of the unique challenges Lantheus faced in obtaining the foreign discovery, the Court permitted fact discovery to be extended until the end of March 2014 (Dkt. #89), and then once again until the end of June 2014 (Dkt. #94).

On July 14, 2014, Zurich filed its motion for summary judgment and accompanying papers.  (Dkt. #106-109).  On August 25, 2014, Lantheus filed its opposition papers.  (Dkt. #114-115, 117-120).  On September 15, 2014, Zurich filed its reply papers.  (Dkt. #124-126).

On November 4, 2014, the Court granted Zurich's request to supplement the summary judgment record with deposition transcripts from Plaintiff's expert witnesses, who had recently been deposed.  (Dkt. #134).  The Court permitted each party to submit a supplemental letter brief regarding the testimony.  (Dkt. #137, 138).

On March 25, 2015, the Court filed an unredacted copy of this Opinion under seal.  On that same day, the Court provided the parties with a copy of the unredacted Opinion and allowed the parties to propose redactions. Pursuant to the Court's directions, the parties will file their materials publicly by April 27, 2015, with certain limited categories of information redacted in

accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  On that date, the parties will also file a joint letter suggesting redactions to the Opinion.  Taking the parties' suggestions into consideration, the Court will then file the redacted Opinion publicly.  The Court now considers the pending motion for summary judgment.

**DISCUSSION**

**A.      Applicable Law**

**1.      Summary Judgment Generally**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

14

trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and

citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### 2. Interpretation of Insurance Contracts

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Porco* v. *Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001) (internal quotation marks omitted)).  Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp.* v. *Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal citation omitted); *see also Parks Real Estate Purchasing Grp.* v. *St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial interpretation of a contract is a matter of law for the court to decide." (internal quotation marks and citation omitted)).[9]

---

[9]    In this diversity action, the issues are governed by either New York or Massachusetts state law.  *See MBIA Inc.* v. *Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011).  The parties cite cases from both jurisdictions interchangeably (*see, e.g.*, Def. Br. 8; Pl. Opp. 14), and neither party asserts that there is a meaningful difference between the two jurisdictions' laws with respect to the instant dispute.  Accordingly, the Court will rely on New York state law.  *See Johnson* v. *Priceline.com, Inc.*, 711 F.3d 271, 276 n.2 (2d Cir. 2013) ("courts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs"); *see also Mem'l Drive Consultants, Inc.* v. *ONY, Inc.*, 29 F. App'x 56, 60 & n.2 (2d Cir. 2002) (summary order) (applying New York law where, "[a]lthough the parties dispute[d] whether New York or

If the Court finds contract provisions to be unambiguous, it must then
interpret the provisions in light of "'their plain and ordinary meaning.'" *Ellicott
Square Court Corp.* v. *Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir.
2011) (quoting *Essex Ins. Co.* v. *Laruccia Constr., Inc.*, 898 N.Y.S.2d 558, 559
(2d Dep't 2010)).  The Court must interpret such terms "in light of 'common
speech' and the reasonable expectations of a businessperson."  *Belt Painting
Corp.* v. *TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003) (internal citation omitted).
"Where contractual language is ambiguous and subject to varying reasonable
interpretations, intent becomes an issue of fact and summary judgment is
inappropriate....  Only where the language is unambiguous may the district
court construe it as a matter of law and grant summary judgment accordingly."
*Palmieri* v. *Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (internal
quotation marks and citations omitted).

If a contract term is "susceptible to at least two reasonable
interpretations," the case may not be resolved on summary judgment, because
the meaning of an ambiguous contract term is "generally an issue of fact,
requiring the trier of fact to determine the parties' intent."  *U.S. Naval Inst.* v.

---

Massachusetts law should govern[,] ... their briefs implicitly agree[d] that the rules for
interpreting contract language [we]re substantially the same under the law of both
states"); *Tutor Perini Corp.* v. *Banc of Am. Sec. LLC*, No. 11 Civ. 10895 (NMG), 2012 WL
2178950, at *8 n.9 (D. Mass. June 13, 2012) ("To the extent Massachusetts law were to
apply, the basic principles of contract interpretation would be the same as under New
York law."); *Water Transp. Co.* v. *Boston Towing & Transp. Co.*, No. 92 Civ. 5290, 1993
WL 625536, at *8 n.4 (S.D.N.Y. Apr. 7, 1993) (Sotomayor, D.J.) ("In their papers both
parties cite cases arising under New York law.  However, the parties also indicate that
Massachusetts law may apply.  Although I rely on cases arising under New York law,
principles of contract interpretation under Massachusetts law are virtually identical to
those in New York.").

*Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) (internal citations omitted).  In contrast, if the terms of the contract are not ambiguous, the dispute is properly resolved on summary judgment, and the court must endeavor to "give effect to the intent of the parties as expressed in the clear language of the contract."  *Mount Vernon Fire Ins. Co.* v. *Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002) (internal quotation marks and citation omitted).

When insurance contracts contain an exclusion provision, "'[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion ... [by] establish[ing] that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'"  *Seneca Ins. Co.* v. *Kemper Ins. Co.*, No. 02 Civ. 10088 (PKL), 2004 WL 1145830, at *10 (S.D.N.Y. May 21, 2004) (quoting *Vill. of Sylvan Beach* v. *Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995)), *aff'd,* 133 F. App'x 770 (2d Cir. 2005) (summary order); *see also Seaboard Sur. Co.* v. *Gillette Co.*, 64 N.Y.2d 304, 311 (1984) (stating that exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction" (internal citation omitted)).

Finally, the burden shifts to the insured to establish coverage once an exception to an applicable exclusion is raised.  *See Ment Bros. Iron Works Co.* v. *Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) ("[A]fter an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies."); *Northville Indus. Corp.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 634

(1997) ("Shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist[.]"); *see generally MBIA Inc.* v. *Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011).

**B.      Analysis**

The Court must first decide, as a threshold matter, whether the provisions at issue are unambiguous as a matter of law.  The parties disagree as to the meaning and application of three provisions: (i) the CBI provision, and specifically what it means to suffer a "necessary suspension" of business activities; (ii) the "corrosion" exclusion, and specifically whether the [redacted] Penetration constitutes corrosion; and (iii) the "ensuing loss provision," and specifically whether otherwise excluded loss caused by "corrosion" can be restored to coverage because of a subsequent, fortuitous event.

> **1.      The Court Need Not Resolve the Issue of Whether the Requisite "Necessary Suspension" of "Business Activities" Occurred**

Zurich argues that Lantheus cannot claim under the Policy's CBI provision in the first instance because it did not suffer a "necessary suspension" of its business activities.  (Def. Br. 15-17; Def. Reply 7-10).  In this regard, Zurich contends that "suspension" is equivalent to total or complete cessation — a level of interruption the Billerica Facility never approached. (Def. Br. 16; Def. Reply 9).  Lantheus counters that the disruptions it faced as a result of the NRU Reactor shutdown were precisely the kinds the parties anticipated when executing the Policy, and, in any event, that the NRU Reactor

shutdown forced it to "suspend" — briefly but repeatedly — its business activities.  (Pl. Opp. 22-24).  The Court notes that there are persuasive arguments on both sides; as set forth in the remainder of this section, however, the Court need not resolve the issue in order to resolve Defendant's motion.

The Policy provides no definition for the term "suspension."  Accordingly, this Court looks to the dictionary to provide the everyday, common meaning of the term.  *Fed. Ins. Co.* v. *Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) ("It is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." (internal quotation marks, alterations and citations omitted)).  Webster's Third New International Dictionary defines "suspension" as "the act of suspending or the state or period of being suspended, interrupted, or abrogated."  Webster's Third New International Dictionary, Unabridged (3d ed.) ("Webster's Dictionary"), http://unabridged.merriam-webster.com/unabridged/suspension (last visited Mar. 24, 2015).  "Suspended" is defined as "temporarily debarred, inactive, inoperative."  Webster's Dictionary, http://unabridged.merriam-webster.com/unabridged/suspended (last visited Mar. 24, 2015).

Other courts have found the word "suspension," as used here, to be unambiguous.  For example, another court in this District found that, given the common meaning of the term "suspension," a "*complete cessation* of activity, even a temporary one, was required" under the express terms of a business income loss provision.  *Madison Maidens, Inc.* v. *Am. Mfrs. Mut. Ins. Co.*, No. 05 Civ. 4584 (LTS), 2006 WL 1650689, at *4 (S.D.N.Y. June 15, 2006)

(granting insurer's motion for summary judgment) (emphasis in original).

Several New York state courts have found similarly. *See, e.g., Broad St., LLC* v.

*Gulf Ins. Co.*, 832 N.Y.S.2d 1, 5 (1st Dep't 2006) ("[T]his Court [has] addressed

the very issue pivotal on this appeal and determined that in order for business

interruption insurance to be triggered, there must be a 'necessary suspension,'

i.e., a total interruption or cessation of operations." (internal quotation marks

and citations omitted)); *54th St. Ltd. Partners, L.P.* v. *Fid. & Guar. Ins. Co.*, 763

N.Y.S.2d 243, 243 (1st Dep't 2003) ("[T]he language of the subject policy clearly

and unambiguously provides that for business interruption coverage to be

triggered, there must be a 'necessary suspension,' i.e., a total interruption or

cessation."); *Howard Stores Corp.* v. *Foremost Ins. Co.*, 441 N.Y.S.2d 674, 676

(1st Dep't 1981) (reversing jury verdict and damages award based on business

interruption coverage where "there was no actual suspension of business

operations, but rather an alleged adverse effect on continuing sales"), *aff'd*, 56

N.Y.2d 991 (1982).[10]

---

[10]     The majority of courts have reached the same conclusion when faced with this
language.  *See generally* 11 Couch on Ins. § 167:11 ("[A] business ... 'suspension'
triggering coverage typically involves a total cessation of business, not merely a
slowdown or reduction of operations."); *see also, e.g., GBP Partners, Ltd.* v. *Md. Cas. Co.*,
505 F. App'x 389, 392 (5th Cir. 2013) (unpublished opinion) ("Under Texas law, a
suspension of operations clause requires business to have completely ceased for some
interval."); *H & H Hospitality LLC* v. *Discover Specialty Ins. Co.*, No. 10 Civ. 1886, 2011
WL 6372825, at *3 (S.D. Tex. Dec. 20, 2011) ("While the Policy does not define
'necessary suspension of your operations,' courts have interpreted language identical or
similar to the clause in this policy to cover the risk of a complete cessation of business
activities at the covered premises[.]"); *Tastee Treats, Inc.* v. *U.S. Fid. & Guar. Co.*, 07 No.
Civ. 338, 2010 WL 4919606, at *6 (S.D. W. Va. Nov. 29, 2010) ("Following the plain
meaning of the Policy's language, the Court finds that a complete shutdown or
cessation of business ... was required for [the insured] to recover lost business
income."), *aff'd*, 474 F. App'x 101 (4th Cir. 2012) (unpublished opinion); *Am. States Ins.
Co.* v. *Creative Walking, Inc.*, 16 F. Supp. 2d 1062, 1065 (E.D. Mo. 1998) ("This
otherwise unqualified language unambiguously refers to a total cessation of Defendant's
business activities."); *Home Indem. Co.* v. *Hyplains Beef, L.C.*, 893 F. Supp. 987, 990 (D.

21

The Policy language concerning what must be suspended in order to trigger CBI coverage — "business activities occurring at [the insured's] premises" — is itself unambiguous.  Read together, the provisions suggest that Lantheus's CBI coverage hinges on whether its business activities at the Billerica Facility ceased completely as a result of the NRU Reactor shutdown. Because they concededly did not, Zurich would appear to be entitled to summary judgment.  However, the Court is loath to grant relief on this basis for two reasons.

---

Kan. 1995) ("holding ... that a complete cessation of ... business was required to trigger coverage"), *aff'd*, 89 F.3d 850 (10th Cir. 1996) (unpublished opinion); *Forestview The Beautiful, Inc.* v. *All Nation Ins. Co.*, 704 N.W.2d 773, 775 (Minn. Ct. App. 2005) ("The plain and ordinary meaning of 'suspension' requires a complete cessation and does not support coverage when only a partial suspension occurred."); *Buxbaum* v. *Aetna Life & Cas. Co.*, 126 Cal. Rptr. 2d 682, 693 (Cal. Ct. App. 2002) ("[A] total cessation of business activity must occur."); *Quality Oilfield Prods., Inc.* v. *Mich. Mut. Ins. Co.*, 971 S.W.2d 635, 639 (Tex. App. 1998) ("[W]e find that 'interruption of business' is an unambiguous term meaning 'cessation or suspension of business.'  Therefore, [plaintiff] was not entitled to business interruption coverage for the work slowdown it experienced, and we find the trial court did not err in granting [defendant's] motion for summary judgment.").  *Cf. Archer Daniels Midland Co.* v. *Aon Risk Servs., Inc. of Minn.*, 356 F.3d 850, 856 (8th Cir. 2004) (finding a provision that "specifically require[d] a suspension of operations" "requir[ed] a shutdown for loss of earnings coverage" to apply, while finding an "extra expense" coverage provision lacking this requirement did not require complete cessation).  *But see Maher* v. *Cont'l Cas. Co.*, 76 F.3d 535, 539 n.1 (4th Cir. 1996) (finding that the policy "clearly contemplate[d] that a policyholder may be compensated for lost income, regardless of whether the business continued to operate at a reduced level immediately following the covered loss"); *Icue Corp.* v. *U.S. Fid. & Guar. Co.*, 07 No. Civ. 1781, slip op. at 2 n.1 (E.D. Pa. Apr. 23, 2008) (unpublished order) ("[T]he term 'necessary suspension' should not be construed to require a total cessation of business operations as prerequisite to payment.").

The Court also notes that the Policy's CBI language does not qualify the "suspension" that must occur with words like "potential" or "partial."  Provisions covering "*potential* suspension" or "*partial* suspension" — by their own express terms — contemplate coverage for less-than-total cessation.  *See Am. Med. Imaging Corp.* v. *St. Paul Fire and Marine Ins. Co.*, 949 F.2d 690, 692 (3d Cir. 1991) (holding that policy language purporting to cover "*necessary or potential* suspension" allowed for coverage up until the insured resumed "normal operations" (emphasis added)); *Aztar Corp.* v. *U.S. Fire Ins. Co.*, 223 Ariz. 463, 469 (Ariz. Ct. App. 2010) ("The addition of the phrase 'total *or partial*' also makes it plain that any stoppage, or hindrance, need not impact the entire 'business' but only a portion." (emphasis added)).

22

The cases described above pertain to "business interruption" or "business income loss" ("BI") coverage, rather than the "contingent business income loss" coverage that is implicated by the instant case.  (*See* Pl. Opp. 23 (observing that the "cases cited by Zurich … do not involve CBI coverage")).  In 2005, the Second Circuit observed that "CBI coverage is a relatively recent development in insurance law and its scope has not yet been fully delineated by the courts."  *Zurich Am. Ins. Co.* v. *ABM Indus., Inc.*, 397 F.3d 158, 168 (2d Cir. 2005).  This observation remains true ten years later, particularly in the context of importing conventions from the field of ordinary BI insurance.

In the context of BI coverage, the circumstances under which a company suffers complete cessation at a given facility, which successfully and uncontroversially triggers a BI loss, are innumerable and easily imagined.  The circumstances under which complete cessation at a facility follows from damage to *contingent* property are less obvious.  *See Pentair*, 400 F.3d at 615 ("Though few reported cases have construed this type of extended business interruption coverage, it has doubtless become more common and significant as companies increasingly out-source component parts manufacturing and rely on so-called 'just in time' inventory systems.").  Perhaps some CBI provisions would more accurately reflect the expectations of the insured parties regarding contingent property if the policies covered "partial suspensions" or "interruptions" short of complete cessation.  Nonetheless, the Court is appropriately reluctant to rewrite the Policy to accommodate perceived conceptual differences between BI insurance and CBI insurance.  *Cf. Duane*

23

*Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 392 (2d Cir. 2005) (modifying the order of the district court that "effectively rewr[ote] the policy by superseding and enlarging upon the more limited coverage provided by the policy's" business interruption provisions).[11]

This reluctance is heightened where the relevant language of the BI and CBI provisions is identical. The Policy contains a BI provision (not at issue in the instant matter) that protects Lantheus from direct damage and loss to its Billerica Facility. This provision contains the very same requirement of a "necessary suspension." (Silverberg Decl., Ex. G at 27). Thus, even if the Court were inclined toward making a distinction between BI and CBI coverage, to do so in the context of *this* Policy would entail reading two parts of the same contract, that contain the same terms, in such a way that they would have two entirely different meanings. *Md. Cas. Co.* v. *W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997), *as amended* (Nov. 18, 1997) ("Terms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended.").

As a point of counterbalance, Lantheus argues that adopting Zurich's interpretation of the CBI provision would render the coverage it received concerning the NRU Reactor effectively illusory. According to Zurich, in order

---

[11]    The Court recognizes that CBI coverage exists for partial suspensions of and/or interruptions in business operations, and accepts Zurich's representation that such coverage was available in 2008.  (*See* Def. Reply 9-10).  What is unclear from the current record is whether such coverage was specifically offered to Lantheus and, if so, the reasons for Lantheus's decision not to obtain such coverage.

to trigger CBI coverage under the Policy, "business activities occurring at a [Lantheus] premises" — in this case the Billerica Facility — must have completely ceased.  Endorsement 6, which concerns the NRU Reactor, does not purport to modify this.  (*See* Silverberg Decl., Ex. G at 76 (changing the sub-limit of insurance to $70 million, but noting that "[a]ll other terms, conditions[,] and limitations of this Policy remain unchanged")).  Lantheus responds that it has multiple lines of production at the Billerica Facility, several of which do not implicate Moly-99; that it specifically bought the CBI coverage at issue here to safeguard the continuation of a single business line; and that requiring a complete cessation of all business activities at the Billerica Facility would thus be fundamentally inconsistent with the Policy's critical concern.  (*See* Pl. Opp. 21, 23-24).  Relatedly, Lantheus asserts that because there is no set of circumstances under which shutdown of the NRU Reactor would cause a complete cessation of operations at the Billerica Facility, the coverage it obtained via Endorsement 6 was illusory.

Under New York law, courts should avoid a contractual interpretation that renders an agreement illusory and unenforceable for lack of mutual obligation.  *See Curtis Props. Corp.* v. *Greif Cos.*, 628 N.Y.S.2d 628, 632-33 (1st Dep't 1995).  It is also "settled" law that New York courts "will not adopt an interpretation that renders a contract illusory when it is clear that the parties intended to be bound thereby."  *Blandford Land Clearing Corp.* v. *National Union Fire Ins. Co. of Pittsburgh, Pa.*, 698 N.Y.S.2d 237, 243 (1st Dep't 1999); *accord Lebowitz* v. *Dow Jones & Co., Inc.*, 847 F. Supp. 2d 599, 604 (S.D.N.Y.

2012), *aff'd*, 508 F. App'x 83 (2d Cir. 2013) (summary order).  The Court has endeavored here to conceive of a set of circumstances in which Lantheus could obtain CBI coverage for the NRU Reactor under the Policy; it has been unable to do so.

In sum, both sides offer cogent reasons for and against interpreting the CBI provision to require total cessation of operations at the Billerica Facility. Zurich offers considerable (if not 100% apposite) case law requiring total cessation, as well as abundant factual evidence that Lantheus continued to operate the Billerica Facility during the relevant time period.  It also notes the size and sophistication of Lantheus and its insurance broker, which, Zurich argues, speaks to the likelihood that Lantheus misperceived the coverage it received.  Lantheus counters with logical explanations why the parties could not, and did not, contemplate a requirement of total cessation.  Because the Court ultimately finds that the corrosion exclusion operates to foreclose coverage under the Policy, it declines to resolve this issue, and assumes for purposes of this motion that Lantheus is entitled to claim under the CBI provision.

### 2.     The Corrosion Exclusion and the Ensuing Loss Provision

#### a.     The Exclusion Applies to Preclude Coverage

The bulk of Zurich's motion is devoted to the argument that coverage is foreclosed because the loss was caused, at least in part, by an excluded peril: corrosion.  (*See* Def. Br. 8-13).  Lantheus counters that "machinery breakdown" caused the loss, and that, even if the [redacted] Penetration played some part,

26

it occurred too rapidly to be considered corrosion as that term is commonly used.  (Pl. Opp. 8-10, 14-18).  Because Zurich has established that "corrosion" is unambiguous as used in the Policy, and that the only reasonable interpretation of "corrosion" includes the [redacted] Penetration that occurred here, Zurich has met its burden of demonstrating that the exclusion applies.

The Court begins with the plain language of the provision in dispute.  The Policy provides, in relevant part, that Zurich "will not pay for loss or damage resulting from … corrosion."  (Silverberg Decl., Ex. G at 24-25).  The provision also contains so-called "anti-concurrent cause" language, providing that "loss or damages [from corrosion] is excluded regardless of any cause or event that contributes concurrently or in any sequence to the loss or damage, except as specifically provided."  (*Id.* at 24).

The Policy provides no definition for the term "corrosion," and the Court will, as before, refer to a dictionary to determine the ordinary meaning of this term.  Webster's defines "corrosion" as "the action or process of corrosive chemical change not necessarily accompanied by loss of form or compactness; *typically*: a gradual wearing away or alteration by a chemical or electrochemical essentially oxidizing process (as in the atmospheric rusting of iron)."  Webster's Dictionary, http://unabridged.merriam-webster.com/unabridged/corrosion (emphasis in original) (last visited Mar. 24, 2015).  The Court notes that both parties agree that the *common* meaning of the term "corrosion" — and not the definition that a scientist or one of the parties' experts might

advance — controls the Court's interpretation of the Policy language.  (*See* Pl. Opp. 14 n.7; Def. Reply. 3-4).  *See also Belt Painting*, 100 N.Y.2d at 383.

The Court will first address Lantheus's argument that machinery breakdown — and not corrosion — caused the loss.  (*See* Pl. Opp. 9-10). Lantheus argues that the NRU Reactor shutdown was caused by a fortuitous event.  Specifically, Lantheus asserts that the refilling of the vessel following the power outage caused a "rapid surge in pressure [that] ruptured the vessel." (*Id.* at 10).  Zurich responds that Lantheus's argument fails at the outset because NRU Reactor was not an "object" for which such coverage was available.  (Def. Br. 7 n.5).  The Court accepts for now Lantheus's arguments that the reactor qualified as an object.  (Pl. 56.1 Response ¶¶ 32-33).  This does not, of course, end the coverage inquiry.

The parties then tussle over the significance of the term "machinery breakdown":  Lantheus argues that the term "machinery breakdown" refers to a covered cause of loss, which is important to its coverage and ensuing loss arguments.  (*See* Pl. Opp. 9-10).  Zurich rejoins, reviewing the Policy language, that "machinery breakdown is thus a type of covered 'physical loss or damage,' not a *cause of loss*."  (Def. Reply 5 (emphasis in original)).  The Court believes that Zurich has the better of the argument, but that this semantic difference does not affect the Court's analysis of the corrosion exclusion.

Considering the evidence in Lantheus's favor, the Court accepts for the purpose of this motion that the breach occurred because of a "pressure surge … act[ing] upon an already weakened point."  (Pl. Opp. 10; *see also*

Bickel Decl., Ex 1 at 67 ("In my opinion, it is more likely than not, that the through-the-wall reactor vessel failure was a direct result of a combination of a 'pre-weakened' condition and a 'triggering event' that came together[.]   A pre-weakened condition alone would not explain the sudden through-wall failure of the NRU reactor vessel, coincident in time with the significant 'triggering event.'" (emphasis omitted))).   However, in light of the anti-concurrent causation language, this theory simply begs the question of what process caused the vessel to be "already weakened."[12]   If corrosion "contribute[d] concurrently or in any sequence to the loss or damage" caused by the pressure surge, then the corrosion exclusion forecloses coverage.   *See Alamia* v. *Nationwide Mut. Fire Ins. Co.*, 495 F. Supp. 2d 362, 368 (S.D.N.Y. 2007) ("[A]n 'anti-concurrent' clause … excludes coverage for damage caused by an excluded peril even when covered perils also contribute to the damage."); *ABI Asset Corp.* v. *Twin City Fire Ins. Co.*, No. 96 Civ. 2067 (AGS), 1997 WL 724568, at *2 (S.D.N.Y. Nov. 18, 1997) ("New York courts have interpreted similar clauses to mean that where a loss results from multiple contributing causes, coverage is excluded if the insurer can demonstrate that any of the concurrent or contributing causes of loss are excluded by the policy.").

Lantheus's next argument addresses the crucial point of whether "corrosion" contributed to the loss.   (Pl. Opp. 14-20).   As detailed above, both St. Pierre and Bickel agree that a thinning over time of the aluminum wall of

---

[12]     After all, according to Lantheus's expert witnesses, the degradation of the vessel wall caused by the aeration cell was ongoing at the time of the power outage [redacted], and had existed for approximately one month before that date.

the reactor vessel, referred to as [redacted] Penetration, was a necessary component to the through-wall breach that occurred after a rapid shift in pressure [redacted].  *See* Background Sec. A(4), *supra*.  Lantheus argues that the [redacted] Penetration that contributed to the loss was not sufficiently gradual to constitute "corrosion" as the term is commonly understood.  The Court notes that Lantheus's interpretation of "corrosion" as a gradual process is completely consistent with the dictionary definition.  However, the Court cannot agree with Lantheus's assertion that "'[c]orrosion' as used in Exclusion 5b, is the gradual corrosion damage *that takes place inevitably over the useful life of a machine*."  (Pl. Opp. 16 (emphasis added)).  To begin with, this is not a reasonable interpretation of the term "corrosion" as it is commonly used.  Nothing in the dictionary definition narrows the scope of "corrosion" to that which occurs "inevitably" over the life of a machine.  Other courts have rejected analogous attempts to narrow the definition of "corrosion."  *See Adams-Arapahoe Joint Sch. Dist. No. 28-J* v. *Cont'l Ins. Co.*, 891 F.2d 772, 777 (10th Cir. 1989) ("[U]nder Colorado law the word 'corrosion' unambiguously refers to all corrosion, however brought about."); *Sports Arena Mgmt., Inc.* v. *Great Am. Ins. Grp.*, No. 06 Civ. 788, 2007 WL 684003, at *4 (N.D. Ill. Mar. 1, 2007) ("The specific type of corrosion or its cause is irrelevant given the policy's clear language."); *City Brewing Co., LLC* v. *Liberty Mut. Fire Ins. Co.*, No. 1-11-1996, 2013 WL 2635847, at *10 (Ill. App. Ct. June 7, 2013) (rejecting "attempt[] to limit corrosion exclusion[] in [an] all-risk polic[y] to certain types of corrosion"); *Alex R. Thomas & Co.* v. *Mut. Serv. Cas. Ins. Co.*, 119 Cal. Rptr. 2d 394, 401

(Cal. Ct. App. 2002) ("No matter how the corrosion occurred, however, it was nevertheless corrosion — an excluded peril — which caused the loss."); *Bettigole* v. *Am. Employers Ins. Co.*, 567 N.E.2d 1259, 1261 (Mass Ct. App. 1991) (finding "no reason for confining the term corrosion in the context of the policy to a wearing away by 'natural' means of weather or the like, or in consequence of conduct of the insured rather than an outsider"); *see generally Gilbane Building Co.* v. *Altman Co.*, No. 04AP-664, 2005 WL 534906, at *3-5 (Ohio Ct. App. Mar. 8, 2005) (reviewing case law from other jurisdictions concerning the corrosion exclusion, and rejecting efforts to impose temporal requirements on what qualified as corrosion).

Lantheus's interpretation remains unreasonable when viewed in the context of the Policy itself.  Relying on a somewhat obscure canon of construction, "reverse *ejusdem generis*," Lantheus argues that, because the string of excluded causes ends with "wear and tear," all of the preceding excluded causes listed must be read to be a subset thereof.  (Pl. Opp. 15-17 (discussing canons of construction)).  *See, e.g.*, *United States* v. *Williams-Davis*, 90 F.3d 490, 508-09 (D.C. Cir. 1996) (describing "a sort of reverse *ejusdem generis* (where the general term reflects back on the more specific rather than the other way around), [such] that the phrase 'A, B, or any other C' indicates that A is a subset of C[.]").  The Court rejects this argument for two reasons.  First, examining the list of excluded perils in Exclusion 5b closely, the Court notes that the putative "catch-all" term, "wear and tear," lacks any hallmark of being a "catch-all."  While the phrase appears at the end of the list, the

exclusion is not preceded by an adjective — such as "other" — that would hint toward the purpose of establishing "wear and tear" as the general class. *Cf. Tverskoy* v. *Ramaswami*, 920 N.Y.S.2d 803, 806 (3d Dep't 2011) ("[I]n our view, this last listed method ..., which includes the term '*other* appropriate means,' is a catch-all clause and, under the rule of statutory construction known as *ejusdem generis*, such a catch-all provision following a list of specific items in a statute will generally be interpreted to include only items of the same type as those listed." (emphasis added)). The absence of a "catch-all" phrase is all the more conspicuous in Exclusion 5b, given that Exclusions 5a and 5h each end with catch-all phrases that plausibly invite the application of *ejusdem generis*. (*See* Silverberg Decl., Ex. G at 25 ("Accumulated effects of smog, smoke, vapor, liquid and dust[,] *or other developing defects*" (emphasis added)); *id.* ("Latent defect or quality in the property that causes it to damage or destroy itself, decay[,] *or other spoilage*" (emphasis added)).

A second problem with Lantheus's application of reverse *ejusdem generis* is that the resulting interpretation of "corrosion" as a subset of inevitable "wear and tear" over a machine's useful life, is not reasonable given the presence of "evaporation" within the same Policy provision. "[I]t has long been recognized that *ejusdem generis* cannot be called into play when the specific terms preceding the general one do not themselves have a common attribute from which a 'kind or class' may be defined." *United States* v. *Amato*, 540 F.3d 153, 160 (2d Cir. 2008). A comparison of the processes of evaporation and

32

corrosion simply does not suggest "inevitable wear and tear" as a conceivable umbrella term.[13]

Similar problems beset Lantheus's reliance on the canon of construction known as *noscitur a sociis*, which a former judge in this District has described as the "cousin" to *ejusdem generis*. *ESI, Inc.* v. *Coastal Corp.*, 61 F. Supp. 2d 35, 75 (S.D.N.Y. 1999) (Conner, J.); *see generally Dole* v. *United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) ("The traditional canon of construction, *noscitur a sociis*, dictates that words grouped in a list should be given related meaning." (internal quotation marks omitted)); *SR Int'l Bus. Ins. Co. Ltd.* v. *World Trade Center Properties, LLC*, 445 F. Supp. 2d 320, 352-53 (S.D.N.Y. 2006). Lantheus argues that the term "corrosion" appears "in the company of words that connote gradual damage." (Pl. Opp. 15). As an initial matter, this argument focuses only on one of eight "sublists" of the exclusion provision; consideration of the remainder of the "Developing, Latent and Other Causes" provision underscores the difficulty in discerning similarities among the items on the list. More fundamentally, accepting Lantheus's argument that the Court should read a "gradualness" requirement into these terms is not the same as specifying a period of time that qualifies as sufficiently gradual; the

---

[13] It also bears noting that unlike some policies, where the corrosion exclusion is contained in a section specifically designated "Wear and Tear," the Policy lists corrosion among numerous (and not easily unified) items grouped under the heading "Developing, Latent and Other Causes." (Silverberg Decl., Ex. G at 25). *Cf. Trupo* v. *Preferred Mut. Ins. Co.*, 872 N.Y.S.2d 786, 788 (4th Dep't 2009) (noting, in a 3-2 decision, that "[t]he title 'Wear and Tear' would lead an average person to believe that the exclusion for 'contamination' therein included only contamination that occurred over time, rather than a sudden occurrence such as the incident here").

juxtaposition of "rust" and "evaporation" in the same sublist confirms the point.

The Court rejects Lantheus's argument that the [redacted] Penetration occurred too rapidly, or not sufficiently gradually, to qualify as "corrosion." (Pl. Opp. 17-18). Implicit in Lantheus's argument is the notion that a "gradual" process cannot also occur rapidly. This is not so. A "gradual" process "proceed[s] by steps or degrees," but it does not necessarily do so slowly. Webster's Dictionary, http://unabridged.merriam-webster.com/unabridged/gradual (last visited Mar. 24, 2015). According to Lantheus's expert, the "localized rapid [redacted]" process that weakened the 8 millimeter vessel wall occurred at a rate of between 10 millimeters and 100 millimeters per year. (*See* St. Pierre Decl., Ex. 1 at 18). Resolving the ambiguity in favor of Lantheus, and thus assuming the more "rapid" 100-millimeter-per-year rate of thinning, this process would have taken approximately 29 days before it penetrated the wall. (*See id.* ("This rate corresponds to the advance of a penetration site through an 8 m[illimeter] wall in less than one month.")).[14] That the progress of the electrochemical cell's effect on the wall can be measured by such increments is, in and of itself, evidence that it was a gradual process; that the weakening effect persisted for several weeks (rather than months or years) is no barrier to this result. This Court agrees with others courts that have addressed similar corrosion

---

[14]   To be precise, at a rate of 100 millimeters per 365 days, the process would have penetrated 7.94 millimeters after 29 days and 8.21 millimeters after 30 days.

exclusions, and finds that even "rapid" corrosion falls within the scope of this Policy's exclusion. *See Pioneer Chlor Alkali Co.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 863 F. Supp. 1226, 1236 (D. Nev. 1994) ("The chemical reaction which caused the perforations and the chemical reaction which caused the hole ... were corrosion.  Whether corrosion takes a matter of days, twenty-five years, or 100 years does not change the fact that it is corrosion."); *City Brewing Co.*, 2013 WL 2635847, at *8 ("Under a reasonable reading of the word 'gradual,' the process of disintegration or wearing away that occurred here over a period of three weeks ... would not be considered a quick occurrence."); *see also Arkwright-Boston Mfrs. Mut. Ins. Co.* v. *Wausau Paper Mills Co.*, 818 F.2d 591, 595 (7th Cir. 1987) ("[T]he speed at which the corrosion took place here is not relevant to whether it falls under the corrosion exclusion."); *TravCo Ins. Co.* v. *Ward*, 284 Va. 547, 508 (Va. 2012) ("There is ... no basis for reading a temporal element into the instant corrosion exclusion.").

Lantheus's remaining challenge is that the [redacted] Penetration, caused by the formation of an electrochemical cell, does not constitute "corrosion given its speed, and the absence of an acid, base, or wear and tear process."  (Pl. Opp. 17).  The Court has already determined that "corrosion," as the term is commonly used and as it used in the context of the Policy, is not reasonably defined as a subset of "wear and tear."  Lantheus ascribes significance to the absence of an "acid."  (*See, e.g.*, St. Pierre Decl., Ex. 1 at 15 ("Importantly, in [an electrochemical cell], acidic action is not involved and does not damage the metal.  Rather, the damage results from the voltage potential created in the

35

water depleted of oxygen, creating an electrical current between the anodic and cathodic surfaces. Acidity is not a necessary part of a differential aeration cell.")). But the Court finds nothing in the dictionary definition that requires the presence of an acid; to the contrary, the dictionary includes "wearing away … by a[n] … electrochemical … process." This definition fully embraces Lantheus's assertion that an "electrochemical cell" caused the [redacted] Penetration.

In sum, the Court finds that Zurich has met its burden of establishing that the corrosion exclusion in the Policy is unambiguous, that the [redacted] Penetration falls squarely within this corrosion exclusion, and that the [redacted] Penetration "contribute[d] concurrently or in any sequence to the … damage." In making this determination, the Court has taken pains not to conflate the two types of weakening that the parties argue were occurring to the vessel wall. That is, the Court acknowledges that disputed issues of fact remain relating to Zurich's assertion that General Corrosion precipitated the NRU Reactor shutdown.[15] These disputes are immaterial to the resolution of this motion because the Court finds that the formation of the [redacted] Penetration and its concurrent involvement in the through-wall breach that

---

[15]    In its briefing, Lantheus contends that the General Corrosion — unlike the [redacted] Penetration — had nothing to do with the NRU Reactor shutdown. (*See* Pl. 56.1 Response ¶¶ 9-10, 12, 14-17). Zurich disagrees, noting that AECL originally determined that the General Corrosion was the cause of the shutdown (*see* Def. 56.1 ¶¶ 9-10, 12), and asserting in the alternative that the electrochemical cell that caused the [redacted] Penetration would not have developed but for the accumulation of General Corrosion products at the base of the annulus (*see* Def. Reply 3). In analyzing the above, the Court has resolved these factual ambiguities in Lantheus's favor, considering both its 56.1 Statement and the statements of its expert witnesses.

shut down the NRU Reactor is sufficient to bring the loss within the corrosion exclusion. *See Demery* v. *Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment, and the mere existence of factual issues — where those issues are not material to the claims before the court — will not suffice to defeat a motion for summary judgment." (internal quotation marks, citation, and alteration omitted)).

### b.   The Ensuing Loss Exception Does Not Restore Coverage

Finally, the Court will consider whether Lantheus has met its burden of establishing that an exception to the exclusion applies. Even if corrosion played some part in the damage to the NRU Reactor, Lantheus argues that the Policy's "ensuing loss" provision provides an exception to the exclusion that restores coverage. (Pl. Opp. 11-13). After careful consideration of Lantheus's arguments, the Court finds the ensuing loss provision cannot be applied here to restore coverage for the loss caused by corrosion.

In the property loss context, courts have found that "[a]n ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separate from the defective property itself. Under New York law, Plaintiff would be entitled to coverage under an exception for ensuing loss only if and to the extent that it could prove that 'collateral or subsequent' damage occurred to other insured property as a result of the [excluded peril]." *Montefiore Medical Ctr.* v. *Am. Protection Ins. Co.*, 226 F.

Supp. 2d 470, 479 (S.D.N.Y. 2002) (citing *Laquila Constr. Inc.* v. *Travelers Indem. Co. of Ill.*, 66 F. Supp. 2d 543 (S.D.N.Y. 1999), and *Narob Devel. Corp.* v. *Ins. Co. of N. Am.*, 631 N.Y.S.2d 155 (1st Dep't 1995)); *accord Hanover New England Ins. Co.* v. *Smith*, 621 N.E.2d 382, 383 (Mass. App. Ct. 1993). Moreover, "[w]here a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk." *Narob Devel. Corp.*, 631 N.Y.S.2d at 155-56.[16]

These concepts have also been recognized in the business income loss context.  In *Rapid Park Indus.* v. *Great Northern Ins. Co.*, 502 F. App'x 40 (2d Cir. 2012) (summary order), the Second Circuit rejected an insured's reliance on an ensuing loss provision to obtain coverage for lost income after the New York City Department of Buildings closed the insured's parking garage because

---

[16]     *See* 11 Couch on Ins. § 153.70 (footnotes omitted):

> Some insurance policies contain "ensuing loss provisions," that provide coverage for certain covered perils which would otherwise be covered even when that covered peril was caused by an excluded peril.  In other words, an ensuing loss provision provides coverage for specific types of losses that are otherwise covered in the policy when that loss is the result of the occurrence of an excluded peril.

> For example, a policy may provide that it does not cover any loss caused by earth movement; however, any ensuing loss by fire which is not excluded or excepted is covered.  This means the policy covers loss caused by fire that would not have occurred but for the earth movement; however, other damage caused by the earth movement is not covered.

> Two of the most common ensuing loss perils are fire and water damage.

of safety issues.  The focus of the Court was on the divisibility of the putative

covered and non-covered perils:

> Plaintiffs' argument that their loss falls within the "ensuing loss or damage" exception to the "wear and tear" exclusion is unavailing.  Plaintiffs argue that it was "originally water seeping into the garage" that resulted in the deterioration of the garage.  While there is testimony to that effect, this damage was not "ensuing," in the sense that it was a separate, subsequent event that occurred due to the deterioration.  Instead, it was "directly related to the original excluded risk," which New York courts exclude from the "ensuing loss" exception.

502 F. App'x at 41-42 (citing, among other cases, *Aetna Cas. & Sur. Co.* v.

*Yates*, 344 F.2d 939, 941 (5th Cir. 1965) (Friendly, J., sitting by designation)

("A likely case for application of the clause would be if water used in

extinguishing a fire or coming from a burst pipe flooded the house and in turn

caused rust or rot; loss from rust or rot so caused would be a loss ensuing on

water damage.  That is not this case, where the rot may have ensued from the

presence of water but not from water damage.")).

Again, the Court starts with the language of the Policy.  The relevant

exception provides that "if [corrosion] results in a covered cause of loss, th[e]

[corrosion] exclusion does not apply to the loss or damage caused by the

covered cause of loss."  (Silverberg Decl., Ex. G at 25 (emphasis added)).  The

plain language sets the stage for a narrow inquiry: whether the "corrosion," as

established in the foregoing, "result[ed] in" a covered "cause" of loss.  Given the

statements of its experts, the burden for Lantheus is considerable: The expert

report of its metallurgist George St. Pierre, summarily stated, is that

(i) corrosion (in the form of "spongy" solids that accumulated — to some critical mass — at the bottom of the annulus as part of the General Corrosion of the aluminum vessel wall) begat (ii) corrosion (in the form of an aeration cell, which emerged from the "confluence of the acidified deaerated water flowing down the reactor vessel wall with the aerated water flowing from the reflector wall and being trapped in the built up solids"), which (iii) accelerated the thinning of the reactor wall, which (iv) coupled with a loss in ductility that took place over the lifetime of the wall, allowed it to become susceptible to breach.  (St. Pierre Decl., Ex. 1 at 2-3, 11-12, 14-15, 18, 23).  The parties agree that General Corrosion is subject to the corrosion exclusion, and the Court has found that the aeration cell is also subject to the corrosion exclusion.  Even under Lantheus's theory of the case, the aeration cell operated in tandem with the hydraulic transient to cause the through-wall breach — there was, therefore, no "ensuing loss."

In its opening salvo on this issue, Lantheus argues that "[a] jury could reasonably conclude that the final, *predominant cause* of the breakdown … was a rapid pressure surge, the electrochemical cell, or their combined effects."  (Pl. Opp. 11 (emphasis added)).  But where, as here, "the Policy includes an anti-concurrent clause, there is no need for the court to undertake this causation inquiry."  *Coney Island Auto Parts Unlimited, Inc.* v. *Charter Oak Fire Ins. Co.*, No. 13 Civ. 1570 (ARR), 2014 WL 3958080, at *8 n.5 (E.D.N.Y. Aug. 13, 2014); *see also Boazova* v. *Safety Ins. Co.*, 968 N.E.2d 385, 394 n.4 (Mass. 2012) ("The inclusion of an 'anticoncurrent cause' provision … is designed to circumvent

the doctrine of efficient proximate cause whereby coverage is afforded as long as the predominant cause of the loss is a covered peril.").

Next, Lantheus argues that the ensuing loss provision restores coverage if Lantheus "come[s] forward with evidence of covered *damage* after the alleged excluded peril even if the earlier excluded period was also a 'but-for' cause." (Pl. Opp. 11 (emphasis added)). To begin with, the assertion elides subsequent *damage* or *loss* stemming from the corrosion with a subsequent *cause* of loss, which is what is required under the terms of the Policy. This distinction makes a difference: Lantheus alleges that an increase in pressure, or "pressure transient," caused the vessel to rupture. (Pl. Opp. 12). But "corrosion" — the excluded peril — did not "result[] in" or trigger this subsequent cause of loss. *See Platek* v. *Town of Hamburg*, 24 N.Y.3d 688, 695 (2015) (finding that ensuing loss provision did not apply where evidence failed to show that an explosion (the putative ensuing cause of loss) was the "result of" excluded water damage).

Lantheus attempts to recast the vessel rupture as "covered machinery breakdown arising from corrosion" (Pl. Opp. 12), but again this conflates ensuing *causes of loss* with the loss itself. Indeed, "machinery breakdown" is defined consistently in the Policy as type of "physical *loss* ... or *damage*." (Silverberg Decl., Ex. G at 50, 52 (emphasis added)). *Cf. Babcock & Wilcox Ebensburg Power, Inc.* v. *Zurich Am. Ins. Co.*, 368 F. Supp. 2d 387, 403-04 (W.D. Pa. 2004) (finding "any loss suffered due to subsequent mechanical breakdown would be covered under the terms of the ensuing loss provision"

where "mechanical breakdown" was defined as a covered *cause* of loss); *Green Meadow Bean Co.* v. *Nationwide Agribusiness Ins. Co.*, No. 08 Civ. 4725 (JMR), 2010 WL 1427271, at *5 (D. Minn. Apr. 8, 2010) (finding the same where there was "a clearly stated exception for losses *caused by* equipment breakdown" (emphasis added)).  To accept Lantheus's argument would effectively read the corrosion exclusion out of the Policy.

Interpreting the record in the light most favorable to Lantheus, the damage to the NRU Reactor was caused, at least in part, by corrosion, and is therefore excluded from coverage under the Policy.  Lantheus's efforts to argue an "ensuing loss" exception fail because it has not raised a genuine issue of material fact that "a separate, subsequent event ... occurred due to the [corrosion]."  *Rapid Park Indus.*, 502 F. App'x at 42 (internal quotation marks omitted).  Further, "interpreting the insurance policy as [P]laintiff[] propose[s] would contravene the [corrosion] exclusion's purpose, as expressed in unambiguous language, which is to preclude coverage for damages caused by" corrosion.  *Platek*, 24 N.Y.3d at 697; *see also Laquila Constr., Inc.*, 66 F. Supp. 2d at 545 ("[T]he exception to an exclusion should not be read so broadly that the rule — the exclusion clause — is swallowed by the exception — here, the exception for ensuing loss."), *aff'd*, 216 F.3d 1072 (2d Cir. 2000).

**CONCLUSION**

For the reasons discussed herein, Defendant's motion for summary

judgment is GRANTED.  The Clerk of Court is directed to terminate Docket

Entry 106.

SO ORDERED.

Dated:      April 28, 2015
            New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge